UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES DEFERIO,

                Plaintiff,

-against-                                              5:16-cv-0361 (LEK/TWD)

CITY OF SYRACUSE, *et al.*,

                Defendants.

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

Plaintiff James Deferio ("Plaintiff") commenced this action against the City of Syracuse and three of its police department personnel[1] (collectively, "Defendants") under 42 U.S.C. § 1983, alleging violations of his First Amendment right to demonstrate at the annual Central New York Pride Week ("CNY Pride") in Syracuse, New York. Dkt. No. 1 ("Complaint"). Specifically, Plaintiff alleges that in both 2014 and 2015, on the day of the Pride Parade and Festival, he was barred by Defendants from demonstrating on the public sidewalk immediately adjacent to the festival's entrance, and instead was forced to move across the street—away from pedestrian traffic into and out of the festival. See id. ¶¶ 45-46, 74. In so doing, Plaintiff claims that Defendants infringed upon his right to free speech.

Five days after filing his Complaint, Plaintiff moved for a preliminary injunction concerning the upcoming 2016 Pride Parade and Festival, which is scheduled to occur on June 18, 2016. Dkt. No. 6-15 ("Plaintiff's Memorandum") at 9; *Festival Information*, Cent. N.Y. Pride,

---

[1] The three named officer Defendants are Chief of Police Frank Fowler, Captain Joseph Sweeny, and Sergeant Jamey Locastro.

http://www.cnypride.com/festival_info.aspx (last visited June 8, 2016). Plaintiff seeks an injunction prohibiting the enforcement of a "40-foot buffer zone" around the festival entrance. Dkt. No. 6-1 ("Motion") at 1. The Constitution requires that, as citizens, we "must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.'" Boos v. Barry, 485 U.S. 312, 322 (1988) (quoting Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56 (1988)). This principle dictates the outcome here. As such, and for the reasons stated below, Plaintiff's motion is granted.

## II. BACKGROUND

The facts discussed here are largely derived from the affidavit Plaintiff submitted in conjunction with his Motion, Dkt. No. 6-2 ("Plaintiff's Affidavit"), along with several other accompanying Exhibits, Dkt. Nos. 6-3 to -14 ("Plaintiff's Exhibits B-M"). As discussed below, Defendants have not—at the preliminary injunction stage—raised any actual dispute regarding this factual background.

### A. The 2014 Pride Festival

Plaintiff in this case is a self-described "Christian evangelist" who "engage[s] in public ministry." Pl.'s Aff. ¶ 3. In so doing, he attempts to "address[] religiously sensitive, but important topics" at public events—in this case, at the Central New York Pride Festival and Parade in Syracuse. Id. ¶¶ 13-14. Though not explicitly stated in his papers, this "public ministry" appears to partially stem from or consist of anti-LGBTQ sentiments. See Pl.'s Ex. F at 1:23-1:27 (noting Plaintiff's opinion that his removal resulted from his disagreement with the festival organizers' "views on homosexuality"); Pl.'s Ex. L at 0:33-0:36 ("[T]his parade is an uncivil parade, and I will rain on that.").

2

The 2014 CNY Pride Festival occurred on June 21, 2014, in Syracuse at an area known as the Inner Harbor. See Pl.'s Aff. ¶ 16. A main entrance to the festival was located on the north side of Kirkpatrick Street where it intersects with the Onondaga Creekwalk, with the northern leg of the Creekwalk serving as the entranceway. See id. ¶ 18-19; Pl.'s Exs. B-C. Plaintiff, armed with a banner and a "personal voice amplifier," see Pl.'s Aff. ¶¶ 8-9, 37; Pl.'s Ex. D; Pl.'s Ex. F at 0:28-0:32, positioned himself on the sidewalk at the northwest corner of the Kirkpatrick Street–Onondaga Creekwalk intersection and began "explaining [his] beliefs to those nearby." Pl.'s Aff. ¶¶ 18, 20; Pl.'s Ex. C. This area of sidewalk, at the corner of those two streets (and thus immediately outside of the festival entrance), appears to be over three times wider than the surrounding area of normal sidewalk. Pl.'s Aff. ¶¶ 18-19; Pl.'s Exs. B-C. The area appears to have remained open to ordinary pedestrian traffic, see Pl.'s Aff. ¶ 17; Pl.'s Ex. D; Pl.'s Ex. F, and Plaintiff claims that pedestrians "could easily walk by [him] and stay on the sidewalk," Pl.'s Aff. ¶ 18.[2]

After some period of Plaintiff's demonstration, Sergeant Jamey Locastro and another City of Syracuse police officer approached and confronted Plaintiff, who video recorded the ensuing conversation. Id. ¶ 21; Pl.'s Ex. D. Sgt. Locastro told Plaintiff that he was "in violation of the permit that the parade has," that CNY Pride was possessed a permit for the sidewalk on the side of the street adjacent to the festival entrance, and that Plaintiff was only allowed to be on the other side of the street. Pl.'s Ex. D 0:04-0:16. Sgt. Locastro showed Plaintiff a copy of the permit, which

---

[2] The video recordings provided by Plaintiff show a relatively normal degree of pedestrian traffic and no congestion in this area at the time in question (excepting, perhaps, a small crowd that was observing Plaintiff's police interaction and that appears to have later dispersed). See Pl.'s Ex. D; Pl.'s Ex. F.

(according to Sgt. Locastro) included hundreds of feet of the north Kirkpatrick Street sidewalk surrounding the festival entrance. See Pl.'s Aff. ¶¶ 22-23, 36-37; Pl.'s Ex. D 0:27-0:45; Pl.'s Ex. F 0:09-0:26. Sgt. Locastro then ordered Plaintiff to move across Kirkpatrick Street, and later specified that if Plaintiff "refuse[d] to move across the street, [he would] be arrested." Pl.'s Ex. D at 2:36-2:41.[3]

After Plaintiff complied and moved across the street, Sgt. Locastro explained the rationale for his order, confirming that the festival organizers could remove "anybody they want to" off of the sidewalk on the north side of Kirkpatrick street because the space had been "permitted" to the Festival. Pl.'s Ex. F at 1:00-1:08. Sgt. Locastro later stated that the festival organizers could "close the sidewalk to anybody who they view[ed] as a protestor. . . . Someone similar to [Plaintiff], somebody with a loudspeaker device, preaching, and having a large banner, that would be like a protestor." Id. at 1:31-1:46. Perhaps unsurprisingly, Plaintiff claims that "no one wanted to go out of their way and cross the street . . . to talk to [him]," and Plaintiff left the event soon thereafter. Pl.'s Aff. ¶¶ 40-41.

**B. Correspondence with the City of Syracuse**

Following the events at the 2014 Pride Festival, Plaintiff retained counsel (the same attorneys representing him in the present action), who, on September 5, 2014, sent a letter on his

---

[3] It is unclear to the Court how the permit itself would serve to exclude Plaintiff or other protestors from the area it encompasses, provided that Plaintiff complies with any other applicable city ordinances. See SYRACUSE, N.Y., CODE OF ORDINANCES § 16-35 (defining permits as a requirement in order for persons to "assemble, congregate, parade or march in or through any of the streets of the city," and not as limiting the rights of others to access the areas in question). As such, it appears that the removal of Plaintiff was instead based on some other policy (though the Court was unable to find any other applicable ordinance) or an *ad hoc* determination by the officers assigned to the event.

behalf to representatives of the City of Syracuse and to Chief of Police Frank Fowler. Id. ¶ 43; Pl.'s Ex. G. In the letter, Plaintiff's counsel asserted that Sgt. Locastro's order for Plaintiff to move across Kirkpatrick Street was unconstitutional, demanding a written assurance of Plaintiff's right to demonstrate on the public sidewalks, nominal damages, and attorney's fees. Pl.'s Ex. G.

On October 24, 2014, the City of Syracuse—through the Office of the Corporation Counsel—responded to Plaintiff's letter. Pl.'s Ex. H. In the letter, the City's attorney noted his previous telephone conversation with Plaintiff's counsel and noted, in relevant part, that

> the City will closely review the geographic aspects of similar future permit applications as they relate to locations of traditional public fora in order to ensure that such fora, and citizens' access to them, remain uninhibited within the requirements of any applicable and lawful time, manner, or place restrictions on religious or other similarly protected expression.

Id.

On October 30, 2014, Plaintiff's counsel responded to the City's attorney, noting receipt of his letter but complaining that it was "vague and deficient" in assuring Plaintiff that his future demonstrations would go undisturbed. Pl.'s Ex. I.[4] According to Plaintiff, there was no response to this second letter. Pl.'s Aff. ¶ 46. Nevertheless, Plaintiff "hoped, based on the [City's] response to [Plaintiff's] first letter, that the City would not keep [Plaintiff] from speaking on the public sidewalk during future Pride Festivals." Id. ¶ 47.

**C. The 2015 Pride Festival**

On June 20, 2015, Plaintiff again attempted to engage in his "public ministry" at the 2015 CNY Pride Festival, this time positioning himself on the public sidewalk at the northeast corner of

---

[4] Plaintiff's counsel also complained that the City did not address his request for nominal damages and attorney's fees. Pl.'s Ex. I.

the Kirkpatrick Street–Onondaga Creekwalk intersection. Id. ¶¶ 48-49; Pl.'s Ex. J. Once again, soon after Plaintiff began his demonstration, he was approached by City of Syracuse police officers, including Captain Joseph Sweeny. Pl.'s Aff. ¶ 51.

At the start of this interaction, Capt. Sweeny asked Plaintiff to move "to the other side of the street . . . [b]ecause [CNY Pride has] exclusive use of [the north] side of the street." Pl.'s Ex. K at 0:02-0:09. Capt. Sweeny explained that if Plaintiff remained on the north side of Kirkpatrick Street, he "could be arrested" because of CNY Pride's "exclusive use to be on [the north] side of the street." Id. at 0:10-0:39.[5] Soon thereafter, Plaintiff complied with Capt. Sweeny's order and followed him across Kirkpatrick Street. See Pl.'s Aff. ¶¶ 59-60; Pl.'s Ex. M.

Once on the other side of the street, Capt. Sweeny explained that the "Corporation Counsel [of the City of Syracuse] stated that what they are doing is giving a 40-foot buffer on the area around the entrance to and across the street for anybody that's protesting that's using any kind of sound amplification device, they can't be in that area." Pl.'s Ex. L at 0:01-0:16. Capt. Sweeny noted that this policy came from "Joe Doyle" in the Corporation Counsel's office,[6] and established "a 40-foot buffer around the entrances." Id. at 0:48-0:58. While Capt. Sweeny mentioned the use of a "sound amplification device" as a condition of the buffer zone policy, Plaintiff earlier offered to stop using the amplifier; this was insufficient to satisfy Capt. Sweeny, who noted that Plaintiff's removal was also based on CNY Pride's "exclusive use" of the north side of the street. Pl.'s Ex. K at 0:39-0:56.

---

[5] Capt. Sweeny also noted that a permit was required for Plaintiff to use a sound amplification device. Pl.'s Ex. K at 0:33-0:52; see also SYRACUSE, N.Y., CODE OF ORDINANCES § 40-16 (restricting the use of sound amplifiers). Plaintiff did not raise a claim related to his use of the sound amplifier in his Complaint or Motion.

[6] Mr. Doyle was also the author of the City's letter discussed above. Pl.'s Ex. H.

6

### D. The Present Litigation

On March 31, 2016, Plaintiff filed his Verified Complaint in this action, alleging violations of his constitutional rights based on the events described above. See Dkt. No. 1. On April 5, 2016, Plaintiff also filed his Motion, along with 13 Exhibits and a Memorandum in support of the Motion. Dkt. Nos. 6 to 6-15.

On April 25, 2016, Defendants responded to the Complaint by filing their Verified Answer, in which Defendants denied knowledge or information sufficient to form a belief as to all of the substantive allegations in the Complaint. See Dkt. No. 12 ("Answer").[7] Eight days later, Defendants responded to the Motion with their Attorney Declaration and a Memorandum of law in opposition to the Motion. Dkt. Nos. 14 ("Defendants' Declaration"); 15 ("Defendants' Memorandum"). In the Defendants' Declaration, they note that, "[u]pon information and belief, the City has been in receipt of a permit application from CNY Pride, Inc. to hold a festival at the Syracuse Inner Harbor on June 18, 2016," but that the "application has not yet been formally reviewed and/or approved by all the necessary City parties." Defs.' Decl. ¶ 11.

The Declaration only makes one factual assertion relating to the Motion, attaching a "Syracuse Police Department Training Bulletin" that purports to "order[] all officers to re-familiarize themselves with the subject public assembly ordinances, and the City of Syracuse's policy regarding the demarcation of boundaries of public assemblies." Id. ¶¶ 12-14; Dkt. No. 14-1

---

[7] The Answer denies knowledge or information for some 79 sequential paragraphs of factual allegations, among others. This includes the denial of "knowledge or information sufficient to form a belief" as to direct quotes of the named Defendants in this action, which were also captured on video provided to Defendants prior to when they filed their Answer. See, e.g., Compl. ¶ 54; Pl.'s Ex. D; Answer ¶ 54; see also FED. R. CIV. P. 11(b) (noting that "denials of factual allegations" must be "reasonably based on . . . a lack of information" determined "after an inquiry reasonable under the circumstances").

"Defendants' Exhibit A").[8] The bulletin notes that officers and permit applicants "must reach an agreement as to the geographic boundaries of the application" when the area listed may include "public right[s] of way such as sidewalks," but makes no mention of non-permitted demonstrators' First Amendment rights or the enforcement of any buffer zone around the entrances to a permitted event. See Defs.' Ex. A.[9] Nowhere in Defendants' Declaration do they deny or attempt to rebut any of the factual statements or material submitted by Plaintiff in support of his Motion. On March 9, 2016, Plaintiff filed a Reply in support of the Motion. Dkt. No. 21 ("Reply").

## III. LEGAL STANDARD

A district court has wide discretion in determining whether to grant preliminary injunctive relief. Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 511 (2d Cir. 2005). Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). In the Second Circuit, a movant can bypass the likelihood-of-success prong by instead showing "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) (quoting Lynch v. City of New York, 589 F.3d 94, 98 (2d Cir. 2009)). In

---

[8] Defendants later filed a new Declaration with an updated version of this bulletin, reflecting formatting changes from the original version filed with the Court. Dkt. No. 19.

[9] The bulletin also attaches an earlier bulletin and other ordinance sections discussing sound reproduction/amplification and the rights of religious and other organizations, but neither of these discuss the interplay between the rights discussed therein and the issuance of a permit for a public assembly such as the CNY Pride Festival. See Defs.' Ex. A.

8

either case, the movant must establish that, without the preliminary injunction, she "will suffer 'an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005) (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

In determining whether Plaintiff has established a likelihood of success on the merits, the Court looks to whether the evidence presented demonstrates that he is likely to prevail at trial on a claim concerning the conduct complained of—in this case, the enforcement of a buffer zone surrounding the entrance to the Pride Festival. Because Defendants agree that Plaintiff's speech is entitled to First Amendment protection, Defs.' Mem. at 13, the question in this case is whether or not the buffer zone is a permissible restriction on Plaintiff's right to free speech. Because such a buffer zone would restrict Plaintiff's right to expression within a traditional public forum, and is not narrowly tailored to promote a substantial governmental interest, Plaintiff has established a likelihood of success on the merits.

*1. Public Forum Analysis*

When considering whether a government entity can regulate private speech, location matters. "[M]embers of the public retain strong free speech rights when they venture into public streets and parks, 'which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."'" Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). A sidewalk is "the

9

'prototypical' traditional public forum," Marcavage v. City of New York, 689 F.3d 98, 104 (2d Cir. 2012), and Defendants again agree that this analysis applies to "the sidewalk in this case," Defs.' Mem. at 13. Since a buffer zone—extending outward from the entrance of the event—would include such public fora, it is subject to a heightened standard of review. See Pleasant Grove, 555 U.S. at 469 ("[G]overnment entities are strictly limited in their ability to regulate private speech in such 'traditional public fora.'").

Even in a public forum, however, the government may still "impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)). As such, a buffer zone surrounding the entrances to the Pride Festival would be constitutionally permissible only if it were content neutral,[10] narrowly tailored, and permitted alternative channels of communication.

### 2. Narrowly Tailored Requirement

"A regulation is narrowly tailored 'so long as [it] . . . promotes a substantial government interest that would be achieved less effectively absent the regulation,' and is 'not substantially broader than necessary to achieve the government's interest.'" Marcavage, 689 F.3d at 106 (alterations in original) (quoting Ward, 491 U.S. at 799-800). Such a regulation "need not be the

---

[10] Restrictions that are content specific can still be upheld, but only if they satisfy strict scrutiny, i.e., "the restriction must be narrowly tailored to serve a compelling government interest." Pleasant Grove, 555 U.S. at 469. Restrictions that are based on the viewpoint being expressed are always prohibited. See id.

least restrictive or least intrusive means" of achieving the government's objective, but "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 798.

Approximately one year before the 2015 Pride Festival, the Supreme Court decided McCullen v. Coakley, 134 S. Ct. 2518 (2014), a case also related to the constitutionality of buffer zones. McCullen addressed the constitutionality under the First Amendment of a Massachusetts statute establishing a 35-foot buffer zone around reproductive health clinics, within which only persons entering or exiting the clinic, or transiting the right-of-way en route to another destination, were permitted to enter. Id. at 2525-26. The petitioners in McCullen described themselves as "sidewalk counsel[ors]" who attempted to engage in one-on-one conversations with women entering the clinic in an effort to dissuade them from obtaining abortions. Id. at 2527. The Court noted the "serious burdens" the buffer zone policy placed on petitioners' speech, finding that the buffer zones "compromise petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" Id. at 2535. The parallels to Plaintiff's claims here are obvious. See, e.g., Pl.'s Aff. ¶ 40 ("I tried sharing my views from [the south side of Kirkpatrick Street], but because I was on the opposite side of the street as people entering the Festival, I was unable to have conversations like I wanted.").

While it was uncontroverted that the buffer zones in McCullen burdened the petitioners' speech, such a regulation could still be permissible if it were narrowly tailored to promote a significant governmental interest. Ward, 491 U.S. at 791. The McCullen Court found this was not the case, since "[t]he buffer zones burdene[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests." 134 S. Ct. at 2537. Similar to Defendants' assertions in

this case, Massachusetts asserted public safety and avoiding obstruction as grounds for its buffer zone policy. Id. The Court noted several possible measures that could achieve these ends without limiting the petitioners' First Amendment rights to such an extreme degree, such as ordinances banning obstruction or interference with access to the clinic, or an ordinance prohibiting the blockage of a sidewalk or other right-of-way. See id. at 2537-39. The Court's reasoning in McCullen is fully applicable to Defendants' governmental interests concerning the entrances to the Pride Festival.

The facts specific to the present case further demonstrate that a buffer zone is not narrowly tailored to promote a significant governmental interest. The interests asserted by Defendants include "maintaining peace and order in the community," preventing violence, and avoiding congestion. Defs.' Mem. at 14, 16. Undoubtedly, these are legitimate governmental interests. See, e.g., Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."). But the question here is whether a buffer zone policy—such as the one enforced by Capt. Sweeny in 2015—is narrowly tailored to achieve these goals without unduly burdening Plaintiff's speech.

The Court's review of the video evidence and other exhibits provided by Plaintiff indicate that a buffer zone policy "burden[s] substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799; accord McCullen, 134 S. Ct. at 2535. While some observers circled around Plaintiff during the events in question,[11] this did not appear to

---

[11] It appears that much of this grouping occurred when bystanders stopped to observe Plaintiff's interaction with the police, and not as a result of his typical "open-air preaching." Compare Pl.'s Exs. D, K, with Pl.'s Exs. F, L. Given the current procedural posture of this case,

12

meaningfully block pedestrian traffic or create a significant security risk. See Pl.'s Exs. D, F, K-L; see also, e.g., Pl.'s Aff. ¶ 18 ("I was standing without affecting foot traffic.") As discussed above, Defendants have provided nothing to rebut the evidence submitted by Plaintiff.

Additionally, Defendants' assertion of a specific risk to Plaintiff based on the content of his speech, Defs.' Mem. at 16, cannot justify a restriction of his First Amendment rights. See Watson v. City of Memphis, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."). Significantly less restrictive means are available for Defendants to achieve their objectives, and the unique facts of this case do not dictate a different outcome from McCullen. See also Ward, 491 U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").

For all of these reasons, Plaintiff has established a likelihood of success on the merits. Also, because the enforcement of a buffer zone surrounding the entrances to the Pride Festival would not be narrowly tailored to serve a significant governmental interest, the Court does not address whether the restriction is content neutral or permits alternative channels of communication.

*3. Burden of Proof*

Because Plaintiff has established a likelihood of success on the merits of his claim, the Court need not reach Defendants' argument that the "fair ground for litigation" alternative is unavailable in this case. See Defs.' Mem. at 2; Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011). Defendants also suggest, however, that Plaintiff—because of the nature of the injunction he

---

however, the Court assumes that such a crowd would have existed regardless of Defendants' actions.

requests—is obligated to establish a *substantial* likelihood of success on the merits. Defs.' Mem. at 2. None of their arguments on this point are well founded.

Defendants claim that the heightened preliminary injunction standard applies when the requested injunction is "mandatory" as opposed to prohibitory. See id. (quoting New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015)). The injunction requested in this case is not mandatory. Here, Plaintiff seeks to *prevent* Defendants from excluding him from a public place (namely, the sidewalks of Syracuse). An injunction that orders Defendants to do nothing is not a mandatory injunction. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) ("A mandatory injunction . . . is said to alter the status quo by commanding some positive act.").

Nor is this a case in which Plaintiff is seeking "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial." Defs.' Mem. at 2 (quoting Actavis, 787 F.3d at 650). The injunction requested by Plaintiff only addresses one of the complained-of policies (the buffer zone first enforced in 2015); it does not make a determination of the constitutionality of his prior removals and does not create a remedy permanently affecting the rights and relationship of the parties. Similarly, the proposed injunction does not provide "relief that cannot be undone"—if Defendants prevail at trial in this case, they would not be enjoined from enforcing the complained-of policies at any future Pride Festival.

In either case, the Court also finds that Plaintiff has established a substantial likelihood of success on the merits. Defendants have submitted no evidence rebutting Plaintiff's affidavit and exhibits, agree that Plaintiff's speech is subject to First Amendment protections, and admit that the sidewalks surrounding the entrance to the Pride Festival constitute traditional public fora. See

Defs.' Mem. at 13; Dkt. Nos. 14, 19. The law governing the remaining issues in this case is well established, and Plaintiff accordingly prevails even under the higher standard of proof that Defendants demand.

### B. Other Preliminary Injunction Factors

While, "in the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the dispositive, factor," N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013), Plaintiff still must demonstrate irreparable harm, that the balance of equities weighs in his favor, and that the public interest favors an injunction, Winter, 555 U.S. at 20. All of these factors have been met in this case.

#### *1. Irreparable Harm*

First, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349 (2d Cir. 2003); see also Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This presumption applies to this case, as the enforcement of a buffer zone around the entrance of the Pride Festival would serve to directly prevent Plaintiff from engaging in protected speech within the affected area.

Defendants argue that this presumption is inapplicable because the complained-of policy "may only potentially affect speech," Defs.' Mem. at 6-7 (quoting Bronx Household, 331 F.3d at 350), and that Plaintiff has failed to show that such a policy would chill his speech, id. at 7-8. This is not such a case. There is no question of "chill" when the Plaintiff's speech has already been frozen: he is not alleging that Defendants' policy dissuaded him from speaking, but rather

15

that—operating under color of law—they ordered him to move across the street.[12] The enforcement of a buffer zone surrounding the entrances to the 2016 Pride Festival would definitively prevent Plaintiff from exercising his right to demonstrate there, and thus would result in irreparable harm.

> 2. *Balance of Equities*

Second, in determining whether the balance of equities tips in Plaintiff's favor, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)); accord Vaguely Qualified Prods. LLC v. MTA, No. 15 Civ. 4952, 2015 WL 5916699, at *12 (S.D.N.Y. Oct. 7, 2015) (applying this standard in the First Amendment context). Here, the hardship faced by Plaintiff is substantial: the loss of his right to demonstrate in a traditional public forum. See N.Y. Progress & Prot. PAC, 733 F.3d at 488 (describing the reduction of constitutionally protected speech as a significant hardship). On the other side, the hardship imposed on Defendants is relatively minimal, since all the requested injunction requires is for them not to ban Plaintiff from the area on the basis of one policy that the Court has determined likely to be unconstitutional. See id. ("[T]he Government does not have an interest in the enforcement of an unconstitutional law." (alteration in original) (quoting ACLU v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003))); see also Invisible Empire Knights of the Ku Klux

---

[12] The Bronx Household court itself noted this distinction, calling "[w]hatever tension may be said to exist in our case law . . . more apparent than real" and explaining the difference between direct and potential restrictions on speech. 331 F.3d at 349-50. Additionally, Defendants' semantic argument—namely, that officers only threatened that Plaintiff *could be* arrested, and not that he *would be* arrested, Defs.' Mem. at 9-10—is not well taken. The police ordered Plaintiff to stop his activity and move across the street; regardless of the verbiage employed, this is not a hypothetical, conjectural harm. See also Pl.'s Ex. D at 2:36-2:42 ("[I]f you refuse to move across the street, you will be arrested.").

16

Klan v. City of West Haven, 600 F. Supp. 1427, 1436 (D. Conn. 1985) ("[T]he balancing of the plaintiffs' interest in free speech against the city's interest in being able to enforce an unconstitutional ordinance clearly establishes that the equities tilt decidedly in favor of the plaintiffs.").

The Court recognizes the additional effort that may be required in order to maintain the peace and prevent foot-traffic congestion without removing Plaintiff, and that the job of law enforcement in protecting citizens at public events is both difficult and serious. This increased burden, however, cannot upset Plaintiff's constitutional right to free speech, especially when—as discussed above—there are other, less restrictive alternatives by which Defendants' legitimate governmental objectives could be achieved.

### 3. Public Interest

Third, the Court finds that the issuance of the requested injunction serves the public interest. While the Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves, see N.Y. Progress & Prot. PAC, 733 F.3d at 488, that is not the case here. "[S]ecuring First Amendment rights is in the public interest," and it is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law. Id.; see also Amarin Pharma, Inc. v. FDA, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015); Vaguely Qualified, 2015 WL 5916699, at *12. Since Plaintiff has established each of the factors required by Winter, the Court will issue a preliminary injunction in this case.

**C. Laches**

In addition to their arguments that Plaintiff failed to meet his burden as to the preliminary injunction factors, Defendants alternatively assert the defense of laches. As Defendants note,

17

"[l]aches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994) (citing Stone v. Williams, 873 F.2d 620, 623 (2d Cir. 1989)). In addition to unreasonable delay, a party seeking to employ the doctrine of laches must also show that it was prejudiced by this delay. E.g., Hizam v. Kerry, 747 F.3d 102, 110-11 (2d Cir. 2014). Furthermore, "[t]he determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." Tri-Star, 17 F.3d at 44.

In this case, Plaintiff did not unreasonably delay his motion for a preliminary injunction, and Defendants were not prejudiced by any reliance on this delay. Defendants point to the 2014 Pride Festival as the date "that [Plaintiff] took Constitutional issue with the City's policies," Defs.' Mem. at 21, but any delay in litigation between the 2014 and 2015 festivals came as a result of the parties' settlement correspondence and Plaintiff's belief that he would not be barred from demonstrating at the 2015 Festival, see Pl.'s Aff. ¶¶ 43-47; Pl.'s Exs. G-I. When Plaintiff was again barred from demonstrating on the sidewalk outside of the 2015 Festival, he filed this action well within one year of this new injury—such a delay cannot be described as unreasonable. Cf. Milan v. Wertheimer, 808 F.3d 961, 963 (2d Cir. 2015) ("Section 1983 actions in New York are subject to a three-year statute of limitations . . . .").

Nor can Defendants point to any way in which they were prejudiced by Plaintiff's delay. Plaintiff's prompt filing of his Motion afforded Defendants a full, unexpedited briefing schedule in accordance with the Local Rules of this District. See L.R. 7.1(b). Defendants' complaint that a limited time now remains between the date of this Decision and the 2016 Pride Festival cannot establish prejudice when they are only being ordered *not* to take some action against the Plaintiff.

18

None of the cases cited by Defendants—cases in which the motions were filed just days before the events in question, and in which the defendants were consequently limited in their ability to respond—command any different result. See Defs.' Mem. at 20-21; see also N.Y. Progress & Prot. PAC, 733 F.3d at 489 (reversing the district court for denying a preliminary injunction on grounds of "artificial urgency," even when the action was filed only 41 days before the election it related to). As such, Defendants cannot assert the doctrine of laches against Plaintiff's Motion.

**D. Security**

Under the Federal Rules of Civil Procedure, the Court may not issue a preliminary injunction without first determining an appropriate security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c); see also Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 158 (2d Cir. 2004) (finding that district courts are required to determine the amount of security, or that security is unnecessary, prior to entering a preliminary injunction). Because there is no plausible basis by which *not* removing Plaintiff from an area surrounding the entrance to the Festival would result in cost or damage to Defendants, the Court finds that the provision of security is unnecessary in this case. See, e.g., Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm . . . .'" (quoting Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996))).

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that, for the reasons stated above, Plaintiff's Motion (Dkt. No. 6-1) for

preliminary injunction is **GRANTED**; and it is further

**ORDERED**, that Defendants in this action are enjoined from excluding Plaintiff from or restricting his ability to demonstrate in the areas surrounding the entrances to the 2016 CNY Pride Festival based on the establishment of a buffer zone; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:   June 8, 2016
         Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge