UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

JAMES DEFERIO,

                    Plaintiff,
                                        Civil Action No.
            -vs-                        5:16-CV-0361

CITY OF SYRACUSE; FRANK FOWLER,
In his official capacity as Chief of
Police for the City of Syracuse
Police Department, JOSEPH SWEENY,
individually and in his official
Capacity as Captain for the City of
Syracuse Police Department, and
JAMEY LOCASTRO, individually and in
his official capacity as Sergeant
for the City of Syracuse Police Department,

                    Defendants.

-------------------------------------------------------

                    Videotaped Examination Before

            Trial of JAMES DEFERIO, held at the

            offices of the City of Syracuse

            Department of Law, Syracuse, New York,

            on March 21, 2017, before

            Mary Regina Butwin, Registered

            Professional Reporter and Notary

            Public in and for the State of

            New York.

APPEARANCES:

For the Plaintiff:

        CENTER FOR RELIGIOUS EXPRESSION
        699 Oakleaf Office Lane, Suite 107
        Memphis, Tennessee  38117
        BY:  MARK MANGINI, ESQ.
            901.684.5485
            mmangini@crelaw.org

For the Defendants:

        CITY OF SYRACUSE
        Department of Law
        City Hall, Room 300
        233 East Washington Street
        Syracuse, New York  13202
        BY:  JOHN A. SICKINGER,
            Senior Assistant
            Corporation Counsel
            315.448.8400
            jsickinger@syrgov.net

            - and -

        TODD M. LONG,
        Assistant Corporation Counsel

Also Present:  VIDEO VISION
        13 Chestnut Street
        Clinton, New York  13323
        BY:  CORRINE GATES, Videographer
            315.853.8378

        *         *        *

I N D E X

PAGE

REQUEST INDEX .................................... 4

\*          \*          \*

E X A M I N A T I O N S

WITNESS                                         PAGE

James Deferio

    BY:  Mr. Sickinger ........................... 9
    BY:  Mr. Mangini ......................... 264
        \*          \*          \*

E X H I B I T S

LETTER                  DESCRIPTION              PAGE

A      Complaint ................................. 7

B      Deferio affidavit ......................... 7

C      Photograph ................................ 7

D      Photograph ................................ 7

E      Photograph ................................ 7

F      Photograph ................................ 7

G      Photograph .............................. 147

H      Photograph .............................. 147

I      Photo on Syracuse.com ................... 189

J      Document ................................ 189

K      Plaintiff's responses to defendant's ...... 189
       request for admissions-genuineness of documents

L      Facebook screenshots .................... 198

R E Q U E S T    I N D E X

Page 36, Lines 5 - 14

Q     Do you have any records in your
possession related to the first two arrests that you
described?
A     No.
Q     But you indicated you have one of the
officer's names written down?
A     I think I do.
Q     Okay.  I would ask that, if you have
that, you please provide it to your attorney so that
he can provide it to us.

Page 38, Line 10 - Page 39, Line 11

Q     Do you recall if you referred to the
Mormon religion as a "cult"?
A     Yes.
          MR. MANGINI:  Object to form.
Q     Yes, you recall, or yes, you did?
A     At some time.  At some point I have.
Q     Referred to the Mormon religion as a
cult?
A     Yes.
Q     Do you recall if you did it at the time
of this arrest in July 2007 or 2008?
A     No.
Q     Do you recall what you were charged with?
A     I don't remember.
Q     You said it was related to using a
megaphone.  Was there some sort of ordinance that you
were alleged to have violated?
A     I don't think there was.
Q     Do you have any records related to this
arrest?
A     Yes.
Q     Are they in your possession?
A     Yes.
Q     I'd again ask that you, please, provide
them to Mr. Mangini so that he can forward them on to
us.

Page 103, Line 18 - Page 104, Line 4

          What was it that the attorney instructed
the city to cease and/or desist?
the city to cease and/or desist?

     A     Threatening me with arrest for exercising
my First Amendment right.
     Q     Okay.  Do you know when that letter was
sent?
     A     I'm not sure.
     Q     Okay.  Do you have a copy of that letter?
     A     I think I do.
     Q     I'd ask that you provide it to
Mr. Mangini and that he produce it for us.

Page 195, Line 8 - Page 196, Line 9

     Q     So you have another Facebook account
that's not been previously disclosed?
     A     One that's not being -- that's not
active.
     Q     Okay.
     A     Active in the sense that I do not post.
I do answer anything on it.  I was going to use it
for college students, and I decided not to.  And I
haven't deleted it yet, the account.
     Q     So there is content on there?
     A     Huh?
     Q     There is content on that account?
     A     Brief content with a certain student from
Buffalo State University -- no, no.  From Buffalo
State College.
     Q     And do you know what the profile user
name is for that account?
                MR. MANGINI:  Object to form.
     A     Yes.
     Q     Okay.  What is it?
     A     "The truth," and then space, "sets free."
     Q     Okay.  Well, defendants will make a
request -- place a request now that all content from
that account be provided to us as it was not
previously disclosed nor was the existence of that
account previously disclosed.

Page 230, Line 17 - Page 231, Line 7

     Q     Well, if I told you that people observed
you with a megaphone at the 2012 Pride flag-raising,
would you have any reason to believe that that wasn't
accurate?
                MR. MANGINI:  Object to form.
     A     I'd have to check my own records on that.
     Q     What record would you check?
     Q     What record would you check?

A       I keep...I try to...I don't always do so, but I try to keep an informal record of where I go, how long I've been there, who I talk to and who I should pray for, and, if I encounter any problems with the police or with anybody else.

Q       Okay.  Well, I would note that I'll ask that you please provide those to Mr. Mangini and that Mr. Mangini please provide those to us.

Page 240, Line 17 - Page 241, Line 12

Q       So the only notes that you have or documents or information you have that you have brought with you here today related to this case are those index cards?

A       These are 2013, 2015 and 2014.  2015 is not made out completely.  And I don't know why but sometimes --

Q       Do you have anything else, Mr. Deferio?

A       Things that don't -- I have a Quran.  I have a Bible.

Q       That relate to this lawsuit?

A       I have the scientific evidence that homosexuality is not inborn.

Q       Anything that you believe specifically relates to this lawsuit?

A       Not with me.

Q       And you're going to attempt to retrieve the other documents and provide them to Mr. Mangini so he can then provide them to us, whatever's in your possession.

*       *       *

1        JAMES DEFERIO

2            IT IS HEREBY STIPULATED by and

3        between counsel for the respective

4        parties that this Examination Before

5        Trial is to be held pursuant to the

6        provisions of the Federal Rules of

7        Civil Procedure; that the presence of

8        a Referee is waived; that the filing

9        of the minutes is waived; that the

10       witness may be sworn by

11       Mary Regina Butwin, Notary Public in

12       and for the State of New York; and

13       that all objections, except those as

14       to form, are reserved until the time

15       of trial.

16

17            *         *         *

18

19            (Documents marked for

20       identification as Exhibits A and B,

21       this date.)

22            (Photographs marked for

23       identification as Exhibits C through

24       F, this date.)

25            THE VIDEOGRAPHER:  My name is

1           JAMES DEFERIO

2           Corrine Gates for Video Vision,

3           13 Chestnut Street in Clinton,

4           New York.  Today's date is March 21st,

5           2017, and the time is 10:38 a.m.  This

6           testimony is being taken at 233 East

7           Washington Street in Syracuse,

8           New York.

9                For the United States District

10          Court, Northern District of New York,

11          Civil Action Number 5:16-CV-0361, the

12          caption of the case is:  James Deferio

13          versus City of Syracuse; Frank Fowler,

14          in his official capacity as chief of

15          police for the City of Syracuse Police

16          Department; Joseph Sweeny,

17          individually and in his official

18          capacity as captain for the City of

19          Syracuse Police Department; and

20          James Locastro, individually and in

21          his official capacity as sergeant for

22          the City of Syracuse Police

23          Department.

24                This witness is James Deferio.

25          This testimony is being taken on

JAMES DEFERIO

1
2          behalf of the defendants and is being
3          recorded in the digital format at the
4          standard play mode.
5              Would counsel please announce
6          appearances for the record.
7              MR. SICKINGER:  Yes.
8          John Sickinger on behalf of all
9          defendants.
10             MR. LONG:  Todd Long on behalf of
11         all the defendants.
12             MR. MANGINI:  Tony Mangini on
13         behalf of James Deferio.
14
15   J A M E S   D E F E R I O ,  having been called as
16       a witness, being duly sworn, testified as
17       follows:
18   EXAMINATION BY MR. SICKINGER:
19       Q    Good morning, Mr. Deferio.  I know we've
20   met before, so you know I'm John Sickinger, attorney
21   for the City of Syracuse and the other defendants in
22   this matter.  I believe you've been deposed before so
23   I think you understand the process, but I'll go over
24   it real briefly with you.
25             I'm going to ask you some questions here

1                    JAMES DEFERIO

2    today.  If at any point in time you don't understand

3    my question, please feel free to ask me to rephrase

4    it, ask it a different way, or, if there's a document

5    you believe that would help you refresh your

6    recollection, please feel free to ask for it.

7              If at any point in time you need to take

8    a break, feel free, just let me know.  We can do

9    that.  I'd just ask that you answer any question

10   that's currently pending before we take any break.

11             If I ask a question, you answer it, I'm

12   going to assume that you understood my question.  Is

13   that fair?

14        A    Yes.

15        Q    Okay.  And the other thing I will tell

16   you is if you would please keep your voice up, number

17   one, and, number two, it's human nature sometimes to

18   want to nod or grunt a response, but it makes life

19   very difficult for our court reporter to take down

20   your response if it's not a verbal response.

21        A    Is this close enough?

22                  THE VIDEOGRAPHER:  It is.  Thank

23             you.

24        Q    All right.  Good morning, Mr. Deferio.

25   Would you please state your full name?

1                    JAMES DEFERIO

2        A      James Thomas Deferio.

3        Q      And your current address, please,

4   Mr. Deferio?

5        A      110 Floral Parkway, Syracuse  13205.

6        Q      And how long have you lived at that

7   address?

8        A      In May it will be 36 years.

9        Q      Are you currently employed, sir?

10       A      No.

11       Q      When was the last time you were employed?

12       A      2001.

13       Q      And what did you do?

14       A      I worked at Troy Manufacturing here in

15   the city.

16       Q      And how long did you work there for?

17       A      I don't recall.

18       Q      Was it more than five years?

19       A      No.  It was under five years.

20       Q      And what was your occupation or trade?

21       A      At that company?

22       Q      Correct.

23       A      I was a one of the workers there and also

24   took care of one of the production lines.

25       Q      What's the last level of education that

1                          JAMES DEFERIO

2    you completed, Mr. Deferio?

3          A       I have two bachelor of science degrees.

4          Q       And where are they from?

5          A       SUNY-ESF.

6          Q       Both of them?

7          A       Yes.

8          Q       And what are they in?

9          A       It says on the diploma resource

10   management, but it's actually the science part of

11   forestry and the other one biology.

12         Q       Did you ever use either of those two

13   degrees in your employment?

14         A       No.

15         Q       If someone were to ask you what your

16   occupation was, what would you believe it to be?

17         A       Are you asking in reference to how do I

18   make money?

19         Q       When you were employed.  What was it that

20   you believe you would do for a living?  I know you

21   indicated that you worked at one place but you

22   didn't --

23         A       I didn't put a label on it.

24         Q       Okay.  Well, what type of work did you

25   perform then?

JAMES DEFERIO

1

2    A    I -- well, I'll have to go into some

3    history, and I don't know if I should do that.

4    Q    Well, I'm just looking for briefly, you

5    know,  generally what you did for a living.

6    A    Well, when I graduated, my wife didn't

7    want to move to Oregon or Northern California, where

8    most of the jobs were in my field.  I was equipped to

9    work in a biological lab or in forestry itself.  So

10   we stayed here, and there was hardly any employment

11   in my field here in Syracuse so I was a stay-at-home

12   dad while my wife was a registered nurse at

13   Crouse Hospital.

14   Q    And how many years were you a

15   stay-at-home dad?

16   A    Till they were grown, 2000.

17   Q    So would that have been approximately 18

18   years or so?

19   A    Yeah.

20   Q    And you mentioned your wife.  How long

21   have you been married, sir?

22   A    Be 42 years in August.

23   Q    Were you previously married?

24   A    No.

25   Q    And does your wife currently reside with

1                    JAMES DEFERIO

2    you?

3         A    Of course, yes.

4         Q    Does anyone else reside with you?

5         A    Yes.

6         Q    Who else resides with you?

7         A    My youngest daughter.

8         Q    Has she always lived with you?

9         A    No.

10        Q    And what's her age?

11        A    She'll be 35 in June.

12        Q    Do you have any other children?

13        A    Yes.

14        Q    Just so I can be clear, what was the --

15   your daughter who's 35, what was her name?

16        A    Michelle.

17        Q    And do your other children live in the

18   area?

19        A    No.

20        Q    What are your other children's names and

21   locations?

22                    MR. MANGINI:  Objection,

23                relevance.

24                    MR. SICKINGER:  Well, we're just

25                trying to get to the witnesses -- for

```
1                    JAMES DEFERIO
2              instance, one of his family members, I
3              believe, has appeared in some of
4              Mr. Deferio's videos with him, so I'm
5              trying to identify who these
6              individuals are.
7                   MR. MANGINI:  Right, right.  I
8              was just really focused on --
9                   MR. SICKINGER:  I mean I don't
10             need personal details of them.  I
11             just -- are they in the Syracuse area,
12             I guess, or do they come to the
13             Syracuse area.
14     A       No.
15     Q       And how many other children do you have?
16     A       Two.
17     Q       And what are their names?
18     A       Christopher.
19     Q       And how old is Christopher?
20     A       He'll be 39 in August.
21     Q       And your other child?
22     A       Monica.
23     Q       And how old is she?
24     A       Thirty-seven.
25     Q       So you have three children?
```

1                    JAMES DEFERIO

2        A      Yeah.

3        Q      Other than the two bachelor's degrees you

4  described earlier, do you have any other higher

5  education?

6        A      You talking about graduate level?

7        Q      Any level.  Did you go to a trade school?

8  Do you have any certificates?

9        A      No.

10        Q      Do you hold any graduate degrees?

11        A      No.

12        Q      Have you taken any graduate courses?

13        A      Yes.

14        Q      What were those in?

15        A      You want a list, the best of my memory?

16        Q      I guess how many are there?

17        A      Six.

18        Q      Are they related to your undergraduate

19  degrees in any way?

20        A      I don't have a graduate degree.

21        Q      No.  Your undergraduate degrees.  The

22  classes related --

23        A      As a superior undergraduate student, you

24  can take graduate courses at ESF --

25        Q      Okay.

1                    JAMES DEFERIO

2        A       -- with a counselor's approval.

3        Q       Let me ask it this way.

4        A       So I did that.

5        Q       Subsequent to obtaining your two

6    bachelor's degrees, did you take any other course

7    work or higher education classes?

8        A       No.

9        Q       During any of your higher education, did

10   you take any religious-based classes or religious

11   training?

12       A       I had to take a humanity class 'cause I

13   wanted to broaden my horizon, and it was rogue

14   religions and it was taught from a secular point of

15   view.  That was at Oregon State University.

16       Q       But neither of your two bachelor degrees

17   are from Oregon State?

18       A       No.  I started off there.

19       Q       Other than what you just described, do

20   you have any other religious or theological training?

21       A       Not formal.

22       Q       When you say not formal, I presume then

23   you believe you have some informal training?

24       A       Yeah.  When I say nonformal, I mean I

25   don't have a diploma from an accredited theological

1                    JAMES DEFERIO

2    seminary or Bible college in those areas.  But as

3    somebody who's been a Christian since March 3rd,

4    1973, I've been studious in my approach to the Bible

5    and...and I...I feel like I know the Bible better

6    than most people who do have theological degrees and

7    who are pastors of churches.

8        Q     Well, let's back up.  You said you don't

9    have any formal theological or religious degree.

10       A     Right.

11       Q     Did you take any classes at any

12   theological institute or theological school?

13       A     I've taking classes in various churches

14   like Believers' Chapel.

15       Q     At any institute of higher learning have

16   you taken --

17       A     No.

18       Q     -- any religious-based classes?

19             And how many of those classes or...I

20   guess I'll call them classes...did you take at

21   Believers' Chapel, the ones you just referred to?

22       A     I think it might have been four or five.

23   Could have been more.

24       Q     Do you know roughly when those were?

25       A     Early 1990's.

1                    JAMES DEFERIO

2        Q      Were you attending that church at that

3    time?

4        A      Yes.

5        Q      Do you still currently attend that

6    church?

7        A      No.

8        Q      Other than what we've already described,

9    have you taken any other religious classes or any

10   other religious training?

11       A      No.

12       Q      Do you have any legal training or have

13   you taken any law-related classes?

14       A      No.

15       Q      Have you ever been arrested, Mr. Deferio?

16       A      Yes.

17       Q      When was that?

18       A      It was on the sidewalk on the east side

19   of the War Memorial, for preaching.  I was handcuffed

20   behind my back.

21       Q      Do you know when that was?

22       A      I don't remember.  It was two years ago

23   maybe, two and a half, three years ago.

24       Q      And when you say War Memorial, you mean

25   the War Memorial here in Syracuse?

1                    JAMES DEFERIO

2        A    Yes.

3        Q    The one over on State Street?

4        A    Yes.

5        Q    And you said it was on the east side?

6        A    Yes.

7        Q    Do you know what you were charged with?

8        A    I didn't obey a police officer.  I guess

9    that was the charge.  But immediately after she

10   handcuffed me a lieutenant walked by and said, told

11   her, "You can't arrest him."

12       Q    Okay.  Let me back up a little bit.  Was

13   it a Syracuse police officer?

14       A    Yes.

15       Q    And do you know her name?

16       A    I have it written down someplace, but I

17   don't remember it.

18       Q    So at some point in time you did learn

19   her name?

20       A    Yes.

21       Q    Okay.  And you indicated that, was it, a

22   lieutenant who came by and directed that you be

23   released?

24       A    Yes.

25       Q    Did you know the lieutenant's name?

1                    JAMES DEFERIO

2          A      No.

3          Q      Have you ever seen that person other than

4    that incident?

5          A      I don't think so.

6          Q      The female officer, had you ever seen her

7    other than that incident you described?

8          A      First and only time I've ever seen her.

9          Q      How long were you placed in handcuffs

10   for?

11         A      She lost the keys to the handcuffs.  I

12   think it was 13 minutes.

13         Q      Were you ever placed in a police vehicle?

14         A      Yes.

15         Q      And how long were you in a police vehicle

16   for?

17         A      This was another incident here in

18   Syracuse.

19         Q      Okay.  I guess I should have clarified

20   then.  With regard to the incident at the War

21   Memorial you were just describing, were you ever

22   placed in a police vehicle?

23         A      No.

24         Q      So you were on the sidewalk handcuffed

25   for approximately 13 minutes?

1                    JAMES DEFERIO

2        A      Yes.

3        Q      Were you formally charged with anything?

4        A      No.

5        Q      Did you go to any court as a result of

6   that arrest?

7        A      No.

8        Q      Were you issued any appearance ticket?

9        A      No.

10       Q      Did you ever request a copy of a police

11  report related to that incident?

12       A      No.

13       Q      And you said this was approximately two

14  years ago?

15       A      It may have been three years ago.

16       Q      And what were you doing at the War

17  Memorial at the time?

18       A      I was preaching.

19       Q      And when you say preaching, what do you

20  mean?

21       A      I was proclaiming what the Bible says to

22  the people that were passing by going into the

23  Syracuse Crunch hockey game.

24       Q      Do you recall what in particular you were

25  preaching about that day or evening?

1                    JAMES DEFERIO

2        A      Sin, the consequences of sin, and what

3    salvation means.

4        Q      Were you carrying any signs?

5        A      Yes.

6        Q      Were they -- strike that.

7               Do you know approximately what size the

8    signs were?

9        A      Approximately the size that was

10   photographed last Thursday here at City Hall.

11       Q      Was anyone with you during that incident?

12       A      No.

13       Q      And do you recall what the sign said?

14       A      I believe it was John 14:6.  It says:

15   Jesus Christ said, "I am the way, the truth and the

16   life.  No one comes to the Father except through me."

17   And on the other side it said "Jesus Christ" and the

18   quotes of a verse from Acts Chapter 4, Verse 12, "Nor

19   is there salvation in any other for there is no other

20   name under heaven given among men by which we must be

21   saved."  So there's two verses from the Bible on that

22   side.

23       Q      Okay.  Let me back up to the point where

24   you indicated earlier that a lieutenant came by and

25   directed that you be taken out of the handcuffs --

1                    JAMES DEFERIO

2        A     Yes.

3        Q     -- is that correct?

4              And could you -- and you may have

5   testified to this already, but could you describe to

6   me what it was that he said to the other officer?

7        A     The only thing I heard was, "You can't

8   arrest him," and he took her aside.

9        Q     And do you recall what the reason for

10  your arrest that was given to you by the female

11  officer was?

12       A     She told me I had to be on the next

13  block, one block away from the War Memorial, and I

14  said -- I asked her to call Captain Sweeny.  She

15  refused and she says, "You need to obey me."  I said,

16  "I'll comply.  I just would like you to call

17  Captain Sweeny first 'cause he said he's my

18  go-between."  She refused, and that's when she said

19  "You're under arrest," and placed me in handcuffs.

20       Q     And you believe she indicated that she

21  was placing you under arrest for not obeying her

22  instruction?

23       A     Yes.

24       Q     Did the officer indicate to you why you

25  had to move to the next block?

1            JAMES DEFERIO

2       A       I don't think so.

3       Q       Have you been arrested any other time?

4       A       Yes.

5       Q       Do you know when that was?

6       A       Yes.

7       Q       When was that?

8       A       April 2005, here in Syracuse.

9       Q       And where in Syracuse?

10      A       Columbus Circle.

11      Q       Was that in front of the cathedral?

12      A       It was near the cathedral.

13      Q       And what were you doing at the time of

14   that arrest?

15      A       John Alvarez, a political activist here

16   in the Syracuse area, and I were doing a political

17   demonstration in opposition to the Syracuse Peace

18   Council, who were calling our servicemen baby killers

19   and women killers.

20      Q       When you say you were -- I'm sorry.  Were

21   you doing a demonstration?

22      A       A protest of the Syracuse Peace Council,

23   who were in Columbus Circle, who were protesting our

24   involvement in Iraq and they were calling out names

25   of servicemen and saying that our servicemen were

1                    JAMES DEFERIO

2    baby killers and women killers.

3         Q     So, when you say you were doing a

4    protest, what do you mean by that?

5         A     We had signs of the jets flying into the

6    Twin Towers and that sort of thing.  I don't remember

7    what all the signs were.  There was a few.

8         Q     Okay.  Do you recall what any of them

9    said?

10        A     No, I don't.  I don't think there was --

11   I think maybe just one sign had some printing on it.

12   It was 2005.  It's almost twelve years ago.

13        Q     And do you know what you were charged

14   with?

15        A     Yes.

16        Q     What was that?

17        A     Our signs were wider than our shoulders.

18        Q     Okay.  And who told you that?

19        A     An officer who's no longer employed by

20   the Syracuse Police Department.

21        Q     Do you know their name?

22        A     I -- it's written down someplace.

23        Q     Was it a male or female?

24        A     Male.

25        Q     Were you issued an appearance ticket?

1                    JAMES DEFERIO

2        A      We were put in handcuffs and put into a

3    police wagon and brought to a storefront operation on

4    Salina Street, brought inside and sat down for one

5    hour while they went through the law books to find

6    what they could charge us with.  When they couldn't

7    find anything, they decided to let us go.

8        Q      Okay.  So do you believe you were ever

9    charged with a crime as a result of that?

10       A      They couldn't find anything in the law

11   books.

12       Q      So that's a no?

13       A      No.

14       Q      Were you making any oral statements at

15   the time you were arrested?

16       A      I...I don't...I wasn't making any oral

17   statements.

18       Q      Was the gentleman that you were with

19   making any oral statements?

20       A      Once in a while.

21       Q      Do you recall what the content of those

22   statements was?

23       A      When one of the leaders of the Syracuse

24   Peace Council would call a name of a serviceman that

25   was killed or something like that, John would say,

1                    JAMES DEFERIO

2   "Is he a baby killer?"  So that was...that was it.

3        Q     Was any of the content of your signs or

4   of the oral statements that the gentleman you were

5   with directed towards or did it pertain to the

6   Islamic religion?

7                    MR. MANGINI:  Object to form.

8        A     I don't recall.

9        Q     All right.  And you never went to any

10  court as a result of that arrest?

11       A     No.

12       Q     Other than those two times you've already

13  described, have you ever been arrested?

14       A     Yes.

15       Q     And when was that?

16       A     April 2007.

17       Q     And do you recall where that was?

18       A     Yes.

19       Q     Where was that?

20       A     Kutztown University in Pennsylvania.

21       Q     Is that with a C or K?

22       A     K.  K-U-T-Z.

23       Q     And do you recall what you were doing at

24  the time of your arrest?

25       A     Yes.

1                    JAMES DEFERIO

2        Q      What were you doing?

3        A      I had started to preach, but I think I

4   got a half of a verse, Bible verse, out of my mouth

5   before I was placed under arrest.

6        Q      When you say started to preach, how do

7   you define preach?

8        A      To proclaim a message from the Bible.

9        Q      Do you recall what specific message you

10  were proclaiming?

11       A      I don't recall exactly what verse I was

12  starting to quote.

13       Q      Do you recall what your message or what

14  the content of your preaching pertained to?

15       A      There was numerous people there with

16  numerous signs.  My sign, my banner, was -- one of

17  them had the message that was photographed on the

18  banner last Thursday.

19       Q      Do you recall which message that was?

20       A      It was, "Thousands of ex-homosexuals

21  have experienced a life change in the love of

22  Jesus Christ.  Check out their testimonies at," and

23  there's three websites.  The websites were different

24  though.

25       Q      Okay.  Do you recall what you were

1                    JAMES DEFERIO

2   charged with as a result of that arrest?

3        A    No.

4        Q    Were you taken to a police station?

5        A    Yes.

6        Q    I'm not familiar with how the

7   Pennsylvania criminal process works, so were you

8   given an appearance ticket or a summons?

9        A    I was put in the jail cell and, yes, we

10  had to appear in court, myself and another person.

11       Q    Was that on the same day or was that at a

12  later date?

13       A    It was at a later date.

14       Q    And as you sit here today, you don't

15  recall what you were charged with?

16       A    I believe it was disorderly conduct, but

17  I'm not sure.  There's a record of it on -- you can

18  find that if you Google it so....

19       Q    And do you know what the ultimate

20  disposition of that charge was?

21       A    It was dismissed.

22       Q    Did you retain an attorney to represent

23  you?

24       A    Yes.

25       Q    Do you know the name of that person?

1                    JAMES DEFERIO

2        A     He's deceased.

3        Q     He's -- did he practice in Pennsylvania?

4        A     Yes.

5        Q     Do you recall what his name was?

6        A     Yes.

7        Q     What's that?

8        A     Scott Shields.

9        Q     Was his office in -- near the university?

10       A     No.

11       Q     Okay.  Other than the three arrests that

12   you've already described, have you been arrested any

13   other times?

14       A     Yes.

15       Q     When was that?

16       A     The next day at East Stroudsburg

17   University.

18       Q     So in April 2007, the day after your

19   arrest at Kutztown University, you were arrested

20   again in East Stroudsburg?

21       A     Yes.

22       Q     I guess just to back up, the previous

23   arrest you were discussing at Kutztown University,

24   were you by yourself at that time?

25       A     No.  There was a large ministry group

1                    JAMES DEFERIO

2    there.

3         Q    Did you travel with anyone to go to that

4    protest?

5                    MR. MANGINI:  Object to form.

6         A    I believe I had my own -- I had my own

7    vehicle.  So there might have been people who were

8    traveling with me.  But I was with two other

9    ministries.  There was at least two ministries

10   represented there.

11        Q    Is that two other ministries?

12        A    Yes.

13        Q    And what do you mean by that?

14        A    Two Christian ministries.  Ministries

15   that exist, you proclaim the gospel, spread Bible

16   message.

17        Q    When you say other ministries, what was

18   your ministry on that date?

19        A    My ministry was to work with them, so I

20   wasn't...I wasn't autonomous.  I was under a

21   director.

22        Q    Okay.  Well, what was the content of the

23   message that you were treating that date at Kutztown

24   University?

25        A    It was a Bible message.  Some of it had

JAMES DEFERIO

1

2  to do with pro-life evangelism, so there was giant

3  aborted babies photos there.  There was several

4  messages going on at the same time.  It was a large

5  ministry group.

6      Q    Do you recall what your specific message

7  pertained to?

8      A    I don't remember.  I'd have to go back

9  and see what photographs were on-line and see what I

10  was holding.

11     Q    All right.  So the next arrest the day

12  after at, I believe you said it was, East

13  Stroudsburg, Pennsylvania....

14     A    East Stroudsburg University at East -- in

15  East Stroudsburg, Pennsylvania.

16     Q    And do you recall what you were arrested

17  for there?

18     A    No, I don't.

19     Q    Do you know, do you recall, was it

20  related to your preaching on that date?

21     A    I wasn't preaching.

22     Q    What were you doing?

23     A    I was holding a banner.  Somebody else

24  was preaching.

25     Q    Okay.  Do you know if your arrest was

1                    JAMES DEFERIO

2   related to holding that banner?

3        A    For some reason the officer thought I was

4   the director of the ministry group there and said we

5   had to leave, and he's talking to me while the other

6   guy's preaching.  And he said, "I'll give you ten

7   minutes to leave," and he says, "I'll give you five

8   minutes to leave."  Then he says, "You're under

9   arrest right now," and he hauled me away.

10       Q    And was this a pro-life message that you

11  were holding on the banner?

12       A    It was -- had several aspects to it.  One

13  of them was pro-life.

14       Q    Do you recall what the other ones were?

15       A    Freedom from sin.  Various sins were

16  mentioned.

17       Q    Was homosexuality one of those sins?

18       A    Yes.

19       Q    Do you consider homosexuality to be a

20  sin?

21       A    Yes.

22       Q    The messages that you preach, do those

23  contain messages that homosexuality is, in fact, a

24  sin?

25       A    Yes.

1                    JAMES DEFERIO

2        Q     Do you recall what the resolution of that

3   arrest was in East Stroudsburg, Pennsylvania?

4        A     It was dismissed.

5        Q     And do you know specifically what you

6   were charged with?

7        A     I don't remember.

8        Q     And did Mr. Shields also represent you

9   with respect to that charge?

10       A     It was another lawyer.

11       Q     Another lawyer in Pennsylvania?

12       A     Yes.

13       Q     Do you recall his or her name?

14       A     No.

15       Q     How did you find that attorney?

16       A     I think Scott Shields asked him to look

17  into it for me, but I'm not sure.

18       Q     With respect to the arrest in Kutztown

19  University and the arrest in East Stroudsburg,

20  Pennsylvania, do you have any documents or records

21  that would indicate what exactly you were charged

22  with?

23       A     You could find an article on-line about

24  this court case if you just type in "James Deferio"

25  and/or --

1                    JAMES DEFERIO

2        Q     But I'm asking if you have any records

3    personally.

4        A     No.

5        Q     Do you have any records in your

6    possession related to the first two arrests that you

7    described?

8        A     No.

9        Q     But you indicated you have one of the

10   officer's names written down?

11       A     I think I do.

12       Q     Okay.  I would ask that, if you have

13   that, you please provide it to your attorney so that

14   he can provide it to us.

15             Okay.  Other than the four arrests you've

16   already described, have you been arrested any other

17   times?

18       A     Yes.

19       Q     When was that?

20       A     I think it was July of 2007.  May have

21   been 2008.

22       Q     And do you recall where that was?

23       A     Yes.

24       Q     Where was that?

25       A     Hill Cumorah in Upstate New York.

1                    JAMES DEFERIO

2       Q       That by Palmyra?

3       A       It's in between Palmyra and Manchester.

4       Q       And do you recall what police department

5   or agency arrested you?

6       A       It was a local sheriff.

7       Q       Do you know what county that is?

8       A       No.

9       Q       Do you recall what you were arrested for?

10      A       Yes.

11      Q       What's that?

12      A       Using a megaphone.

13      Q       Using a megaphone?

14      A       Yes.

15      Q       What were you doing at the time of your

16  arrest?

17      A       I was preaching.

18      Q       Were you preaching in any particular

19  location?

20      A       Yes.

21      Q       What's that location?

22      A       It was outside the parking lots at Hill

23  Cumorah as cars were leaving the parking lot.

24      Q       And do you recall the content of your

25  message?

1                    JAMES DEFERIO

2          A      In general I do.

3          Q      And what was that?

4          A      That the Book of Mormom can't be trusted,

5    that sort of message, and that the Bible has proven

6    itself to be true, the content, the historical facts

7    in the Bible have proven to be true, and that you

8    can't trust the Book of Mormon in its historicity or

9    in its spiritual message.

10         Q      Do you recall if you referred to the

11   Mormon religion as a "cult"?

12         A      Yes.

13                    MR. MANGINI:  Object to form.

14         Q      Yes, you recall, or yes, you did?

15         A      At some time.  At some point I have.

16         Q      Referred to the Mormon religion as a

17   cult?

18         A      Yes.

19         Q      Do you recall if you did it at the time

20   of this arrest in July 2007 or 2008?

21         A      No.

22         Q      Do you recall what you were charged with?

23         A      I don't remember.

24         Q      You said it was related to using a

25   megaphone.  Was there some sort of ordinance that you

1                    JAMES DEFERIO

2    were alleged to have violated?

3         A     I don't think there was.

4         Q     Do you have any records related to this

5    arrest?

6         A     Yes.

7         Q     Are they in your possession?

8         A     Yes.

9         Q     I'd again ask that you, please, provide

10   them to Mr. Mangini so that he can forward them on to

11   us.

12               Do you recall what the ultimate

13   disposition of that arrest was?

14        A     I was fined.

15        Q     Did you end up pleading to a certain

16   criminal offense or violation?

17        A     I didn't plead to anything.

18        Q     Were you represented by an attorney with

19   regard to that?

20        A     Yes.

21        Q     And who was that?

22        A     I don't recall his name.

23        Q     Do you know where his office was located?

24        A     North Syracuse.

25        Q     But you believe you have records related

1                     JAMES DEFERIO

2    to that arrest in your possession?

3         A    Yes.

4         Q    Other than the fine, was there any other

5    penalty or punishment as a result of that arrest?

6         A    Yes.

7         Q    What was that?

8         A    I had to stay away from Hill Cumorah for

9    one year.

10        Q    So there was an order of protection

11   issued?

12        A    I don't recall it being worded like that.

13        Q    The attorney in North Syracuse who

14   represented you with regard to that arrest, had they

15   previously represented you?

16        A    No.

17        Q    Have they represented you subsequent to

18   that arrest?

19        A    No.

20        Q    How did you find this person?

21        A    I was referred to him.

22        Q    And do you have any knowledge if this

23   person is still practicing today?

24        A    I don't.

25        Q    All right.  Other than the five arrests

1                    JAMES DEFERIO

2    you've already described, have you been arrested any

3    other time?

4         A    Yes.

5         Q    When was that?

6         A    July, I think, it was 2010.

7         Q    And where was that?

8         A    Palmyra, New York.

9         Q    Do you recall specifically where?

10        A    Yes; Palmyra.

11        Q    Where in Palmyra?

12        A    It was on the corner.

13        Q    And do you recall what you were arrested

14   for?

15        A    Yes.

16        Q    What's that?

17        A    Using amplification.

18        Q    Using sound amplification?

19        A    Yes.

20        Q    Was there some sort of ordinance in

21   Palmyra that prohibited that?

22        A    I don't remember the officer citing an

23   ordinance.

24        Q    Okay.  But you believe that your arrest

25   was related to a violation of some rule or ordinance

1                     JAMES DEFERIO

2    pertaining to sound amplification?

3         A    Yes.

4         Q    And do you recall what law enforcement

5    agency arrested you?

6         A    Local police.

7         Q    Was that the Palmyra police?

8         A    Yes.

9         Q    And do you recall what the disposition of

10   that arrest was?

11        A    Yes.

12        Q    What was that?

13        A    He received a call.  They asked him if I

14   was compliant, and he affirmed that I was so they

15   said, "Okay, let him go."

16        Q    When you say he, you're referring to the

17   arresting officer?

18        A    Yes.

19        Q    Do you recall who this telephone call was

20   from?

21        A    No.

22        Q    Were you ever taken to the police

23   station?

24        A    No.

25        Q    Were you placed in a police vehicle?

1                    JAMES DEFERIO

2          A     Yes.

3          Q     So were you ever taken anywhere in the

4     police vehicle?

5          A     No.

6          Q     So you were placed in the police vehicle

7     and then subsequently released from the police

8     vehicle?

9          A     Yes.

10         Q     How long were you detained for?

11         A     Perhaps ten minutes.

12         Q     As part of your release, were you

13    required to not use any amplification device in

14    Palmyra anymore?

15         A     Yes.

16         Q     And did you comply with that?

17         A     Yes.

18         Q     Were you issued any sort of appearance

19    ticket or paperwork relative to that detainment?

20         A     No.

21         Q     Okay.  Other than those six, any other

22    arrests?

23         A     No -- yes.  Sorry.  Yes.

24         Q     That's okay.  There's a lot -- I'm sure

25    there's a lot to remember.

1                    JAMES DEFERIO

2              Do you recall when that was?

3         A    Yes.

4         Q    When was that?

5         A    July 2006.

6         Q    And where was that?

7         A    Navy Pier, Chicago.

8         Q    And do you recall what law enforcement

9    agency arrested you?

10        A    Yes.

11        Q    Who was that?

12        A    Chicago police.

13        Q    And do you recall what you were arrested

14   for?

15        A    Trespass.

16        Q    You know what?  Just to clarify, I'm

17   sorry to go back, but the previous arrests that you

18   were describing in Palmyra, do you know what it was

19   that you were -- do you recall what it was that you

20   were saying with your sound amplification device at

21   the time you were arrested?

22        A    No.

23        Q    Was it part of your preaching, do you

24   believe?

25        A    Yes.

1                    JAMES DEFERIO

2       Q     Okay.  Sorry for the detour.  So, back to

3    Arrest Number 7 in Chicago, do you recall what it was

4    that you were doing that you were arrested for?

5       A     Yes.

6       Q     What was that?

7       A     Standing on a sidewalk.

8       Q     And I'm not familiar with Illinois

9    criminal law, so was that the actual charge?

10      A     No.

11      Q     What was the actual charge?

12      A     Trespassing.

13      Q     And what were you doing while you were

14   standing on a sidewalk?

15      A     Preparing to preach and preparing to

16   display signs.

17      Q     You say preparing.  What do you mean by

18   that?

19      A     We had just left the parking garage at

20   Navy Pier, and I believe there was five of us, maybe

21   four -- no.  There was five of us, and we were

22   carrying signs towards the front of Navy Pier at the

23   park and arrived on the sidewalk, and that's when the

24   police intercepted us.

25      Q     Okay.  When you say intercepted, what

1                    JAMES DEFERIO

2    specifically do you mean?

3         A    Well, before we even had a chance to

4    preach, say anything, or to raise a single sign

5    'cause they were upside down when we were hanging

6    onto them, they intervened and stopped us.

7         Q    Okay.  And when you say they intervened,

8    did they physically restrain you?

9         A    No, they didn't physically restrain us.

10        Q    What did they do to stop you?

11        A    They ordered us to the other side of the

12   street.

13        Q    And did you comply?

14        A    Yes.

15        Q    Do you recall why you were arrested then

16   if you'd complied?

17        A    Yes.

18        Q    Why was that?

19        A    Because when we went to the other side of

20   street on that sidewalk, the officer changed his mind

21   and says, "Now you have to go to the other end of the

22   park," quite a ways away, and we asked why.  In

23   asking why, he placed the director of the outreach in

24   handcuffs.  And I was videoing, and he saw me

25   videoing and he wanted my videotape so he placed me

1                    JAMES DEFERIO

2    under arrest also.

3              Then he placed another young man who was

4    with us under arrest, who was calling attention to

5    these two unlawful arrests.  So three of us were

6    placed under arrest, and then my wife was threatened

7    by another officer saying -- after we were arrested,

8    she was told, "Wherever you go in this city, we're

9    watching you."

10        Q    Okay.  And you said...in your statement

11   just now, you said it was part of the ministry you

12   were with?

13        A    Yes.

14        Q    What ministry was that?

15        A    Repent America.

16        Q    And what exactly is the message of Repent

17   America?

18        A    That Jesus Christ came to save us from

19   sin.

20        Q    You indicated you were carrying some

21   signs but that you hadn't yet had the opportunity, I

22   guess, to display them; is that correct?

23        A    Yes.

24        Q    And do you recall what the content of

25   those signs were?

1                     JAMES DEFERIO

2          A     No, I don't.

3          Q     And you said you were charged with

4     trespassing?

5          A     Yes.

6          Q     What was the disposition of that charge;

7     do you recall?

8          A     Yes.

9          Q     What was it?

10         A     There was a lawsuit and -- one lawsuit.

11         Q     Right.  But the actual criminal charge,

12    what was it?

13         A     It was actually settled out of court.

14         Q     But the criminal charge itself?

15         A     Dismissed.

16         Q     And who represented you with respect to

17    that trespassing charge?

18         A     It was a local law firm.

19         Q     Local in Chicago?

20         A     Yes, affiliated with Alliance Defense

21    Fund, as they were called back then.

22         Q     What are they called now?

23         A     The Alliance Defending Freedom.

24         Q     During all seven of the arrests that

25    you've described, did you have sound amplification

1                    JAMES DEFERIO

2    equipment with you?

3                    MR. MANGINI:  Object to form.

4         A    No.

5         Q    So let's go through them.  Arrest

6    Number 1 at the War Memorial here in Syracuse, did

7    you have sound amplification equipment with you?

8         A    Yes.

9         Q    How about Arrest 2 in Columbus Circle?

10        A    No.

11        Q    Arrest 3 at Kutztown University?

12        A    No.

13        Q    Arrest Number 4 in East Stroudsburg,

14   Pennsylvania?

15        A    Yes, but I wasn't using it.

16        Q    So, so far, you were just using it during

17   Arrest Numbers 1 and 2?

18        A    As I recall.

19        Q    Arrest Number 5 at Hill Cumorah, you

20   indicated that you were using a megaphone?

21        A    Yes.

22        Q    Number 6 in Palmyra, you were arrested

23   for using sound amplification?

24        A    Yes.

25        Q    Or a sound amplification device, I should

                        JAMES DEFERIO

 1    say.

 2              What about Number 7 in Chicago?

 3        A    No.

 4        Q    Did you have it with you?

 5        A    I don't recall.

 6        Q    Do you recall if someone else from your

 7    group had it with you?

 8        A    I think on that day we weren't using

 9    any -- we did have megaphones but we left them in the

10    vehicle.  We weren't using any sound amplification on

11    that day.

12        Q    Okay.  Other than those seven arrests

13    that you described, have you been arrested any other

14    times?

15        A    No.

16              MR. SICKINGER:  Off the record.

17              (Discussion off the record.)

18    BY MR. SICKINGER:

19        Q    Of all those seven arrests, Mr. Deferio,

20    do you recall how many of them resulted in you being

21    convicted of a crime or an offense?

22        A    One.

23        Q    Which one was that?

24        A    At Hill Cumorah.

1                    JAMES DEFERIO

2          Q      And you've indicated in your responses to

3    my questions about your arrest record that sometimes

4    you've been out by yourself preaching and sometimes

5    you're with a group.  Do you -- I guess what I'm

6    trying to understand...and I'll ask you it this way

7    and if you don't understand it let me know, I can

8    rephrase it, but how do you decide whether you're

9    going to go out by yourself or with a group, or

10   what's the determining factor for you?

11                    MR. MANGINI:  Object to form.

12         A      Are you speaking in regards to local

13   preaching or preaching in a...in a city other than

14   Syracuse?

15         Q      Generally.  I guess I'm trying to

16   understand -- from your responses, it sounds like

17   sometimes these are like planned groups and planned

18   trips, and then sometimes it sounds like it's, you

19   know, your regular activity, so to speak, that you go

20   out and preach and I guess I'm just trying to

21   understand is there a certain schedule that you keep

22   to or...I guess I'm trying to understand how it is

23   that you plan your preaching sessions.

24         A      It's very open.  It's very organic, and I

25   see what's going on and I pray about certain -- where

1                          JAMES DEFERIO

2    I should go and, if I should go there, what I should

3    say and what kind -- if I should bring a banner or

4    not and if I should -- I just seek direction through

5    prayer from God what I should do, what banner I

6    should bring and what kind of message I should preach

7    and who I should preach with.

8                     Sometimes I'll consult with certain

9    groups in different cities to ask them if they would

10   want to -- if I could join them or they can join me.

11   When that's not an option, I'll go -- and I feel I

12   still should go and preach, I'll go by myself.

13        Q    Okay.  And how do you decide what

14   particular messages you're going to preach on that

15   particular day?

16        A    It depends on the group that I'm

17   preaching to.

18        Q    Okay.  Well, clarify this for you.  Well,

19   let me see.  Other than your pro-life message and

20   your message that homosexuality is a sin, what other

21   messages have you publicly preached?

22                     MR. MANGINI:  Object to form.

23        Q    I should include there as well your

24   message that the Mormon religion is a cult.  Besides

25   those three.

1                    JAMES DEFERIO

2                    MR. MANGINI:  Same objection.

3       A     It depends on the group I'm preaching to.

4       Q     Okay.

5       A     If I'm preaching to -- at a rock concert,

6  usually my message will include a message about

7  drugs, harm of drugs and especially alcohol.

8       Q     Okay.  Well, I guess let me go down the

9  list and maybe we can clarify it that way.  Has your

10 preaching ever included statements that the Roman

11 Catholic religion is a cult?

12                   MR. MANGINI:  Object to form.

13      A     In a broad sense.

14      Q     Have you ever referred to the Roman

15 Catholic religion as a cult?

16      A     Yes.

17      Q     Has your message ever included or your

18 preaching messages ever included statements regarding

19 the Islamic religion?

20      A     Yes.

21      Q     And do you recall what those messages

22 were?

23      A     Yes.

24      Q     What were they?

25      A     That Islam is an illogical murderous

1                          JAMES DEFERIO

2   barbaric religion and that the founder of Islam,

3   Muhammad, was a pedophile, which is well-established

4   in Islamic literature, he was a murderer, he was

5   polygamist and that sort of thing, an historical

6   overview of their religion.

7        Q    Has your public preaching about Islam

8   ever included you making the statement, "The only

9   thing as wacky as Islam is Buddhism?"

10                  MR. MANGINI:  Object to form.

11       A    I don't recall that.

12       Q    Do you recall making statements of a

13  similar sentiment?

14                  MR. MANGINI:  Object to form.

15       A    I specifically don't recall.

16       Q    Have you ever in your public preaching

17  referred to the Islamic religion as "violent"?

18       A    Yes.

19       Q    During the course of your public

20  preaching, have you ever made comments or preached

21  about the attire that women were wearing?

22       A    I don't recall.

23       Q    Do you recall ever referring to a woman

24  during a public preaching as a harlot?

25                  MR. MANGINI:  Object to form.

1                    JAMES DEFERIO

2        A      No.

3        Q      Do you recall ever making any comments

4   during your public preaching about the attire that

5   men were wearing?

6        A      What men?

7        Q      Any men.

8        A      Can you be more specific?

9        Q      Have you ever during the course of your

10  public ministry or public preaching ever made any

11  comment which pertained to or addressed the attire of

12  any male?

13       A      Yes.

14       Q      Do you recall what that message was?

15       A      I'm -- I think I can.

16       Q      And what do you think that was?

17       A      One of the homosexual parades in downtown

18  Syracuse, they invited a group from Toronto be part

19  of the parade and the men were close to being naked.

20       Q      Had you ever preached outside of a

21  religious building or church with regard to the

22  attire that people entering or leaving the church or

23  building were wearing?

24                    MR. MANGINI:  Object to form.

25       A      I don't -- no.

1                          JAMES DEFERIO

2          Q     Be more specific then.  Have you ever

3     preached or commented publicly during your public

4     preaching with regard to any person wearing shorts or

5     short pants to a religious building or church?

6          A     What church?

7          Q     Any church.

8          A     Who does that?

9          Q     I'm asking a question, Mr. Deferio.

10         A     I don't recall.

11         Q     Okay.  Do you recall ever doing it out in

12    front of the cathedral in downtown Syracuse?

13         A     No.  You do realize that I'm not the only

14    preacher in Syracuse.

15         Q     No, but I will say, to your credit,

16    Mr. Deferio, you seem to have a way of promoting

17    yourself and making yourself probably the most well-

18    known.

19               Okay.  Mr. Deferio, you referred -- why

20    don't I just show it to you and make it easier.

21    Mr. Deferio, I'm going to show you what's been

22    already mark as Exhibit B.  Would you take a look at

23    that for me, please?  Have you ever seen this

24    document before, Mr. Deferio?

25         A     Yes.

1                    JAMES DEFERIO

2        Q      Do you recognize what that document is?

3        A      Yes.

4        Q      What do you recognize it to be?

5        A      It's a part of -- it's part of paperwork

6    that my lawyer has filed.

7        Q      As part of this lawsuit?

8        A      Yes.

9        Q      Is that your signature on the last page

10   of the document?

11       A      Yes.

12       Q      And your statement is attesting that the

13   contents of the document are true and accurate to the

14   best of your knowledge?

15       A      Yes.

16       Q      Okay.  Mr. Deferio, would you please look

17   at Paragraph Number 3 on the first page.  When you

18   say that you're a "Christian evangelist," what do you

19   mean by that?

20       A      I mean to say by that that I have been

21   born again, I have repented of my sins and received

22   Jesus Christ as my Lord and Savior and I follow the

23   teachings of the Bible.  That makes me a Christian, a

24   follower of Christ.  As an evangelist, I'm spreading

25   the Good News of what Christ came to do, which is to

1                    JAMES DEFERIO

2    save us from sin and give us eternal life in His

3    name.  So, as a Christian evangelist, I'm one who

4    reads the Bible, obeys it, applies what I'm preaching

5    to myself also, and that's what a Christian

6    evangelist is.

7         Q    Okay.  And I'm sorry.  You said something

8    about preaching the Good News?

9         A    That's what evangelism means.

10        Q    Okay.  So do you consider your preaching

11   that the Roman Catholic religion and the Mormom

12   religion are a cult to be part of that Good News?

13                    MR. MANGINI:  Object to form.

14        A    Yes.

15        Q    Why do you believe that to be Good News?

16        A    You can't repent of something if you

17   don't have knowledge of that you're doing wrong.  So

18   part of evangelism is instructing people of what

19   they're doing wrong so they can know about that and

20   think about it.  And repent in the Bible is from a

21   word that means change of mind, so it starts with the

22   thinking about what you're doing and where you're

23   headed.  So part of evangelism is pointing out sin

24   and then the solution to the sin.

25        Q    Okay.  So you just said that you want to

1                    JAMES DEFERIO

2    point out what's, I believe you said, right and

3    wrong; is that correct?

4          A     Yes.

5          Q     Okay.  And how do you determine what's

6    right and wrong as pertains to your public preaching?

7          A     The Bible's considered what is called a

8    canon, a measuring stick, a measuring rod, and you

9    measure other truth claims by the Bible, so that's

10   how I determine what's right and wrong as according

11   to what's written in the Bible.

12         Q     So you how did you determine that the

13   Roman Catholic religion was a cult?

14                    MR. MANGINI:  Object to form.

15         A     Because of its violation of clear

16   commands in the scripture in the Bible.

17         Q     And you came to that opinion yourself?

18                    MR. MANGINI:  Object to form.

19         A     You mean merely on my own?

20         Q     Yes.

21         A     I came to that conclusion after having

22   been a Roman Catholic.

23         Q     Okay.  And I guess I'll ask you the same

24   question.  How did you come to that conclusion with

25   regard to the Mormon religion?

1                    JAMES DEFERIO

2        A     Through study.

3        Q     And how did you come to that conclusion

4    with regard to the Islamic religion?

5        A     I've read the entire Quran from cover to

6    cover.

7        Q     Okay.  And what in particular about that

8    made you believe it was a cult?

9                    MR. MANGINI:  Object to form.

10       A     They're following a man, Muhammad, who

11   took pieces of various pagan religions and pieces of

12   Christianity and synthesized them and made a new

13   religion and obtained followers.  That would describe

14   a cult.

15       Q     Okay.  Well, I guess that was going to be

16   my next question.  What is your definition of a cult?

17       A     Okay.  It's -- if you look that up

18   on-line, in different dictionaries you'll find many

19   definitions of cult.  My definition --

20       Q     All right, but I'm asking what your

21   definition is.

22       A     And I will get to that.  My definition of

23   a cult is somebody who's following another person

24   who's leading them astray from the truth.

25       Q     Okay.  All right.  And in Paragraph

1                    JAMES DEFERIO

2    Number 3 where you say that you've been engaged in

3    public ministry since 1973, the term public ministry,

4    is that the preaching you've already described here

5    today?

6         A    No.

7         Q    What is the public ministry then?

8         A    It was beginning 1973, the year I was

9    saved, March 3rd, 1973, I began going out on the

10   streets in Phoenix, New York, where I lived,

11   witnessing to people and giving out tracts.

12        Q    I guess I'm just trying to understand.

13   What do you mean by public ministry then in Paragraph

14   Number 3?

15        A    It's in the public.

16        Q    So is your preaching that you've already

17   described...is that part of your public ministry?

18        A    Yes.

19        Q    But it's not all of it?

20        A    Correct.

21        Q    And what's the remaining portion of it?

22   Giving out literature?

23        A    Yes.

24        Q    Anything else?

25        A    Yes.

1          JAMES DEFERIO

2     Q     What would that be?

3     A     Counseling people.

4     Q     Anything else?

5     A     Sometimes displaying a Christian banner

6     or -- either with Bible verses on it or a Christian

7     message on it without saying anything; sometimes

8     going door to door and leaving literature on the

9     door; other times just engaging people if they want

10    to talk to you on the street, handing them a tract

11    and talking to them.

12    Q     Okay.  All Right.  In Paragraph 5, your

13    affidavit states, "In my ministry efforts over the

14    years, I have actively looked for opportunities to

15    share my faith in public places.  I typically go out

16    alone."

17          Those words "actively looked," where you

18    say you actively looked for opportunities, what do

19    you mean when you say you actively looked?

20    A     I'll check Syracuse.com, for example, for

21    events in the Syracuse area.  For example, Wicked is

22    playing at the Landmark Theatre.  Normally I would go

23    and -- some distance from the marquee on the corner

24    and set up there an hour and a half before people

25    come in, so I'll look to see what's playing in the

1                    JAMES DEFERIO

2    area and whether I should -- and think about whether

3    I should go to this event where people -- where

4    there's people present.  And it's that sort of thing.

5         Q    So, besides looking at Syracuse.com, how

6    do you actively look for the opportunities that you

7    described in Paragraph 5?

8         A    Well, sometimes people contact me, on

9    Facebook or by phone, asking me to -- if I would join

10   them in a certain city or certain area and to

11   minister with them.

12        Q    Are there any other ways that you

13   actively look for opportunities to share your faith?

14        A    Besides going on-line and looking for

15   events?

16        Q    Besides what you've already just

17   described.

18        A    I think that pretty much describes it.

19        Q    And your public ministry takes you to

20   events that pertain to homosexuality?

21        A    Yes.

22        Q    And do you find those events any other

23   way or method other than what you've already

24   described?

25        A    Besides going on-line?

1                    JAMES DEFERIO

2          Q     Correct.

3          A     And people contacting me --

4          Q     Correct.

5          A     -- asking for help?  I don't recall any

6     other way.

7          Q     When you say going on-line, where do you

8     go on-line to look for these events?  Do you go to

9     gay-themed websites, or where exactly do you look?

10                    MR. MANGINI:  Object to form.

11         A     Some years ago there was a website called

12    Gay Festivals or something like that, but usually,

13    since I know a lot of preachers across the country

14    and we're in contact on Facebook and other ways,

15    through e-mail, I already know about these festivals.

16    I just go for the dates because I have to -- I just

17    can't go anyplace at any time.  So I have to -- you

18    know, I check with my wife, see if there's anything

19    going on, so I just mainly check for the dates.

20         Q     In Paragraph Number 6, your first

21    sentence states, "I prefer to share my faith through

22    cordial conversations with others."  And that's

23    correct?

24         A     Yes.

25         Q     Why do you then carry a bullhorn or a

1                    JAMES DEFERIO

2    sound amplification device with you?

3                    MR. MANGINI:  Object to form.

4         A    I don't carry a bullhorn.  That was years

5    ago.

6         Q    So you did at one point in time but you

7    no longer do?

8         A    Correct.

9         Q    Then why do you carry a sound

10   amplification device if you are attempting to have

11   cordial conversations with people?

12                   MR. MANGINI:  Object to form.

13        A    With amplification, I can be heard at a

14   certain distance.  I don't care to be heard way down

15   the block or anything like that.  And all sound

16   amplification I do have has volume control.  So I --

17   my goal is to reach a certain small area near where

18   I'm standing and have a banner, something that sets

19   me apart from the rest of the people that are maybe

20   passing by on a busy street, and so that gives people

21   a visual.  And often people come up and talk to me,

22   and I gladly turn off the amplifier.  Sometimes I

23   even forget it's on because it's in front of me,

24   but, when I remember to, I turn it off and I just

25   would rather converse with them than preach.  The

1                    JAMES DEFERIO

2    most boring thing in the world is to stand there and

3    repeat yourself over and over again.

4        Q     So, if someone comes up to you and asks

5    you to turn your sound amplification device off, you

6    will?

7        A     They don't ask me to.  I turn it off when

8    I'm talking to them, if I remember.  Like I said,

9    though, sometimes I forget that it's even on.

10   Usually what I do is I just pull the headset down.

11   If it's winter, because I'm wearing gloves and it's

12   kind of hard to fumble around with the volume

13   control, I just pull the headset down so I can speak

14   in a normal voice to these people rather than blow

15   them away with amplification when they're that close

16   to you.

17       Q     When did you stop using a bullhorn as

18   part of your public ministry?

19       A     When I discovered Aker amps.

20       Q     Is that the name of the sound

21   amplification device you now use?

22       A     Yes.

23       Q     Do you recall when that was?

24       A     Oh, boy.  Might have been four years ago,

25   maybe five years ago.  Those are the small amps that

                    JAMES DEFERIO

1

2  you took photographs of last Thursday.

3       Q     Okay.  If you look at to Paragraph

4  Number 8, the second sentence, you state, "I never

5  want to disrupt an event, so I don't get too loud."

6  Is that accurate?

7       A     Yes.

8       Q     So your goal is never to interrupt an

9  event that you're preaching at or outside of?

10                    MR. MANGINI:  Object to form.

11      A     Not a stationary event.

12      Q     What do you mean?

13      A     Not -- if an event is moving on a street,

14  for example a parade, and there's people making all

15  kinds of noise on either side of the street, then, to

16  be heard, I will raise the volume on the

17  amplification, or, if I am not using amplification, I

18  will raise my voice.

19      Q     So it's not your intent, though, to

20  disrupt the event?

21      A     No.

22      Q     And you state that, "I don't get too

23  loud"?

24      A     Try not to.  I've had my wife and other

25  people give me feedback about how loud it is and

1                    JAMES DEFERIO

2    where I should put the volume control because, like I

3    said, I'm standing back a bit, so I need feedback.

4    And I've asked the police officers, too, up at

5    Syracuse University when the people are coming up to

6    the basketball games the football games, "Officer, is

7    this okay, this volume?"  They'll go, "Yeah."

8         Q    You say in that last sentence of

9    Paragraph 8, "I just want to draw attention to my

10   message."  And that's the only intent you have by

11   using your sound amplification device?

12        A    Yes.

13        Q    So at no time is your intent to interrupt

14   or disrupt the event that you are protesting at?

15                    MR. MANGINI:  Asked and answered.

16                    THE WITNESS:  Excuse me?

17                    MR. MANGINI:  Sorry.  That was an

18              objection.  Go ahead.

19        A    Yes.  I mean, well -- can you ask that

20   again?

21        Q    Sure.  So at no time --

22        A    Is that one more like 'you still beat

23   your wife'?

24        Q    At no time then is your intent to disrupt

25   the event that you're preaching at?

1                    JAMES DEFERIO

2        A     My intent is not to disrupt any event,

3   with a few exceptions.

4        Q     What are those exceptions?

5        A     The first homosexual flag-raising at City

6   Hall.  And that was a protest.  I was not preaching.

7   That was 2003.

8        Q     What, in your mind, is the difference

9   between preaching and protesting?

10       A     Preaching is proclaiming a Bible message.

11       Q     And what's protesting by your definition?

12       A     Protesting is having a difference of

13   opinion and imposing that opinion on others and

14   trying to be obstructive.

15       Q     Okay.

16       A     Trying to obstruct.

17       Q     So at some point in time then your public

18   actions you've undertaken with the intent to

19   obstruct; is that correct?

20                    MR. MANGINI:  Object to form.

21       A     Not as a preacher.

22       Q     As a protester?

23       A     Once.

24       Q     Okay.

25       A     No.  Twice.

1                    JAMES DEFERIO

2        Q    Well, I'm just asking as James Deferio,

3   not any sort of label you give to yourself, how many

4   times have you attempted to interrupt or disrupt an

5   event that you were attending or outside of?

6                    MR. MANGINI:  Object to form.

7        A    Twice.

8        Q    And you said one was a flag-raising here?

9        A    Mm-hmm, yes.

10       Q    What you were doing to disrupt that

11  event?

12       A    I stood between the flagpole and the

13  Syracuse administrator who was going to put the flag

14  onto the pole.

15       Q    Okay.  And why did you do that?

16       A    As a protest.

17       Q    Why that action in particular?

18       A    Because I don't think civil government

19  has a right to celebrate uncivil behavior.

20       Q    And you consider homosexuality uncivil?

21       A    Yes.

22       Q    How do you define uncivil?

23                   MR. MANGINI:  Object to form.

24       A    Civil refers to citizens and being under

25  government and contracts made between citizens and

1          JAMES DEFERIO

2   government and how to act.  That's a broad definition

3   of civil.

4        Q     So how do you define uncivil?

5        A     And -- but, using that definition, then

6   you could say that, well, the Nazis were being civil

7   because they were obeying their government and they

8   had certain laws in place that dehumanized the Jews.

9        Q     I don't care about the Nazis.  I'm asking

10  how do you define uncivil.

11       A     So I'm getting to it.  I would say that

12  civil rights have to be based on natural rights,

13  which is based on human nature, and human nature is

14  rational substance in relationship with others.  It's

15  rational.  You use reason to come to natural rights

16  and natural law.  And what homosexuals do is

17  illogical, it's irrational.  Sexual reproductive

18  organs are designed by our DNA, designed by God, for

19  the opposite sex, not the same sex, not for animals.

20  We come to this conclusion through reason.  When

21  we -- so that's how I would define...that's how I

22  would define natural rights and natural law.

23       Q     Okay, but you still haven't answered my

24  question.  What is your definition of uncivil?

25       A     Uncivil is acting contrary to rational

1                    JAMES DEFERIO

2    thinking.  It's being irrational.

3         Q    So your definition of uncivil then is any

4    behavior that's irrational?  I'm just trying to

5    understand you here.

6         A    Yes.

7         Q    Okay.  All right.  So what happened after

8    you did that?  After you stood between the flag pole

9    and the other individual, what happened?

10        A    An officer took me by the shoulders and

11   moved me to the side, and I complied.

12        Q    Was it a police officer?

13        A    Yes.

14        Q    A Syracuse police officer?

15        A    Yes.

16        Q    What did that police officer say to you?

17        A    I don't recall.

18        Q    Do you know the name of that police

19   officer?

20        A    No.

21        Q    Had you ever seen that person before?

22        A    I don't recall.

23        Q    Have you ever seen that person since

24   then?

25        A    I don't recall.

                        JAMES DEFERIO

1

2       Q     Was it a male or female?

3       A     Male.

4       Q     So they escorted you then to another

5    location; is that correct?

6       A     No.

7       Q     What did they do?

8       A     Just moved me aside.

9       Q     Did they physically pick you up?

10      A     No.

11      Q     Well, then how did they move you?

12      A     Applied pressure to my shoulder and moved

13   me to the side.

14      Q     And then you said you -- I believe you

15   said you complied?

16      A     Yes.

17      Q     How did you comply?

18      A     I didn't resist.

19      Q     So you walked on your own power then?

20      A     I allowed his hand to guide me to the

21   side.

22      Q     Okay.  How far approximately were you

23   moved or did you move?

24      A     As I recall, it was only a few feet.

25      Q     And you weren't charged with any crime?

1                        JAMES DEFERIO

2          A     No.

3          Q     And you weren't removed from the area?

4          A     No.

5          Q     And you were allowed to remain at the

6     flag-raising?

7                         MR. MANGINI:  Object to form.

8          A     Yes.

9          Q     And you weren't detained?

10                        MR. MANGINI:  Object to form.

11         A     No.

12         Q     And you weren't placed in handcuffs?

13         A     No.

14         Q     Other than being escorted or guided or

15    whatever word you just used to describe moving, what

16    happened as a result of your protest?

17                        MR. MANGINI:  Object to form.

18         A     You mean what influence did I have on it?

19         Q     No.  What was the effect on you?  Did

20    anything else happen to you?  Were you charged with

21    any crime or was -- anything else happen to you?

22         A     No.

23         Q     Okay.  And the flag-raising continued

24    after that?

25         A     Yes.

1                    JAMES DEFERIO

2        Q     And you remained at the event for the

3   remainder of the flag-raising?

4        A     Yes.

5        Q     Did you make any oral statements at the

6   flag-raising?

7        A     I think I did.

8        Q     When you say you think you did, you don't

9   recall or you do recall?

10       A     There was a lone woman there with a small

11  sign.  I don't know who this woman was.  I've never

12  seen her before.  She was protesting the event and

13  everybody was picking on her, and I think I told them

14  to leave her alone.  I think that's the only thing I

15  said.

16       Q     Did you make any comments with regard to

17  homosexuality?

18       A     I don't recall.

19       Q     Were you carrying any signs?

20       A     No.

21       Q     Did you distribute any literature?

22       A     I don't recall.  I don't think I did.

23       Q     Was anyone else -- did anyone else go

24  with you to this event?

25       A     No.

1                    JAMES DEFERIO

2        Q     Did you record this event?

3        A     No.

4        Q     Did you take any photographs of this

5   event?

6        A     No.

7        Q     Did you later make any comment about this

8   event in any other forum?

9        A     No.

10       Q     And what year did this take place?

11       A     It was the first year of the flag-raising

12  for the gay pride celebrations, so whatever year that

13  was, 2003 or 2002, something like that.  I'm not

14  sure.

15       Q     And you said...just to go back, you said

16  this was one of two times that your intent was to

17  disrupt an event?

18       A     Yes.

19       Q     Do you recall who was raising the flag?

20       A     I believe Matt Driscoll was the mayor

21  that year, so I don't know if he was -- I believe he

22  was officiating.  I don't know who was going to

23  place -- who was placing the flag onto the pole.  I

24  don't recall.

25       Q     Did you have any sound amplification

1                    JAMES DEFERIO

2   equipment with you on that date?

3        A     No.

4        Q     And did you attempt to use any sound

5   amplification equipment on that day?

6        A     No.

7        Q     All right.  What was the other event that

8   you mentioned where your intent was to disrupt the

9   event?

10       A     Columbus Circle, Syracuse Peace Council.

11       Q     And was that the incident you described

12  earlier with the war protest, I think it was?

13       A     Yes.

14       Q     And why was your intent to disrupt that

15  as opposed to preach?

16       A     Disrupt in the sense of drawing attention

17  away from them and their message against the United

18  States.  A lot of us think that the Syracuse Peace

19  Council is a communist organization and they're anti-

20  American, so we wanted to focus on America and the

21  good things America does.  So it was that kind of

22  disruption, where we were trying to get the focus off

23  of them and onto our signs.

24       Q     Okay.  I guess what I'm trying to

25  understand then is what made you decide to protest as

1                    JAMES DEFERIO

2    opposed to the other actions you described, which you

3    characterize as preaching?

4         A    Again, preaching is proclaiming a message

5    from the Bible.  Those two times I just described, I

6    was not proclaiming a message from the Bible.

7         Q    Okay.  So, with the second incidence with

8    the war protest, you believe because you were making

9    secular statements about the country as a whole it

10   wasn't Bible related?

11        A    Correct.

12        Q    Okay.  Then what was it about the first

13   event, the flag-raising, that makes you think you

14   weren't making -- or makes you say that you weren't

15   making Bible-related statements?

16                   MR. MANGINI:  Object to form.

17        A    There's a lot of people who don't believe

18   the Bible and they don't believe any religious book,

19   they don't believe in God, period, who believe that

20   homosexuality is wrong, and so you could be somebody

21   protesting homosexuality and not be a Muslim and not

22   be -- you know, like Muslims do in the Middle East,

23   throw homosexuals off rooftops.  Well, you don't have

24   to be a Muslim to hate what homosexuals do and think

25   homosexuality is wrong.  You don't have to be a

JAMES DEFERIO

1
2  Christian to think it's wrong.  My father was an
3  atheist.  He believed homosexuality was wrong from
4  the point of view of reason alone.  So it was a
5  secular -- what I was doing was in a sense purely
6  secular.
7          Now, you can say that my Christianity
8  shaped my views, but I always thought homesexuality
9  was wrong before I was even a Christian.
10     Q    Okay.  I guess what I'm trying to
11  understand is not your personal belief about
12  homosexuality.  What made you decide at that event to
13  attempt to disrupt the event as opposed to where you
14  previously described where you would hand out
15  literature and have conversations with people about
16  the Bible?
17     A    I wasn't doing evangelism.  I was
18  thinking about what I should do, whether I should --
19  because I was involved in some political protest with
20  John Alvarez, who's a political protester, he's an
21  Army veteran, and I was doing some soul-searching
22  whether I should stay -- continue with John and the
23  other groups with political protests or do what I had
24  been doing years ago and what I had been called to
25  do, which was share the faith, share the Bible.

1                    JAMES DEFERIO

2         Q    So are these two -- are these two

3    instances -- you believe then your actions were

4    protesting and not preaching, the two you just

5    described?

6         A    Yes.

7         Q    Okay.  All right.

8         A    I'm sorry if my answers are coming kind

9    of slow.  I only got three hours sleep last night.

10        Q    No.  That's okay, Mr. Deferio.  I'm just

11   trying to get you in and out of here as, you know,

12   quickly and succinctly as we can.  So I'm trying not

13   to keep you here any longer than we have to, and I

14   would appreciate you trying to get to the answer so

15   that --

16        A    I was hoping this coffee would wake me

17   up.

18        Q    Just trying to move it along.

19                    MR. MANGINI:  Can we take a break

20               though?

21                    MR. SICKINGER:  Sure.

22                    THE VIDEOGRAPHER:  We'll go off

23               record at 12:04.

24                    (Whereupon, a brief recess was

25               taken.)

1                    JAMES DEFERIO

2                    THE VIDEOGRAPHER:  We are back on

3              record at 12:14.

4    BY MR. SICKINGER:

5         Q    Mr. Deferio, you mentioned earlier that

6    you have a wife and three children.  Have any of

7    those individuals attended any of your public

8    preaching sessions with you?

9         A    Yes.

10        Q    And do you -- have any of them video

11   recorded you at those sessions?

12        A    Yes.

13        Q    So you're aware of the Syracuse Pride

14   Festival?

15        A    Yes.

16        Q    Have any of those individuals, your wife

17   or your three children, ever attended the Syracuse

18   Pride Festival with you?

19        A    Yes.

20        Q    Could you tell me who and what years?

21        A    Specifically the Pride Festival?

22        Q    Yes, in Syracuse.

23        A    Not the parade.

24        Q    Okay.

25        A    The festival?

1                    JAMES DEFERIO

2        Q     The parade or the festival.

3        A     Okay.  2013, my daughter Michelle.

4        Q     Was that at the parade or at the

5    festival?

6        A     It was at the parade.  Excuse me.  It was

7    my wife.  It was not my daughter.  I can't remember

8    if my daughter was there, but I remember my wife was

9    there.

10        Q     And was she there for both the parade and

11    the festival?

12        A     Just the parade.

13        Q     And you said as you sit here today you

14    can't recall whether your daughter was present?

15        A     Correct.

16        Q     Did your wife video record you or

17    videotape you at the 2013 Pride Parade?

18        A     I don't recall if she did or didn't or

19    was...or it was me who was videoing because sometimes

20    I'll turn the camera around.  It's just a little tiny

21    camera.

22        Q     Okay.  Other than 2013, has your wife or

23    any of your children attended the Syracuse Pride

24    Festival or Parade with you?

25        A     Yes.

1                      JAMES DEFERIO

2        Q      What year would that be?

3        A      It may have been 2007 when it was held at

4    Everson Park, my daughter Michelle.

5        Q      And was that the parade or just the

6    festival?

7        A      I think it was just the festival.  She

8    handed out tracts.

9        Q      Do you recall if she video recorded you

10   during the 2007 Pride Festival?

11       A      No.

12       Q      Any other years that you recall either

13   your wife or your children going with you to the

14   Pride Festival or Parade?

15       A      I don't recall.  I do hundreds of events,

16   hundreds and hundreds, and I can't recall everything.

17   It just becomes a blur after a while.  I do recall

18   people I talk to and take -- if they want to, they

19   can give me their names, I'll ask for their names,

20   and I'll pray for them, and I do recall these people.

21   But to recall who was with me and what my message was

22   for each specific event over the last twelve years

23   when I've done hundreds and hundreds of events, it's

24   hard to recall.

25       Q      Okay.  Let's start with that then.  You

1                          JAMES DEFERIO

2    say you've done hundreds and hundreds of events.

3    Approximately how much public preaching events do you

4    do in the City of Syracuse each year?

5         A    For the most parts, I neglected the City

6    of Syracuse and I would only show up for maybe a

7    couple, two or three, special events a year and that

8    was it.  And then maybe four years ago I started

9    concentrating on the City of Syracuse more instead of

10   going out of town.

11        Q    Okay.  So prior to approximately four

12   years ago you would on an approximate average

13   publicly preach in the City of Syracuse about two to

14   three times a year?

15        A    I think that -- it might have been about

16   two or three times a year.

17        Q    Now, within the past four years,

18   approximately how many times do you publicly preach

19   within the city of Syracuse in a year?

20        A    Probably somewheres between 30 and 40.

21        Q    So would you say roughly once a week

22   approximately?

23        A    A lot of that -- could be.  A lot of that

24   was the basketball games and football games.

25        Q    Did you go to most of the Syracuse home

1                    JAMES DEFERIO

2   football and basketball games to preach?

3        A     Not for the last two years.  I've only

4   been to one in the last two years.

5        Q     Before that, did you go to them?

6        A     Yes.

7        Q     Did you go to all of them?

8        A     Most of them.

9        Q     So you think -- I'm sorry.  What was your

10  number?  Approximately 40 times a year that you --

11       A     Perhaps 30 to 40.

12       Q     And that's currently?

13       A     No.  Currently I rarely preach.

14       Q     When did you change from the

15  approximately 30 or 40 public preaching events in the

16  City of Syracuse to whatever your current level is?

17       A     When I had two heart attacks in October

18  of 2015.

19       Q     So since 2000 -- or October 2015

20  approximately how many times a year do you publicly

21  preach in the City of Syracuse?

22       A     Since then?

23       Q     Since then.

24       A     I think twice.

25       Q     So approximately twice a year?

1                    JAMES DEFERIO

2      A    No.  Since 2000 -- no.  I think -- you

3  asked how many times have I preached since

4  October 2015 here in Syracuse?

5      Q    Per year, how many times do you average.

6      A    Oh, per year?  2016, I preached once in

7  the City of Syracuse.

8      Q    Would that be at the Pride Festival?

9      A    Yes.

10     Q    So far in 2017, have you publicly

11  preached in the City of Syracuse?

12     A    Yes.

13     Q    How many times?

14     A    Once.

15     Q    Do you know where that was?

16     A    Yes.

17     Q    And where was it?

18     A    Up on the hill, SU.

19     Q    Was it for a sporting event?

20     A    Yes.

21     Q    When was that?

22     A    Whenever Syracuse University played

23  Duke University.  Was that February 21st?

24     Q    I'd have to look at the schedule.

25     A    A Wednesday.  I remember it was a

1                    JAMES DEFERIO

2   Wednesday.

3        Q     All right.  So prior to -- I'm just

4   trying to understand your timeline here, Mr. Deferio.

5   You said it was approximately four years ago that you

6   increased the number of times that you publicly

7   preach in the City of Syracuse?

8        A     Yeah, approximately four years ago.  It

9   could have been five years ago.

10       Q     And so approximately four or five years

11  ago is when you went from roughly two to three times

12  a year to thirty or forty times a year?

13       A     Yes.

14       Q     And then in October of 2015 you said you

15  had two heart attacks?

16       A     Yes.

17       Q     And now after that -- after your two

18  heart attacks you publicly preach approximately two

19  times a year, once or twice, in the City of Syracuse?

20       A     All I can say is that since my two heart

21  attacks I preached twice in the City of Syracuse.

22       Q     And that would be at the Syracuse

23  basketball game and the 2016 Pride Festival?

24       A     Yes.

25       Q     And the decrease in numbers of times you

1                    JAMES DEFERIO

2    publicly preach in the City of Syracuse, that's

3    related to your heart attack and your health?

4         A    For the first seven months it was.

5         Q    So when did you first attend the Syracuse

6    Pride Festival or Parade?

7         A    Think it was 2004.

8         Q    And, now, was that the first year it was

9    held?

10        A    No.

11        Q    So you believe it had been held prior to

12   2004?

13        A    That's my understanding, yes.

14        Q    And your appearances at the Syracuse

15   Pride Festival and Parade, do you consider them to be

16   a protest or a preaching?

17        A    Preaching.

18        Q    All right.  Have you gone to the Syracuse

19   Pride Festival and Parade every year since 2004?

20        A    No.

21        Q    What years did you miss?

22        A    I think it was 2008.

23        Q    2008, you said?

24        A    Yes.

25        Q    And why did you not attend that year?

                         JAMES DEFERIO

1

2      A     Lawyer-client privilege.

3            MR. MANGINI:  That's privileged.

4      Q     The reason you didn't attend was

5   privileged?

6            MR. MANGINI:  Yeah, yeah.

7      Q     Okay.  Because I'm trying to

8   understand...I'm not trying to invade the

9   attorney-client privilege; I'm trying to understand

10  how a lack of attendance somewhere -- I'm not asking

11  for communication of any sort; I'm just asking why

12  you didn't attend an event.

13                 MR. MANGINI:  Yeah, it's -- let

14                 me put it this way.  It's -- it can

15                 get into privilege to really go into

16                 that.  It's kind of complex.

17                 MR. SICKINGER:  I guess I'm not

18                 following you, Mr. Mangini.  What is

19                 it that would be potentially

20                 privileged?  I'm not asking for

21                 information but I guess the category

22                 because it's not a communication of

23                 any sort that I am asking for.  I'm

24                 asking for what precluded him from

25                 going.

1          JAMES DEFERIO

2              MR. MANGINI:  Yeah, I think the

3          issue is it comes into communications

4          with his attorneys.  It necessarily

5          does, just the situation.

6              MR. SICKINGER:  Okay.  So his

7          lack of attendance, you believe, is

8          somehow covered by attorney-client

9          privilege?

10             MR. MANGINI:  Yeah, his reason

11         for lack of attendance has to do with

12         or may have to do with attorney

13         communications.

14             MR. SICKINGER:  Okay.  Well, if

15         it's may, it's not covered.  It either

16         does or it doesn't.

17             MR. MANGINI:  Okay.  Yeah, yeah,

18         my understanding is it does.

19             MR. SICKINGER:  Okay.  Well, we

20         don't believe that's a proper basis

21         for not answering a question that

22         doesn't ask in any way, shape or form

23         for any privileged communications or

24         the content of any conversations or

25         communications he had with his

JAMES DEFERIO

1   attorney.  So we note that, and, if

2   you're going to continue to assert

3   privilege and instruct your client not

4   to answer, we'll address this with the

5   court.

6       Would you like to take a minute

7   to talk to your client?

8       MR. MANGINI:  Yeah, yeah, that'd

9   be good.

10      THE VIDEOGRAPHER:  We'll go off

11  record at 12:28.

12      (Whereupon, a brief recess was

13  taken.)

14      THE VIDEOGRAPHER:  We're back on

15  record at 12:31.

16      MR. SICKINGER:  Mr. Mangini, have

17  you had a chance to speak to your

18  client while we took a break?

19      MR. MANGINI:  Mm-hmm.

20      MR. SICKINGER:  I guess do you

21  wish to have your client answer the

22  question at this point?

23      MR. MANGINI:  Yes, yes, to the

24  best he can.

1                    JAMES DEFERIO

2    BY MR. SICKINGER:

3        Q     Okay.  Mr. Deferio, why did you not

4    attend the Syracuse Pride Festival or Parade in 2008?

5        A     I was fearful of arrest.

6        Q     Okay.

7        A     I was fearful of arrest.

8        Q     What made you fearful of arrest?

9        A     April of that year, I was preaching with

10   no sound amplification in Armory Square, and two

11   officers on bicycles approached me and said that

12   someone complained about me.  I was across the street

13   from Freedom of Expresso.  And I -- that video is up

14   on YouTube, by the, way on my YouTube channel.  And

15   they said if the person signs a complaint I will be

16   under arrest.

17       Q     Okay.  What was it that you were -- what

18   was it this person complained about, I guess,

19   specifically?

20       A     That they could hear me.

21       Q     Were you using sound amplification

22   equipment at the time?

23       A     I said I wasn't using sound application.

24   I was using my bare voice and I wasn't even speaking

25   that loud.

1                       JAMES DEFERIO

2        Q      Okay.  So do you know who these two

3   officers were?

4        A      Their names -- if you check my YouTube

5   channel, you can see the names of the officers.  I

6   videoed the whole thing.

7        Q      Okay.  So this was in April of 2008?

8        A      I believe it was 2008.  It could have

9   been 2009.  I -- like I said, I do hundreds of

10  events.  I can't remember every year.

11       Q      Just to clarify the record, Mr. Deferio,

12  let me interrupt you there.  What could have been in

13  2008, the year you didn't attend the parade or the

14  year with the bicycle incident?

15       A      Both, because the bicycle incident -- the

16  two bicycle officers was in April and then the Pride

17  Parade was in June.

18       Q      And you think that was either 2008 or

19  2009?

20       A      Yes.

21       Q      I guess I'm still not understanding you.

22  What was it about an event in April that made you not

23  attend the Pride event two months later?

24       A      I was threatened with arrest by these two

25  officers on bicycles in Armory Square for using my

1                         JAMES DEFERIO

2    bare voice.

3         Q     But hadn't you been threatened with

4    arrests by other police officers prior to that event?

5         A     Prior to 2008 or '9?

6         Q     Correct.

7         A     For different things.

8         Q     Were any of them related to your public

9    preaching?

10        A     One was a sign being supposedly wider

11   than my shoulders.  The other was the incident at the

12   War Memorial.  I forgot what year that was.  That

13   wasn't that long ago.  I think it was three years

14   ago.

15        Q     Okay.  Were you involved in any sort of

16   lawsuit at the time in 2008 or 2009?  Is that the

17   time you just described?

18                    MR. MANGINI:  Object to form.

19        A     Yes.

20        Q     What lawsuit was that?

21        A     I think it was Elmira, New York.

22        Q     So was the reason you didn't attend

23   related to that lawsuit?

24        A     No.

25        Q     Do you know who this person was that

1                     JAMES DEFERIO

2    allegedly made this complaint about you in April of

3    that year?

4         A     No.

5         Q     So the reason you didn't attend the Pride

6    event in 2008 or 2009 is because of an alleged

7    complaint made by an unknown person that was relayed

8    to you by two unknown police officers?

9                     MR. MANGINI:  Object to form.

10        A     The police officers are known.  I don't

11   recall their names.  If you look at my video that's

12   up for public inspection on YouTube, you will see

13   their names.

14        Q     Okay.  So is that a yes?

15        A     It's a no.

16        Q     Okay.  So suddenly in 2008 or 2009 you

17   had a fear of arrest when you hadn't had that prior

18   to this point?

19                     MR. MANGINI:  Object to form.

20        A     Yes.

21        Q     Okay.  What changed?  People have

22   complained about you for years.  Why suddenly in 2008

23   or 2009 --

24        A     That's not true.

25                     MR. MANGINI:  Object to form.

JAMES DEFERIO

1

2     A     That's not true at all.

3     Q     Okay.  Well, you haven't had other people

4  complain about your message or your preaching prior

5  to 2008 or 2009?

6     A     As I told you probably half an hour ago,

7  that I hardly -- I neglected the City of Syracuse for

8  years and I started doing more in the City of

9  Syracuse four, five years ago, and that's when some

10  people started complaining.

11     Q     So the --

12     A     And I don't recall when this was done in

13  Armory Square.  It could have been 2008, could have

14  been 2009.  I don't -- well, somebody has a computer

15  here.  You can check it right now.

16     Q     Okay.

17     A     If you're after the facts, you can check

18  my YouTube channel right now and get the names of the

19  officers and the date.

20     Q     I'm asking you for the facts because

21  you're the one who's alleging this occurred.  So what

22  I'm saying is:  What was different about this?

23  You've indicated that other people had complained

24  prior to this.  You suddenly -- you indicated that

25  you attended in 2004, 2005, 2006, 2007 at the

1                    JAMES DEFERIO

2      Syracuse Pride Festival and/or Parade.

3           A      Yes.

4           Q      What was it about 2008 or 2009 that was

5      so different?

6           A      I don't recall anybody complaining in

7      2004, 2005, 2006 or 2007.

8           Q      Okay.  Let me ask you this.  Why did you

9      go back the following year to the Syracuse Pride

10     Festival or Parade?  Weren't you still afraid that

11     someone was going to complain?

12               MR. MANGINI:  Object to form.

13          A      I believe that's when Captain Sweeny told

14     me he had been assigned as my go-between and that was

15     okay.  He came up to me.  He talked to me.

16          Q      So it was because of the reassurance of

17     Syracuse Police Officer --

18          A      It could have been.

19          Q      -- Captain Sweeny that you felt

20     comfortable gong back to the Syracuse Pride Festival?

21          A      It could have been because, even though I

22     didn't preach that year, except for at Armory Square,

23     I did some pro-life -- I think I did some pro-life

24     evangelism, which doesn't amount to hardly any

25     preaching at all, over on East Genesee Street, just

1                    JAMES DEFERIO

2    holding a large aborted baby photo outside of Planned

3    Parenthood and talking to people who come up to me

4    and ask me what's going on here, what's that photo

5    of.  They're often amazed that this is a first-

6    trimester baby that's been murdered.  So -- and I ran

7    into some trouble with officers there, and I think

8    that's when Captain Sweeny intervened.

9        Q     So back to my question, was it

10   Captain Sweeny's reassurances to you that made you

11   feel comfortable going back to the Syracuse Pride

12   Festival or Parade?

13       A     It could have been.  I don't recall for

14   sure.  I -- but I -- if I recall what I was thinking

15   back then, that -- what happened, the incident that

16   happened in Armory Square, wasn't going to happen

17   again.

18       Q     I guess what I'm trying to understand,

19   Mr. Deferio, is you attend this Gay Pride event like

20   clockwork, you don't miss one.  You've gone every

21   single year except for one.  So why is it that this

22   year you have some anonymous unknown complaint that

23   you can't verify that you have no proof of and yet

24   that's your reason why you didn't allegedly go this

25   year?

                    JAMES DEFERIO

1

2      A      Those are your words, of course.  And you

3  say I have no proof, but the proof is right on my

4  YouTube channel.

5      Q      Okay.  Did you file a complaint with the

6  Citizen Review Board about the officers' conduct?

7      A      No.

8      Q      Did you contact anyone to issue or to

9  make some sort of formal complaint to the city about

10  the officers' conduct?

11      A      No.

12      Q      Did you make any complaint to the police

13  department about the officers' conduct?

14      A      No.

15      Q      Did you do anything to investigate who

16  this alleged complainant was?

17      A      No.

18      Q      So basically the only thing you did after

19  you were presented with this is not go to the Pride

20  Festival and Parade two months later?

21                    MR. MANGINI:  Object to form.

22      A      Incorrect.

23      Q      Okay.  Well, what did you do then that

24  you haven't described?

25      A      Contacted a lawyer, and I came into

1                    JAMES DEFERIO

2   City Hall and asked them about the noise ordinance.

3        Q    Okay.  Who did you ask?

4        A    I went to this office actually, and

5   somebody made photocopies of different sections of

6   city ordinances.

7        Q    So at your request you were provided by

8   the city with a copy of the city's noise ordinance?

9        A    Yes.

10       Q    In the two-month period between April of

11  2008 or 2009, whichever year it was that you're

12  describing, and the third Saturday in June of that

13  year when the Pride event would have been held, did

14  you do any public preaching within the City of

15  Syracuse?

16       A    No.

17       Q    Did you do any public protesting within

18  the City of Syracuse in that intervening period?

19       A    I don't recall doing any.  Well, I don't

20  protest, number one.  I stopped that in 2004 or 2003.

21  I started doing evangelism again.

22       Q    Okay.  Well, back up.

23       A    Well, I stopped doing that in 2005.

24  Excuse me.

25       Q    Okay.  You stopped protesting in 2005?

1                    JAMES DEFERIO

2      A    Yeah, I stopped doing political protests,

3  yes, in 2005.

4      Q    Did you do any other sort of protests

5  after that?

6      A    No.

7      Q    Okay.  So, other than contacting an

8  attorney and coming to get a copy of the Syracuse

9  noise ordinance, what did you do in response to these

10  officers describing this anonymous complaint to you?

11      A    I asked them to explain themselves and

12  why I would be arrested because somebody -- when

13  there's so much noise in Armory Square --

14      Q    I'm not talking about the officers.  I

15  mean subsequent to that incident, in that two-month

16  intervening period, what else did you do, if

17  anything?

18      A    In the City of Syracuse?  Are you asking

19  what have I done in the City of Syracuse?

20      Q    No.  I'm asking you:  In that time

21  period...I said what did you do as a result of that,

22  and you indicated you contacted -- this conversation

23  with these two officers --

24      A    Yes.

25      Q    -- you indicated that you contacted an

1                    JAMES DEFERIO

2    attorney and that you came into this office to obtain

3    a copy of the noise ordinance.

4         A    Yes.

5         Q    I'm asking is there anything else that

6    you did in response to that conversation with those

7    two officers?

8         A    No.

9         Q    Did you take any legal action as a result

10   of the conversation with those two officers?

11        A    I'm not a lawyer.

12        Q    You already established that.  I'm

13   asking:  Did you take any legal action as a result of

14   that conversation with those two officers?

15        A    I consulted a lawyer.

16        Q    Okay.  But did you initiate any actual

17   legal proceedings?

18        A    No.

19        Q    Did you serve any notice of claim on the

20   city as a result of that?

21        A    Through the lawyer.

22        Q    Okay.  So who was your lawyer?

23        A    I don't recall.

24        Q    Where was his or her office?

25        A    I don't...I don't recall.

1                    JAMES DEFERIO

2      Q     So where did you meet with this attorney?

3      A     I was referred to this attorney through

4  the Alliance Defense Fund.

5      Q     Are you sure that this person's even an

6  attorney?

7      A     Yes.

8      Q     What did this person do on your behalf

9  other than submitting a notice of claim to your

10  knowledge?  Well, strike that.

11            What legal action did they take on your

12  behalf other than submitting a notice of claim?

13      A     This lawyer submitted...I believe it was

14  a cease-and-desist letter, a demand letter to the

15  city.

16      Q     So, if you don't recall, what did --

17  strike that.

18            What was it that the attorney instructed

19  the city to cease and/or desist?

20      A     Threatening me with arrest for exercising

21  my First Amendment right.

22      Q     Okay.  Do you know when that letter was

23  sent?

24      A     I'm not sure.

25      Q     Okay.  Do you have a copy of that letter?

JAMES DEFERIO

1

2      A      I think I do.

3      Q      I'd ask that you provide it to

4   Mr. Mangini and that he produce it for us.

5             Where did you meet with this attorney?

6   Was it in your home?

7      A      Phone.  Phone conversation.

8      Q      So you never actually met this attorney

9   in person?

10     A      No.

11     Q      How did you sign a notice of claim if you

12  never met this person?

13     A      I don't know what a notice of claim is.

14  I'm not a lawyer.  I recall that the lawyer did send

15  a complaint...I don't know what you would call it in

16  legal terms...to the city to stop what they were

17  doing towards me.

18     Q      Do you recall receiving a response to

19  that, or do you recall if your attorney received a

20  response to that?

21     A      I may have received a response, and I

22  must have because the next -- that next year I felt

23  that it was okay to preach in the City of Syracuse.

24     Q      Okay.  Do you recall if you received the

25  response before or after the third Saturday of June

JAMES DEFERIO

1

2  of that year?

3      A    I didn't receive a response before that.

4      Q    Okay.  And do you have a copy of this

5  letter that you've just referred to or that you

6  believe you just referred to?

7      A    I should have a copy of everything that

8  was sent to me.

9      Q    Okay.  Well, again I'd ask that you

10 produce it to Mr. Mangini and that he, in turn,

11 produce if for us.

12     Any other reason you didn't attend the

13 Pride Festival or Parade in the year that you've

14 described, 2008 or 2009?

15     A    That's the primary reason.

16     Q    What were the secondary reason or

17 reasons?

18     A    I was asked to join a friend in

19 Lancaster, Pennsylvania, to preach if I was

20 available, and I indicated that I was because I might

21 be subject to arrest here in Syracuse.

22     Q    And was this Lancaster,

23 Pennsylvania...was that on the same day --

24     A    Yes.

25     Q    -- as the Pride event?

1                      JAMES DEFERIO

2              I'm sorry.  What lawsuit did you believe

3      you were involved with at the time of this incident

4      in 2008 or 2009?

5              A      Elmira, New York.  I could be wrong on

6      that date.  It could have been 2009.  It could have

7      been 2008.  It could have been Ithaca, New York.

8              Q      Oh, you mean which suit you were involved

9      in at the time?

10             A      Yes.  When you say at the time, are you

11     talking about June of 2008?

12             Q      No.  I'm talking about at the time that

13     you had this incident and then made the subsequent

14     complaint, whichever year it was that you were

15     referring to.

16             A      Oh.  What happened in Ithaca and Elmira

17     was subsequent to that.

18             Q      Okay.  So you were not involved in any

19     legal action at the time?

20             A      I don't think I was.

21             Q      And would that have also been at the time

22     of the Pride event in the third Saturday in June?

23     It's a little bit hard for me to imagine this 'cause

24     you're not even clear on which year it is, so it's

25     kind of hard to pin it down, but I'm trying to narrow

1                    JAMES DEFERIO

2    it down for you.

3         A    It you asked these questions ahead of

4    time, I could have brought all the papers with me.

5         Q    Well, that's not the way it works,

6    Mr. Deferio, so we'll take it as it comes.  But if

7    you just will supply them to Mr. Mangini, we'll get

8    it straightened out in the end.

9              But again I guess what I'm asking is:

10   Were you involved in legal action on that third

11   Saturday of June of whatever year it is that you're

12   trying to describe here that you don't recall?

13        A    Only -- as far as I can recall, only as

14   concerned the case with the two officers in Armory

15   Square.

16        Q    Okay.  All right.  Other than -- was it

17   your -- other than your wife and what you believe was

18   2013 and your daughter Michelle in 2007, have you

19   ever attended the Syracuse Pride Festival or Parade

20   with anyone else?

21        A    Yes.

22        Q    Who would that be and what years would

23   those be?

24                  MR. MANGINI:  Object to form.

25        A    There's a number of people.

JAMES DEFERIO

1

2      Q     Okay.  Well, let's start at the first

3   year you went, 2004.  Did you go alone or did you go

4   with anyone?

5      A     I met people down there.

6      Q     And was this something that you had

7   planned to meet them or --

8      A     No.

9      Q     -- you just happened to see them there?

10     A     Just happened to see them there and we

11  joined together.

12     Q     I guess I'm asking for years that you

13  actually planned to go with someone or to meet

14  someone.

15     A     Okay.  That perhaps started in 2005.

16     Q     Okay.  And who would that have been?

17     A     Kevin Degin.

18     Q     And is he another person that was engaged

19  in public preaching?

20     A     Yes.

21     Q     And how do you know Mr. Degin?

22     A     Having met him at the Syracuse Pride

23  Festival -- Pride Parade, I believe it was the year

24  before in 2004.

25     Q     Okay.  And do you know, does he reside in

1                    JAMES DEFERIO

2    Syracuse?

3         A    No.

4         Q    Do you know where he resides?

5         A    Yes.

6         Q    Where's that?

7         A    Near Buffalo.

8         Q    So he came from Buffalo to attend the

9    Syracuse Pride event?

10        A    Yes.

11        Q    All right  Any other years where you

12   attended with someone or planned to meet someone at

13   the Syracuse Pride event or festival?  Other than

14   the --

15        A    Yes.

16        Q    -- ones you already described.

17             What year would that be?

18        A    Every year up until 2012.

19        Q    And except for the year that you didn't

20   attend obviously?

21        A    Yes.

22        Q    And who would that person or persons be?

23        A    Kevin Degin and several others.

24        Q    All right.  And this is the same group of

25   people you attended with every year?

1                    JAMES DEFERIO

2          A    Yes, when they were able to make it.

3     Some years some members didn't make it and others

4     did.

5          Q    Members of what?

6          A    They're a fundamental Baptist preaching

7     group called Street Preachers Fellowship.

8          Q    And where are they located?

9          A    They're loosely -- they're affiliated

10    with Street Preachers -- they were affiliated with

11    the Street Preachers Fellowship and -- but they live

12    in Rochester area and Buffalo.

13         Q    Okay.  I guess for the sake of

14    expediency, Mr. Deferio, other than the people who

15    were affiliated with the group you just described and

16    other than the family members and Mr. Degin --

17         A    Mm-hmm.

18         Q    -- that you've already described, were

19    there any people that you attended any of the

20    Syracuse Pride Parades or Festivals with or that you

21    planned to meet at these festivals --

22         A    Yes.

23         Q    -- parade?

24              And who would that be?

25         A    Miles Lewis.

1                    JAMES DEFERIO

2        Q     And what year would that be?

3        A     I don't recall.

4        Q     And how do you know Mr. Lewis?

5        A     He's an open-air evangelist.  He was an

6    open-air evangelist, young man.

7        Q     Okay.  Does he live in Syracuse?

8        A     He was residing at the time in North

9    Syracuse.

10       Q     Do you know where he is today?

11       A     Yes.

12       Q     Where is he?

13       A     North side of Oneida Lake with his

14   family.

15       Q     Okay.  And how is it that you came to

16   know Mr. Lewis?

17       A     Can't quite remember.  There's not that

18   many people doing open-air evangelism, so we tend to

19   meet, know each other through social media, through

20   articles we see about so-and-so doing this or that.

21   So you just get to meet people like that.

22       Q     Okay.

23       A     And I think my wife knew his mother.

24       Q     So is he no longer involved in public

25   preaching?

1                    JAMES DEFERIO

2          A     Correct.

3          Q     And do you know when the last time he was

4     involved in that was?  That you're personally aware.

5          A     Perhaps the year he got married.

6          Q     Anyone else other than the people you've

7     already described that you met or planned to attend

8     with?

9          A     From the Syracuse area?

10         Q     From any area.  I'm just....

11         A     It was mainly Street Preachers

12    Fellowship.  Other people that showed up, they showed

13    up independently.  There was a Roman Catholic group

14    of -- an old-school Roman Catholic group who was --

15    who actually believed the Bible.  They showed up a

16    few years with their banners.

17         Q     I'm just trying to get you in and out of

18    here as expeditiously as I can --

19         A     Yeah.

20         Q     -- so if you just stick to answering my

21    question it will make life go a lot easier.

22         A     Yeah.

23         Q     I'm just trying to understand:  Were

24    there other people other than those you've already

25    described who you actually coordinated with to attend

1                        JAMES DEFERIO

2     and planned to attend or meet with?

3           A     Just my wife and daughter.  Once one year

4     my son and --

5           Q     What year did your son go?

6           A     It was actually -- I don't believe it was

7     at the parade.  It was at the flag-raising.  I don't

8     recall the year.

9           Q     Okay.

10          A     It was very early on though.

11          Q     Other than the one time your daughter

12    attended the parade or festival, the one time you

13    described that your wife attended the parade and/or

14    festival and the flag-raising with your son, had your

15    family members ever attended any other Pride Parade

16    or Festival with you?

17          A     Specifically parade/festival?

18          Q     The Syracuse Pride Festival or Parade.

19          A     Okay.  No, that I can recall.

20          Q     That you can recall, okay.  Had they

21    attended other related events?  The way you hesitated

22    there leads me to believe there was something

23    that -- I'm just trying to make sure I'm clear on

24    this.  Is there another event that you're thinking of

25    that's not the Pride event?

1                          JAMES DEFERIO

2          A      Of course.

3          Q      Okay.  All right.  I don't need a list of

4     all the times you've preached with them.  I'm just

5     trying to understand:  The actual times that they've

6     appeared at the Syracuse Pride Festival and Parade

7     with you were just the three that you described?

8     Well, one was the flag-raising.

9          A      Okay.  There's usually three separate

10    events for Pride week, or more than that now.  But it

11    was the flag-raising, one event, then the parade a

12    second event, then after the parade the festival, so

13    you have three different events there.  Now, some

14    years my wife and daughter were at the flag-raising

15    but not at the parade.  And one year my daughter was

16    at the festival, which was held at Everson Park that

17    year, just to hand out literature.  That's all she

18    did.  That was -- that could have been around 2005 or

19    2006.  So there's three separate things going on

20    here, the flag -- now they have the flag-raising on a

21    different day than the parade and the festival, but

22    back then they had -- usually had the flag-raising

23    here at City Hall.  Then the parade would leave from

24    City Hall and wind around the streets and go over to

25    Everson Park.  So, those years, maybe one or two

1          JAMES DEFERIO

2    family members, my daughter or my wife, would attend

3    one or two of those events and then leave and I would

4    be left alone or with that group of street preachers

5    from Rochester and Buffalo.

6          Q     Okay.  So what you're saying is the list

7    of times that your family members might have attended

8    the Pride Festival/Parade or flag-raising with you is

9    longer than what you actually described before?

10         A     If you include the flag-raising, yes.

11         Q     Okay.  All right.  And do you recall what

12   years it was that --

13         A     No, I don't.

14         Q     -- they attended the flag-raising?

15               It's multiple then?

16         A     Whatever year they stopped going to

17   Everson Park and they started going over to the Inner

18   Harbor, that was the year they stopped going to the

19   flag-raising.  And the parade started from a

20   different location when it started -- when it was

21   transferred over to the Inner Harbor.

22         Q     Other than the Syracuse Pride, let's call

23   it, festivities, which encompasses all three of the

24   events you just described, are there any recurring

25   events or regular events you attend to publicly

1                    JAMES DEFERIO

2   preach at?

3        A     I think it was two years or maybe three

4   years, Taste of Syracuse.

5        Q     And that was here in Syracuse?

6        A     Yeah, Taste of Syracuse.

7        Q     And you would publicly preach at those

8   events?

9        A     Yes.

10        Q     Did you use sound amplification devices

11   at any of those times?

12        A     Aker amp, small Aker amp.

13        Q     So that's a yes?

14        A     Yes.

15        Q     And what years was it that you believe

16   you attended?

17        A     I don't remember.  It was before my heart

18   attacks, so it would have been 2015 and 2014 and it

19   may have been 2013.

20        Q     Okay.  So you believe that all those

21   years you preached at the Taste of Syracuse with your

22   sound amplification equipment?

23        A     Yes, either one or two of those days.

24        Q     Okay.  Any other events that you would --

25   or recurring events that you would attend to publicly

1                    JAMES DEFERIO

2    preach at?

3         A     I think it was two years at -- for the

4    Polish Festival.

5         Q     Again, was that here in the City of

6    Syracuse?

7         A     Yes.

8         Q     Do you recall what those years were?

9         A     It may have been 2015 or 2014, but I'm

10   not sure.  It could have been 2013 or 2014.

11        Q     And did you use sound amplification

12   equipment during those events?

13        A     Yes.

14        Q     Any other events or recurring events that

15   you would attend to publicly preach at?

16        A     For those annual events, I don't recall

17   any, but there's -- I don't recall any for annual

18   events.

19        Q     Were there semiannual or other recurring

20   events that you would --

21        A     Like I said before, if something's

22   showing at the Landmark Theatre, a play that may

23   attract a lot of people, I may attend...I may attend

24   that or stand on the corner with the marquee.

25        Q     All right.  During your public preaching,

1                    JAMES DEFERIO

2    have you ever been threatened with violence or bodily

3    harm?

4         A    Yes.

5         Q    Approximately -- well, how many times?

6         A    Hmm.  It's A very small percentage of the

7    time considering the hundreds of times I've been out

8    there preaching, so I can't put a number on it but

9    it's a very small percentage.  It's....

10        Q    More than ten times?

11        A    It could have been.

12        Q    So as you sit here today you have no idea

13   how many times in total that you've been threatened

14   with physical violence?

15        A    No.  I don't write this down.  Sometimes

16   somebody will walk by on the other side of the street

17   and just yell something over to me, like 'keep

18   talking, I'm going to come over there and punch you

19   in the face' or something like that, and they just

20   keep walking by, you know, that kind of thing.  I

21   call it a drive-by or a walk-by.

22        Q    And what specific threats of violence or

23   bodily harm do you recall being made against you

24   while you were publicly preaching?

25        A    That sort of thing I just said.

                              JAMES DEFERIO

1

2          Q        Anything else?

3          A        Talking about just threats?

4          Q        Threats of violence or bodily harm.

5    We'll get to the actual violence later on.

6          A        Threats usually are what I just

7    described.

8          Q        Okay.  So that they might come and punch

9    you and things of that nature?

10         A        They're threatening to do that.

11         Q        Okay.  All right.  And as you sit here

12   today, you don't have any idea how many times in

13   total that has happened to you?

14         A        No, I don't have any idea.

15         Q        All right.  Let's talk about times that

16   you actually have been subjected to violence or

17   bodily harm while publicly preaching.  How many times

18   has that occurred?

19         A        Maybe six or seven.

20         Q        And were any of those occurrences within

21   the City of Syracuse?

22         A        Twice.

23         Q        All right.  What was the first one?

24         A        I believe it was 2005 at the Syracuse

25   Pride Parade.

1                    JAMES DEFERIO

2          Q      2005, you said?

3          A      Yes.

4          Q      Okay.  And what was the actual bodily

5    harm that was inflicted on you?

6          A      He didn't harm me, but he made physical

7    contact.

8          Q      When you say he, who's he?

9          A      One of the attendants at the parade.

10         Q      At the Pride Festival Parade?

11         A      Yeah.

12         Q      In 2005?

13         A      Yes.

14         Q      And that was in Syracuse?

15         A      Yes.

16         Q      When you say he made contact, did he push

17   you or shove you?

18         A      Yes, he pushed me.

19         Q      Did he say anything to you?

20         A      No.

21         Q      Did you make any sort of complaint with

22   the police or file a police report?

23         A      There was no police report filed.

24         Q      Subsequently, though, did you go to the

25   police and file a report?

1                    JAMES DEFERIO

2        A      No.

3        Q      Did you call 911?

4        A      No.

5        Q      Did you actually suffer any injury as a

6   result of that?

7        A      No.

8        Q      So it was just the push or the shove?

9        A      Yes.

10       Q      Do you recall what was said --

11       A      Well, that's...that's what instigated it,

12  yes, a push.

13       Q      Instigated what?

14       A      A confrontation with him.

15       Q      Okay.  Did you video record this?

16       A      No.

17       Q      What did the confrontation consist of?

18       A      I reacted by pepper-spraying his eye.

19       Q      You pepper-sprayed this person?

20       A      He wouldn't stop pushing me.  He kept

21  pushing me back, back, back, back, so I

22  pepper-sprayed him in the eye.

23       Q      Okay.  Do you always carry pepper spray

24  with you when you publicly preach?

25       A      That was the only time.

1                      JAMES DEFERIO

2        Q    Just -- that was the one time you carried

3   it with you?

4        A    Yes.

5        Q    Why did you carry it with you that day?

6        A    I regularly carry it because I live in an

7   area of Syracuse where they have a lot of pit bulls

8   that run loose -- well, not a lot but there's enough

9   that causes some concern, so I learned to carry some

10  kind of pepper spray.  I now carry bear spray when I

11  go for a walk in the Valley area of Syracuse, and

12  because of the coywolves also down there.

13       Q    Because of the what?

14       A    Coywolves.

15       Q    So there was one day in 2005 at the

16  Syracuse Pride Parade, was it?

17       A    Yes.

18       Q    That's the only time you ever carried

19  pepper spray with you while you were publicly

20  preaching?

21       A    Yes, that I can recall, yes.

22       Q    And you just happened to use it that day?

23       A    Yes.

24       Q    How many times were you pushed before you

25  used it?

1                    JAMES DEFERIO

2       A      Pushed me a number of times.  I don't

3    recall how many times.  And just prior to that, he

4    had taken a pole and, one of the guys from Rochester,

5    he pushed a pole in the guy's mouth.

6       Q      A pole?

7       A      Yes, that was holding a banner.

8       Q      So you were pushed several times,

9    escalated to the point that someone was hit with a

10   pole and you pepper-sprayed someone and yet you never

11   contacted the police?

12      A      The police happened to see when he turned

13   around and punched me in the face.

14      Q      The police saw that?

15      A      Yes.

16      Q      You just said there were no police there.

17      A      I didn't say that.

18      Q      Yes, you did.

19      A      I said -- no.

20                    MR. MANGINI:  Object to form.

21      A      There was no police when he was pushing

22   me.

23      Q      Okay.  So when were the police there?

24      A      Well, the police are trying to control

25   the crowd and traffic on the street because this is

1          JAMES DEFERIO

2    when the parade was downtown, and it would start at

3    Armory Square and wind down Jefferson Street and turn

4    north on Salina Street.  So the officer was there

5    near the corner trying to -- you know, a lot of

6    things to look at and control.  So he didn't see the

7    initial pushing that happened.  He did see him turn

8    around and punch me in the face.

9          Q    So, in addition to the pushing and

10   shoving, you were punched in the face?

11         A    Yes.

12         Q    Okay.  And you believe this police

13   officer witnessed it?

14         A    Yes.

15         Q    And you still didn't file any sort of

16   complaint?

17         A    Police officer called us over to him; he

18   asked me if I wanted to file any complaints against

19   the man that punched me and was pushing me.  I said

20   no.  He asked him if he wanted to a file a complaint

21   for him using the pepper spray on you, and he said

22   no.  So it was --

23         Q    Okay.  Were you punched before or after

24   you used the pepper spray?

25         A    After.

1                      JAMES DEFERIO

2          Q     So he had just pushed you a couple times

3     and then you --

4          A     Several times.

5          Q     Several times.  Then you pepper-sprayed

6     him and then he punched you?

7          A     Yes.

8          Q     Okay.  Anything else as a result of that

9     confrontation?  Any other physical contact?

10         A     No.

11         Q     You said that was the first incident.

12    What was the second one?

13         A     2015.

14         Q     Would that be with Mr. Weiner?

15         A     Yes.

16         Q     What happened there?

17         A     He seemed to be think -- he seemed to

18    think that he was acting on behalf of the festival

19    organizers.

20         Q     What makes you say that?

21         A     Because he kept saying to me --

22         Q     Hold on.  Let me just clarify for the

23    record.  This is at the Syracuse Pride Festival?

24         A     At Inner Harbor, yes.

25         Q     But in 2015?

1                    JAMES DEFERIO

2        A      Yes.

3        Q      Okay.  Go ahead.

4        A      He kept telling me that I needed -- I had

5    to go across the street, and I kept saying well, wait

6    until an officer comes and clears this up.  And he

7    was pushing on me.  I said --

8        Q      Pushing you physically?

9        A      Yes.  And I had a small video camera and

10   grabbing the camera and trying to wrench it out of my

11   hands.  And a number of other festival-goers were

12   insistent that I go across the street, that they --

13   they seemed to think they had authority to tell me to

14   go across the street on behalf of the festival

15   organizers, and I kept saying well, wait until an

16   officer comes and clears this up.  And they didn't

17   want to wait, and so I was being pushed around and

18   one older woman grabbed my video camera and snapped

19   the band.  I had it around my wrist, and she snapped

20   it and tried to run with it and I quickly turned

21   around and was able to grab it and pull it back away

22   from her.  And then it escalated to the point -- I

23   kept trying to talk to these people.  It's all

24   recorded on video.  I'm sure you've seen the video.

25   Norm Weiner with his left hand hit me right here.

JAMES DEFERIO

And that's when I turned to my daughter Michelle on

the other side of the street and I said, "Michelle

can you call 911?"

Q    Okay.  You told me that your daughter

attended the Syracuse Pride Festival with you in

approximately 2007.  So she was also there in 2015?

A    Not to preach or witness.  She was just

there on the other side of the street to video.

Q    Right.  I asked you if your family had

attended with you.  I didn't ask you for what

purpose.

A    When you say attended with me, I'm an

open-air preacher, so you're implying that they're

ministering with me.

Q    Not at all.  I asked did they attend with

you.  Were they there physically with you?

A    My daughter was in 2015 and 2016, the

video, also.

Q    Any other years besides 2007, 2015 and

2016?  And this is your daughter Michelle?

A    Yes.

Q    Any other years besides that that she was

present with you?

A    It's hard to recall.  Like I said, I've

1                    JAMES DEFERIO

2  done so many of these events.

3        Q     But at least three that you recall?

4        A     At least three.

5        Q     Okay.  And she witnessed the incident

6  with Mr. Weiner in 2015?

7        A     She videoed it.

8                    MR. SICKINGER:  I'm just going to

9               note for the record, Mr. Mangini, that

10              we're likely to issue a subpoena for

11              Mr. Deferio's daughter.  She's a

12              witness to all of this.  I just want

13              to put you on notice of that now.

14       Q     What other years besides 2013 did your

15  wife attend then?

16       A     Hmm, one year was at the flag-raising.  I

17  don't recall what year that was.

18       Q     Okay.  Anything else?

19       A     If you want to ascertain the year that my

20  wife attended, Syracuse.com has a photograph of me

21  talking to a homosexual man and I have a banner that

22  says, "Do you enjoy your STDs?  God made sex for

23  marriage only, one man plus one woman."  Syracuse.com

24  has that photo and it's public, so, whatever year

25  that was, that's the year my wife attended the

1                    JAMES DEFERIO

2    flag-raising.

3        Q    Okay.  Any other years that she attended

4    either the --

5        A    I don't recall.

6        Q    Okay.  So you believe that there's at

7    least two years that she attended?

8        A    At least two years, the flag-raising, and

9    one year for the parade.

10                    MR. SICKINGER:  All right.

11                    Again, Mr. Mangini, I'll just put you

12                    on notice now that we're likely to

13                    issue a subpoena for Mr. Deferio's

14                    wife since she's a witness to all

15                    this.

16        Q    All right.  Let's go back to the incident

17    with Mr. Weiner.  At some point in time did you

18    file -- or excuse me.  Did you seek to pursue

19    criminal charges against him?

20        A    Immediately.

21        Q    Immediately?  Okay.  When you say

22    immediately, did you walk over to a police officer?

23        A    I told Officer -- I can't remember his

24    name.  Hmm.

25        Q    If you don't remember, you don't

1                    JAMES DEFERIO

2    remember.

3         A     Yeah.  He was a big guy.  I just can't

4    remember his name.  And I talked to him about it, and

5    he said he'd go look for the person.

6         Q     Okay.  Was there a crowd around you at

7    this point in time when the altercation occurred with

8    Mr. Weiner?

9         A     There were several people around me.

10        Q     Do you recall approximately how many?

11        A     No.  It's on the video though.

12        Q     And the same question with respect to the

13   2005 incident; when this confrontation with the

14   pushing and the shoving and the pepper spray was

15   going on, was there a crowd of people around you?

16        A     There was a crowd of people on the

17   sidewalk, but they were facing the parade and

18   watching the parade.  They weren't -- they were just

19   ignoring us preachers basically except for this one

20   big guy who thought he had the right to assault us.

21        Q     Okay.  And that's the person that you

22   pepper-sprayed?

23        A     Yes.

24        Q     All right.  Did you suffer any physical

25   injury as a result of being punched by Mr. Weiner?

1                    JAMES DEFERIO

2        A     No.

3        Q     Did you have to seek any medical

4   treatment?

5        A     No.

6        Q     Did you participate in any criminal

7   proceedings against Mr. Weiner?

8        A     Explain criminal proceedings.

9        Q     Did you testify in court, did you have to

10  give any sort of statements, anything like that?

11       A     I gave a statement to that officer.

12  Right now his name eludes me.

13       Q     Beyond that did you do anything?

14       A     No.  I was told that it was being held in

15  the courts and I didn't have to show up.

16       Q     Who told you that?

17       A     I believe I received a letter.

18       Q     Would it be from the District Attorney's

19  office?

20       A     It may have been.

21       Q     Did Mr. Weiner say anything to you prior

22  to punching you?

23       A     Yes.

24       Q     What did he say?

25       A     That I needed to go across the street.

1              JAMES DEFERIO

2        Q     And that was all he said and then he

3    punched you?

4        A     Oh, he said other things too.  It's all

5    on the video.

6        Q     Well, I'm not asking about the video.

7    I'm asking about your recollection.

8        A     Yeah, my recollection is that I don't --

9    I don't have a recollection of everything he said.

10   As an open-air evangelist who goes to many events, I

11   try to put those kind of things in the past so I can

12   concentrate on the present and on what's going on --

13   I may do in the future and I also have a list of

14   people that I pray for every day also, so my concern

15   is -- I am actually concerned about people whether

16   they express hatred towards me or not, because so

17   many of these people turn right around and then thank

18   me afterwards.  And I personally know ex-homosexuals,

19   ex-drunkards, et cetera.  So my -- I concentrate

20   on -- I'm a people person.  I concentrate on helping

21   people out of their sin.  And if they display some

22   kind of anger towards me --

23       Q     Mr. Deferio, I'm trying --

24       A     I can't remember.  I don't live in the

25   past.

JAMES DEFERIO

1

2    Q    I really don't care about your

3    interactions with homosexuals, drunkards or anything

4    of that sort.

5    A    If you want exact dates and who was with

6    me, then --

7    Q    I'm trying to ask what your recollection

8    of Mr. Weiner saying to you is.  I don't care about

9    people that you believe you helped.

10    A    Yeah.  That's all I can remember, is what

11    he kept saying over and over again, that I had to go

12    across the street.

13    Q    Okay.  So you believe he said to you

14    multiple times you have to go across the street and

15    then he punched you?

16    A    Yes.

17    Q    Okay.  Do you recall what, if anything,

18    you said to Mr. Weiner in response?

19    A    I -- from what I recall, I turned to my

20    daughter Michelle and I said, "Michelle, can you call

21    911?  I was just assaulted."

22    Q    Okay.  And do you recall if she did?

23    A    Yes.  I saw her.

24    Q    Okay.  And then what happened?  What do

25    you recall happening next?

1

2    A    Officers arrived.  And Norman Weiner left

3  before the officers arrived.  And I was told to go

4  across the street, and that's when Captain Sweeny

5  confronted me.

6    Q    Okay.  So Captain Sweeny confronted you

7  in 2015 after you'd already been punched?

8    A    Yes.

9    Q    Okay.  And you made a videotape of that

10  interaction, is that correct, with Captain Sweeny?

11    A    Yes.

12    Q    Mr. Deferio, I'm going to show you what's

13  been marked as Exhibit A.  Do you recognize that

14  document?  And take a minute to look it over.

15    A    Yes.

16    Q    And what do you recognize it to be?

17    A    Part of the lawsuit that my lawyer filed

18  for this case against the City of Syracuse regards to

19  2014-2015 at the Inner Harbor.

20    Q    And that's the lawsuit that we're here

21  about today?

22    A    Yes.

23    Q    On the last page of that document,

24  Page 21, is that your signature on the verification?

25    A    Yes.

1                    JAMES DEFERIO

2        Q    Okay.  And you're attesting that the

3   contents of the complaint are true to the best of

4   your knowledge?

5        A    Yes.

6        Q    Could you please turn to Paragraph 73?

7   Can you just read that paragraph to yourself?  You

8   don't have to read it out loud.

9        A    Okay.

10       Q    The Pride Festival private security guard

11  that you refer to in that paragraph, how do you know

12  that they were associated with the Pride Festival?

13       A    If I recall correctly, they had a little

14  name -- something on their shirt indicating that they

15  were connected with the Pride Festival.

16       Q    Okay.  Were they wearing like a security

17  guard uniform?

18       A    I think he was.

19       Q    Okay.

20       A    I don't recall for sure.

21       Q    At any point in time did you ascertain

22  the identity of this person?

23       A    It may be on video.  I did see what my

24  daughter recorded, and he did -- you can see clearly

25  that he pushed me into the street.

1                    JAMES DEFERIO

2        Q      Okay.  How was he physically aggressive

3    with you?

4        A      By pushing me into the street and

5    grabbing my pole and wanted me to go across the

6    street by hanging onto the pole so he was just

7    pulling me along.

8        Q      When you say your pole, you mean one of

9    your sign poles?

10       A      Yes.

11       Q      Did he ask you to cross the street prior

12   to grabbing your pole?

13       A      Yes.

14       Q      And do you recall what, if anything, you

15   responded to him?

16       A      I don't recall my exact words.  It should

17   be on video.

18       Q      Do you recall in sum or substance what

19   you said to him?

20       A      It was -- could have been that I have a

21   right to be here, it's a public sidewalk, and I may

22   have insisted that 'let the police come and sort this

23   out.'

24       Q      Did you contact the police at that point?

25       A      No.

1                    JAMES DEFERIO

2        Q    Did you ask your daughter or anyone else

3   to contact the police at that point?

4        A    No.

5        Q    And it says in the last sentence of that

6   paragraph you returned to the sidewalk.  What section

7   of the sidewalk are you talking about?  On the same

8   side of the street as the Pride event?

9                    MR. MANGINI:  Object to form.

10       A    It was the Inner Harbor side of the

11  street.

12       Q    Okay.  So the side where the event was

13  going on?

14       A    Yes.

15       Q    So, after being pushed into the street,

16  you returned to the same sidewalk that you were

17  previously on?

18       A    Yes.

19       Q    Okay.  And then subsequent to that is

20  when you were struck by Mr. Weiner?

21       A    Yes.

22       Q    And were there other people around you at

23  this point in time on the sidewalk?

24       A    Yes.

25       Q    Do you know approximately how many people

1                    JAMES DEFERIO

2    were around you?

3         A    I don't recall.

4         Q    Was it a large number?  Was it a crowd of

5    people in your estimation?

6                    MR. MANGINI:  Object to form.

7         A    Don't recall.

8         Q    At any point in time did you ask to see a

9    permit from the person you identified as a security

10   guard in Paragraph 73?

11        A    I don't recall.

12        Q    Do you recall at any point in time being

13   shown a permit from anyone at the 2015 Pride

14   Festival?

15        A    I was never shown a permit.

16        Q    Were you ever given a copy of it?

17        A    No.

18        Q    Did you subsequently obtain a copy of it?

19        A    No.

20        Q    So as you sit here today you've never

21   seen a copy of the permit from the 2015 Pride

22   Festival?

23        A    I don't recall ever seeing the permit.

24   May have been shown it, but in the -- at the moment I

25   don't recall that.

1                   JAMES DEFERIO

2        Q     Okay.  So you don't recall ever seeing

3   the permit that's at the center of this lawsuit?

4        A     No.

5                   MR. MANGINI:  Object to form.

6        Q     So, when you signed the verification on

7   the last page of this complaint, Page 21, you signed

8   that without ever even seeing the permit that was

9   issued to Pride for 2015?

10                  MR. MANGINI:  Object to form.

11       A     Yes.

12       Q     Okay.  All right.  Why did you not

13  contact the police when the security guard became

14  physically aggressive with you as you describe in

15  Paragraph 73?

16       A     I didn't think it was -- it warranted

17  police action.

18       Q     And why was that?

19       A     It was just a push.

20       Q     Okay.  Were you concerned that the people

21  around you were -- well, strike that.

22             In your own opinion, did you believe that

23  the people around you at this time were becoming more

24  hostile or agitated?

25                  MR. MANGINI:  Object to form.

                        JAMES DEFERIO

1

2        A      Just two.

3        Q      Just two?

4        A      (Nodding in the affirmative.)

5        Q      And that would be Mr. Weiner?

6        A      Mm-hmm.

7        Q      And whom else?

8        A      This older woman.

9        Q      Was she the one that tried to grab your

10   camera?

11       A      She did grab my camera and snapped it off

12   my wrist.

13       Q      Okay.  Approximately how old was she?

14       A      I don't know.  She could have been around

15   70.

16       Q      And approximately how old is Mr. Weiner?

17       A      He looked around the same age.

18       Q      Okay.  So two 70-approximately-year-old

19   people were the two that you believe were becoming

20   agitated and/or hostile?

21       A      Yes.

22       Q      Anyone else?

23       A      Not that I can recall that were like

24   them.

25       Q      At this point in time, were you fearful

1                    JAMES DEFERIO

2    for your own safety?

3                    MR. MANGINI:  Object to form.

4         A    No.

5         Q    Why not?

6         A    Well, I thought the police were going to

7    arrive very soon and straighten things out, so I felt

8    there was no urgency of allowing myself to become

9    anxious about what was going on.  And I've often seen

10   people become agitated when you -- especially in

11   today's culture where you oppose their opinion on

12   things and then they settle down.  And I've had

13   people apologize to me afterwards for becoming

14   agitated and angry.  So I've seen it so many times

15   it's just -- I just wait it -- I try to wait it out.

16        Q    Okay.  So, at the point in time you

17   described in Paragraph 73 of your complaint, you were

18   not fearful for your own safety?

19        A    Only after I was punched.

20        Q    But prior to that you weren't?

21        A    No.

22        Q    Okay.  All right.  Those are the two

23   incidents you described in the City of Syracuse where

24   you were physically harmed or subjected to violence

25   as a result of your public preaching.  You indicated

1                    JAMES DEFERIO

2   that there were, what, approximately six total?

3        A     Yes.

4        Q     Where were the other four?

5        A     Three happened in Salem, Massachusetts.

6        Q     In Salem, Massachusetts?

7        A     Yes.

8        Q     Were they all on the same date?

9        A     No.

10       Q     When were they?

11       A     One was 2005, October 31st.

12             Finally he smiles.

13       Q     Any other times?

14       A     I think it was 2007, Salem,

15  Massachusetts.  I think it was October 31st.  Could

16  have been October 30th.

17       Q     Okay.  And I'm going to go out on a limb

18  and say the other time was also on Halloween or about

19  that time period?

20       A     Yeah, 2 -- yeah, 2006, I think it was.

21  Salem, Massachusetts.

22       Q     Okay.

23       A     I think it was the day before Halloween.

24       Q     What physically happened to you on each

25  one of those --

1          JAMES DEFERIO

2               MR. MANGINI:  Form.

3     Q     -- occasions?  You can take them in

4     order.

5     A     Yeah.  2005 on Halloween day -- we were

6     there for three days.  It wasn't bad the other days.

7     Halloween day, you have groups of college students

8     from Boston area coming up, and also you get street

9     gangs coming up too.  People are drinking.  And later

10    in the evening it starts getting pretty rough 'cause

11    the booze is flowing and you know what alcohol does

12    to some people.  And this one large homosexual who

13    was really upset at one of the guys on their ministry

14    team, who's an ex-homosexual, was really agitated

15    with the ex-homosexual and he started getting really

16    mad.  And then he runs around our group, and I'm

17    right there and he hits me in the face from behind

18    and then grabs my banner that had nothing to do with

19    homosexuality and started running off with it.  But

20    he dropped it, and I got it back and the police

21    officers grabbed him.

22         Q     What did your banner pertain to?

23         A     The Wicca religion.

24         Q     And did you suffer any physical injury as

25    a result of being hit in the face?

1                    JAMES DEFERIO

2       A    No.  I'm Italian.

3       Q    What were the other two times?

4       A    This -- I think it was 2006.  This man

5  was really agitating one of the preachers, who's a

6  very good preacher, who's pretty gentle, and he was

7  just cursing him out with some of the most filthy

8  language and there's kids all over the place.  And I

9  mean this guy looked like he was demon possessed.  If

10 you ever seen this guy, you go like 'wow, this is

11 something out of a horror movie.'  So I got the

12 camera out.  I said, "I better record this. If he

13 sees the camera, maybe he'll back off."  Well, he saw

14 me with the camera and he comes over and hits me in

15 the face.

16      Q    Okay.  Again, did you suffer any physical

17 injury as a result of being punched?

18      A    No.

19      Q    Did he just punch you the one time?

20      A    Yes.

21      Q    And what was the third time?  Well,

22 strike that.

23           What was your message that you were

24 publicly preaching at that second time you were

25 punched?

1               JAMES DEFERIO

2       A      The second time, I wasn't preaching.

3       Q      Were you carrying any signs?

4       A      I may have had a sign.  I don't...I don't

5   remember.

6       Q      And you don't recall what it would have

7   pertained to then?

8       A      No.  I said that the other man was

9   preaching, he's a very gentle preacher, so you don't

10  interrupt somebody.  So it wasn't my turn to preach,

11  so I was just listening to him.

12      Q      Okay.  So what was the third time in

13  Salem?

14      A      I think it was the day before Halloween,

15  Salem.  It might have been 2007-2008.  I think it was

16  2000 -- could have been 2006.  Someone was holding a

17  sign that said "Homosexuality's a sin.  Christ can

18  set you free."  A small group of people were walking

19  by, and I think one of their family members was a

20  homosexual and this guy became very agitated, came

21  over and started physically attacking the guy that

22  was holding the sign.  And I got the camera out, and

23  he saw me with the camera and he gives me a straight

24  right hand.  He's a Puerto Rican guy from

25  New York City.  I think he was from New York City.

JAMES DEFERIO

1

2  Drove me backwards, but I never went down.  And you

3  know what?  I came right back at him, I says, "Hey,

4  man, I love you.  That's why we're out here, to give

5  you the Gospel."  And I could have had him arrested,

6  and I didn't.

7       Q     Okay.  So that time you were punched in

8  the face?

9       A     Straight...straight right hand.

10      Q     Okay.  All right.  Did you suffer any

11 physical injury as a result of being punched that

12 time?

13      A     Yes.

14      Q     What was it?

15      A     Well, I didn't know I had a physical

16 injury at the time, but my front tooth loosened up

17 and it had to be repaired.

18      Q     Any other injury?

19      A     No.

20      Q     Okay.  And you indicated there was

21 approximately six times in total.  So far you

22 described five.  Were there any other times that you

23 were subjected to physical violence while you were

24 preaching?

25      A     Yeah.  See, I was giving you an

1                    JAMES DEFERIO

2    approximate number.  I don't recall.

3         Q    Okay.

4         A    There may have been one or two other

5    incidents.

6         Q    And -- but as you sit here today, there's

7    only two in the City of Syracuse that you recall and

8    those are the two you've already described?

9         A    Yeah, and that guy pushing me into the

10   street but it wasn't...it wasn't the kind of push

11   that that other guy in 2005 was doing towards me.  He

12   was just -- this guy was just trying to get me to

13   move across the street.

14                   MR. SICKINGER:  All right.  Off

15                   the record.

16                   THE VIDEOGRAPHER:  We'll go off

17                   record at 13:32.

18                   (Whereupon, a brief recess was

19                   taken.)

20                   (Photographs marked for

21                   identification as Exhibits G and H,

22                   this date.)

23                   THE VIDEOGRAPHER:  We are back on

24                   record at 2:32.

25   BY MR. SICKINGER:

JAMES DEFERIO

1

2      Q     Mr. Deferio, earlier you testified about

3  some sound amplification devices you used in the past

4  and you indicated that at one point in time you used

5  a bullhorn.  Could you please describe what it is you

6  mean by bullhorn?

7      A     I never used the word bullhorn.  I said

8  megaphone.

9      Q     Okay.  And what exactly do you mean by

10  megaphone?

11      A     It's a sound amplification device that

12  real...what do they call it; they went out of

13  business...Radio Shack made, approximately this long

14  with a cone-shaped...what would you call it...where

15  the sound exits so it spreads the sound out.  And it

16  was -- I think it was 10 watts.

17      Q     Okay.

18      A     But it was very loud.  If you turned it

19  all the way up, it was very loud --

20      Q     Okay.

21      A     -- even though it was only 10 watts.

22      Q     Okay.  Did you use that device at the

23  2014 Pride Festival or Parade?

24      A     No.

25      Q     When was the last time you used that type

                        JAMES DEFERIO

2    of device?

3         A    I don't recall.

4         Q    Would it be within the past year or two,

5    do you believe?

6         A    No.  I've only done two events since

7    October 2015.

8         Q    Okay.  So --

9         A    And that was with a small Aker amp.

10        Q    And I believe you indicated that the 2012

11   Pride flag-raising here at City Hall was one of the

12   instances where you used a megaphone?

13        A    I used -- I believe at that -- that year,

14   I believe I used a cheerleader megaphone.

15        Q    The what?

16        A    A cheerleader megaphone.

17        Q    Oh, okay.  So --

18        A    A big --

19        Q    -- not an electric one?

20        A    No, not -- it was not electronically

21   amplified.

22        Q    Okay.  So as you sit here today you can't

23   recall when the last time you used the megaphone you

24   described was for your public preaching?

25        A    Yeah.  I have two megaphones, and one is

JAMES DEFERIO

1

2   completely broken.  The other one just works

3   intermittently and you never know when it's going to

4   go off -- I mean go out.  So I think the last time I

5   used that was three years ago, and I think it was an

6   event...it might have been Hill Cumorah during the

7   allowed times for preaching with a megaphone.

8          Q      And that's the Hill Cumorah event you

9   described earlier today?

10         A      Yes.

11         Q      All right.  Mr. Deferio, I'm going to

12  show you what's been marked as Exhibits G and H.

13  I've already given Mr. Mangini a copy of those.

14         A      Yeah, my....

15         Q      Do you recognize the item pictured in

16  Exhibits G and H?

17         A      Yes.

18         Q      Could you tell me what that is?

19         A      It's an Aker 16 watts.

20         Q      Anchor?

21         A      Aker, A-K-E-R.

22         Q      Okay.  And that's the manufacturer?

23         A      Yes.

24         Q      Sixteen watts, you say?

25         A      Mm-hmm.

JAMES DEFERIO

1

2    Q    So that has more wattage then than the

3    megaphone you were just describing?

4    A    Yes, but not as loud.

5    Q    And is this your personal property,

6    what's pictured in Exhibits G and H?

7    A    Yes.

8    Q    Where did you purchase it?

9    A    On-line, Amazon.

10    Q    And how long have you had this

11    amplification device for?

12    A    I had three of them.  One broke.  I have

13    two that are working.  My 12-watt Aker amp broke.  So

14    I have two of this style.

15    Q    Two of the style that's depicted in H?

16    A    They're the same thing, aren't they?

17    Q    Yes, it's the same --

18    A    Yeah, the same amp.  I mean my two amps

19    look the same.  There's a slight difference.  This

20    one can pick up the radio.

21    Q    Okay.

22    A    The other one can't pick up a radio.

23    But, other than that, it's about exactly the same

24    thing.  And I think it was around four years ago.

25    Q    Okay.  Are they both a Aker 16-watt

1                    JAMES DEFERIO

2     machine?

3          A     Yes.

4          Q     And did you purchase them both from

5     Amazon?

6          A     Yes.

7          Q     And you said the only difference between

8     the two of them is one has radio function?

9          A     Yes.

10         Q     And do they both look like what's

11    depicted in Exhibits G and H?

12         A     Exactly the same size, look the same.

13         Q     And they have the same capabilities other

14    than the radio function?

15         A     Right.

16         Q     Okay.  What would -- strike that.

17               How would you determine whether or not

18    you were going to use a sound amplification device

19    like what's pictured in G and H during your public

20    preaching?

21                    MR. MANGINI:  Object to form.

22         A     How large I thought the crowd might

23    become.  Traffic if I'm on a street.  When I go to a

24    college campus, I don't use amplification.  If I'm on

25    a street, there's, especially in Syracuse on

1                    JAMES DEFERIO

2    Salina Street, a lot of buses, a lot of trucks on

3    Salina Street and it's very difficult to be heard

4    sometimes.  So that's when I would use something like

5    this.  At the basketball games, there's usually -- as

6    you know, Syracuse University men's basketball is

7    very popular, except for the NIT games, and, I mean,

8    there's thousands and thousands of people going

9    through there and I try to be heard only

10   kitty-corner.  So I'll adjust the volume for that.

11   And I have my wife stand kitty-corner...what's it

12   called...Crouse and Waverly.  I had her stand

13   kitty-corner and ask her how does this sound to you,

14   is it too loud, is it too soft, can you hear it, and

15   she said -- she let me know what the volume setting

16   was where I can be heard over there.

17            So my aim is to reach the crowds of

18   people that are within a certain distance, not to be

19   reached down the block, and I am often upset at

20   preachers who use megaphones and turn it way up and

21   try to be heard one, two blocks away.

22       Q    The testing that you just described with

23   your wife standing across the street to see if she

24   could hear it at different volumes, did you ever do

25   that at the Syracuse Pride Parade or Festival?

1                      JAMES DEFERIO

2        A      There's no need to.

3        Q      So that's no?

4        A      No.

5        Q      And why do you feel there wasn't a need

6    to?

7        A      'Cause I already know what the settings

8    on this and how loud it is.

9        Q      Okay.  So, if you already know the

10   settings and how loud it is, why did you need to do

11   it up at Syracuse University?

12       A      Because that's when I first got these

13   amps.

14       Q      So you've only done that one time?

15       A      Captain Sweeny gave me feedback couple

16   times.  Once he said, "Jim, I can hear you half a

17   block away.  Can you turn it down a bit?"  I said,

18   "Okay, sure."  I said, "I didn't realize I could

19   reach that far," and that was several years ago when

20   I first started using these amps.

21       Q      Okay.  And he didn't issue you any sort

22   of ticket or arrest you that point in time?

23       A      No.  Why would he?

24       Q      I'm just asking if he did.

25       A      No.

1                    JAMES DEFERIO

2       Q      And he didn't do anything other than ask

3   you to turn it down?

4       A      Correct.

5       Q      Okay.  Do you recall what you were --

6   where you were when that occurred?

7       A      Yes.

8       Q      Where?

9       A      On the SU side of Waverly at the end of

10  University Ave, the south end.

11      Q      Was it for a sporting event?

12      A      Hmm.  It may have been the day that

13  Oprah Winfrey was going to speak up there.  It may

14  have been that time.  I think they had a pavilion set

15  up outside near the steps, near the Newhool School

16  of Communication.  But I could be wrong about that

17  'cause I've gone up there many times.

18      Q      Okay.  You testified a couple times now

19  that you know Captain Sweeny or that he's your...I

20  think you called him a go-between at one point in

21  time.  How did you first meet Captain Sweeny?

22      A      I don't recollect.  It might have been

23  because I called and asked for a supervising officer

24  one of the times that I was being threatened with

25  arrest.  It may have been because of that.

JAMES DEFERIO

1

2     Q     So you called the police department and

3  just asked for a supervisor?

4     A     I think I asked the officer to have a

5  supervising officer come.

6     Q     Okay.  And you believe that --

7     A     I think that's when it happened.

8     Q     -- Captain Sweeny, Joseph Sweeny, you

9  believe he's the one that responded?

10     A     Mm-hmm.

11     Q     Do you recall approximately when that

12  was?

13     A     No.

14     Q     Did you know Joseph Sweeny prior to the

15  incident you just described?

16     A     No.

17     Q     Has Captain Sweeny ever issued you any

18  sort of citation or ticket for any of your protesting

19  activities or preaching activities?

20     A     No.

21     Q     Has any Syracuse police officer ever

22  issued you a ticket or a citation for any of your

23  preaching or protesting activities?

24     A     No.

25     Q     Have you ever been charged with a crime

JAMES DEFERIO

1
2    by any Syracuse police officer as a result of your

3    protesting or preaching activities within the City of

4    Syracuse?

5         A    Formally charged?

6         Q    Correct.

7         A    No.

8         Q    Approximately how many interactions...and

9    by interactions I mean conversations or seeing him in

10   person...have you had with Captain Sweeny while you

11   were either protesting or preaching publicly?

12                        MR. MANGINI:  Object to form.

13        A    I don't know.  Sometimes if he's in the

14   area he'll just stop by and say hi, or he'll be in a

15   car, roll his window down and say, "Hi, Jim," and

16   drive off.

17        Q    Okay.  But you don't have any

18   recollection as you sit here today of any --

19        A    No.

20        Q    -- sort of number?

21        A    There's been probably over a dozen.

22        Q    Okay.  And you've named Captain Sweeny as

23   a defendant in this lawsuit; correct?

24        A    Yes.

25        Q    Okay.  What specific action has

1                        JAMES DEFERIO

2    Captain Sweeny taken that you believe has resulted in

3    you naming him as a defendant in this suit?

4                        MR. MANGINI:  Object to the form.

5         A     Well, under fear of arrest, I went across

6    the street and he said -- I asked him would I be

7    arrested and he says "could be."  Well, a year before

8    Officer Locastro said the same thing, and he said,

9    "Well, let me make this plain.  You will be

10   arrested."  So I took it to mean a "could be" means

11   you will be arrested.  So under fear of arrest I went

12   across the street with Captain Sweeny.

13        Q     But he said you could be; correct?

14        A     Yes.

15        Q     And did you continue to have a

16   conversation with him on the other side of the

17   street?

18        A     Very short one.

19        Q     But you did?

20        A     Yes.

21        Q     Okay.  So anything else that

22   Captain Sweeny has done that has resulted in you

23   naming him as a defendant in this suit other than

24   saying you could be arrested if you don't cross the

25   street?

1           JAMES DEFERIO

2                MR. MANGINI:  Object to form.

3      A     He said I couldn't be on that side of the

4  street.

5      Q     Okay.  And then he subsequently --

6      A     He said I had to move across the street.

7      Q     Did he say, was that because of the

8  permit that was issued to CNY Pride?

9      A     Yes.

10     Q     Do you recall him saying that he had

11 spoken with attorneys from the City of Syracuse

12 Corporation Counsel's office and that they had

13 directed him  that that's how the permit had to be

14 enforced?

15     A     Yes.

16     Q     Do you recall him saying that to you

17 in -- or strike that.

18           What year do you recall him saying that

19 to you?

20     A     Last year -- no.  Excuse me.  2015.

21     Q     Do you recall him saying that to you in

22 2014?

23     A     I don't remember seeing him in 2014.

24     Q     So you do have recollection, though, as

25 you sit here today of Captain Sweeny saying to you

1            JAMES DEFERIO

2     that he was instructed by the city Corporation

3     Counsel's office to have you on the other side of the

4     street if you were going to use a sound amplification

5     device?

6          A     Yes.

7          Q     Do you also recall him saying to you at

8     some point in time during the 2015 Pride Parade or

9     Festival that he was instructed by the City of

10     Syracuse Corporation Counsel's office that the Pride

11     group had exclusive use of the sidewalk on the Inner

12     Harbor side of the street?

13                    MR. MANGINI:  Object to form.

14          A     I think he said that.

15          Q     Okay.  Is there any inaction that you

16     believe Joseph Sweeny should have taken that has

17     resulted in you naming him as a defendant in this

18     suit?

19                    MR. MANGINI:  Object to form.

20          A     When I turned off the amplifier and said,

21     "I'll stay on this side of the street then," he says,

22     "No, you can't."

23          Q     And --

24          A     And so under fear of arrest I went across

25     the street.

1                    JAMES DEFERIO

2        Q     Was that at that point in time when he

3   indicated to you that his instructions or his

4   guidance from the City of Syracuse office of

5   Corporation Counsel was that you could not be on that

6   side of the street because of the permit that had

7   been issued to CNY Pride?

8        A     Yes.

9        Q     I'm going to see if I can try and do this

10   and save some time this way, Mr. Deferio.  Basically

11   I want to understand the same questions I asked you

12   about Captain Sweeny with regard to Frank Fowler.

13        A     I knew I should have turned that off.

14   Sorry about that.  I'll turn this off.

15                    (Discussion off the record.)

16        Q     So, as I was saying, Mr. Deferio, what

17   I'm going to try and do is see if we can streamline

18   this line of questioning with respect to the other

19   two individuals you've named as defendants, so let me

20   try and ask you this way and if you don't understand

21   it I'll be happy to rephrase it.  What action has

22   Frank Fowler taken that has resulted in you naming

23   him a defendant in this lawsuit?

24                    MR. MANGINI:  Object to form.

25        A     The police are under his control and he's

1                    JAMES DEFERIO

2    the chief of police, Syracuse chief of police.

3    Ultimately they answer to him.

4         Q    Okay.  So your intention as you sit here

5    today is that you named him as a defendant because

6    he's a supervisor or a superior of the other two

7    officers named as defendants?

8                    MR. MANGINI:  Object to form.

9         Q    And if that's not your understanding,

10   please, you know, let me know 'cause I'll be happy to

11   try and rephrase it.  I just want to understand your

12   explanation from your earlier answer.

13        A    Can you restate the question?

14        Q    Sure.  Is there anything -- or strike

15   that.

16                    Is your reason for naming Frank Fowler as

17   a defendant in this lawsuit solely based on the fact

18   that he's a supervisor or superior of the other two

19   officers named as defendants?

20        A    Yes.

21        Q    Okay.  And let me ask you the same

22   question with respect to Sergeant Locastro,

23   Jamey Locastro.  What action has Jamie Locastro taken

24   that has as resulted in you naming him as a defendant

25   in this lawsuit?

1

2      A      He threatened to arrest me in 2014.

3      Q      Is that the incident you referred to

4  earlier when he said you could be arrested if you

5  didn't cross the street?

6      A      He said that at first, and then he said

7  that he would make it clear that I would be arrested

8  if I didn't leave.

9      Q      And did he also use the word "could be

10  arrested," "could be arrested," multiple times before

11  he said "would" in 2014?

12      A      Perhaps two or three times.

13      Q      During that interaction with

14  Jamey Locastro in 2014, did you request that he

15  contact Captain Sweeny?

16      A      I'm pretty sure I did ask him that.

17      Q      And do you recall subsequently speaking

18  with Captain Sweeny?

19      A      No, I did not.  In fact, I did request

20  that, and he said he was the officer in charge, he

21  had the authority.

22      Q      So, other than what you've already

23  described with him telling you a few times, two or

24  three times, that you could be arrested in 2014 and

25  saying to you that you would be arrested in 2014 if

1                    JAMES DEFERIO

2   you didn't cross the street, is there any action that

3   Jamey Locastro has taken that has resulted in him

4   being named as a defendant by you in this lawsuit?

5                    MR. MANGINI:  Object to form.

6       A    There was no further action that he took

7   against me.

8       Q    Okay.  Is there any inaction or anything

9   that you believe Jamey Locastro should have done at

10  any point in time that has resulted in you naming him

11  as a defendant in this lawsuit?

12                   MR. MANGINI:  Object to form.

13      A    I think he should have acted like an

14  officer at Kutztown University acted the day I was

15  arrested, which was refused to arrest me.

16      Q    I'm sorry.  Could you repeat that?

17      A    I think I should have acted like an

18  officer at Kutztown University in 2007 acted, which

19  was this officer at Kutztown University refused to

20  arrest me when instructed to do so by the chief of

21  police there.

22      Q    But you subsequently were arrested at

23  Kutztown University; correct?

24      A    By another officer.

25      Q    Okay.  So one of the reasons then why

1              JAMES DEFERIO

2   you've named Jamey Locastro as a defendant in this

3   suit is because -- I guess I'm confused here because

4   he didn't arrest you, so you're saying that he

5   shouldn't have arrested you but he did?

6        A    No.  He shouldn't have told me he was

7   going to arrest me to begin with.

8        Q    Which he did, I believe, after you said

9   he told you you could be arrested a number of times?

10                  MR. MANGINI:  Object to form.

11       A    He plainly stated that I would be

12   arrested if I didn't go across the street.

13       Q    And that was subsequent to --

14       A    And that's when I said I would comply and

15   I went across the street, after I asked for a

16   clarification about what law would I be breaking.

17       Q    And that was subsequent to him saying

18   that you could be arrested?

19                  MR. MANGINI:  Object to form.

20       A    Yeah.

21       Q    Okay.

22       A    And I understood his definition of "could

23   be" as you would be.

24       Q    Even though he said "could" multiple

25   times?

1                  JAMES DEFERIO

2                  MR. MANGINI:  Object to form.

3        A    His authoritative statement at the

4   conclusion of all that was "you would be arrested."

5        Q    Okay.  Why was that authoritative as

6   opposed to the times he said "could"?

7        A    'Cause he said he would make this very

8   clear to me.

9        Q    He said what?

10       A    He said he would make it very clear to

11  me.

12       Q    Would make what very clear?

13       A    What "could be" means.

14       Q    Okay.  So what was that in response to?

15                  MR. MANGINI:  Object to form.

16       A    It was in response to me asking him if I

17  would be arrested, not if I could be.

18       Q    Okay.  Mr. Deferio, I'm going to show you

19  what's been previously marked as Exhibit E.  Do you

20  recognize -- extra one....  I'm sorry, Tony.  You'll

21  have to share.  I only have two copies of each.

22                  Do you recognize Exhibit E or what's

23  depicted in Exhibit E?

24       A    Yes.

25       Q    And what do you recognize that to be?

1                    JAMES DEFERIO

2        A     It's my banner.

3        Q     When you say --

4        A     My scripture banner.

5        Q     And is this a banner that you use as part

6   of your public preaching?

7        A     Yes.

8        Q     When you -- the second sentence where it

9   states, "Do not be deceived.  Neither fornicators nor

10  idolators nor adulterers nor homosexuals nor

11  sodomites nor thieves nor covetous nor drunkards nor

12  revilers nor extortioners shall inherit the kingdom

13  of God," why is "homosexuals," "adulterers,"

14  "fornicators" and, "Do not be deceived," underlined?

15                    MR. MANGINI:  Object to form.

16       A     To emphasize that there are people who

17  have deceived themselves into thinking sexual sins

18  are okay.

19       Q     Okay.  And was there any reason why you

20  didn't underline some of the other words in that

21  sentence?

22       A     Yeah.

23                    MR. MANGINI:  Object to form.

24       A     Having read some medical papers, having

25  visited the Centers for Disease Control websites

1                    JAMES DEFERIO

2   numerous times and read their literature, having two

3   medical workers in my family, it became very clear to

4   me that sexual sins often result in great personal

5   cost with afflictions that are with a person for a

6   lifetime.

7        Q    And this is sexual sin as defined by you?

8             MR. MANGINI:  Object to form.

9        A    No.

10       Q    You've indicated that you don't want your

11  message to anger or upset people, is that correct,

12  the message that you publicly preach?

13       A    I didn't say that as a blanket statement.

14       Q    Well, let's look at your sworn statement.

15  Please go back to Exhibit B, look at Paragraph

16  Number 9.  This is your sworn affidavit that was

17  submitted as part of this suit.

18       A    Which one?  Oh.  What paragraph?

19       Q    9.  You might have the wrong document.

20       A    Oh.

21       Q    Okay.  See Paragraph 9?

22       A    Yeah.

23       Q    Okay.  And referring back to Exhibit E,

24  the sign that you have described as being pictured in

25  Exhibit E, is your testimony here today that you

1                    JAMES DEFERIO

2  believe that this sign actually furthers friendly

3  conversations with people?

4                    MR. MANGINI:  Object to form.

5       A    Are you -- can you restate that?

6  Concerning whether it's intents or by practice?

7       Q    No.  I'm sitting here saying your sworn

8  statement under --

9       A    Yeah.

10      Q    -- oath is, "I want to display signs with

11  Bible verses on them further drawing interest in

12  friendly conversations"?

13      A    Yes.

14      Q    And I'm asking:  You really believe that

15  this sign is going to promote friendly conversations?

16                    MR. MANGINI:  Object to form.

17      A    It has.

18      Q    Okay.  Calling people sodomites then, in

19  your opinion, is a way to promote friendly

20  conversations?

21                    MR. MANGINI:  Object to form.

22                    This is kind of getting close to

23                    harassment.

24                    MR. SICKINGER:  I don't care what

25                    you think, Mr. Mangini.  I'm asking a

JAMES DEFERIO

1

2          question.  There's nothing improper

3          about that question.  If you have a

4          personal opinion, that's irrelevant to

5          it.  If you have a legal objection,

6          please state it.

7   BY MR. SICKINGER:

8          Q     You really think calling people sodomites

9   promotes a friendly conversation?

10         A     I am not personally calling anybody a

11  sodomite.  That's a Bible verse.  It applies to whom

12  somebody chooses to acknowledge it for their own

13  lifestyle.

14         Q     Okay.

15         A     So, if they don't see themselves as a

16  sodomite, there's nothing I can do about that.

17         Q     You've never called anyone a sodomite?

18                    MR. MANGINI:  Object to form.

19         A     I try not to use that word.

20         Q     But you have?

21         A     I....

22                    MR. MANGINI:  Object to form.

23         A     I'll refer to Sodom and Gomorrah, Admah

24  and Zeboiim --

25         Q     Have you ever called anyone a sodomite as

                              JAMES DEFERIO

1

2    part of your public preaching?

3                    MR. MANGINI:  Object to form.

4         A    I may have at one time or another, but

5    it's a perfectly good Bible word.

6         Q    Okay.  And it's one that you believe

7    promotes friendly conversations with people?

8                    MR. MANGINI:  Object to form.

9         A    It has.

10        Q    Okay.  And you believe that calling

11   people fornicators promotes friendly conversation

12   with people?

13                   MR. MANGINI:  Object to form.

14        A    It has.

15        Q    Does it always?

16        A    No.

17        Q    In fact, it's caused people to be hostile

18   toward you; correct?

19                   MR. MANGINI:  Object to form.

20        A    Verbally hostile, yes.

21        Q    And that's occurred on more than one

22   occasion?

23        A    Yes.

24        Q    Mr. Deferio, I'm going to show you what's

25   been marked as Exhibit F.  Do you recognize what's

1                    JAMES DEFERIO

2    depicted in Exhibit F?

3         A     Yes.

4         Q     And what do you recognize that to be?

5         A     A scripture banner with some added words.

6         Q     And is this a sign that is your personal

7    property?

8         A     Yes.

9         Q     When you say at the top of the sign "The

10   problem," what do you mean?

11        A     It's very self-evident 'cause it explains

12   it right underneath.

13        Q     Okay.  So you're saying then the problem

14   is the text that's contained below it?

15                    MR. MANGINI:  Object to form.

16        A     I'm saying that the problem is that

17   everybody is going to have a consequence of death

18   because of their sin in one way or another.  Ten out

19   of ten people die.  And I explain that in friendly

20   conversation with people.

21        Q     Okay.  And friendly conversation includes

22   your statements that you believe homosexuality is a

23   sin?

24        A     Yes.

25        Q     Have you made or publicly posted that

                          JAMES DEFERIO

1

2    statement on a sign at any of the Syracuse Pride

3    Festivals or Parades, that homosexuality is a sin?

4         A     Yes.

5         Q     And so this sign, "The problem for the

6    wages of sin is death," so you're saying then that

7    the problem is that homosexuality results in death?

8                    MR. MANGINI:  Object to form.

9         A     This is a spiritual message, and the

10   death that the spiritual message is speaking of is

11   spiritual death.  The physical death happened with

12   the original sin.

13        Q     Does your sign in any way clarify that

14   you don't actually mean physical death?

15        A     Well....

16                    MR. MANGINI:  Object to form.

17        A     -- the bottom part of that verse would,

18   seem to me, make it clear that it's a spiritual

19   message.

20        Q     Okay.  It's clear to you, but again I'll

21   ask the question.  Does your sign in any way indicate

22   that the death you refer to is not physical?

23                    MR. MANGINI:  Object to form.

24        A     In today's culture, I can't be sure about

25   what anybody thinks about anything.  This culture has

1                      JAMES DEFERIO

2    been dumbed down to a great extent, so my -- the

3    reason why I'm there is to share the Bible verse,

4    Bible verses, and then to explain them to them.  And

5    I explain this to a great many people, even people

6    who were agitated at first, who calm down.

7         Q    The question is not about the dumbing

8    down of society, Mr. Deferio.  My question is:  Does

9    your sign in any way indicate that the death you

10   refer to is not physical?  It has nothing to do with

11   your view of society.

12        A    My looking at that, it's a spiritual

13   message.  It's from the Bible.

14        Q    I'm not asking about the message.  I'm

15   asking:  Does the sign indicate that the death you're

16   referring to is not physical?  That's all I'm asking.

17        A    Can you restate the question without that

18   negative?

19        Q    Is the word "death" in this...the word

20   "death" in this Exhibit F, is there anything else in

21   the sign that's depicted in that exhibit which

22   indicates that the word "death" is not physical?

23        A    It's a spiritual message.

24        Q    So is that a no?

25                      MR. MANGINI:  Object to form.

1                    JAMES DEFERIO

2        A    That's my answer.  It's a spiritual

3   message.

4        Q    Okay.  So you're not going to answer the

5   question?

6        A    I did.

7                    MR. MANGINI:  Object to form.

8        Q    Okay.  Well, your definition of an answer

9   and mine are very different then.

10              Mr. Deferio, you've held this sign or

11  signs like it at the Syracuse Pride Parade and

12  Festival; correct?

13       A    Yes.

14       Q    And those at times have elicited a

15  hostile response?

16       A    At the Syracuse Pride Festival, not

17  this -- not these two signs.

18       Q    But signs with similar messages?

19       A    No.

20       Q    No?  What signs have elicited a hostile

21  response at the Syracuse --

22       A    The other sign that you took a photograph

23  of.

24       Q    Which is?

25       A    "Thousands of ex-homosexuals have

1                    JAMES DEFERIO

2    experienced life-changing love of Jesus Christ.

3    Check out their testimonies at," and I give three

4    websites and there's a big rainbow heart.  That is

5    the banner.

6         Q    Did you have that banner in 2014?

7         A    2015.

8         Q    So you brought it to the 2015 Pride

9    Festival?

10        A    Yes.

11        Q    Did you have it prior to 2015?

12        A    Yes, but I didn't use it at the Pride --

13   I believe I used it at the 2013 Pride Festival.

14        Q    And for some reason you didn't use it at

15   the 2014?

16        A    Correct.  I used this banner at the 2014.

17        Q    If you go to Exhibit B, Paragraph

18   Number 12, you state, "I don't force anyone to

19   listen"; see that?

20        A    Yes.

21        Q    You've also testified that you use a

22   sound amplification device, so how does someone not

23   have the option to listen if you're using a sound

24   amplification device?

25                    MR. MANGINI:  Object to form.

1                   JAMES DEFERIO

2        A     I'm usually set up in the locations where

3   people are passing by, not where people are

4   stationary and in a position where they can't move.

5   So I don't have a captive audience when I do street

6   preaching.  And when I go to college campuses and

7   large-crowd forums, I'm using my bare voice and they

8   can come and go if they want to.  Most choose to skip

9   classes so that they can talk to me.

10       Q     Okay.  So, again, if you'd answer my

11  question, this will go much more quickly.  How is it

12  that someone has the ability to not listen to you if

13  you are using a sound amplification device?

14                   MR. MANGINI:  Object to form.

15       A     What this is getting at is that I'm not

16  following people around.  If somebody ignores the

17  message, I do not go after them.  I do not trail

18  them.  I'm not a Bible thumper in that sense of the

19  word.  I speak a message.  I'm in a stationary

20  position.  And when I do what I call street

21  preaching, people are coming and going and no -- I'm

22  not forcing anyone to listen to me.

23                   And if there were -- if I happen to be in

24  a location where there's tables set up and people are

25  eating, I will give a brief message and I'll turn

1                    JAMES DEFERIO

2    around to the other side so that -- not to bother

3    their experience of eating outside at a restaurant,

4    for example, Cafe Kubal downtown.

5         Q    Okay.  Well, can I have you look at

6    Paragraph 13, Exhibit B, please?  Do you see the

7    second sentence of Paragraph 13?

8         A    Yes.

9         Q    And that sentence reads, "I know that

10   some people don't like what I have to say, but I'm

11   respectful of others and their opinions and I don't

12   intend to insult anyone."  Do you believe that's an

13   accurate statement?

14        A    Yes.

15        Q    Do you believe that calling someone's

16   religion a cult would be insulting to them?

17                    MR. MANGINI:  Object to form.

18        A    They may take it as an insult.

19        Q    Well, it's certainly not a compliment.

20                    MR. MANGINI:  Object.

21        Q    So how else would someone take it?

22                    MR. MANGINI:  Object to form.

23        A    As a truth statement.

24        Q    Okay.  So you believe, because your

25   opinion is that it's true, it's not an insult?

1                    JAMES DEFERIO

2                    MR. MANGINI:  Object to form.

3        A      You can say it's my opinion but....

4        Q      Well, is it not your opinion?

5        A      No, it's not my opinion.

6        Q      So you don't believe that the Mormon

7   church is a cult?

8        A      Again, what I said earlier this morning,

9   that the Bible is a canon, which means the measuring

10   stick and you measure other truth claims by it, so,

11   according to that measuring stick, Mormonism --

12       Q      Okay.  Mr. Deferio --

13       A      -- falls short.  It doesn't measure up.

14       Q      -- I don't care about that.

15       A      Okay.

16       Q      All I'm asking is:  Were you accurate in

17   your statement earlier or are you accurate in your

18   statement now, that your opinion is not that

19   Mormonism is a cult?

20                   MR. MANGINI:  Object to form.

21       A      It's not my opinion.

22       Q      So you don't believe that?

23       A      If I was an atheist, why would I have

24   that -- an opinion like that?

25       Q      I don't know why you would think that nor

1                    JAMES DEFERIO

2    does it matter to the question, Mr. Deferio.  I am

3    trying to get you through this examination.  We are

4    going to be here for a very long time if you persist

5    with this.  I would like to avoid that.  If you would

6    simply answer the question I'm presenting to you,

7    this will go much more quickly.  It will go much more

8    smoothly.

9                    So, again, you've testified earlier this

10   morning it is not -- that it was your opinion that

11   the Mormon church and the Roman Catholic church were

12   a cult, but now you're saying that it is not your

13   opinion that Mormonism is a cult.  I'm trying to

14   understand which one is the truthful and accurate

15   statement.

16                    MR. MANGINI:  Object to form.

17        A    If you're using "opinion" as it's just

18   merely my subjective view of what they're doing and

19   it's not based on anything else, you could use

20   "opinion" like that.  But if my opinion is shaped by

21   truth and I examine truth claims against the canon of

22   scripture of the Bible --

23        Q    Let's define "opinion" as your personal

24   belief.  Is your personal belief then that Mormonism

25   is a cult?

JAMES DEFERIO

2    A    It's my belief that the Bible is true and
3    the Bible itself measured against these other truth
4    claims shows them to be cultic.

5    Q    So you believe then...when you say in
6    Paragraph 13 that you're respectful of others and
7    their opinions and you don't intend to insult anyone,
8    you believe then that your statements that Roman
9    Catholics and Mormons are part of a cult is neither
10   insulting nor is it disrespectful?

11              MR. MANGINI:  Object to form.

12   A    Yes.  It's an expression of love --

13   Q    Okay.

14   A    -- just like when somebody in Southern
15   California came up to me and told me about Roman
16   Catholicism, I view that as an expression of love to
17   me, even though I was angry at the person at first.

18   Q    Have you ever stated, "One can never
19   believe a Muslim"?

20   A    Yes.

21   Q    And you don't believe that that statement
22   might be insulting or disrespectful to someone?

23              MR. MANGINI:  Object to form.

24   A    The statement was intended for
25   non-Muslims, and that's on my Facebook page.

1                    JAMES DEFERIO

2        Q     Okay.  But is there any way that you

3   filtered it so that a Muslim would not see that?

4        A     I don't have any Muslim friends.  I have

5   ex-Muslim friends.

6        Q     Well, if you go around posting that one

7   can never believe a Muslim, I'm not surprised you

8   don't have any Muslim friends, Mr. Deferio.  I'm just

9   trying to understand:  What is it that you've done

10  then to ensure that no Muslim would see that, if

11  that's what you're saying?

12                    MR. MANGINI:  Object to form.

13       A     Yeah, George Bush had Muslim friends,

14  Saudi Arabians, that and look what happened to --

15       Q     Okay.  Well, he's not a plaintiff in this

16  suit.

17       A     Again, I read this book cover to cover.

18  Lying is permitted in Islam, and you can never

19  believe a Muslim when they're speaking to somebody

20  they regard as somebody who's apostate from the

21  Muslim religion or somebody they consider an infidel

22  or an unbeliever or an idolater, and they consider

23  Christians to be all three and they consider Jews to

24  be two of those.  It states right here -- if you're

25  talking about insulting people, it says, "Take

JAMES DEFERIO

1

2    neither Christians or Jews as your friends for

3    they're friends with one another."

4        Q    Have you ever said or posted, and I

5    quote, "It is difficult trying to reason with Mormons

6    because they have, for the most part, cast

7    rationality aside and allowed feelings to control

8    them.  In this respect, they are like

9    homosexualists"?

10       A    Mm-hmm, yes.

11       Q    And again, you believe that that

12   statement was made with no intent to be disrespectful

13   of others and to be respectful of their opinions?

14       A    That's addressed to my Facebook friends.

15       Q    Is it not --

16       A    And they're all Christians.

17       Q    Okay.  But is it not something that could

18   then be reposted or forwarded by someone else?

19       A    People can do with certain things --

20       Q    Is that a yes?

21       A    Yes.

22       Q    Okay.  So it can be.  So, again, you

23   believe it's okay then to have messages that are

24   not -- well, strike that.

25            Your testimony then today is that in

1          JAMES DEFERIO

2    public you're always respectful of other people's

3    opinions or religions but in private you're not?

4                    MR. MANGINI:  Object to form.

5        A     What I'm -- when it states I'm respectful

6    of their opinions, it's not their opinions about

7    matters of -- that are black-and-white.  They could

8    have opinions about other things, for example, about

9    their journey in life after traumatic events that

10   happen in their life.  For example, many people who

11   claim to be homosexual were sexually molested as a

12   child or had a bad relationship with a parent.  And

13   so I'm respectful of their opinion, how they came

14   through these things.

15                   By the way, in 2013, one young woman who

16   was screaming at me --

17       Q     I don't care, Mr. Deferio.

18       A     -- started crying and told me she was

19   sexually molested and that's how she became a

20   lesbian.  And she gave me a hug for standing there

21   and listening to her and showing love towards her.

22       Q     Mr. Deferio, I simply don't care, and

23   it's not relevant to anything --

24       A     I believe you don't care.  I do believe

25   you don't care.

                        JAMES DEFERIO

1

2       Q      Your interactions --

3       A      And that's what separates me from you.

4       Q      Okay.  Well, I don't care about your,

5   quite frankly, offensive outrageous positions about

6   religion and other topics, but you have a right to

7   your misguided opinion.  I'm not here to talk about

8   that.  I'm here to talk about the lawsuit that you

9   brought against the City of Syracuse and others.  You

10  seem to want to talk about anything but that.  So,

11  again, how is it then -- strike that.

12             Your testimony here today is that in

13  public you're respectful of other people and their

14  religions and their opinions, but yet you suddenly

15  can turn it off when you're in private?

16                        MR. MANGINI:  Object to form.

17      Q      Yes or no, Mr. Deferio.

18      A      I meet people where they are.

19      Q      So you don't have an answer for this?  If

20  you don't want to answer these questions,

21  Mr. Deferio, perhaps you shouldn't have brought this

22  lawsuit.  Are you going to answer this question or

23  not? so we can please move on.

24      A      What's the question?

25      Q      So your positions as you sit here today

JAMES DEFERIO

1
2    is you have the ability to somehow turn off and on

3    your statements as to whether or not they're

4    disrespectful or insulting of other people's

5    religions based on whether or not you're in public or

6    not?

7                    MR. MANGINI:  Object to form.

8        Q    Okay.  I'll ask it differently, make it

9    easier.  Why should we believe you when you say then

10   that in public you're respectful of other people when

11   clearly in your private statements or what you

12   perceive to be private statements you're clearly not?

13                    MR. MANGINI:  Object to form.

14       A    Well, I suppose you could -- there's lots

15   of recordings from the Inner Harbor of myself, video

16   and, I'm sure, other people.  I saw people making

17   many other recordings.  Why don't you search those

18   recordings and see what I said?

19       Q    Okay.  Why don't we read your own words.

20   You indicated that you told Mormons -- you described

21   an incident when you were out for a walk with your

22   wife where you then told them that their religion is

23   a cult.  Do you remember posting something like that,

24   to that effect, on Facebook?

25       A    What year was that?

1                          JAMES DEFERIO

2          Q      I couldn't tell you what year that was.

3          A      I thought you were looking at the

4     screenshot right there.

5          Q      You don't post the actual years on these,

6     Mr. Deferio.  It just says the date.  So again I'm

7     asking:  Do you recall posting something to that

8     effect?

9                          MR. MANGINI:  Object to form.

10         A      Can you read that again?

11         Q      I'm paraphrasing it here.

12         A      Well, can you read it?

13         Q      Yes.  I know --

14         A      How can I agree to a paraphrase?

15         Q      Mr. Deferio, I can ask the question any

16    way I want.  Again, if you didn't want to answer

17    these, you should have thought about that before you

18    brought this lawsuit.

19                 Do you recall an incident where you were

20    taking a walk with your wife and you came across two

21    Mormon gentlemen?

22         A      What city was that?

23         Q      Mr. Deferio, do you typically go out for

24    walks every night in other cities?

25         A      Yes.

1          JAMES DEFERIO

2               MR. SICKINGER:  Mr. Mangini, your

3               client is clearly trying to avoid

4               answering my questions and he's

5               clearly prolonging this for no

6               necessary reason.  Now, he can either

7               start answering these questions or I'm

8               going to stop this deposition and call

9               the judge about this 'cause this is,

10              quite frankly, getting ridiculous.

11              MR. MANGINI:  I don't think --

12    A    You need to state city because I travel

13 across the country many times.

14    Q    Okay.  In Syracuse.  I'm trying --

15    A    I think you're referring to Louisville,

16 Kentucky.

17    Q    It would be more helpful if your postings

18 had a year on them, but let me see.

19    A    I can access that and they all have a

20 date on it.

21    Q    Well, let me see.

22              MR. MANGINI:  Can we take a

23              break?

24              MR. SICKINGER:  Sure, let's take

25              a break.

1                    JAMES DEFERIO

2                    THE VIDEOGRAPHER:  We'll go off

3              record at 3:20.

4                    (Whereupon, a brief recess was

5              taken.)

6                    (Documents marked for

7              identification as Exhibits I, J and K,

8              this date.)

9                    THE VIDEOGRAPHER:  We're back on

10             record at 3:39.

11   BY MR. SICKINGER:

12        Q    Mr. Deferio, I'd ask you to look at what

13   you've previously been handed and what's in front of

14   you.  I believe it was marked as Exhibit I.

15        A    Mm-hmm, yes.

16        Q    Do you recognize that document?

17        A    Yes.

18        Q    What do you recognize it to be?

19        A    Photo on Syracuse.com.

20        Q    And do you know what that photo is from?

21        A    Yes.

22        Q    What was it?

23        A    When I was ministering near the Inner

24   Harbor at the Syracuse Pride Festival.

25        Q    And that was in 2014 according to the

1                    JAMES DEFERIO

2      article?

3           A      Yes.

4           Q      And the couple that's pictured in the --

5      in front of you, the women in the wedding dress and

6      in the yellow shirt, were they participating in a

7      marriage ceremony at the time, to your recollection?

8           A      No, not at the time.

9           Q      Do you recall, did they get married at

10     the Pride Festival that year?

11          A      They never got married.

12          Q      What -- I guess let me ask you this

13     question.  Do you know what street you were on or

14     where exactly you were located when that picture was

15     taken?

16          A      This would have been Kirkpatrick Street.

17          Q      And based on the picture being there, you

18     were not removed from that location; is that correct?

19                    MR. MANGINI:  Object to form.

20          A      I don't recall if this was before I was

21     asked -- no.  This would have been after I was asked

22     to move.  And what I recall about this is that they

23     came over just to mock me, then left.  It was very

24     short.  They made a very short visit.

25          Q      Okay.  But you're clearly in close

JAMES DEFERIO

1
2    proximity to some of the attendees at the Pride
3    Festival?
4         A    Not in the way I hoped.
5         Q    All right.  Well, I'll take that as a
6    yes.
7              The sign that you're holding, is that a
8    sign that you own?
9         A    Yes.
10        Q    And is that a sign that you had used at
11   other times when you were preaching about
12   homosexuality?
13        A    I rarely use it for that purpose.
14        Q    Well, the fact that it again refers to
15   homosexuals and sodomites, you don't use this sign to
16   address your views on homosexuality?
17        A    I rarely use it for that purpose.
18        Q    Okay.  But you were using it at the Pride
19   Festival for that purpose in this picture; correct?
20        A    Yes.
21        Q    Have you used that sign at other Pride
22   Festivals?
23        A    I may have.  I don't recollect.  Usually
24   I use the ex-homosexuals banner.  But they've already
25   seen that numerous times, so I decided to use this

1           JAMES DEFERIO

2    one.

3         Q     Mr. Deferio, I'm going to show you what's

4    been marked as Exhibit K.  Whoops, I think I just

5    gave you two copies.  Sorry.  I think I gave you

6    mine.

7                    MR. MANGINI:  Oh, okay.

8         Q     If you would just take a minute to look

9    that over, Mr. Deferio.  You don't have to read it

10   line by line but just generally to familiarize

11   yourself with it.  Just let me know when you're

12   ready.

13        A     Okay.

14        Q     The document that is in front of you as

15   Exhibit K, have you ever seen this document before?

16        A     No.

17        Q     Okay.  Do you recall any point in time --

18   and I'm not asking for the content of any

19   communications you had, but do you recall assisting

20   your attorneys with responding to some requests for

21   admissions that the city sent in?

22        A     Yes.

23        Q     Okay.  And if I told you that this was

24   the response that your attorney ultimately sent, do

25   you have any reason -- sent us, would you have any

                    JAMES DEFERIO

1

2   reason to believe that that's not accurate?

3        A    That's what the -- my attorney said.

4   I --

5        Q    Okay.

6        A    -- don't doubt it.

7        Q    Well, I'll just note for the record this

8   is a copy of the request -- the response to the

9   request for admissions that we received from your

10  attorney on your behalf.

11             MR. MANGINI:  Mm-hmm.

12       Q    And if you would turn to the second page,

13  there's a number of statements that you were asked to

14  either admit or deny that pertain to your Facebook

15  account.  They begin at Request Number 3 at the top

16  of the page.  Do you see that there?

17       A    Yes.

18       Q    Okay.  And if you look at Request

19  Number 8 -- or excuse me.  If you look at Request

20  Number 5, it says that Facebook has security settings

21  and then your response is that you lack personal

22  knowledge to admit or deny this request.  As you sit

23  here today, are you aware whether or not Facebook has

24  security settings?

25             MR. MANGINI:  Object to the form.

JAMES DEFERIO

1

2      A      Restate the question.

3      Q      Sure.  As you sit here today, do you have

4  any answer to Question or Request Number 5, and that

5  is to say, as you asked to rephrase it, do you know

6  whether or not Facebook has security settings --

7      A      Yes.

8      Q      -- that are optional?

9      A      Yes.

10     Q      They do, okay.  And are you aware that

11 one of the options is to have a what's called public

12 account?

13                 MR. MANGINI:  Object to form.

14     A      Yes.

15     Q      Okay.  And are you aware that if you post

16 any material to a public account or the public

17 portion of an account on Facebook that it's available

18 to any Facebook user to review?

19                 MR. MANGINI:  Object to form.

20     A      No.

21     Q      Okay.  So you're not aware that if you

22 post a message or content to a public account or to

23 an account that -- yeah, to a public account that

24 it's available to any Facebook viewer to review?

25                 MR. MANGINI:  Object to form.

JAMES DEFERIO

1

2      A      I have another Facebook account and I'm

3    not friends with myself and some of my public things

4    are not available to -- on my other Facebook account

5    for me to view.  For example, my Facebook notes, that

6    even if I put them on -- for public I cannot view

7    them on another Facebook account.

8      Q      So you have another Facebook account

9    that's not been previously disclosed?

10      A      One that's not being -- that's not

11    active.

12      Q      Okay.

13      A      Active in the sense that I do not post.

14    I do answer anything on it.  I was going to use it

15    for college students, and I decided not to.  And I

16    haven't deleted it yet, the account.

17      Q      So there is content on there?

18      A      Huh?

19      Q      There is content on that account?

20      A      Brief content with a certain student from

21    Buffalo State University -- no, no.  From Buffalo

22    State College.

23      Q      And do you know what the profile user

24    name is for that account?

25                    MR. MANGINI:  Object to form.

1                          JAMES DEFERIO

2          A      Yes.

3          Q      Okay.  What is it?

4          A      "The truth," and then space, "sets free."

5          Q      Okay.  Well, defendants will make a

6    request -- place a request now that all content from

7    that account be provided to us as it was not

8    previously disclosed nor was the existence of that

9    account previously disclosed.

10              Going back to what's been marked as

11   Exhibit K, Mr. Deferio, so I guess I'll ask the

12   question again because I'm not clear whether or not

13   you answered that.  Are you aware that if you post

14   content to a Facebook account that is a public

15   account that any Facebook viewer is available to

16   review it --

17              MR. MANGINI:  Object to form.

18         Q      -- or it's available to them to review

19   it?

20         A      I'm not aware that everything can be

21   viewed.

22         Q      All right.  So you're not aware that if

23   you post something to a public account that any

24   Facebook user can review it?

25         A      Correct.

1                    JAMES DEFERIO

2        Q    Okay.  If I told you that we were able to

3   obtain all the quotes that I had previously -- or

4   statements of yours I was previously addressing from

5   Facebook because you put them on a public account,

6   would you have any reason to believe that that's not

7   accurate?

8                    MR. MANGINI:  Object to form.

9        A    No.

10       Q    So -- well, let me ask it this way.  You

11  have a user account under the user profile name

12  Jim Deferio, correct, on Facebook?

13       A    Yes.

14       Q    Okay.  And you frequently post content on

15  that account?

16       A    Yes.

17       Q    And do you know everyone who you are,

18  quote, friends with on that account?

19       A    In what capacity?

20       Q    Do you know who they are?

21       A    You mean on a personal basis?

22       Q    Do you know their name?  Do you know who

23  they are?  Is there anyone who's a friend of yours

24  that you don't know who it is?

25       A    No.

                         JAMES DEFERIO

1

2          Q     Okay.  So let me ask you it this way

3     then.  To your knowledge, would there be any other

4     way that we would be able to obtain these other than

5     you having publicly posted all the content?

6          A     I don't know what you have.

7          Q     Okay.  Well, we can rectify that.

8                      (Discussion off the record.)

9                      (Document marked for

10                     identification as Exhibit L, this

11                     date.)

12    BY MR. SICKINGER:

13         Q     Okay.  Mr. Deferio, since you indicated

14    you don't know what we have, I'm going to show you

15    what's been marked as Exhibit L, and we will advise

16    you to cut to the chase that these are all

17    screenshots of postings from your Facebook account,

18    which were all publicly available and that our office

19    screenshotted and then provided to your attorney in

20    discovery as we begin at Bates number 0208.

21               Let me know when you're ready.  You're

22    all set?

23         A     Yes.

24                     MR. SICKINGER:  Okay.  I would

25                     just note for the record, Mr. Mangini,

                        JAMES DEFERIO

1

2              that since we were not even advised of

3              the existence of Mr. Deferio's other

4              Facebook account, and despite

5              requesting it, that we're going to

6              reserve our right to depose him on any

7              new content which is provided from

8              that account, but we can obviously

9              deal with that at a later date and

10             time depending on what's provided.

11       Q    Mr. Deferio, if you'd hold onto Exhibit L

12  for me, I'm going to ask you some questions about it.

13             MR. SICKINGER:  I'm sorry.  Could

14             you read back my last question?

15             (Discussion off the record.)

16             (Whereupon, the requested portion

17             of the record was read.)

18  BY MR. SICKINGER:

19       Q    Now that -- Mr. Deferio, now that you've

20  seen the documents that are Bates stamped 0208 -- or

21  excuse me.  Actually starts at an earlier number.  I

22  just have mine out of order.

23             MR. MANGINI:  There's the Bates

24             stamp number.

25             THE WITNESS:  Okay.

1                    JAMES DEFERIO

2          Q    I'll get the exact numbers later for the

3    record, but, in any event, the documents that I just

4    showed you that have been marked as Exhibit L, now

5    that you've seen them, are you able to answer my last

6    question, which was:  Is there any -- are you aware

7    of any way that we would have obtained this content

8    if it were not publicly posted by you?

9          A    This was publicly posted by me.

10         Q    Okay.  Well, let's go back about half an

11   hour ago or so.  Didn't you testify that only your

12   friends can see your comments that are posted on

13   Facebook?

14         A    No.

15         Q    What did you testify to?

16         A    I said they're meant for my friends.

17         Q    Oh, okay.  So your comment -- your

18   testimony then is not that only your friends can see

19   it; it's that you only mean for them to see it?

20         A    It's instructions for my friends.

21         Q    Okay.  So I'm going to ask the question

22   again, and this is why we had this hiccup here last

23   time, Mr. Deferio, and I'm trying to proceed with

24   this.  If you just answer the questions before you,

25   we can get through this much more quickly.

1                    JAMES DEFERIO

2          So your testimony here today is that you

3     post comments and content on Facebook that any member

4     or user can see but that you only intend for your

5     friends to see it?

6                    MR. MANGINI:  Object to form.

7          A     I address them for my friends.  If

8     somebody wants to eavesdrop, they can do that.

9          Q     Why don't you make it a private posting

10    then if you only want your friends to see it?  Why

11    don't you let it just to people who are your friends?

12         A     Because there's people who aren't my

13    friends and who have requested me as a friend but I

14    don't accept a friend request for certain reasons.

15         Q     Okay.  What are those reasons?

16         A     One of them is that sometimes the friends

17    of friends can cause trouble for people on Facebook.

18         Q     Okay.  So then, again, why don't you post

19    these things privately?

20         A     Because I intend to have these for

21    friends, people that I know...I know a lot of street

22    preachers...who would read these posts and maybe get

23    something out of it, whether it's a news item or

24    maybe something I mention about the mind-set of

25    Mormons, for example, or the mind-set of what I --

1              JAMES DEFERIO

2   who I call homosexualists.

3        Q    Okay.  So, again, you don't adjust the

4   privacy settings so that only your friends can see it

5   because you want people who are not your friends on

6   Facebook to be able to view it?

7        A    I want people who are my friends but are

8   not formally my Facebook friends to view them.

9        Q    Okay.  But you're aware that any member

10  of the public who has a Facebook account can review

11  the postings that are contained in Exhibit K?

12                  MR. MANGINI:  Object to form.

13       A    In a public setting, a setting where

14  these posts are public, so somebody who wants to

15  snoop could do so.

16       Q    Well, how is it snooping if you put it

17  out there publicly for the whole world to see?

18                  MR. MANGINI:  Object to form.

19       A    It's called trolling, and there's people

20  who aren't content with their own lives and they want

21  to see what everybody else is doing, people that --

22       Q    That sounds like an accurate description

23  of someone here.  Yes?

24       A    Yes, because since I didn't go to your

25  Facebook, if you have one, to get screenshots and you

1                    JAMES DEFERIO

2    did this to mine, so I suppose you're speaking of

3    yourself.

4         Q    No.  I was actually referring to you, but

5    again that's beside the point.

6         A    Mm-hmm.

7         Q    If you're going to not answer the

8    question, again I'm going to stop this and just call

9    the judge --

10                  MR. MANGINI:  I think he has.

11        Q    -- because every single question I've

12   asked you since we've come back from the break you've

13   refused to answer.

14        A    I already told you it's a public setting.

15        Q    Okay.  So you're revising your testimony

16   then to -- earlier, only my friends can see it, to,

17   now, anyone can see it but I only want my friends to

18   see it; is that correct?

19        A    No.  They're addressed for my friends for

20   edification, news items.  There's -- I post a lot of

21   news items, making -- sometimes making no comment,

22   sometimes making a small comment.  I have Facebook

23   notes that go into a lot of detail on certain things.

24   Lot of them are public settings but you can't see

25   them, and you can't see them either even though

1                    JAMES DEFERIO

2    they're a public setting.

3         Q      How can we not see them if it's a public

4    setting?

5         A      Take it up with Facebook.  I don't

6    understand that.

7         Q      Well, clearly people -- any member of the

8    public can see this because if you look at the --

9    Page 1 --

10        A      This is not a note.  These are not

11   Facebook notes.

12        Q      Okay.  This is a posting under your

13   account; correct?

14        A      Do you have a Facebook account?

15        Q      Mr. Deferio, we've gone over this before.

16   I'm not under oath and I'm the one asking you the

17   questions.

18        A      That's not what I'm trying to get at.

19        Q      Mr. Deferio, yes or no.

20        A      Do you know what a Facebook note is?

21        Q      Mr. Deferio, I'm asking the questions.

22   Now, either answer the question or I'm stopping this

23   right now and calling the judge.

24        A      I answered the question.

25        Q      What is your answer then?

1                    JAMES DEFERIO

2       A      It's a public setting.

3       Q      Okay.  So you --

4       A      On these anyway.

5       Q      I'm sorry?

6       A      On these.  It's a public setting.

7       Q      So you publicly posted this content on

8    Facebook that's contained in Exhibit K?

9       A      Yes.

10      Q      Okay.  And clearly people who -- any

11   member of the public can see this because the public

12   can post it; correct?

13      A      Yes.

14      Q      Okay.  And in fact --

15                    MR. MANGINI:  Quick, for the

16               record, this is Exhibit L, isn't it?

17                    MR. SICKINGER:  Oh, I'm sorry.

18               Did I refer to it as K?

19                    MR. MANGINI:  I think you did.

20                    MR. SICKINGER:  I meant L.  Thank

21               you, Mr. Mangini.

22                    MR. MANGINI:  Mm-hmm.

23   BY MR. SICKINGER:

24      Q      If you look at the first page of

25   Exhibit L, under June 27th at 9:36 p.m., see the

1                    JAMES DEFERIO

2    second sentence where you post, "The homosexuals and

3    atheists are extremely intolerant and mean-spirited

4    and they were spamming me and making physical

5    threats.  I blocked many people and deleted many

6    photos"?

7         A     Mm-hmm.

8         Q     So that clearly indicates then that

9    you're making public posts to Facebook with content

10   such as contained in Exhibit L?

11        A     Yes.

12        Q     And, in fact, as you describe in that

13   posting on June 27th at 9:36 p.m., some of your

14   postings have caused you to receive physical threats?

15        A     Yes.  Oh, excuse me.  Let me read that.

16   Were you paraphrase -- even with my reading glasses

17   I'm having a hard time here.

18              No, it was not my posts that were causing

19   this.

20        Q     What was causing it?

21        A     Going out in public and preaching in

22   public.

23        Q     Okay.  So your public preaching then was

24   causing physical threats against you?

25        A     So this would have been after the

JAMES DEFERIO

1    Syracuse homosexual festival, and through the

2    newspaper they learned my name so they seek me out on

3    Facebook just to call me names and make threats.

4        Q     So your testimony is then that your

5    public preaching at the Syracuse Pride Festival

6    resulted in people making physical threats to you on

7    Facebook?

8        A     People that may have read the article on

9    Syracuse.com, not necessarily people that were at

10   the --

11       Q     So either --

12       A     -- festival.

13       Q     We can make it broadly.  So either people

14   had seen your preaching and heard you preaching at

15   the Pride Festival or read an account of it on

16   Syracuse.com and that then you believe caused them to

17   send you physical threats on Facebook?

18       A     I believe that was people that read it on

19   Syracuse.com.

20       Q     Okay.  So you don't believe that anyone

21   who heard your preaching or witnessed your preaching

22   at the Pride Festival itself sent you any physical

23   threats?

24       A     No.

1                          JAMES DEFERIO

2          Q     What makes you believe that?

3          A     People that come up and speak to me don't

4    usually ask me my full name, so they don't -- I may

5    say, "Hi, I'm Jim," and they may say, "Hi, I'm

6    Jennifer," or "Bob" or something like that.  They

7    don't ask me my last name, and I usually don't ask

8    them their last name.

9          Q     Do you believe that you're widely known

10   in the local homosexual community?

11         A     Among some people.

12         Q     Okay.  So some of the attendees at the

13   Pride Festival would know who you are just from

14   recognizing you; is that your belief?

15         A     Some, yes.

16         Q     If you turn to the second page of

17   Exhibit L, I'm looking at your posting of June 15th,

18   2015.  Begins in all capital letters "HOMO

19   FLAG-RAISING AND VAN ROBINSON"?

20         A     Mm-hmm.

21         Q     What do you mean by homo?

22         A     Homosexual.

23         Q     And do you believe the word homo is a

24   slur?

25         A     It's abbreviation.

                              JAMES DEFERIO

1

2       Q     So you don't believe that there's any

3   negative connotation to the word homo?

4                   MR. MANGINI:  Object to form.

5       A     They refer to themselves as queer,

6   homo --

7       Q     Not what I asked you, Mr. Deferio.

8       A     -- dyke and other things.

9       Q     Do you believe there's any negative

10  connotation to the word homo?

11                  MR. MANGINI:  Object to form.

12      A     Only for lawyers.

13      Q     Only for lawyers?

14      A     Yes.

15      Q     Lawyers are the only people who believe

16  that that's a term that has a negative connotation?

17      A     I've been to over 70 homosexual events in

18  18 different cities --

19      Q     Yes, we're well-aware --

20      A     -- and --

21      Q     -- that you are a frequent attendee at

22  homosexual events.

23      A     Yes.

24      Q     I'm trying to get to whether or not --

25  why you believe that the word homo has no negative

1                    JAMES DEFERIO

2    connotation.

3                    MR. MANGINI:  Object to form.

4         Q    To anyone other than lawyers.

5         A    Oh.  It's because they use it for

6    themselves.

7         Q    Okay.  Well, aren't there other groups of

8    people who use terms for themselves and doesn't that

9    make that term no less derogatory?

10                   MR. MANGINI:  Object to form.

11        A    Not among certain groups.

12        Q    Are you going to sit there and testify

13   that the N word is not derogatory because African

14   Americans may use that about themselves?

15                   MR. MANGINI:  Object to form.

16        A    If I respond yes or no, then it would --

17   I'd have to explain that.  Since I have spoken to

18   many, many black people, they don't use it in regards

19   to themselves as a derogatory term.

20        Q    Okay, but that wasn't my question.  My

21   question was:  You don't believe that has a negative

22   connotation?

23        A    Not when blacks use it for other blacks.

24        Q    Okay.  So your testimony here as you sit

25   here today then, that the word homo is not something

1                    JAMES DEFERIO

2    that has a negative connotation?

3                    MR. MANGINI:  Object to form.

4         A     For some people it may.

5         Q     Do you believe for homosexuals it may?

6         A     What I have learned over the years is

7    that the word homosexual has a negative connotation

8    to it for some people, using the word homosexual, and

9    the men who identify as homosexual would rather I use

10   and other people use the word gay.  So, you know,

11   these kind of things change all the time from year to

12   year, it seems like, and I'm not out there to try to

13   be politically correct in using what is the latest

14   word that I should be using in regards to a group of

15   people.  I'm going to use the word that best

16   describes these people and homosexual --

17        Q     And you believe homo is that word?

18        A     Homo, homosexual, homosexualist, I refer

19   to those words.

20        Q     You don't believe the word gay would be a

21   better way to describe them?

22        A     No.

23                    MR. MANGINI:  Object to form.

24        Q     Why is that?

25                    MR. MANGINI:  Object to form.

JAMES DEFERIO

1

2      A      Gay doesn't express the sexual attraction

3   they have for one another, whereas homosexual

4   expresses more accurately what's going on

5   biologically with them and why their actions are

6   irrational.

7      Q      Your first sentence there after the all

8   caps in your June 15 posting, "I missed preaching at

9   the homo flag-raising at Syracuse City Hall this

10  morning," you don't believe that that statement has

11  any negative connotation to it?

12     A      It could among some -- certain people.

13     Q      The next paragraph, you say "out."  I'm

14  assuming that's a typographical error for the word

15  "our"?

16     A      Where is this?

17     Q      The second paragraph.  It says, "Out

18  sexually confused mayor, S. Miner hosts this event

19  every year."

20     A      Oh, yeah, that's a typo.

21     Q      And, "Black common council member

22  Van Robinson is always there to represent the

23  Syracuse black community support of sexual

24  perversity"?

25     A      Mm-hmm, yes, that's what I wrote.

1                    JAMES DEFERIO

2      Q    Okay.  What do you mean by -- and again I

3  think you mean "our."  What do you mean by "Our

4  sexually confused mayor, S. Miner"?

5                    MR. MANGINI:  Object to form.

6      A    Her alliance with the Syracuse homosexual

7  community, her activity as grand marshal of the

8  parade one year, and I believe she was chosen another

9  year and I could be wrong about that.  So that's what

10 I meant by that.

11     Q    Okay.  'Cause you disagree with her

12 position on homosexuality, that's why you're stating

13 you believe she's sexually confused?

14     A    Her activism has caused me to think

15 that.  It's not something that occurs just once a

16 year.

17     Q    Okay.  I guess I'm trying to understand

18 the word confused.  Are you just trying to imply that

19 you believe she's mistaken in her beliefs?

20                    MR. MANGINI:  Object to form.

21     A    Well, of course, I believe she's

22 mistaken.  I know she's mistaken in her beliefs.

23     Q    Okay.  Is that all you're trying to relay

24 then in that sentence?

25     A    I think it goes -- it may go deeper than

1                        JAMES DEFERIO

2    that.

3         Q      I'm sorry.  You what?

4         A      It perhaps goes deeper than that.

5         Q      What do you mean by that?

6         A      With people that are activists for

7    certain things, irrational acts by other groups of

8    people, may indicate that there's some confusion on

9    their end also, where they can identify with this

10   group of people.

11        Q      Wouldn't it also be accurate then that

12   people such as yourself who spend so much time and

13   invest so much effort attending homosexual activities

14   and events might actually be homosexual themselves?

15                     MR. MANGINI:  Object to form.

16        A      Well, if you can produce some research to

17   prove that link.

18        Q      I think your attendance record at all

19   these gay events, I think, would speak for itself.

20   You don't seem to ever miss one, Mr. Deferio.

21        A      I miss a lot.

22                     MR. MANGINI:  Object to form.  I

23                think this is getting into harassment.

24        A      I went to 60 college campuses many of

25   times, numerous times, and that doesn't make me a

1            JAMES DEFERIO

2     student.

3          Q     Mr. Deferio, when you say "our sexually

4     confused mayor," you said it may go deeper than that.

5     I'm trying to understand what you mean by that.

6          A     Okay.  I already explained it.

7          Q     Are you implying that you believe she's a

8     lesbian herself?  Is that what you're trying to

9     imply?

10         A     I think there's a possibility, yes.

11         Q     Because she supports gay rights?

12               MR. MANGINI:  Object to form.

13         A     Activist for it.

14         Q     And that's why you think she's

15    potentially a lesbian?

16         A     Yes.

17               MR. MANGINI:  Before we continue,

18               can we -- what's the relevance of

19               these really?

20               MR. SICKINGER:  The relevance is

21               that your client swore under oath that

22               he doesn't make statements that are

23               disrespectful, doesn't attempt to

24               harass anyone, doesn't attempt -- he

25               attempts to be respectful of others

1          JAMES DEFERIO

2          and their opinions, he never intends

3          to insult anyone, on and on, which he

4          swears to under oath and then he goes

5          and posts this.

6               MR. MANGINI:  Yeah.  And --

7               MR. SICKINGER:  So, at the very

8          least, we're contending that your

9          client has potentially perjured

10         himself here in his statement and

11         these postings directly contradict his

12         sworn statement.  So they're entirely

13         relevant, every single one of them

14         that he has posted here, and whatever

15         content is posted on his previously

16         undisclosed and just now made aware to

17         us Facebook account.

18              MR. MANGINI:  I don't think so.

19         The --

20              MR. SICKINGER:  Okay.  Well, if

21         you have an objection to form, state

22         it.  Otherwise, you don't have any

23         objection, Mr. Mangini.  We could have

24         been done by now if your client had

25         simply answered these and moved along

1                    JAMES DEFERIO

2              with this.  Instead, we've had to go

3              over and over and over things.

4    BY MR. SICKINGER:

5        Q    So again I'll ask my question.  The

6    second paragraph, last sentence, you say, "I've yet

7    to see a black Christian from the Syracuse community

8    speak up against this evil," you're referring to

9    homosexuality then as an evil?

10       A    Yes.

11              MR. MANGINI:  Object to form.

12       Q    And in the second-to-last sentence of

13   that posting, when you say, "Robinson is nothing but

14   a perverse race hustler," what do you mean by that?

15              MR. MANGINI:  Object to form.

16       A    Van Robinson has promoted the idea that

17   I-81 is a racial divide in the city that separates

18   the blacks from the near south side and the west side

19   of Syracuse University from the rest of the city and

20   the purpose of that highway was to cause a racial

21   division.  And I have stated on Syracuse.com and

22   other places...and I provided the map showing that

23   the railroad has been there since around 19 -- I mean

24   1862 and I-81 follows that railroad up until close to

25   Adams Street and then the railroad tracks go off to

1                    JAMES DEFERIO

2    the northwest and further divide the city, whereas

3    I-81 as a viaduct doesn't form a barrier through the

4    rest of downtown and that Van Robinson is using race

5    to divide the city.  And it's not the highway that's

6    dividing the city.  It's Van Robinson that's dividing

7    the city because, as a physical divide, the railroad

8    had been there since 1862.

9         Q    In the interest of expediency,

10   Mr. Deferio, the next page you begin in all capital

11   letters your June 20th, 2015, post with "SEXUAL

12   PERVERTS DAY IN SYRACUSE"?

13        A    Yes.

14        Q    Can you tell me what you're referring to

15   there?

16        A    Homosexuality is sexual perversion.

17        Q    And you don't believe that calling

18   someone a sexual pervert could be a derogatory

19   statement?

20                    MR. MANGINI:  Object to form.

21        A    Is calling somebody a child molester when

22   they're a child molester something that is -- is that

23   an insult or is that an accurate description of what

24   they do?

25        Q    One more time and then I'm done and I'm

1                    JAMES DEFERIO

2    calling the judge.  This has gone on way too long

3    with you not answering questions.

4              Don't you believe -- or do you believe

5    that calling somebody a sexual pervert can be a

6    negative or derogatory comment?

7         A    For some people.

8         Q    Who wouldn't, in your opinion, be

9    offended by being called a sexual pervert?

10                  MR. MANGINI:  Object to form.

11        A    The ones that realize they are and the

12   ones that realize what it is.

13        Q    You don't think that anyone else would be

14   offended by being called a sexual pervert?

15                  MR. MANGINI:  Object to form.

16        A    Perhaps -- no, there's -- I would say

17   people that have been programmed to think that

18   whatever expression you -- whatever feeling you act

19   upon in a sexual way is okay.  They may object to

20   that.

21        Q    And you believe then that calling

22   homosexuals sexual perverts is being respectful of

23   others and their opinions?

24                  MR. MANGINI:  Object to form.

25        Q    These are your words in your affidavit,

1                    JAMES DEFERIO

2    Mr. Deferio.

3                    MR. MANGINI:  Object to form.

4        A    My affidavit concerns public preaching.

5        Q    And we've already gone over at great

6    length that these are public postings.

7        A    Mm-hmm.

8                    MR. MANGINI:  Object.

9        Q    And you've already testified that you

10   want people who are not your Facebook friends to be

11   able to view these?

12       A    No.  I said I want people who are my

13   friends, whether they're formally my Facebook friends

14   or not, to view them.

15       Q    You didn't say formally.  You said I want

16   people who are not my Facebook friends.  This is why

17   it takes so long, 'cause you keep trying to revise

18   your answers.

19       A    No, I don't.

20       Q    So, again, you believe that calling

21   someone a sexual pervert is being respectful of them

22   and their opinion?  Yes or no.

23                   MR. MANGINI:  Object to form.

24       A    I can respect somebody's opinion about

25   their life journey, seeing that I used to be a sinner

1                    JAMES DEFERIO

2    myself and was engaged in a sexual sin, not

3    homosexuality but premarital sex, before I became a

4    Christian, and somebody -- I used to be an atheist.

5    I used to be an evolutionist.  I'm very well-educated

6    in these areas of evolution and things like that.

7    And I can see where somebody can be confused about

8    these matters because they go through public school

9    and college and they're taught that as fact.  And I

10   can be respectful of their opinion and how they came

11   to these conclusions, but when they make their

12   opinion -- they state their opinion as a matter of

13   fact and as a truth statement then I can take issue

14   with that and I could --

15        Q     By that logic, wouldn't somebody take

16   issue with you then?

17        A     Of course they do, all the time.  And I

18   don't mind people questioning me whatsoever in that

19   capacity on the street.  I have people coming up to

20   me telling me I'm anti-science because I don't

21   believe evolution, and to which I respond well, give

22   me a definition of science.  And usually people

23   can't.

24        Q     Mr. Deferio, in the interest of

25   expediency, do you have any reason to believe that

1                    JAMES DEFERIO

2     all the postings that are contained in Exhibit L

3     are -- do you have any reason to believe that they're

4     not true and accurate copies of what you've posted on

5     Facebook?

6          A     These are my --

7                    MR. MANGINI:  Object to form.

8          A     These are my statements on Facebook.

9          Q     Okay.  So you have no reason to believe

10    that these are not true and accurate copies of your

11    Facebook postings?

12         A     Can you just ask it in a positive way?

13         Q     Do you believe that these are accurate

14    copies of your Facebook postings in Exhibit L?

15         A     Yes.

16         Q     Okay.  As part of your message, do you

17    ever advocate violence?

18         A     Once.

19         Q     Once?  When was that?

20         A     About a man entering a woman's restroom

21    when somebody's wife or daughter is in there.

22         Q     If I read to you a public posting on your

23    Facebook account that reads, "If some dude goes into

24    the restroom while your wife or daughter is in there,

25    you need to man up and knock the queer right out of

1                           JAMES DEFERIO

2   them.  Show no mercy.  Yes, I am advocating violence,

3   justified violence", is that --

4                       MR. MANGINI:  Object to the form.

5        Q     -- the posting you referred to?

6        A     Yes.

7        Q     And you made that posting on April 7th of

8   2016?

9        A     Sounds correct.

10        Q     Okay.  Do you have any reason to believe

11   that that's not accurate?

12        A     It's accurate.

13        Q     So let me go back to your affidavit.  Did

14   you consider this posting, the one that I just read

15   to you...did you consider that part of your public

16   ministry?

17                       MR. MANGINI:  Object to form.

18        A     No.

19        Q     What did you consider it to be?

20                       MR. MANGINI:  Object to form.

21        A     An expression of outrage of what's going

22   on in this country with this transgender movement and

23   the fact that women have no -- potentially have no

24   privacy anymore in a public restroom and be free of

25   men coming in on them and perhaps viewing them and

1                        JAMES DEFERIO

2   perhaps they can assault them, and molesting them.

3        Q    Okay.  So I guess my question then is:

4   How did you delineate in your mind -- and I'm just

5   trying to understand your interpretation on this.

6   How do you delineate that statement from your other

7   statements regarding homosexuals or transgender

8   people that you did consider part of your public

9   preaching --

10                  MR. MANGINI:  Form.

11       Q    -- or public ministry?  I don't know what

12   you're referring to it as.

13       A    Well, you're assuming that's homosexuals,

14   homosexualists, or homosexualists, and people that

15   consider them --

16       Q    Transgender.

17       A    -- transgender are one and the same

18   person or same group, and they're not.  And queer

19   referred to the -- queer in the sense of something

20   that's -- it's not logical.  It's something that's

21   out there.

22       Q    Okay.  Well, you know what?  Let's

23   clarify this a little bit.  If you would go to

24   Exhibit A for me.

25                  MR. MANGINI:  Which one's

1                          JAMES DEFERIO

2                  Exhibit A?  The complaint?

3      Q      Complaint.

4                  MR. MANGINI:  Okay.

5      Q      And if you would turn to Paragraph

6   Number 20 in that document.  See the second sentence

7   of that paragraph?

8      A      Yes.

9      Q      I'll just read the whole paragraph, I

10  guess, so it's in context.  "Deferio does not harass

11  anyone.  He does not encourage violence.  He strives

12  to conduct himself in a peaceful and respectful

13  manner."  And as you previously testified, that's

14  your signature on the verification page of the last

15  page of that complaint?

16     A      Yes.

17     Q      So why does this say he does not

18  encourage violence if you have publicly posted that,

19  "If some dude goes into the restroom while your wife

20  or daughter is in there, you need to man up and knock

21  the queer right out of them, show no mercy.  Yes, I'm

22  advocating violence, justified violence"?

23                 MR. MANGINI:  Object to form.

24     A      Again, what I do in public ministry out

25  on the streets or college campuses --

1          JAMES DEFERIO

2      Q      Doesn't say that in Paragraph 20.

3  Doesn't limit it to that.

4      A      This lawsuit concerns my public ministry

5  on the streets of Syracuse, New York.  It does not

6  concern Facebook posts.  It does not concern anything

7  on YouTube that I might post underneath a YouTube

8  video.

9      Q      Where does it indicate in here that

10  you've limited it to just your public statements?

11      A      Well, it's obvious that the purpose of

12  this lawsuit, the purpose of these papers, is to

13  address the injustice done to me --

14      Q      Your testimony --

15      A      -- in June of 2014 and June of 2015.

16      Q      So your testimony here today is that you

17  don't believe that what you say in Paragraph 20 of

18  your complaint is a false statement?

19      A      I have never advocated violence against

20  anyone.  Even when I've been struck, I've never

21  struck back.

22      Q      Okay.  Well, first off, you just

23  testified that on one occasion you did advocate

24  violence against someone --

25                  MR. MANGINI:  Object to form.

1          JAMES DEFERIO

2     Q     -- and you admitted that it's your

3  posting, so again --

4     A     We're talking about a restroom situation

5  where I consider that an assault on women.

6     Q     Right, but you already said you --

7     A     And a man, a real man, would do something

8  about that.

9     Q     Okay.  So how is this posting not

10  encouraging violence, your posting on April 7, 2016,

11  that you agreed is yours; how is that not encouraging

12  violence?

13     A     As I explained.

14     Q     Which your explanation is a real man

15  would do something?  That's your explanation?

16     A     My explanation is that my public ministry

17  on the streets concerning this lawsuit in the City of

18  Syracuse, New York, even at times when I've been

19  pushed or punched or anything thrown at me, I have

20  never struck back, never.

21     Q     Okay.

22     A     And that includes all the other times

23  including Salem, Massachusetts, and anyplace else,

24  hundreds and hundreds of times that I've been out

25  there.

JAMES DEFERIO

1

2    Q    Okay.  So, to answer my question then,

3    your position and your testimony here today is that

4    Paragraph 20 of your complaint does not contain a

5    false statement?

6    A    In regards to the City of Syracuse and

7    public preaching, no.

8    Q    I didn't ask that.  I asked --

9    A    Well, that's the context.

10   Q    Mr. Deferio, I'm asking you -- please

11   listen to my question and then respond to my

12   question.  I'm asking you as you sit here today:  You

13   don't believe that the content of Paragraph 20 of

14   your complaint...and I'll read it again:  "Deferio

15   does not harass anyone.  He does not encourage

16   violence.  He strives to conduct himself in a

17   peaceful and respectful manner"...you don't believe

18   that that contains a false statement?

19   A    I think if you looked further you might

20   see a statement of mine concerning aggression towards

21   the United States and people have a right to bear

22   arms and to join the armed services and to fight for

23   this country.

24   Q    You know what....

25   A    Is that encouraging violence?

1          JAMES DEFERIO

2                MR. SICKINGER:  Mr. Mangini, I

3                think we're going to go off the

4                record.  I'm going to contact the

5                court.  This is -- enough is enough.

6                That's a simple question, yes or no.

7                And this is about the tenth time --

8      A    But it's a loaded question.

9      Q    Mr. Deferio --

10     A    There's a context involved here.

11     Q    Well, again, if you don't want to answer

12 questions, you should have thought about that before

13 you brought this suit.  Please answer yes or no.  Do

14 you believe it contains a false statement?  There's

15 no right or wrong answer.  I'm just looking --

16     A    No false statement.

17     Q    Okay.  Thank you.  That's all it took.

18                Did you attend the 2012 Pride Parade in

19 Syracuse?

20     A    I think I did.

21     Q    Do you have any reason to believe you

22 didn't attend it?

23     A    No.

24     Q    Was that the year that you used the

25 megaphone at the flag-raising?

1                    JAMES DEFERIO

2          A     Cheerleader megaphone?

3          Q     Yes, the one where you described earlier

4    in your testimony that someone came to you and moved

5    you physically or tried to move you physically.

6          A     No.  I said that in 2003 at the first

7    homosexual flag-raising at City Hall, the rainbow

8    flag-raising, I was there as a protester and I stood

9    between the person with the flag and the flag pole.

10         Q     That testimony -- the testimony earlier

11   where you described that event, that was not in 2012?

12         A     No.  That was 2003 or 2004.

13         Q     Do you recall bringing a megaphone to the

14   flag-raising for the Pride event in 2012?

15         A     I don't recall that.  I may have.  I

16   think I did.  It was -- I think I used an Aker amp.

17         Q     Well, if I told you that people observed

18   you with a megaphone at the 2012 Pride flag-raising,

19   would you have any reason to believe that that wasn't

20   accurate?

21                    MR. MANGINI:  Object to form.

22         A     I'd have to check my own records on that.

23         Q     What record would you check?

24         A     I keep...I try to...I don't always do so,

25   but I try to keep an informal record of where I go,

1                          JAMES DEFERIO

2    how long I've been there, who I talk to and who I

3    should pray for, and, if I encounter any problems

4    with the police or with anybody else.

5         Q    Okay.  Well, I would note that I'll ask

6    that you please provide those to Mr. Mangini and that

7    Mr. Mangini please provide those to us.

8         A    If I have them.

9         Q    So, again, your statement then, I guess,

10   was that you believe you had a megaphone in 2012 but

11   you're not a hundred percent sure?

12        A    I think I had an Aker amp.  I think that

13   might be the first year I started using it.

14        Q    And that's the item depicted in --

15                  MR. MANGINI:  G.

16        Q    -- H and G?

17        A    What are you referring to?

18                  MR. MANGINI:  Sorry.  He's saying

19             these two.

20        A    Oh.

21        Q    The device that you're referring to --

22        A    Yes.

23        Q    -- bringing with you 2012 to the

24   flag-raising, is that what's depicted in H and G?

25        A    Yes.

1                    JAMES DEFERIO

2        Q     Okay.

3        A     But I'm not certain of it.

4        Q     Okay.

5        A     I think at 2012 there was another

6   preacher there.

7        Q     At the flag-raising?

8        A     Yes.

9        Q     So you believe that he might or she might

10  have been the one that had the megaphone?

11       A     I think Don Mauro was there and he had --

12  he's a short man.  I believe he had a megaphone.

13       Q     And I guess I'm trying to understand.

14  Are you clarifying your earlier testimony to indicate

15  that you think that Mr. Mauro had it, or are you

16  saying that he might have had one in addition to

17  yours?

18       A     He may have had the megaphone, and I may

19  have had this --

20       Q     Okay.

21       A     -- 'cause I am shying away from using a

22  megaphone.

23       Q     Did you attend the Pride Parade in 2012?

24       A     I think -- yes, I'm pretty sure I did.

25       Q     Do you recall breaking through a

1                    JAMES DEFERIO

2    barricade and disrupting the parade's path?

3         A      No.

4                    MR. MANGINI:  Object to form.

5         Q      Have you ever stepped through a barricade

6    during the Pride Parade?

7         A      Here in Syracuse?

8                    MR. MANGINI:  Object to form.

9         Q      Here in Syracuse.

10        A      I don't recall so.

11        Q      Have you ever had to be instructed by

12   the -- any member of the Syracuse Police Department

13   to go back or get back on the sidewalk grass during

14   any of the Syracuse Pride Festival Parades?

15        A      Hmm.  See, the parade has taken different

16   paths over the years.  When it's been downtown,

17   there's been no grass I would be able to step out to.

18        Q      That's why I asked about grass or

19   sidewalk.

20        A      One was on Genesee Street.  There was

21   grass, I believe, which Officer Locastro called

22   curtilage.  I was not instructed to get on the grass

23   or get off the grass on any of those parade routes.

24        Q      At any year during the Pride Parade were

25   you instructed to get out of the roadway back onto a

1                    JAMES DEFERIO

2    sidewalk or grass?

3         A    I don't recall so, recall that being --

4    that occurring, but there was one incidence,

5    incidence where -- it's when the parade was downtown,

6    where I thought the parade was going to turn from

7    Jefferson Street to go down Salina and I didn't know

8    they were coming straight that way.  I may have been

9    off the curb and told to get back on the curb.  I may

10   have been.  It was a long time ago.

11        Q    Do you recall --

12        A    And I think it was Officer Klug or Kluge

13   or something like that.

14        Q    Okay.  So you believe then that he

15   instructed you to get out of the roadway?

16        A    That may have occurred.  It may not have.

17   I could have -- I might have a false memory about

18   that.

19        Q    Do you recall approximately what year

20   this might have been?

21        A    That was the year I did use a megaphone,

22   so that would have been -- should have been prior to

23   2012.

24        Q    Did you attend the 2013 Pride Festival

25   and Parade?

1                    JAMES DEFERIO

2       A     Yes.

3       Q     Do you recall having a confrontation with

4    men in drag outfits outside the entrance to the Inner

5    Harbor?

6                    MR. MANGINI:  Object to form.

7       A     No.

8       Q     Do you recall at any point in time having

9    discussion at either the Pride Festival or Parade in

10   any year with any men in drag costumes?

11                   MR. MANGINI:  Object to form.

12      A     No, I don't.  Usually that sort of thing

13   I try not to keep a memory of.

14      Q     So as you sit here today you have no

15   recollection of having communication with men in drag

16   outfits at any time during any of the Pride Parades

17   or Festivals?

18                   MR. MANGINI:  Object to form.

19      A     It's -- I don't recall.

20      Q     Okay.  If you would turn to Exhibit A,

21   the complaint again, would you please look at

22   Paragraph 70?

23      A     I have my notes from 2013, and I did not

24   write anything down about anybody in drag.  Just

25   about a girl who went from screaming at me to hugging

1                    JAMES DEFERIO

2    me.  She said she had been sexually molested at eight

3    years old.

4         Q    Okay.  Can I Ask, Mr. Deferio, why you

5    never produced those notes before now?

6         A    I found this last night.

7         Q    Had you previously looked for them?

8         A    Things are a little bit in disarray in my

9    back room.

10        Q    I'm not asking you whether they're in

11   disarray.  I'm asking if you looked.

12                   MR. MANGINI:  Object to form.

13        A    Yes, I looked for them purposely last

14   night.

15        Q    Prior to last night had you ever looked

16   for that?

17        A    No.

18        Q    Why is that?

19                   MR. MANGINI:  Object to form.

20        A    I had other things on my mind, I suppose.

21   I didn't know why this would come into -- 2013 would

22   be pertinent to something that happens in 2014 where

23   I'm threatened with arrest and I have fear of arrest

24   and 2015 where I had fear of arrest.

25        Q    At any point in time do you recall being

JAMES DEFERIO

1    advised that our office had made requests for

2    documents in your possession related to the lawsuit

3    and the events described in the lawsuit?

4

5                    MR. MANGINI:  Objection.  I think

6                    that's getting into privilege.  You're

7                    asking --

8         Q    I'm not asking if it came from you.  I'm

9    just asking do you recall ever being advised by

10   anyone that we had made a request for documents.  I'm

11   not looking for the content of that.  I'm just

12   looking had you been --

13        A    I don't recall.  But, if I had been, I

14   wouldn't consider these official documents.  This is

15   just something as I recollect.  Sometimes I don't

16   make these cards out for another -- a week or two

17   afterwards.

18        Q    All right.  Let me ask it this way.  You

19   reviewed those notes last night in preparation for

20   today's deposition?

21        A    No.

22                    MR. MANGINI:  Object to the form.

23        Q    When did you review them?

24        A    I just went over it just now.

25        Q    What did you review to prepare for

1                    JAMES DEFERIO

2    today's deposition?

3         A    I read Exhibit A, B, and I looked at a

4    few of the videos.

5         Q    Do you recall which videos?

6         A    Yes.

7         Q    Which ones?

8         A    2014, 2015.

9         Q    Which one from 2015?

10        A    The ones concerning Captain Sweeny.

11        Q    Other than your attorney, and I'm not

12   looking for information about that, did you discuss

13   with anyone your coming to this deposition today?

14        A    Yes.

15        Q    And who would that person be, or persons?

16        A    My wife and daughter, and I just told

17   them 'cause my wife's -- was spending a week with her

18   mother in Philadelphia.  I said, "When you come back,

19   I might not be there.  I might be in a deposition."

20        Q    What did you describe or tell your

21   daughter about your coming here to this deposition

22   today?  And is this your daughter Michelle?

23        A    Yes.

24        Q    And she's the one that's attended some

25   Pride events with you in the past?

1                    JAMES DEFERIO

2       A     Yes.

3       Q     What did you tell her about your coming

4  to this deposition today?

5       A     Just told her I had a deposition at 10:00

6  and that I hope I can get a good night's sleep, which

7  I didn't.  And she said she had to go down to

8  Watkins Glen area.  That's all.

9       Q     Besides your attorney and those two

10 individuals, did you discuss today's deposition with

11 anyone else?

12      A     I don't recall.  I don't -- no, no.  Who

13 would I talk to about this?

14      Q     I don't know.

15      A     Oh, I mentioned it to my oldest daughter.

16 I just said it seems like I'm under investigation

17 instead of the police officers who threatened me with

18 arrest.  That's all I said.

19      Q     Okay.  And you said this to your oldest

20 daughter?

21      A     Yes.

22      Q     Did you say this in person?

23      A     No.

24      Q     Is this during a telephone call?

25      A     Yes.

JAMES DEFERIO

1

2     Q     Other than the documents that you

3  described already, did you review anything else to

4  prepare for today's deposition?

5     A     No.

6     Q     Do you have any other notes, cards,

7  documents or information with you today similar to

8  what you have on the table there that you just

9  produced?

10     A     Of course, yes.

11     Q     What do you have with you that you

12  brought here today?

13     A     Oh, that I have with me?

14     Q     Yes.

15                MR. MANGINI:  Object to form.

16     A     Nothing about this case.

17     Q     So the only notes that you have or

18  documents or information you have that you have

19  brought with you here today related to this case are

20  those index cards?

21     A     These are 2013, 2015 and 2014.  2015 is

22  not made out completely.  And I don't know why but

23  sometimes --

24     Q     Do you have anything else, Mr. Deferio?

25     A     Things that don't -- I have a Quran.  I

1                    JAMES DEFERIO

2    have a Bible.

3          Q      That relate to this lawsuit?

4          A      I have the scientific evidence that

5    homosexuality is not inborn.

6          Q      Anything that you believe specifically

7    relates to this lawsuit?

8          A      Not with me.

9          Q      And you're going to attempt to retrieve

10   the other documents and provide them to Mr. Mangini

11   so he can then provide them to us, whatever's in your

12   possession.

13               Again, if we can go back to --

14         A      Are you calling these documents?

15         Q      Yes.  I call them materials.  Any

16   materials in your possession.

17               If you turn to Page 11 of your complaint,

18   which is Exhibit A, can you just read from

19   Paragraph 67 on down?  You don't have to read it out

20   loud.  Just read it to yourself if you would.

21               Don't put these too far away 'cause we're

22   going to need to make a copy of those before you go.

23               Have you reviewed those paragraphs?

24         A      Yes.

25         Q      You describe in those paragraphs some

1                    JAMES DEFERIO

2    communication with an attorney from our office.  Do

3    you recall that sequence of events?

4         A    Yes.

5         Q    Did you ever communicate directly with

6    anyone in this office, or was all your communication

7    through your attorney?

8         A    Through my attorney.

9         Q    And the -- actually, I have to go back to

10   the preceding page, but, the Paragraph 64, you

11   describe a September 5th, 2014, letter that you

12   submitted to the city?

13        A    Oh, where is this?

14        Q    If you go back to the page before,

15   Page 10.

16                    MR. MANGINI:  64.  Paragraph 64.

17              Sorry.

18        A    Yes.

19        Q    The -- what's described in Paragraph 64,

20   is that the first communication that you or someone

21   on your behalf had with the city with regard to the

22   allegations contained in your lawsuit?

23        A    My attorney handled this, handled this

24   part.

25        Q    Right.  But I guess I'm trying to

JAMES DEFERIO

1
2    understand:  There was nothing that came before it

3    that we're not aware of?  There's no other letters or

4    anything that weren't described before that?

5         A     I don't remember there being any.

6                    (Discussion off the record.)

7         Q     The Pride event in 2014 happened in June;

8    correct?

9         A     Yes.

10        Q     And this letter wasn't sent till

11   September.  Was there any reason you waited that

12   long?

13                    MR. MANGINI:  Object to form.

14        A     I didn't send the letter.

15        Q     Are you aware of any reason why it took

16   so long for the letter to be sent?

17        A     Well, I'm not aware of any reason --

18                    MR. MANGINI:  Object to form.

19        A     -- no.

20        Q     If you turn to the next page,

21   Paragraph 70, you allege that the city's response to

22   earlier communications from your attorney was vague

23   but that you still hope that an attorney in this

24   office's discussions would adequately resolve the

25   issue.  What -- that language, you still hoped that

1                    JAMES DEFERIO

2    Mr. Doyle's discussions with Syracuse officials would

3    adequately resolve the issue, what was the basis for

4    you asserting that?

5                    MR. MANGINI:  Object to form.

6         A    What was stated on the page previous,

7    that -- oh, in Paragraph 67, "We trust these

8    assurances resolve the matter," that's what gave me

9    hope.

10        Q    Okay.  So --

11        A    So I thought the matter was resolved or

12   was going to be resolved by the time the Pride

13   Festival came around the next -- the following year.

14        Q    Okay.  So the basis for your statement in

15   Paragraph 70 is what you describe in Paragraph 67?

16        A    Yes.

17                    MR. SICKINGER:  You want to

18               change tape?

19                    THE VIDEOGRAPHER:  We'll go off

20               record at 4:46.

21                    (Whereupon, a brief recess was

22               taken.)

23                    THE VIDEOGRAPHER:  We're back on

24               record at 4:50.

25   BY MR. SICKINGER:

1                   JAMES DEFERIO

2        Q     Mr. Deferio, I want to show you two

3    videos that you submitted as exhibits as part of your

4    affidavit, which is Exhibit B that you previously

5    viewed.  Are you able to see the computer screen?

6        A     Yes.

7        Q     Okay.  I'm going to show you what you

8    describe in Paragraph 51 of your affidavit; it was

9    attached to your affidavit as Exhibit K, and you

10   describe it as a "DVD showing my interaction with

11   Captain Sweeny on the festival side of

12   Kirkpatrick Street on June 20th, 2015."  If you just

13   watch the video, and then I have a few questions for

14   you after that.

15       A     Where does it say that in 51?

16       Q     Paragraph 51 of your affidavit.

17                  MR. MANGINI:  Oh, that's your

18             complaint.

19       Q     It should be B.

20       A     Oh, B.  Okay.

21       Q     Again, if you just watch the video, then

22   I'll have a few questions for you afterwards.

23                  MR. LONG:  You ready?

24                  (Playing video.)

25       Q     Mr. Deferio, if I could, I'd like to ask

JAMES DEFERIO

1

2  you a few questions about that video.  Do you know

3  who recorded that video?

4       A     I did.

5       Q     And what did you use to record it with?

6       A     A small Kodak video camera.

7       Q     Okay.  And do you believe that that video

8  accurately records the interaction you had with

9  Captain Sweeny that's described in Paragraph 51 of

10 your affidavit?

11      A     Yes.

12      Q     Okay.  And that was taken at the 2015

13 Pride Festival?

14      A     Yes.

15      Q     Do you recall Captain Sweeny asking you

16 to stop filming?

17      A     No.

18      Q     Okay.  Well, let's play it again so you

19 can hear --

20      A     No.  I heard that --

21      Q     Okay.

22      A     -- at the -- when I was there.  You can

23 hear a woman in back of me.  See, the camera is in

24 front of me, so the camera's not picking up this

25 woman and -- like my ears are picking up this woman.

```
 1                      JAMES DEFERIO
 2   I thought Captain Sweeny asked me to turn the
 3   amplifier off.
 4        Q    So --
 5        A    So that's what I did.  I reached down and
 6   I switched it off, and you can hear my voice after
 7   that that I'm not -- it's not being amplified.  I'm
 8   still videoing.  He would see that I'm still
 9   videoing, which he called filming.  I'm still
10   videoing him 'cause I have to hold it up like this.
11        Q    It wasn't attached to any of your body?
12   How do you hold a sign up and hold a camera at the
13   same time?
14        A    It's very easy.
15                  MR. MANGINI:  Object to form.
16               Sorry.
17        Q    So it wasn't attached to your body?
18        A    Excuse me?
19        Q    Wasn't the camera attached to your body?
20        A    It was on a strap.
21        Q    Okay.  So why did you tell Captain Sweeny
22   'okay, I'll stop filming' and then proceed to film
23   it?
24                  MR. MANGINI:  Object to form.
25        A    I did not say that, I'll stop filming.
```

JAMES DEFERIO

1

2      Q      You said I'll turn the camera off.

3                  MR. MANGINI:  Object to form.

4      A      No, I didn't say that.

5      Q      Okay.  Let's play the tape again.

6      A      Says you've encountered a problem.

7      Q      Hold on one second.  Mr. Deferio, you

8   don't dispute that Captain Sweeny said, "Please stop

9   filming me," "Stop filming me"; is that correct?

10     A      Can you restate that?

11     Q      You know what?  Just watch the video.

12                 MR. LONG:  Let me just reset

13             here.  Can you see it?

14                 THE WITNESS:  Yes.

15                 (Playing video.)

16     A      Do I have to listen to the whole thing?

17  BY MR. SICKINGER:

18     Q      Now that you've seen the video for a

19  second time, Mr. Deferio, do you agree that

20  Captain Sweeny says to you 'stop filming me'?

21     A      I said that the first time, that he said

22  that, but I did not hear him say that.

23     Q      I'm just asking if you agree he said it.

24     A      The camera picked him up saying that.  I

25  did not hear him say that.  I thought he said turn

1                    JAMES DEFERIO

2     off the amplifier.

3          Q     Okay.  So you weren't lying to him when

4     you said 'okay, I'll turn this off' and you didn't

5     turn your camera off; that's your position?

6          A     Yes.

7          Q     Even though the video directly

8     contradicts that?

9                    MR. MANGINI:  Object to form.

10         A     It doesn't contradict that because

11    further on in the video I said I already turned it

12    off.

13         Q     Did you make any other --

14         A     I said I already turned off...and it was

15    obvious it was the amplifier I was talking about.

16         Q     Why is that obvious?

17         A     Because he said, "You can't be on this

18    side with the amplifier," and I said, "Okay, I

19    already turned it off.  I'll stay here."

20         Q     You talked about where you were, not

21    talking about the camera.  I'm asking you --

22         A     I was talking about the amplifier.

23         Q     Let me ask you this.  Did you make any

24    other false statements to Captain Sweeny that day?

25                    MR. MANGINI:  Object to form.

JAMES DEFERIO

1

2    A    I didn't make a single false statement.

3    Q    Okay.  Well, again, the video contradicts

4  you.

5         Let me ask you this.  Do you recall

6  Captain Sweeny stating to you that he had

7  instructions from the Corporation Counsel's office

8  that you were to be across the street?

9    A    Yes.

10   Q    Okay.  And do you recall him saying that

11 he'd received a letter from the Corporation Counsel's

12 office with those instructions?

13   A    Yes.

14   Q    And do you recall that he said that to

15 you, that he was making you go across the street on

16 the instructions of Corporation Counsel's office,

17 more than once?

18   A    Technically, no.  It wasn't the

19 Corporation Counsel he was talking about.  He said a

20 lawyer, Syracuse lawyer.

21   Q    Okay.  Did he say "our lawyers"?

22   A    He said a Syracuse lawyer.

23   Q    Okay.  So do you have any reason to

24 believe that it was not this office?

25   A    I have no reason to believe that.

1                    JAMES DEFERIO

2        Q     Okay.  So you heard him say that twice

3   then, that he was relying on the instructions he

4   received from the Syracuse lawyers?

5                    MR. MANGINI:  Object to form.

6        A     Yes.

7        Q     Do you have any reason to believe that

8   that statement was not accurate, that those two

9   statements were not accurate?

10                   MR. MANGINI:  Object to form.

11       A     No.

12       Q     Okay.  All right.  If we could look at

13  the next video, which is Exhibit L to your affidavit,

14  and it was described by you in Paragraph 60 as "a DVD

15  showing my interaction with Captain Sweeny on the

16  south side of Kirkpatrick Street on June 20th, 2015."

17       A     Paragraph 60?

18       Q     If you look at Paragraph 60.  It starts

19  on Page 9.

20       A     Oh, okay.

21                   (Discussion off the record.)

22                   (Playing video.)

23  BY MR. SICKINGER:

24       Q     Is that, what you just saw in that video

25  which you attached as Exhibit L to your affidavit

1                    JAMES DEFERIO

2    submitted in support of your request for a

3    preliminary injunction...is that a video that was

4    taken by you?

5         A    Yes.

6         Q    Do you believe that that video fairly and

7    accurately depicts the interaction that you had with

8    Captain Sweeny on the south side of

9    Kirkpatrick Street on June 20th, 2015?

10        A    Yes.

11        Q    Okay.  Let's start at the end and work

12   backwards.  Why did you say to Captain Sweeny, "I

13   wouldn't want you to be named in any lawsuit," and

14   then sue him as a defendant in this case?

15                    MR. MANGINI:  Object to form.

16        A    Well, as a non-lawyer I don't know

17   what -- I assumed what would be involved if there was

18   a lawsuit, that he wouldn't be named, that it would

19   be a broad designation of the City of Syracuse.  I'm

20   not a lawyer.  So I misspoke.

21        Q    Okay.  So you're saying you misspoke when

22   you say that I wouldn't want you to be named in any

23   lawsuit?

24                    MR. MANGINI:  Object to form.

25        A    Yes.

1                    JAMES DEFERIO

2        Q    And you misspoke because then -- I guess

3    I don't understand.  How is it misspeaking?

4                    MR. MANGINI:  Object to form.

5        A    I am not a lawyer.  I don't know what's

6    involved in drawing up a lawsuit so --

7        Q    You don't have to be a lawyer.  I'm just

8    asking.  You said I don't want you named in a

9    lawsuit, but then you sued him.  Did something change

10   in your opinion?

11                   MR. MANGINI:  Object to form.

12       A    Yes.

13       Q    What changed?

14       A    What changed was how lawsuits are drawn

15   up and why certain officers have to be named and why

16   this lawsuit was drawn up the way it was.

17       Q    Okay.  And just to be sure, that's your

18   signature on the last page of the complaint,

19   Exhibit A; correct?

20       A    Yes.

21       Q    Ask you about the video.  They talk about

22   taking a photo and then they take your photograph of

23   your face and they said that it's to show that

24   there's no serious injury.  Was that because you'd

25   been punched by Mr. Weiner?

1                    JAMES DEFERIO

2        A    Yes.

3                    MR. MANGINI:  Object to form.

4        Q    You said at one point on the tape to

5   Captain Sweeny I'm "always on the other side of the

6   street," and you said "Taste of Syracuse, Polish

7   Festival."  What did you mean by that?

8        A    Taste of Syracuse and the Polish Festival

9   have music stages.  Usually they have two.  One's

10  near Salina Street.  The other one is further back.

11  And my purpose being there is not to compete with the

12  music from those festivals but to address people

13  walking through the festival.  At Syracuse Pride

14  Festival at Inner Harbor, there's no music stage

15  there at the entrance, and I said I would not

16  interfere with this -- I said -- when I said I would

17  rain on their parade, I was talking about the parade

18  itself, not the festival, and I said I would not

19  interfere with it.

20       Q    We're going to get to that statement

21  separately.  I'm asking you:  Why is it then that

22  it's okay for you to be across the street at the

23  Taste of Syracuse and the Polish Festival but now you

24  sued because you were across the street at the Pride

25  Parade?

1                    JAMES DEFERIO

2                    MR. MANGINI:  Object to form.

3        A     Well, I don't have to be across the

4   street at the Polish Festival.

5        Q     You said, "I'm always on the other side

6   of the street, Taste of Syracuse, Polish Festival."

7        A     I don't have to be.

8        Q     You said "I always am," so I guess I'm

9   asking you:  Why is it okay for you to be on the

10  other side of the street for those two but yet you

11  sue when you're on the other side of the street for

12  the Pride Parade?

13                   MR. MANGINI:  Object to form.

14       A     Like I explained, the Polish Festival and

15  Taste of Syracuse has music stages.

16       Q     So does the Pride Festival.

17       A     Not at the entrance.

18       Q     Okay.  So that's your reason?

19       A     The reason is to avoid confusion with the

20  Taste of Syracuse and the Polish Festival with their

21  music venue.  To avoid confusion, I will cross the

22  street voluntarily.  There's no -- there would be no

23  confusion whatsoever at the Pride Festival since

24  there's no music stand there.  The music stand is

25  back further into the park.

1                      JAMES DEFERIO

2      Q    So you're saying you can't hear it from

3  the street at the Pride Festival?

4                 MR. MANGINI:  Object to form.

5      A    Correct.

6      Q    You can't hear any of the music that's

7  coming from the ampitheater or tent they have there

8  at the music station; you can't hear any of that from

9  Kirkpatrick Street?

10                 MR. MANGINI:  Object to form.

11     A    If there's music coming from that, I --

12  apparently it's white noise to me because I'm

13  concentrating on talking to people.

14     Q    Okay.

15     A    At the Polish --

16     Q    You're not going to answer my question.

17     A    At the Polish Festival and the Taste of

18  Syracuse, the music is extremely loud.

19     Q    All right.  Do you recall on that video

20  that that video depicts Captain Sweeny saying to you

21  on more than one occasion he was again following

22  guidance and instruction from the city Corporation

23  Counsel's office?

24                 MR. MANGINI:  Object to form.

25     Q    Do you recall him saying that to you?

1                    JAMES DEFERIO

2        A     Yes.

3        Q     Do you recall him specifically referring

4   to an attorney Joe Doyle, who gave him that

5   instruction?

6                    MR. MANGINI:  Object to form.

7        Q     That you were to be on the other side of

8   the street?

9        A     Yes.

10       Q     Do you have any reason to believe that

11  those statements by Captain Sweeny are not accurate?

12       A     No.

13       Q     Why did you say to him, "I don't want to

14  rain on anyone's parade, but this is an uncivil

15  parade and I will rain on that"?

16       A     I was specifically speaking of the

17  parade, which had ended, and I mentioned parade.  I

18  did not say festival.  And I said right after that

19  "I'm not going to" -- "I don't want to interfere with

20  this either."  And when I talk about raining on a

21  parade, the Bible uses the word rein, as in ladder

22  rein, in the letter James, and I'm talking about

23  using words to address the people, raining words on

24  them.

25       Q     Okay.  So you don't want to interrupt

1                          JAMES DEFERIO

2     anyone's events or parades except for the Pride

3     Parade?

4                          MR. MANGINI:  Object to form.

5          A     I wouldn't be interrupting the parade.

6     The parade is a moving venue and it goes by lots of

7     people, who are shouting a lot of things.  And what

8     I -- me standing on the side, mostly I have a banner

9     because usually even with an amplifier I can't be

10    heard, but it's important for people to see that

11    banner because it has a message of hope on it.

12         Q     Okay.  So once again I'll ask you the

13    question.  You don't want to interrupt anything but

14    the Gay Pride Parade?

15                         MR. MANGINI:  Object to form.

16         Q     'Cause you surely didn't answer it the

17    last time I asked you.

18         A     No.

19         Q     So this is the only thing you wanted to

20    interrupt?

21                         MR. MANGINI:  Objection.

22         A     Incorrect.

23         Q     What else do you want to interrupt?

24                         MR. MANGINI:  Object to form.

25         A     I didn't say I wanted to interrupt

1                         JAMES DEFERIO

2    anything.

3         Q     What other parades do you want to rain

4    on?

5                    MR. MANGINI:  Object to form.

6         A     To my knowledge, there's no other

7    parades.  I don't see any parades for adulterers or

8    fornicators or -- maybe in some cities there might be

9    neo-Nazi parades.

10        Q     Why do you believe that the Pride Parade

11   was a "uncivil parade"?

12        A     As I explained earlier about civil and

13   natural law and natural rights.  So it goes back to

14   that.

15        Q     Okay.  So you think it has something to

16   do with natural rights?

17        A     I'd say it's unnatural rights.

18        Q     I don't want to get into semantics with

19   you, but that's what the genesis of that statement

20   is?

21        A     Yes.

22        Q     All right.  You know what, Mr. Deferio?

23   I'll just take a short break, go over my notes, and I

24   think I'm pretty much ready to wrap up here.

25                    THE VIDEOGRAPHER:  We'll go off

                         JAMES DEFERIO

1

2            record at 5:13.

3                  (Whereupon, a brief recess was

4            taken.)

5                  THE VIDEOGRAPHER:  We're back on

6            record at 5:26.

7    BY MR. SICKINGER:

8        Q    Mr. Deferio, in 2014 at the Pride

9    Festival, after you crossed Kirkpatrick Street, how

10   much longer did you stay at the event?  And again for

11   the record --

12       A    I can't tell you exactly.

13       Q    I said again for the record we're going

14   to copy any notes that you brought with you today

15   that you're relying on.

16       A    Until 3:25 p.m.

17       Q    And do you know what time you crossed the

18   street?

19       A    No.

20       Q    Do you know what time you arrived at the

21   festival?

22       A    11:15 a.m.

23       Q    So in total you were there from 11:15

24   till 3:25?

25       A    Yes.

1                    JAMES DEFERIO

2        Q     Were you allowed to keep your sign when

3    you crossed the street?

4        A     Yes.

5        Q     And, in fact, you were photographed with

6    that sign across the street and that photograph ended

7    up on Syracuse.com; is that correct?

8        A     It's -- can you show me the photograph?

9        Q     Sure.  It's Exhibit I.  I think you

10   had --

11       A     No.  You can just turn it around and show

12   it to me.  I can see it from there.  Yes.

13       Q     Okay.  So this was on the other side of

14   Kirkpatrick Street?

15       A     Yes.

16       Q     In 2014?

17       A     Yes.

18       Q     And you still had your sign?

19       A     Yes.

20       Q     So no one stopped you from displaying

21   your sign?

22       A     No.

23       Q     And no one stopped you from talking to

24   the festival-goers that are pictured near you?

25       A     They didn't want to talk.

1                    JAMES DEFERIO

2          Q     But no one stopped you from talking to

3     them?

4          A     No.

5          Q     Okay.  Let me ask you the same questions

6     with respect to 2015.  How long were you at the

7     festival after you crossed Kirkpatrick Street in

8     2015?

9          A     I was there from 11:10 a.m. to 2:25 p.m.

10         Q     11:10 till 3:25?

11         A     No.  2:25.

12         Q     2:25.  Do you know what time you crossed

13    the street?

14         A     No.

15         Q     Do you know approximately how long you

16    were there after you crossed the street?

17         A     No.

18         Q     Did anyone take your sign away from you

19    after you crossed the street in 2015?

20         A     No.

21         Q     Did anyone preclude you or stop you from

22    talking to any festival-goers on the other side of

23    the street after you crossed over in 2015?

24         A     What few there were, no.

25         Q     Okay.  Other than what you've already

1                    JAMES DEFERIO

2    described, Mr. Deferio, are there any other

3    materials, documents, recordings that you're aware of

4    that relate to this lawsuit that you haven't already

5    identified?  So that would be either your YouTube

6    videos...we already know about those...your Facebook

7    postings...we already know about those; well, one of

8    your accounts; the other one we just learned about

9    today...the notes that you apparently brought with

10   you and you indicated there might be some other notes

11   that you're going to look for, but beyond those

12   documents and materials is there anything else that

13   is a material or document that --

14        A    Those are the only things I've turned

15   over to the attorney.

16        Q    So everything -- other than what you

17   described today you've already turned over to your

18   attorney?

19        A    Yes.

20        Q    And at no point in time when you attended

21   any of the Pride Festivals or Parades were your signs

22   taken away from you; is that correct?

23        A    Correct.

24        Q    All right.  I don't believe I have any

25   further questions for you, Mr. Deferio.

1                    JAMES DEFERIO

2                    (Discussion off the record.)

3

4    EXAMINATION BY MR. MANGINI:

5         Q    So in 2015 when -- from -- in the video

6    we just watched with Captain Sweeny, when he asked

7    you to turn something off, what do you believe he

8    said?

9         A    To turn the amp off.

10                   MR. SICKINGER:  Object to form.

11                   That's not what he stated.  He said,

12                   "Stop filming me."  Just to clarify

13                   the record.  You can replay it if

14                   you'd like.

15        Q    Okay.  What did you believe he was asking

16   you to do?

17        A    To turn my amplifier off.

18        Q    And did you?

19        A    Yes.

20        Q    Okay.  At the time, did you believe -- at

21   the time, did you believe that he was asking you to

22   turn off your -- to stop recording him?

23                   MR. SICKINGER:  Object to form.

24        A    No.

25        Q    Okay.  So, at that point, did you have

1                    JAMES DEFERIO

2    any reason to believe you ought to stop recording?

3         A    No.

4                    MR. MANGINI:  Okay.  No further

5              questions.

6                    MR. SICKINGER:  Nothing further.

7                    THE VIDEOGRAPHER:  All right.

8              This concludes the testimony of

9              James Deferio.  Time off record is

10             5:32.

11                   *         *         *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF WITNESS

3    I, JAMES DEFERIO, hereby certify that I have read the

4    foregoing transcript of my deposition taken on

5    March 21, 2017, at approximately 10:38 a.m., at

6    Syracuse, New York, pursuant to the applicable Rules

7    of Civil Procedure, and that the foregoing 265 pages

8    of transcript are in conformity with my testimony

9    given at that time (with the exception of any

10   corrections made by me, in ink, and initialed by me

11   on the attached errata sheet).

12

13

14              _____

                JAMES DEFERIO
15

16   STATE OF _____

17   COUNTY OF _____

18   SUBSCRIBED AND SWORN to before me, the undersigned

19   authority, on this the_____day of_____, 2017.

20

21

22              _____

                Notary Public in and for
23
                _____ County, State of
24              New York

25              My Commission Expires_____

1

2

3                     REPORTER'S CERTIFICATE

4

5          I, MARY REGINA BUTWIN, Court Reporter and

6   Notary Public, certify:

7          That the foregoing proceedings were taken

8   before me at the time and place therein set forth, at

9   which time the witness was put under oath by me;

10         That the testimony of the witness and all

11  objections made at the time of the examination were

12  recorded stenographically by me and were thereafter

13  transcribed;

14         That the foregoing is a true and correct

15  transcript of my shorthand notes so taken;

16         I further certify that I am not a relative

17  or employee of any attorney or of any of the parties,

18  nor financially interested in the action.

19

20

21

22         _____
           MARY REGINA BUTWIN,
23         Notary Public

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION

---

**JAMES DEFERIO,**

> **Plaintiff,**

vs.

**CITY OF SYRACUSE; FRANK FOWLER,** in his official capacity as Chief of Police for City of Syracuse Police Department, **JOSEPH SWEENY,** individually and in his official capacity as Captain for the City of Syracuse Police Department, and **JAMEY LOCASTRO,** individually and in his official capacity as Sergeant for the City of Syracuse Police Department,

> **Defendants.**

**CIVIL ACTION NO.:**   5:16-CV-0361 (LEK/TWD)

**VERIFIED COMPLAINT FOR CIVIL RIGHTS PURSUANT TO 42 U.S.C. § 1983**

---

Comes now Plaintiff James Deferio and avers the following:

## INTRODUCTION

1.      This is a civil rights action challenging City of Syracuse policy and practice, enforced by City of Syracuse Police Department, empowering a private entity with a heckler's veto and creating a 40-foot buffer zone that bans protected speech from occurring on a public sidewalk during a public festival.

2.      Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff James Deferio seeks injunctive relief, declaratory relief, nominal damages, and litigation costs and expenses against Defendants City of Syracuse, Frank Fowler, in his official capacity as Chief of Police for the City of Syracuse Police Department, Joseph Sweeny, individually and in his official capacity as Captain



EXHIBIT
A
3/31/17 mlb

for the City of Syracuse Police Department, and Jamey Locastro, individually and in his official

capacity as Sergeant for the City of Syracuse Police Department.

3.      This action implicates Plaintiff's fundamental rights to free speech and due

process as set out in the First and Fourteenth Amendments to the United States Constitution.

4.      Defendants' policy and practice have deprived and will continue to deprive

Plaintiff of his constitutional rights.

5.      Defendants named herein committed every act alleged and each act was

committed under the color of state law and authority.

## JURISDICTION AND VENUE

6.      This action raises federal questions, specifically, under the First and Fourteenth

Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has jurisdiction over

Plaintiff's claims for injunctive relief and nominal damages.  Pursuant to 28 U.S.C. §§ 2201 and

2202, this Court has jurisdiction over Plaintiff's request for declaratory relief.  Pursuant to 42

U.S.C. § 1988, this Court has jurisdiction over Plaintiff's claims for costs and attorney fees.

8.      In accordance with 28 U.S.C. § 1391(b), venue is proper in the Northern District

of New York, because all claims arise out of this district and Defendants reside in this district.

## PLAINTIFF

9.      Plaintiff James Deferio ("Deferio") is a resident of Syracuse, New York.

## DEFENDANTS

10.     Defendant City of Syracuse ("Syracuse") is a municipal governmental authority in

the State of New York.  Syracuse controls and is responsible for regulation of public sidewalks

2

and ways in the city.

11.      Defendant Frank Fowler ("Chief Fowler") is the Chief of Police for the City of Syracuse Police Department.  In his official capacity, Chief Fowler is responsible for overseeing and implementing all policies affecting law enforcement, including enforcement of laws on public streets and sidewalks in the city.  Chief Fowler is sued in his official capacity.

12.      Defendant Joseph Sweeny ("Captain Sweeny") is a police captain with the City of Syracuse Police Department.   In his official capacity, Captain Sweeny is responsible for enforcing Syracuse laws and policies, including those that regulate conduct on public streets and sidewalks.  Captain Sweeny is sued in his official and individual capacities.

13.      Defendant Jamey Locastro ("Sgt. Locastro") is a police sergeant with the City of Syracuse Police Department.  In his official capacity, Sgt. Locastro is responsible for enforcing Syracuse laws and policies, including those that regulate conduct on public streets and sidewalks. Sgt. Locastro is sued in his official and individual capacities.

## STATEMENT OF FACTS

### Deferio's Religious Expression

14.      Deferio is a professing Christian whose faith compels him to share his religious views in public.

15.      Deferio's basic message is that everyone has sinned and is therefore separated from God, but anyone who trusts in Jesus Christ as Lord and Savior will be saved.

16.      Because of his sincere and ardent concern for others, Deferio actively pursues opportunities to tell others about his Christian faith.  He frequently goes to public places during public events so he can share his message with as many people as possible.

3

17.     In Deferio's experience, respectful one-on-one conversations are the most effective way to tell others about his religious beliefs. These discussions allow him to address specific concerns and answer questions.

18.     Deferio also views occasional preaching (publically proclaiming his beliefs) as an important means of communication. And, sometimes Deferio will display signs to attract attention to his cause. These methods let him convey his message to a large number of people at one time and help stimulate one-on-one or small group discussions.

19.     When engaged in his expressive activity, Deferio does not impede pedestrian traffic or cause congestion. He intentionally places himself in public areas where people can freely pass by him.

20.     Deferio does not harass anyone. He does not encourage violence. He strives to conduct himself in a peaceful and respectful manner.

21.     Offering views on spiritual matters from his particular perspective, Deferio realizes some might take offense to his remarks. But Deferio does not intend to offend anyone. He does not seek to insult anyone. He only wants to share a message about eternal consequences that he earnestly believes people need to hear.

22.     Deferio wants to convey his religious beliefs on a public sidewalk abounding Inner Harbor in Syracuse during Central New York Pride Festivals due to the large number of people who attend these events.

**Pride Festival at Inner Harbor**

23.     Central New York Pride, Inc. ("CNY Pride") sponsors an annual Pride Week in Syracuse, New York, which takes place for one week in June each year.

4

24.     CNY Pride is a private 501(c)(3) non-profit corporation that seeks to promote and celebrate the LGBTQ community.

25.     Pride Week consists of a series of events that occur in various locations throughout Syracuse, New York.  The highlight of the event is the Pride Parade followed by the Pride Festival, which takes place in Inner Harbor in Syracuse.

26.     Inner Harbor is a former barge canal terminal located between West Kirkpatrick Street to the southeast, Van Rensselaer Street to the southwest, Bear Street West to the northwest, and Solar Street to the northeast.

27.     The southern corner of Inner Harbor is a public area that hosts an array of public events, including the Pride Festival.

28.     The Inner Harbor Amphitheater, a central point for Pride Festival entertainment, rests along the Onondaga Creek, marking the Pride Festival's northeastern border.

29.     The Pride Festival area also consists of a wide-open grassy field and a wide paved area where vendors set up.  The Onondaga Creekwalk, a public way, passes straight through this area.

30.     To sponsor and put on the Pride Festival in this public area, CNY Pride procures a special events permit from Syracuse.

31.     The Pride Festival offers various attractions for attendees, including food vendors and live entertainment.

32.     The Pride Festival is free and open to the public at all times.  CNY Pride does not charge for admission and no invitation is needed to enter the Pride Festival.

5

33.     There are no fences around the Inner Harbor area.  And there are no other barriers that limit pedestrian access to the Pride Festival.

34.     Although attendees may enter the Pride Festival from a variety of open spots, the intersection of West Kirkpatrick Street and the Onondaga Creekwalk serves as a main entrance for the Pride Festival.

35.     The public city sidewalk that abounds Inner Harbor along West Kirkpatrick Street is especially wide near this entrance to Inner Harbor.  The sidewalk is open to the public all year-round, including during the Pride Festival.

36.     People freely stand on the sidewalk and the grass immediately adjacent to it to watch the Pride Festival parade as it enters Inner Harbor.  Following the parade, pedestrians use this same sidewalk to enter the Pride Festival or walk or stand alongside West Kirkpatrick Street for other reasons.

37.     At all times during the Pride Festival, the public has unrestricted access to the public sidewalks that surround the event.  Anyone may traverse these sidewalks and use them for a variety of activities unrelated to the Pride Festival, including loitering, conversing, publically orating, wearing expressive clothing, displaying signs, talking on cell phones, and walking dogs.

**Ban on Deferio's Expression on Public Sidewalk during 2014 Pride Festival**

38.     On June 21, 2014, Deferio went to the public sidewalk between Inner Harbor and West Kirkpatrick Street to convey his religious beliefs to Pride Festival attendees.

39.     Deferio chose this specific date and location because he knew the presence of the Pride Festival would assure him an adequate number of people with whom to share his Christian message.

40.     Deferio wanted to reach people nearby as they entered or left the Pride Festival.

6

41.    Deferio did not enter the Pride Festival area. He did not seek to participate in any of the Pride Festival activities. He only wanted to stand in the wide portion of the sidewalk where people traversed to and from the Pride Festival and communicate his message – a message that was distinct from any messages presented by CNY Pride or their vendors.

42.    Deferio positioned himself at the section of the public sidewalk on the corner of West Kirkpatrick Street and the Onondaga Creekwalk, next to a wide entrance to Inner Harbor. This particular section of sidewalk is significantly wider than other sidewalks, leaving plenty of room for people to walk around him.

43.    After getting situated, Deferio began to share his religious beliefs in a peaceful and respectful way. Some listeners voiced disagreement with Deferio's message, but there were no physical altercations.

44.    While he was standing on the public sidewalk, in this wide-open area, Deferio did not impede traffic or otherwise cause congestion.

45.    A short while later, Sgt. Locastro of the Syracuse Police Department and another police officer approached Deferio. Sgt. Locastro informed Deferio that he was "in violation of the permit" held by CNY Pride and asserted that he was putting Deferio on notice so he would know where he was allowed to be.

46.    Sgt. Locastro further informed Deferio that he could not be on the sidewalk bordering the Inner Harbor and would have to go to other side of West Kirkpatrick Street.

47.    Deferio questioned the directive because he believed he had a constitutional right to speak there. In response, Sgt. Locastro showed him the permit obtained by CNY Pride and

7

indicated they had control over the public sidewalk during the Pride Festival, even though the sidewalks was not within the festival confines.

48.     Noting that the permit did not specify the grass, Deferio said he would move over to the grassy area next to the sidewalk, but Sgt. Locastro rejected this offer, claiming the grassy area was within the "curtilage" of the sidewalk.

49.     Deferio objected to the directive, noting the grassy area was not referenced in the permit, but Sgt. Locastro insisted that Deferio leave the entire area.

50.     Deferio did not want to move across the street because that location would deprive him of an audience. He asked for a copy of CNY Pride's event permit, but Sgt. Locastro required Deferio to relocate to the opposite side of the street before he could see it.

51.     Sgt. Locastro added that he was giving Deferio a lawful order to move across the street for him to be in compliance with the permit and if Deferio failed to do so he could be subject to arrest.

52.     Deferio asked Sgt. Locastro to call Captain Sweeny, but the sergeant refused, saying he did not have to do that. He elaborated that he was the sergeant on the detail, claiming he had "command and authority" over the area.

53.     Wanting to confirm the consequences for not moving across the street, Deferio inquired as to whether he would be arrested if he refused to leave, and Sgt. Locastro replied that he "could be subject to arrest."

54.     Desiring more clarification, Deferio asked Sgt. Locastro to elaborate on what he meant when said Deferio "could be subject to arrest." Sgt. Locastro replied: "If you want definitive answers, then, yes, if you refuse to move across the street, you will be arrested."

55.     Deferio asked what the charge for arrest would be and Sgt. Locastro answered he would be charged with disorderly conduct for failure to disperse when asked.

56.     Deferio asked why he was being forced to disperse, and Sgt. Locastro answered it was because CNY Pride had a permit and they did not want Deferio on the sidewalk.

57.     Sgt. Locastro reiterated his order that Deferio move across the street to continue with his message, and he then escorted Deferio across the street.

58.     Arriving on the other side of the street, Deferio sought further clarification from Sgt. Locastro as to where he could be on the side of the street where the festival was taking place. Sgt. Locastro replied that that entire sidewalk, from the Onondaga Creek Bridge to the corner of Van Rensselaer Street, was off-limits to Deferio, even though others were allowed to walk and be in that area.

59.     Deferio had a sign with him and he offered to put it away if he could stay on the festival side of the street, but Sgt. Locastro said it would not make any difference and Deferio would have to remain on the other side of the street.

60.     Deferio pointed out that, under Sgt. Locastro's interpretation, CNY Pride's permit authorized them to selectively ban anyone whose views they did not like. Sgt. Locastro confirmed this arrangement, saying CNY Pride could ban anyone they viewed as a "protestor" from the public sidewalk surrounding the Pride Festival.

61.     Deferio thanked Sgt. Locastro for answering his questions. Fearing arrest, Deferio did not return to the sidewalk on the Pride Festival side of West Kirkpatrick Street.

62.     Deferio tried to convey his message to Pride Festival attendees from the sidewalk opposite Inner Harbor, but he was not able to reach them effectively. Shortly after the parade

9

ended, police reopened West Kirkpatrick Street to vehicular traffic, separating him from his audience. As a consequence, His sign and preaching went unnoticed for the most part. And to the limited extent he could draw the attention of passersby on the other side of the street, they were unwilling to walk across and engage Deferio in conversation. Because he could not convey his message in an effective way, he soon left.

### Deferio Seeks Relief After 2014 Pride Festival

63.     Deferio was frustrated by the situation because he was deprived of opportunity to share his faith on the public sidewalk running along the border of Inner Harbor during the Pride Festivals. Not only had he lost the chance to do so during the 2014 Pride Festival but he was barred from communicating his message on that public sidewalk during future festivals.

64.     Hoping to share his faith at future events and to work out this issue with Syracuse officials without having to resort to litigation, Deferio, through counsel, sent a letter on September 5, 2014 to the Mayor of Syracuse, Chief of Police, and Syracuse Corporation Counsel, specifically asking for relief from the policy banning his expression on public sidewalks and ways during the Pride Festivals.

65.     The letter outlined the events that transpired on June 21, 2014 that served to censor his speech and explained how the on-going policy violated Deferio's First Amendment rights.

66.     The letter expounded on case law, identifying the public sidewalk as a traditional public forum and substantiating Deferio's constitutional right to speak on that public sidewalk during the Pride Festival. The letter showed why the permit given to CNY Pride does not change the status of the forum during the Pride Festival and why the total ban on Deferio's expression was unconstitutional. This letter also asked Syracuse officials for assurance that it would no

10

longer apply the ban on Deferio's expression on the public sidewalk during future festivals, specifically mentioning the upcoming 2015 Pride Festival.

67.    On September 25, 2014, Syracuse Assistant Corporation Counsel Joseph Doyle ("Doyle") called Deferio's counsel and discussed Deferio's concerns. Doyle followed-up with a letter on October 24, 2014, reporting that he had spoken with various Syracuse officials and promised the city would closely review the geographic aspects of future permit applications as they relate to traditional public fora to ensure uninhibited access for citizens like Deferio. Doyle concluded the letter stating "we trust these assurances resolve this matter" and invited contact for any remaining questions or concerns.

68.    Deferio was encouraged by this response, but he noticed the letter did not specifically assure him of his freedom to engage in his expression on the public sidewalk along Inner Harbor. Therefore, Deferio, through counsel, sent Doyle a reply letter on October 30, 2014, requesting a more specific assurance, among other things.

69.    Deferio did not receive a response to this request.

70.    Despite the vague nature of Syracuse's response, Deferio still hoped Doyle's discussions with Syracuse officials would adequately resolve the issue and enable him to speak freely on the public sidewalk during future Pride Festivals.

**Ban on Deferio's Expression on Public Sidewalk during 2015 Pride Festival**

71.    On June 20, 2015, Deferio returned to the public sidewalk on the Inner Harbor side of West Kirkpatrick Street to peacefully share his religious perspectives with Pride Festival attendees.

11

72.     Once again, Deferio did not wish to enter the Pride Festival area. He just wanted to communicate his viewpoints from the sidewalk near the Pride Festival's entrance where people were traversing and mingling.

73.     Before Deferio began to speak, a Pride Festival private security guard came up to him, and was physically aggressive with him, forcing Deferio into the street. Deferio returned to the sidewalk, and was able to have peaceful conversations with others. Also, a bystander struck Deferio without provocation.

74.     About ten minutes later, Captain Sweeny of the Syracuse Police Department, along with another police officer, approached Deferio and asked him to go to the other side of West Kirkpatrick Street, just as he had been required to do the year before. Deferio asked why and Captain Sweeny answered that CNY Pride had exclusive use of the festival side of the street, including the public sidewalk.

75.     Puzzled, Deferio asked if CNY Pride could have control over a public sidewalk and Captain Sweeny replied "Yes."

76.     Deferio asked Captain Sweeny what the consequences would be if he refused to move across the street and Captain Sweeny replied that Deferio could be arrested.

77.     Captain Sweeny defended this position on the purported basis that CNY Pride had control of the sidewalk and indicated that if Deferio used his amplifier without a permit, the police could force him to go across the street.

78.     This was the first time Deferio had been told his amplifier was a concern. He offered to turn off his amplifier so he could remain on the Pride Festival side of the street, but

12

Captain Sweeny was not satisfied, saying Deferio had to leave anyway because CNY Pride had control over that sidewalk.

79.      Deferio was still incredulous of the idea that CNY Pride had control over a public sidewalk, but Captain Sweeny indicated that Syracuse lawyers concurred with this position.

80.      Deferio pointed out that he had correspondence from the corporation counsel for Syracuse indicating the opposite, particularly, that he would be allowed to speak on a public sidewalk without interference.   Nonplussed, Captain Sweeny responded that he also had correspondence from the corporation counsel saying the police could force Deferio to go across the street from the Pride Festival.

81.      Deferio asked to see the correspondence and Captain Sweeny waved Deferio to accompany him to his police car across the street. Deferio followed.

82.      Soon after they arrived, Captain Sweeny explained that the ban on Deferio's speech was linked to a policy established by Syracuse creating a 40-foot buffer zone around entrances to the Pride Festival, preventing anyone who was engaged in "protesting" from speaking there.

83.      Captain Sweeny also noted that using sound amplification with the intent to disrupt the event was strictly prohibited, even if the speaker was positioned across the street. Referring to past experiences with Captain Sweeney in other scenarios, Deferio stressed that he would never disrupt an event, and Captain Sweeny agreed with that assessment.

84.      After advising Deferio of the policy, Captain Sweeny remarked that he had said what he needed to say, and started to walk away, but Deferio asked the Captain for a copy of the correspondence from corporation counsel setting out this policy regarding the 40-foot buffer

13

zone. Captain Sweeny replied that he did not actually have a copy but he had reviewed a copy that was sent to the festival organizer.

85.    Captain Sweeny elaborated further that Doyle authored the correspondence describing the 40-foot buffer zone. Because he had his own correspondence from Doyle, Deferio recognized the name. Continuing on, Captain Sweeny reiterated that the ban is a 40-foot buffer around the entrances of the Pride Festival.

86.    Deferio discerned that the 40-foot buffer zone prevented him from being anywhere on the sidewalk adjacent to the Pride Festival but observed that the distance should put him in the middle of the street. Captain Sweeny disagreed with the calculation, concluding the 40-foot buffer would put Deferio on the other side of the street.

87.    Captain Sweeny then confirmed the 40-foot buffer zone policy required Deferio to be on the opposite side of the street during the Pride Festival.

88.    Another police officer came up and asked Deferio if he could take a photograph of Deferio and Deferio acquiesced to this request.

89.    Deferio recognized he would not be able to speak on the public sidewalk next to the festival, but he was still perplexed by the buffer zone, particularly, in light of the correspondence he had received from Doyle.

90.    Deferio explained his confusion to Captain Sweeny, saying he thought the issue was settled and that he received correspondence from Doyle indicating that he could speak on the sidewalk. To which, Captain Sweeny repeated that he was told "a 40-foot buffer zone" applied Deferio's speech and he left.

91. For fear of arrest, Deferio did not return to the Festival-side sidewalk. Deferio tried to share his message from the place Captain Sweeny forced him to be, but, as with the year prior, his efforts to share his faith from the opposite side of the street were mostly in vain. Deferio watched as members of the public were allowed to freely use the public sidewalk from where he had been exiled. A little while later, he left.

92. If not for Syracuse's policy supplying CNY Pride with proprietary control over the public sidewalk adjacent to the Pride Festival, and imposing a 40-foot buffer zone around entrances of the festival, along with accompanying threats of arrest from police officers, Deferio would have freely shared his religious message via respectful conversations from the public sidewalk on the Pride Festival side of West Kirkpatrick Street during the Pride Festival that day.

**Irreparable and Enduring Suppression of Deferio's Speech**

93. Syracuse maintains an on-going policy and practice that vests CNY Pride with the power to discriminatorily ban disfavored expression from a public sidewalk and imposes a 40-foot buffer zone that incorporates this traditional public forum within its reach. The Syracuse Police Department enforces this unconstitutional heckler's veto and buffer zone under the threat of criminal arrest.

94. While Deferio's message is banned on the public sidewalk as coming within the 40-foot buffer zone, others may freely walk around or remain stationary on that same sidewalk while engaged in expression as long as the viewpoints expressed are not disfavored by CNY Pride.

95. Sharing his views on the opposite side of the street does not afford Deferio the access he needs to have meaningful communications with Pride Festival attendees. While Pride Festival attendees greatly utilize the sidewalks on the Festival side of West Kirkpatrick Street to

15

travel to the Pride Festival, the sidewalks on the opposite side of the street are devoid of meaningful pedestrian traffic patterns, depriving Deferio of access to his desired audience. The presence of vehicular traffic on West Kirkpatrick Street separates Deferio from attendees of the Pride Festival, preventing him from reaching them.

96.     Deferio desires to convey his religious views on the public sidewalk bordering the Pride Festival, but Syracuse's policy banning him from being present within 40 feet of an entrance to the Pride Festival based on the whim of CNY Pride chills and deters him from speaking there due to fear of arrest.

97.     The next Pride Festival will occur on June 18, 2016. But the fear of arrest keeps Deferio from engaging in his constitutionally-protected expression on the public sidewalk near the Pride Festival.

98.     The impact of chilling and deterring Deferio from exercising his constitutional rights on a public sidewalk constitutes irreparable harm to him.

99.     Deferio has no adequate remedy at law for the continued denial of his constitutional rights.

## FIRST CAUSE OF ACTION

### Violation of Free Speech Clause

100.     Deferio's religious expression constitutes protected speech under the First Amendment.

101.     Defendants' policies and practices, and the enforcement thereof, including, but not limited to granting a private entity power over speech on public property, creating a 40-foot

buffer zone that incorporates a public sidewalk, and resultantly banning Deferio's expression on a public sidewalk bordering Inner Harbor during Pride Festivals:

    a.    are vague and overbroad;

    b.    single out religious speech for discriminatory treatment;

    c.    restrain constitutionally-protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the policy;

    d.    bar the free speech of Deferio and possibly other third-party citizens in a traditional public forum;

    e.    allow for the exercise of unbridled discretion;

    f.    create a content-based and viewpoint-based heckler's veto that silences Deferio's expression due to hostile audiences;

    g.    lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression; and

    h.    are unreasonable measures.

102.    Defendants have no compelling or legitimate reason that can justify their censorship of the religious viewpoints that Deferio seeks to communicate on a public sidewalk.

103.    Defendants' policies and practices, and the enforcement thereof, thus violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

**SECOND CAUSE OF ACTION**

**Violation of Due Process Clause**

104.     Defendants' policies and practices of granting a private party power over speech on public property, creating a 40-foot buffer zone that incorporates a public sidewalk, and resultantly banning expression on public sidewalk bordering Inner Harbor during Pride Festivals, are vague and lack sufficient objective standards to curtail the discretion of city officials and police officers. This gives Defendants opportunity to enforce speech restrictions in an *ad hoc*, arbitrary, and discriminatory manner.

105.     Defendants have no compelling or legitimate reason that can justify their vague policies and practices.

106.     The policies and practices, and Defendants' enforcement thereof, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Deferio respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring that the actions taken by Defendants in prohibiting Deferio from expressing his religious views on a public sidewalk while the Pride Festival was taking place in Inner Harbor on June 21, 2014 and June 20, 2015 violated Deferio's constitutional rights, specifically, his rights to free speech and due process.

C.     Enter a judgment and decree declaring Defendants' policy and practice of maintaining a 40-foot buffer zone around the entrances of the Pride Festival, encompassing a public sidewalk and other public ways, so as to ban protected speech in traditional public fora, is

18

unconstitutional on its face and as applied to Deferio's desired speech because it violates rights guaranteed under the First and Fourteenth Amendments to the United States Constitution;

D.    Enter a judgment and decree declaring Defendants' policy and practice authorizing CNY Pride to retain a heckler's veto over expression taking place on public sidewalk during Pride Festivals and censor disfavored viewpoints in traditional public fora is unconstitutional on its face and as applied to Deferio's desired speech because it violates rights guaranteed under the First and Fourteenth Amendments to the United States Constitution;

E.    Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying Defendants' policy and practice enforcing a 40-foot buffer zone around the entrances of the Pride Festival that bans protected speech in traditional public fora;

F.    Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying Defendants' policy and practice enabling a heckler's veto of a permittee so as to restrict disfavored expression on public sidewalks and ways;

G.    Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

H.    That this Court award Plaintiff nominal damages arising from the acts of the Defendants as an important vindication of his constitutional rights;

I.    That this Court award Plaintiff his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

J.      Grant such other and further relief as appears to this Court to be equitable and

just.

Respectfully submitted,

s/Nathan W. Kellum
NATHAN W. KELLUM
NDNY Bar Roll #302459
TN BAR #13482; MS BAR #8813
MARK A. MANGINI*
TN BAR #33422
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax

Attorneys for Plaintiff James Deferio
*Motion for admission *pro hac vice* forthcoming

## VERIFICATION OF COMPLAINT

I, James Deferio, a citizen of the United States and a resident of Syracuse, New York, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

_____  James Deferio
JAMES DEFERIO

21

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

| | |
|---|---|
| **JAMES DEFERIO,** | |
|         **Plaintiff,** | |
| **vs.** | Civil Action No: 5:16-cv-0361 (LEK-TWD) |
| **CITY OF SYRACUSE; FRANK FOWLER,** in his official capacity as Chief of Police for City of Syracuse Police Department, **JOSEPH SWEENY,** individually and in his official capacity as Captain for the City of Syracuse Police Department, and **JAMEY LOCASTRO,** individually and in his official capacity as Sergeant for the City of Syracuse Police Department, | **AFFIDAVIT OF JAMES DEFERIO** |
|         **Defendants.** | |

1.     My name is James Deferio and I am the Plaintiff in this case. All matters set out in this affidavit are based on my own personal knowledge.

2.     I am 65 years old and a resident of Syracuse, New York.

3.     I am a Christian evangelist and have been engaged in public ministry since 1973.

4.     I believe God has called me to tell others about Jesus Christ. I want to tell people that by trusting in Jesus as their Lord and Savior, they can be set free from their sins.

5.     In my ministry efforts, over the years, I have actively looked for opportunities to share my faith in public places. I typically go out alone.

6.     I prefer to share my faith through cordial conversations with others. This is the most effective way I can reach people with my message. The exchange gives me an opportunity to respond to specific questions and objections that others might have about my faith.



Exhibit "A"

7.     I frequently engage in open-air preaching, that is, I publically proclaim my faith. Preaching lets me reach a large number of people with my basic message. And it helps stimulate discussions.

8.     For preaching, I sometimes use a personal voice amplifier so I can speak in a normal conversational tone and be heard by those nearby over background noise. I never want to disrupt an event, so I don't get too loud. I just want to draw attention to my message.

9.     For similar reasons, I often display signs with Bible verses on them, further drawing interest in friendly conversations.

10.     When I share my faith, I place myself in a public area. I make sure people can walk by me without stopping. I do not impede traffic or cause congestion.

11.     I do not ask for donations and I do not try to sell anything.

12.     I don't force anyone to listen. I don't harass anyone or encourage violence.

13.     My message addresses religiously sensitive, but important topics. I know that some people don't like what I have to say, but I am respectful of others and their opinions and I don't intend to insult anyone. I truly believe people need to hear about Jesus before they die.

14.     I like to share my faith at public events so I can reach many people with my message. I particularly want to share the Gospel on the public sidewalk next to Inner Harbor during the Central New York Pride Festival because of the significant number of people who attend this event.

15.     I do not want to go into the Festival, be a part of the Festival, or interfere with what they're trying to do in the Festival. I just want to share my message with those attending the Festival.

2

16.     On June 21, 2014, I went to the public sidewalk along West Kirkpatrick Street during the Central New York Pride Festival to share my religious beliefs. Attached to my Motion for Preliminary Injunction as Exhibit "B" is an overhead photograph showing the portion of Inner Harbor where the Pride Festival takes place. It was obtained from Google Maps.

17.     As expected, the Festival attracted a lot of people with whom I could share my message. There were no barriers preventing me or anyone else from walking on the sidewalks or entering the Pride Festival.

18.     I positioned myself on the corner of the intersection of Kirkpatrick Street and the Onondaga Creekwalk. The sidewalk at that spot is much wider than a normal sidewalk, so I was standing without affecting foot traffic. Anyone could easily walk by me and stay on the sidewalk. Attached to my Motion for Preliminary Injunction as Exhibit "C" is a photograph obtained from Google Maps showing the wide portion of sidewalk on the Festival Side of Kirkpatrick Street on which I stood on June 21, 2014, as it appeared that month. An X marks the precise location where I was standing.

19.     Because this location is right next to a main entrance to the Pride Festival, it offers a great opportunity to speak to people as they enter or leave the Festival.

20.     I began explaining my beliefs to those nearby. Some people didn't like what I had to say, but they were peaceful. Others were more receptive to my message, and I was able to have several good conversations.

21.     After a short while, though, Sergeant Locastro and another police officer with the Syracuse Police Department walked up to me. I videotaped our conversation. Attached to my Motion for Preliminary Injunction as Exhibit "D" is a DVD showing my interaction with Sgt.

3

Locastro on the Festival Side of Kirkpatrick Street on June 21, 2014.

22.     Sgt. Locastro said that I was in violation of the festival organizer's permit and that I could not speak on the sidewalk on that side of the street. I explained I had been allowed to speak there the prior year, but Sgt. Locastro showed me the permit and said that the organizer controlled activity taking place on the sidewalk.

23.     I didn't understand how a private entity could obtain a permit for a public sidewalk, but I noticed the permit didn't include grass, so I said that I would move into the grass next to the sidewalk. But Sgt. Locastro said that he would include the grass as part of the "curtilage" in the permit.

24.     I objected, observing that he couldn't just add stuff to the permit, but he insisted that he could, and that I could only speak on the other side of Kirkpatrick Street.

25.     I did not want to speak from across the street because I could not communicate my message from there. I want to visit with people as they are going into the Festival and a vast majority of them park down the block on the same side as the Festival. Even if Festival attendees happen to see my sign, they would have no reason to cross Kirkpatrick Street and have a conversation with me, especially since vehicular traffic resumes after the parade. I was there to have conversations.

26.     I did not want to leave without getting a copy of the permit, which was supposedly the basis for kicking me off the public sidewalk, so I asked Sgt. Locastro for a copy. He demanded I move across the street before he would give me a copy.

27.     Sgt. Locastro indicated that refusal to comply immediately with his order was making our interaction a confrontation.

4

28.    Sgt. Locastro then commented that he had plenty of witnesses that he was ordering me to leave, and that if I refused I could be subject to arrest.

29.    I did not want to get arrested. From prior interactions with Syracuse police, I was familiar with Captain Sweeny of the Syracuse Police Department and I asked to speak with him, hoping we could straighten this issue out. But Sgt. Locastro refused to call him, asserting he had command and authority over the situation.

30.    I wanted to be clear on whether I would be arrested for failing to leave a public sidewalk, so I asked Sgt. Locastro directly about this. He replied that I "could" get arrested. I sought a more definitive answer and Sgt. Locastro just repeated that I could be subject to arrest.

31.    I asked what that meant, and Sgt. Locastro blithely replied "You're an intelligent man." I pointed out his answer was vague and he didn't tell me what the consequences would be. Sgt. Locastro finally gave me a straight answer and said, "If you want definitive answers, then, yes, if you refuse to move across the street, you will be arrested."

32.    I asked what the charge would be and Sgt. Locastro replied that I would be charged with disorderly conduct for failure to disperse after Sgt. Locastro ordered me to.

33.    I specifically asked for the reasoning behind the order to disperse, and Sgt. Locastro said the permit authorized the organizer to kick me off of the public sidewalk because they did not want me there.

34.    Sgt. Locastro then demanded I move across the street. I complied, and we went to the sidewalk across the street. As we crossed the street I stopped recording. Attached to my Motion for Preliminary Injunction as Exhibit "E" is a photograph of the area obtained from Google Maps. The X marks the sidewalk across the street where Sgt. Locastro forced me to go.

5

35.     After arriving, I began recording again to keep a record of what was said. Attached to my Motion for Preliminary Injunction as Exhibit "F" is a DVD showing my second interaction with Sgt. Locastro on the south side of Kirkpatrick Street on June 21, 2014.

36.     I asked Sgt. Locastro whether I was forbidden from even walking on the public sidewalk on the Inner Harbor (festival) side of Kirkpatrick Street, and Sgt. Locastro confirmed this reality, saying I couldn't be there.

37.     I offered to put my sign away, thinking that might help, but Sgt. Locastro rejected this arrangement.  He made it clear that I couldn't be there, with my sign or not, even though others were freely allowed to walk there.

38.     I pointed out that under his interpretation the Festival organizer could selectively ban anyone whose views they did not like.  Sgt. Locastro saw no problem with this, saying the organizer had the right to ban anyone they perceived as a "protestor," including me.

39.     I knew this was unconstitutional, but I did not want to get arrested, so I thanked Sgt. Locastro for answering my questions and agreed not to return to the Inner Harbor side of Kirkpatrick Street.

40.     I tried sharing my views from where I was, but because I was on the opposite side of the street as people entering the Festival, I was unable to have conversations like I wanted. While people had been interested in speaking with me when I was on the Festival side of the street, no one wanted to go out of their way and cross the street, and traffic, to talk to me.  There was little foot traffic on the far side of the street.

41.     I was discouraged about all the conversations I was missing.  Plenty of pedestrians were allowed to walk on the same sidewalk where I was banned from being.

6

Because I was unable to reach a meaningful audience, I soon left.

42.    I wanted to return to the sidewalk on the Festival side of the street during future Pride Festivals, but I knew that the organizer could have the police arrest me if they disliked what I was saying.

43.    To resolve this problem, I sent a letter, through counsel, in September 2014 to city officials explaining what happened and how my First Amendment rights were violated, and I asked them to let me to speak on the Festival side sidewalk during future Pride Festivals. A true and correct copy of this letter is attached to my Motion for Preliminary Injunction as Exhibit "G".

44.    One of the corporate counsel attorneys for Syracuse, Joseph Doyle, later called my counsel and discussed the situation. He then followed-up with a letter that promised to consider the geographic aspects of future permits to ensure that my constitutional rights would be respected. A true and correct copy of the City's response letter is attached to my Motion for Preliminary Injunction as Exhibit "H".

45.    I was encouraged by the response, but I was also worried because the letter did not specifically assure me that I could engage in my expression on the Festival-side sidewalk. So, through counsel, I sent a follow-up letter to Doyle, asking the City to give me explicit assurance that my rights not be violated again as they had in August 2014, and some other relief. A true and correct copy of my second letter is attached to my Motion for Preliminary Injunction as Exhibit "I".

46.    Neither Doyle nor anyone else with the City never responded to this second letter.

47.    Despite the failure to respond, I still hoped, based on the response to my first

7

letter, that the City would not keep me from speaking on the public sidewalk during future Pride Festivals.

48.    So, on June 20, 2015, I returned to the public sidewalk on the Inner Harbor side of Kirkpatrick Street to share my views with people as they entered the 2015 Pride Festival.

49.    I did not try to enter the Festival, I just went to the wide portion of sidewalk near the entrance, just as I did the year before. Attached to my Motion for Preliminary Injunction as Exhibit "J" is a photograph obtained from Google Maps showing the wide portion of sidewalk on the Festival Side of Kirkpatrick Street on which I stood on June 20, 2015. It is the same photograph from June 2014, with the X now marking the precise location where I stood in 2015.

50.    But before I could even begin, a private security guard came toward me and became physically aggressive. He pushed me into the street. I returned to the sidewalk and after a few minutes of conversation, some bystander suddenly struck me for no reason.

51.    Soon after this, I was approached by Captain Sweeny and another Syracuse police officer. I recorded the conversation that followed. Attached to my Motion for Preliminary Injunction as Exhibit "K" is a DVD showing my interaction with Captain Sweeny on the Festival side of Kirkpatrick Street June 20, 2015.

52.    Captain Sweeny said I had to go to the other side of the street. I asked Captain Sweeny why I would have to move. Captain Sweeny replied that the Festival organizer had control over the public sidewalk.

53.    I was surprised this same problem had come up again after the City attorney had promised they would start considering geographic aspects.

54.    I asked whether I would be arrested if I refused to leave the sidewalk, and Captain

8

Sweeny replied that I "could be."

55.     I didn't want to go through this "could be" stuff again, so I asked Captain Sweeny what would be the determining factor in whether I would be arrested.  Before answering my question, Captain Sweeny asked that I speak to him without the amplifier, so I turned my amplifier off and repeated the question.  Captain Sweeny replied that I would be arrested because the Festival organizer had control over the sidewalk and I didn't have a permit to use amplification there.

56.     This was the first time any issue about amplification was ever mentioned to me.  I did not want to leave, so I agreed to keep my amplifier off so that I could remain on the Festival side sidewalk.  But this was not good enough.  Captain Sweeny responded that I still had to move across the street because the Festival organizer had control of the public sidewalk.

57.     I protested that the sidewalk was a public sidewalk, but Captain Sweeny said that the City's attorney instructed him that they could force me to move across the street.  I was shocked to hear this, since City attorney indicated to me that I could be there and speak.

58.     I pointed out to Captain Sweeney that I had correspondence from a City attorney indicating my right to speak on a public sidewalk, but Captain Sweeny replied that their correspondence from the City lawyer instructed them to force me across the street.

59.     I couldn't believe it. The two letters seemed to contradict each other.  I asked to see a copy of that correspondence, and Captain Sweeny agreed to show it to me, but asked for me to come over to his car to discuss it further, so I followed him across the street and soon turned off my camera.

60.     Shortly after crossing the street, I resumed recording.  Attached to my Motion for

9

Preliminary Injunction as Exhibit "L" is a DVD showing my interaction with Captain Sweeny on the south side of Kirkpatrick Street on June 20, 2015.

61.     Captain Sweeny explained that the City had established a 40-foot buffer zone around the entrances to the Pride Festival and that the police were supposed to ban anyone who would be viewed as protesting.

62.     I wasn't protesting the event or homosexuality, I just wanted to share my faith, but it didn't matter because the Pride Festival viewed me as a protestor.

63.     Captain Sweeny also advised that amplification could not be used to intentionally disrupt what was going on inside the Festival. Captain Sweeny knows me, and I pointed out that I would never try to disrupt the Festival, and he acknowledged that I would never do that.

64.     I still wanted to see the correspondence that described the 40-foot buffer zone policy, so I asked for a copy of it, but Captain Sweeny clarified that he didn't actually have a copy of it. Captain Sweeny said the Festival organizer had a copy of correspondence from Joseph Doyle describing the policy enforcing a 40-foot buffer zone on my speech.

65.     From what I could see, I estimated that 40 feet from the entrance would put me in approximately in the middle of the street, but Captain Sweeny said it would put me on the sidewalk on the opposite side of the Festival.

66.     To confirm, I pointed from the entrance to the opposite sidewalk and asked for confirmation that that entire area was supposedly permitted to the Festival organizer and I was banned from speaking anywhere on that sidewalk, and Captain Sweeny told me that was correct.

67.     The other officer asked to take a photograph of me and I consented.

68.     I asked how I could acquire a copy of that correspondence, and Captain Sweeny

10

said I would have to speak with Joseph Doyle.

69.   I explained that I had thought this issue had been resolved after corresponding with Joseph Doyle, but Captain Sweeny maintained that he had received instruction to ban speech within the 40-foot buffer zone from Doyle.

70.   I could tell that we were at an impasse, and not wanting to get arrested, I agreed to stay on the opposite side of the street.  The officers left.  Attached to my Motion for Preliminary Injunction as Exhibit "M" is a photograph of the area obtained from Google Maps.  The X marks the sidewalk across the street where I was once again forced to go.

71.   I tried to share my views from there, but just like the previous year, I wasn't able to have that many conversations and left a short while later.

72.   I am disappointed in how this was handled.  I wanted to avoid a lawsuit.  I had tried working this out with the City but instead of alleviating the problem, as the lawyer indicated they would, the City enforced a 40-foot buffer zone on my speech.

73.   The next Pride Festival is coming up on June 18, 2016.  I strongly desire to share my message with people on the sidewalk on the Festival side of Kirkpatrick Street, but unless this court grants relief, I cannot or else I will be arrested.

74.   I need relief from this ban on my religious expression on the public sidewalk during the upcoming Pride Festival and future Festivals.

11

I declare under the penalty of perjury that the foregoing is true and correct to the best of

my knowledge.

JAMES DEFERIO

STATE OF NEW YORK
COUNTY OF Onondaga

On this 11 day of March, 2015, before me, a Notary Public of the State and
County aforesaid, personally appeared James Deferio, to me known (or proved to me on the
basis of satisfactory evidence), and who, upon oath, acknowledged that he executed the
foregoing instrument for the purpose therein contained.

Notary Public

My Commission Expires:

4/20/2019

RANDY DUDLEY
No. 01DU6162945
Notary Public, State of New York
Qualified in Onondaga County
My Commission Expires 03/19/28
4-20-19

12



Inner Harbor Amphitheater

Inner Harbor

Exhibit "B"



EXHIBIT
C
3/21/17 mb
PENGAD 800-631-6989



Inner Harbor
Amphitheater

*Inner Harbor*

W Kirkpatrick St

W Kirkpatrick St

Google

Imagery ©2016 Google, Map data ©2016 Google    Terms

Exhibit "B"



Exhibit "C"



EXHIBIT

D

3/21/17
PENGAD 800-631-6989



Exhibit "C"



**WARNING!**

"Do you not know that the unrighteous shall not inherit the Kingdom of God?

Do not be deceived!

neither fornicators, nor idolaters, nor adulterers, nor homosexuals, nor sodomites, nor thieves, nor covetous, nor drunkards, nor revilers, nor extortioners shall inherit the Kingdom of God."

1 Corinthians 6:9-10

PENGAD 800-631-6989

EXHIBIT

E



**THE PROBLEM:**

For the wages of sin is death.

**THE SOLUTION:**

But the gift of God is eternal life through Jesus Christ our Lord.

Romans 6:23

PENGAD 800-631-6989

EXHIBIT
1
3/21/17 mh



EXHIBIT
G
3/21/17 MA
PENGAD 800-631-6989



PENGAD 800-631-6989

EXHIBIT H

 **Photos from syracuse.com**
News, Sports, Entertainment, CNY Life & More Photos.

# Wedding Ceremony at CNY Pride Festival



Saturday, June 21, 2014 3:19 PM

**Search for Photos**

**From The Post-Standard**

Subject, keyword, photographer, tag...

All Categories      All Dates

Return to Home Page

This gallery:
**Wedding Ceremony at CNY Pride Festival** (21 photos)

  

**Protect Your Business**
with the General Liability Experts



COMMERCIAL & PERSONAL INSURANCE
GROUP BENEFITS

0

**By David Lassman | dlassman@syracuse.com**
Follow

The CNY Pride Festival hosts its first ever wedding today between Michelle LaVancha and Sara Verne at the Inner Harbor. Following the ceremony the wedding party including Sara (left, center) and Michelle along with Madison DeVine (Tim Reitz who officiated the wedding) went over to stand next to protester Jim Deferio who is set up across the street. June 21, 2014 David Lassman | dlassman@syracuse.com

Share this photo       Story tools    Email    Print


EXHIBIT
I
3/21/17

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0168

http://photos.syracuse.com/post-standard/2014/06/wedding_ceremony_at_cny_pride_festival_11.html       1/2

**Related articles**

- **Watertown couple makes history with first ever wedding at CNY Pride Festival (gallery)** June 21, 2014, 3:45 PM
- **I-690 reopens, support the Syracuse Chiefs and 7 more stories you missed this weekend** June 23, 2014, 8:30 AM
- **Federal appeals court: States can't ban gay marriage** June 25, 2014, 4:33 PM

**Related galleries**

- **Wedding Ceremony at CNY Pride Festival**

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2016 Syracuse Media Group. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Syracuse Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

« Florida's Anti-Gay Attorney General Pam Bondi Taken to Task by Anderson Cooper for Her Past Bigotry

Televangelist Jim Bakker's Guest: The "Spirit of Antichrist" Lies in Hillary Clinton »

## Judge Strikes Down "Buffer Zone" for Christian Preacher During Central New York Pride Festival

June 14, 2016 (2016-06-14T11:20:20-00:00) by Hemant Mehta <http://www.patheos.com/blogs/friendlyatheist/author/hemant-mehta/>

**Jim Deferio** is one of those anti-gay Christian preachers who shows up at Pride parades with giant signs letting the crowd know they're all going to Hell. At this point, it's such a cliché, I wouldn't be surprised if some people stood near him just so they could get a picture.



But let's not forget it's a pretty horrible thing, too. Someone is basically saying LGBT individuals are doomed to be tortured for all eternity because they're not following this guy's interpretation of his favorite book. If we weren't so used to biblical bigotry, maybe we'd be more shocked.

Deferio has had less of an impact on recent Pride festivals in Syracuse, New York because police made him observe a 40-foot "buffer zone" away from participants. That's about to change <http://www.syracuse.com/crime/index.ssf/2016/06/judge_rules_buffer_zone_kept_anti-gay_protester_away_from_cny_pride_fest.html>, though:



"

... this year, **U.S. District Judge Lawrence Kahn ordered that Deferio must not
be prohibited from protesting on the sidewalk in front of the festival entrance.**

...

But the buffer zone at the yearly Inner Harbor festival restricted Deferio's right to talk to
people freely in a public space, Kahn ruled.

...

**Video of prior years' protests show Deferio did not block foot traffic or cause a
safety problem,** the judge ruled. And any concerns could be dealt with using less
restrictive measures, such as an order that Deferio not block entrance to the festival, the
judge ruled. (There's no evidence Deferio blocked entrances in past years.)

"

In other words, because Deferio is in public space and not *technically* in the way of
anyone there for the festival, there's no legal reason he must remain at a distance. I
guess you could call that a victory for free speech.

But it's worth noting that Deferio has called for physical
violence *<https://www.facebook.com/jim.deferio/posts/1129309009660x30>* against the trans community, base
on the sort of fear-based lies spread by conservative Christian groups:



**Jim Deferio**
April 7 · 

If some dude goes into the rest room while your wife or daughter is in there
you need to man up and knock the queer right out of them. Show no mercy.
Yes, I am advocating violence - justified violence.

*0*

"

If some dude goes into the rest room while your wife or daughter is in there **you need to
man up and knock the queer right out of them.** Show no mercy. **Yes, I am
advocating violence — justified violence.**

"

What's to say Deferio wouldn't physically attack people at the Pride event because he
fears they're "recruiting" kids or ruining straight marriages or some other bullshit
Christian myth?

I'm all for freedom of speech, but the judge could easily have been justified in keeping
the buffer in place based on the *totality* of Deferio's views (and not just his actions at
past festivals). Instead, he ignored the Facebook comment — it's possible there are
more where that came from — and LGBT people will now have another reason to be
worried this Saturday when the CNY Fest takes place.

Avoid him if you can, everyone.

(Image via Facebook<https://www.facebook.com/reignamerica/photos/a.100000458132660/1865828990008/?type=3&theater>. Thanks to **Chris** for the link)

| [f] (Facebook) 543 | [t] (Twitter) | [G+] (Google+) | [p] (Pinterest) 2 | [⟳] (More Options) |

**Related posts from Friendly Atheist:**

(Judges Rule in Favor of Student-Delivered Christian Invocations at TX District's Board Meetings)

Judges Rule in Favor of Student-Delivered Christian Invocations at TX

(Katy Perry's Memorable Move from Jesus Camps to Kissing Girls: "People Can Change")

Katy Perry's Memorable Move from Jesus Camps to Kissing Girls

(A TX School is Helping Muslims, So the Attorney General Now Cares About Church/State Separation)

A TX School is Helping Muslims, So the Attorney General Now Cares About

(Tennessee Republicans Want the Phrase "In God We Trust" on Every License Plate in the State)

Tennessee Republicans Want the Phrase "In God We Trust" on Every

« Florida's Anti-Gay Attorney General Pam Bondi Taken to Task by Anderson Cooper for Her Past Bigotry

Televangelist Jim Bakker's Guest: The "Spirit of Antichrist" Lies in Hillary Clinton »



**About Hemant Mehta**

**Hemant Mehta** is the editor of Friendly Atheist, appears on the Atheist Voice channel<https://www.youtube.com/user/TheAtheistVoice/> on YouTube, and co-hosts the uniquely-named Friendly Atheist Podcast<http://friendlyatheistpodcast.com/>. You can read much more about him here<http://www.patheos.com/blogs/friendlyatheist/about-the-contributors/>.

---

**352 Comments**    Friendly Atheist                    🔴 Login ᐯ

♡ Recommend  1          ⤴ Share                    Sort by Best ᐯ

👤  Join the discussion…

**Doug105** • 9 months ago



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

RECEIVED
2016 NOV 17 AM 11:46
CITY OF SYRACUSE
DEPARTMENT OF LAW

JAMES DEFERIO,

        **Plaintiff,**

vs.

**CITY OF SYRACUSE; FRANK FOWLER,**
in his official capacity as Chief of Police for
City of Syracuse Police Department, **JOSEPH
SWEENY,** individually and in his official
capacity as Captain for the City of Syracuse
Police Department, and **JAMEY
LOCASTRO,** individually and in his official
capacity as Sergeant for the City of Syracuse
Police Department,

        **Defendants.**

Civil Action No: 5:16-cv-0361 (LEK-TWD)

**PLAINTIFF'S RESPONSES TO
DEFENDANTS' REQUEST FOR
ADMISSIONS – GENUINENESS OF
DOCUMENTS**

      Plaintiff James Deferio states the following in response to Defendants' Requests for

Admissions:

      **You are requested to admit to the following facts:**

      <u>**REQUEST NO. 1:**</u>  That "Facebook" is an online social media and social networking

service.

      <u>**RESPONSE:**</u>  Plaintiff lacks personal knowledge to admit or deny this request.

      <u>**REQUEST NO. 2:**</u>  That Facebook allows registered users to have profiles free of

charge.

      <u>**RESPONSE:**</u>  Admit.



**EXHIBIT**
K
3/21/17

**REQUEST NO. 3:** That Plaintiff has and operates a Facebook profile.

**RESPONSE:** Admit.

**REQUEST NO. 4:** That Plaintiff's Facebook profile user name is "Jim Deferio."

**RESPONSE:** Admit.

**REQUEST NO. 5:** That "Facebook" has security settings.

**RESPONSE:** Plaintiff lacks personal knowledge to admit or deny this request.

**REQUEST NO. 6:** That the security settings of Facebook allow a profile user to have a "public account."

**RESPONSE:** Plaintiff lacks personal knowledge to admit or deny this request.

**REQUEST NO. 7:** That a public account on Facebook is viewable and/or may be interacted with by any and all Facebook users.

**RESPONSE:** Plaintiff lacks personal knowledge to admit or deny this request.

**REQUEST NO. 8:** That Facebook allows users to share pictures and other media, make comments, and share messages with other users.

**RESPONSE:** Admit.

**REQUEST NO. 9:** That Plaintiff's Facebook profile was a public account from September 14 through September 16.

**RESPONSE:** Admit.


**REQUEST NO. 10:** That Plaintiff's Facebook profile page has a world wide web address of "www.facebook.com/jim.deferio".

**RESPONSE:** Admit.


**You are requested to admit the genuineness of the following described documents:**

**REQUEST NO. 11:** Plaintiff's Facebook profile showing a June 27, 2016 post and comment made by Plaintiff followed by comments by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0208.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.


**REQUEST NO. 12:** Plaintiff's Facebook profile showing a June 15, 2015 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0170.

3

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 13:** Plaintiff's Facebook profile showing a June 20, 2015 post and comment made by Plaintiff followed by comments by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0171.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 14:** Plaintiff's Facebook profile showing a June 20, 2015 comment

4

made by Plaintiff on a post on his Facebook page, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0172.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 15:** Plaintiff's Facebook profile showing a June 20, 2015 post and comment made by Plaintiff followed by comments by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0173.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

5

**REQUEST NO. 16:** Plaintiff's Facebook profile showing a June 16, 2014 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0174.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 17:** Plaintiff's Facebook profile showing a June 21, 2014 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0175.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his

objection to the admissibility of this document.

**REQUEST NO. 18:** Plaintiff's Facebook profile showing a June 22, 2014 and June 23, 2014 comments made by Plaintiff, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0176.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 19:** Plaintiff's Facebook profile showing a June 21, 2014 comment made by Plaintiff followed by comments by Plaintiff on his Facebook page on June 23, 2014, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0177.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these

objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 20:** Plaintiff's Facebook profile showing a June 27, 2014 comment made by Plaintiff followed by comments by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0178.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 21:** Plaintiff's Facebook profile showing a June 27, 2014 comment made by Plaintiff, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0179.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of

8

this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 22:** Plaintiff's Facebook profile showing a September 13, 2016 ("Yesterday") comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0180.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 23:** Plaintiff's Facebook profile showing a September 13, 2016 ("Yesterday") post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0181.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible

evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 24:** Plaintiff's Facebook profile showing a September 11, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0182.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 25:** Plaintiff's Facebook profile showing two September 9, 2016 posts and comments made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0183.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced

document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 26:** Plaintiff's Facebook profile showing a September 8, 2016 post and comment made by Plaintiff followed by a comment by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0184.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 27:** Plaintiff's Facebook profile showing a September 8, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is

11

attached as Exhibit "A," Bates Stamp number 0185.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile.  Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 28:**  Plaintiff's Facebook profile showing a September 7, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0186.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile.  Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 29:**  Plaintiff's Facebook profile showing a September 6, 2016 post and

comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0187.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 30:** Plaintiff's Facebook profile showing a September 4, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0188.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 31:** Plaintiff's Facebook profile showing two September 3, 2016 posts and comments made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0189.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 32:** Plaintiff's Facebook profile showing an August 31, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0190.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

14

**REQUEST NO. 33:** Plaintiff's Facebook profile showing two August 27, 2016 posts and comments made by Plaintiff followed by a comment by Plaintiff on his Facebook page on the second post, a copy of which was a screenshot taken on September 16, 2016, is attached as Exhibit "A," Bates Stamp number 0191.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 34:** Plaintiff's Facebook profile showing two August 27, 2016 posts and comments made by Plaintiff followed by a comment by Plaintiff on his Facebook page on the first post, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0192.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these

15

objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 35:** Plaintiff's Facebook profile showing an August 26, 2016 post and comment made by Plaintiff followed by a comment by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0193.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 36:** Plaintiff's Facebook profile showing an August 25, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0194.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of

this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 37:** Plaintiff's Facebook profile showing an August 15, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0195.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 38:** Plaintiff's Facebook profile showing two August 10, 2016 posts and comments made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0196.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible

17

evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 39:** Plaintiff's Facebook profile showing an August 8, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0197.

**RESPONSE:** Plaintiff objects to this request as vague regarding which August 8 post and comment from the document Defendants are referring to. In either event, Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 40:** Plaintiff's Facebook profile showing an August 1, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is

18

attached as Exhibit "A," Bates Stamp number 0198.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 41:** Plaintiff's Facebook profile showing a July 17, 2016 post and comment made by Plaintiff followed by a comment by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0199.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 42:** Plaintiff's Facebook profile showing a July 15, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0200.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 43:** Plaintiff's Facebook profile showing a July 14, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0201.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 44:**  Plaintiff's Facebook profile showing a July 14, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0202.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence.  Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case.  Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile.   Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 45:**  Plaintiff's Facebook profile showing a July 4, 2016 post and comment made by Plaintiff followed by a comment by Plaintiff on his Facebook page, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0203.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence.  Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case.  Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits

the screenshots portray genuine posts on Plaintiff's Facebook profile.  Plaintiff reserves his objection to the admissibility of this document.


**REQUEST NO. 46:**  Plaintiff's Facebook profile showing a June 30, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0204.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile.  Plaintiff reserves his objection to the admissibility of this document.


**REQUEST NO. 47:**  Plaintiff's Facebook profile showing a June 30, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0205.

**RESPONSE:**  Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots.   However, without waiving these

objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 48:** Plaintiff's Facebook profile showing a June 29, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0206.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 49:** Plaintiff's Facebook profile showing a June 28, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0207.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal

23

knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 50:** Plaintiff's Facebook profile showing a June 27, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0209.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 51:** Plaintiff's Facebook profile showing a May 26, 2016 post and comment made by Plaintiff, a copy of which was a screenshot taken on September 14, 2016, is attached as Exhibit "A," Bates Stamp number 0210.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of

24

this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

**REQUEST NO. 52:** Plaintiff's Facebook profile showing a May 23, 2016 post and comment made by Plaintiff followed by a comment by Plaintiff on his Facebook page, a copy of which is a screenshot, is attached as Exhibit "A," Bates Stamp number 0211.

**RESPONSE:** Plaintiff objects to this request on the grounds that the referenced document is irrelevant, immaterial, and not reasonably calculated to produce admissible evidence. Whether Plaintiff posted the content at issue bears no relation to the subject-matter of this case. Furthermore, Plaintiff cannot admit or deny the request as worded as he lacks personal knowledge as to the nature/origin of the screenshots. However, without waiving these objections, and in a good-faith effort to support a cooperative discovery process, Plaintiff admits the screenshots portray genuine posts on Plaintiff's Facebook profile. Plaintiff reserves his objection to the admissibility of this document.

Respectfully submitted this 11th day of November, 2016.

s/Mark A. Mangini
MARK A. MANGINI*
TN BAR #33422
NATHAN W. KELLUM
NDNY Bar Roll #302459
TN BAR #13482; MS BAR #8813
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax
mmangini@crelaw.org
nkellum@crelaw.org

Attorneys for Plaintiff James Deferio
*Admitted to practice *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of November 2016, I served the foregoing pleading by sending a copy via U.S. Mail, postage prepaid to John A. Sickinger and Todd M. Long, 300 City Hall, 233 East Washington Street, Syracuse, NY 13202.

s/Mark A. Mangini
Attorney for Plaintiff



Jim Deferio

i was granted a preliminary injunction against the City of Syracuse for their un-
Constitutional buffer zone against me at the pride festival at the Syracuse
Inner Harbor. In 2014 and 2015 I was made to depart from the public sidewalk
under threat of arrest.

I preached there ON THE SIDEWALK June 16, 2016 with a pastor friend of
mine, Tony. I was the only Christian from the Syracuse area willing to share
the Gospel with the lost at the CNY Pride Festival (Tony is closer to Rochester
than Syracuse).

cases.justia.com
CASES.JUSTIA.COM

↪ Share

💬 3

Tony Alexander It's good to see you back. I noticed you had turned your
Facebook off.
June 27 at 9:36pm

Jim Deferio I had to. The homosexuals and atheists are extremely intolerant and
mean-spirited and they were spamming me and making physical threats. I
blocked many people and deleted many photos. One put up a phony Facebook
account in my name. I think it was this lame anti-theist from Vermont. Among his
life pursuits he is into Medieval warfare and spamming Christians. I bet he
worships Warcraft the video game.
👍 1 · June 27 at 11:12pm

Jim Deferio
June 27 · 🌐

I deleted most of the people on my friends list from two weeks ago. There are
so many fake Christians that it makes me sick. If you are not living by these
two verses then please unfriend me (eventually I'll unfriend you).

2 CORINTHIANS 5:14-15
"For the love of Christ compels us, because we judge thus: that if One died for

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0208


EXHIBIT



downloaded three different English versions of the Qur'an on her I-Phone. She can easily refute Islam from a purely logical (philosophical) point of view (she was born with a gift for logic) but wants to learn more about the book. She said Muslims think like KJV Onlyists. lol (i.e. they argue in a vicious circle using the exact same arguments that KJV Onlyists use). Yes, I do have to laugh...

Share

1

**Jim Deferio**
June 15, 2015 ·

**HOMO FLAG RAISING & VAN ROBINSON**
I missed preaching at the homo flag raising rally at Syracuse City Hall this morning. I've been battling a severe upper respiratory infection (perhaps caused by a combination of my two grandsons being at the house while they were still a bit sick and our very old air conditioner). I was coughing so much that I didn't fall asleep until about 6:30 am and I woke up at about 11:47 am very groggy and with a hoarse voice.

Out sexually confused mayor, S. Miner, hosts this event every year and black Common Council member VAN ROBINSON is always there to "represent" the Syracuse black community's support of sexual perversity. I have been preaching at this event since it started about 12-13 years ago (I missed one year while my lawyer looked into a matter for me). I have yet to see a black Christian from the Syracuse community speak up against this evil.

In the past I have asked Robinson repeatedly (publicly over my amp) if his blackness is as mutable as homosexuality is but he refuses to answer me. He's a very wicked guy who blames black poverty, crime and inopportunity on I-81 dividing the city into two halves. This is absolutely absurd because I-81 parallels the railroad tracks through the black section of the city. The RR has been there since about 1864!!! Robinson is nothing but a perverse race hustler. Why aren't the black churches speaking out against this guy?

Share

**Jim Deferio**
June 15, 2015 ·

**SMH**
I'm shaking my head because I read today that the movie JURASSIC WORLD hauled in at least $512 MILLION worldwide over the weekend (a record) while the extremely well directed, acted and scripted FAR FROM THE MADDING



Sponsored

Gluten Free

Lucky Charms
luckycharms.com
Your day just got luckier!
Lucky Charms are Gluten
Free!

Brazi Bites Cheese Bread
Enter our giveaway for the
chance to win 4 bags of
gluten-free Brazi Bites cheese
bread! H...

Like Page

June 20, 2015 at 6:39pm

**Jim Deferio**
June 20, 2015

**SEXUAL PERVERTS' DAY IN SYRACUSE**
God gave the rainbow to a righteous man, Noah, not to the unrighteous.
Today in Syracuse the sexual perverts in the area congregated to celebrate
sin, irrationality, eros, and perversity.

I was once again the only Christian at the pride parade and festival (3 plus
hours) and I was assaulted (I will be filing charges against the guy) and called
every filthy name in the dirty name book and flipped off by many including
children being raised by wicked parents who can't think above the waistline.

Many told me they were Roman Catholics. Figures. More and more are
confessing that they were sexually molested and/or raped and that was their
pathway into homosexuality. They still have NO EXCUSE. You don't do evil
and justify evil because someone did evil to you. Here's the difference in
2015: I'm seeing that people are using their past sexual molestation to harden
their hearts and become "homosexual activists".

Bruce Carter, who refers to himself as "Dr.", was there. I have publicly
challenged Bruce to a face to face debate at Syracuse University but he
wimps out. Yeah, he can bully children into thinking they were "born gay" but
when confronted by a real man he runs. I wonder about his past...
Wow Bruce, you have a doctorate... BIG DEAL! I have two science degrees
and 230 semester hours of college. Debate me!

Now, on to some thing else. This is what I think: I think there will be greater
wrath on all of the worldly and cowardly Christians in Central NY than on
those who don't know Christ as Lord and Savior. The reason being is that they
know God's will and have denied Christ by their apathy, cowardice, and
worldliness.

LUKE 12:47-48
"And that servant who knew his master's will, and did not prepare himself or
do according to his will, shall be beaten with many stripes.
But he who did not know, yet committed things deserving of stripes, shall be
beaten with few. For everyone to whom much is given, from him much will be
required; and to whom much has been committed, of him they will ask the
more."

JAMES 4:17
"Therefore, to him who knows to do good and does not do it, to him it is sin."

Share



Sponsored

Relax & Recharge
www.hyatt.com
Relax knowing you got the
best available rate. Book
direct at Hyatt.com.

Personalized Baby Blanke...
lollywollydoodle.com
Personalized baby blankets
for your bundle of joy.
Handmade with love and care
in NC, USA!

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0172



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0173



Sponsored

Family organization witho...
thetreehouseapp.com
Have Treehouse do the dirty
work for you. Shared
calendars and to-do lists help
you create...

Get a $75 Coupon Now!
skinlaze.com
The Trusted Leader in Laser
Hair Removal & Skin
Rejuvenation in Syracuse and
Central NY

**Jim Deferio**
June 16, 2014

HOMO FLAG RAISING AT SYRACUSE CITY HALL

I am grateful that God has given me great health and a strong voice and a clear mind. I do die to self to go out and preach and witness and I use the abilities that God gave me.

This is what bothers me: WHERE ARE ALL OF THE OTHER CHRISTIANS! I was the only Christian at Syracuse City Hall this afternoon to preach to the crowd that gathered for the homo flag raising. There was a good-sized crowd of the sexually immoral, immoral politicians, immoral media journalists, and the other sin-laden pagans.
WHERE WERE ALL OF THE CHRISTIANS???
(They must be having coffee at Cafe Kubal. After an hour at City Hall I then went to another part of downtown near this cafe and preached and witnessed for another hour. I wonder what the "Christians" in this cafe thought?).

This is the sign I used today.
https://www.facebook.com/photo.php...

Share

4

Don Konz You're right Jim, most Christians just hide in their church bldgs and when in public remain silent... about everything! If I was over where you are I would have gone with you!
June 16, 2014 at 10:50pm · 1

**Tim Connelly** ▶ Jim Deferio
June 15, 2014 · Carmichael, CA

Happy Fathers Day, Jim!

1

Jim Deferio Hey, thanks!
Happy Father's Day to you!
June 15, 2014 at 8:44pm

Tim Connelly Right on, thanks Jim!
June 15, 2014 at 8:53pm

Jim Deferio



At the Syracuse "gay" pride event today, two people opened up to me about how they become "gay." One young man, who looked like he was about 18 years old, told me that his father raped him six years ago; a young woman told me that her husband was brutally beating her so she left him and is now in a relationship with another woman. Over the years I have heard far too many stories like this.

"Homosexuals" are MADE that way, NOT born that way.

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0175



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0176



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0177



Sponsored

Steven Hunsberger, Agent
Accidents happen, but my
team will help you get back
quickly. Get to a better State®

2016 Chevy Trax AWD - T...
cnychevy.com
Find new roads in the 2016
Chevy Trax AWD. Now lease
Trax for as low as $169 a
month. Offe...

Jim Deferio
June 27, 2014

Me (noooo, not in the forefront - behind the flag) at the Syracuse homosexual
flag raising ceremony at Syracuse City Hall on June 16, 2014.
These two guys trying to block me with their rainbow flag were also
threatening me with physical assault. This went on for 5-10 minutes and then
two police officers came over to tell me that I had to go across the street. I
refused. They said just don't disrupt the speeches and I told them that I wasn't
there to do that but that I will continue to preach using amplification before and
after the speeches. Those two guys left me alone after that.
How sad and wicked for this old person with one foot in the grave celebrating
a deathstyle!
Photo by the Syracuse New Times.

Share

6

Jim Deferio Here is the short video that the Syracuse New Times did. I'm glad
they had that audio bite from me right after the old homosexualist spoke, "The
Bible says let God be true but every man a liar." This guy was certainly a LIAR.

https://www.youtube.com/watch?v=Vu63YWOqpmY

CNY Pride Flag Raising - June
16th, 2014



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0179



Jim Deferio
Yesterday at 1:09pm

American feminists couldn't care less though. They're too busy having same-sex relations with one another and aborting babies and screaming at American men.

**7-Year-Old Girl Slaughtered by Her Muslim Father After Mother Left Islam | Pamela Geller**

7-Year-Old Girl Slaughtered by Her Muslim Father After Mother Left Islam By Pamela Geller on September 12, 2016 Apostates and "Moderate" Muslims Muslim...

PAMELAGELLER.COM

Share

6

1 share

Sponsored

WordPress.com
wordpress.com
Join the 27% of websites that are powered by WordPress: Outstanding Designs & Custom Domains

When you switch to AT&T
smallbiz.att.com
Shop small business offers now

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0180



Sponsored

Create Your Premium Web...
WordPress.com
Don't delay, create your
website today! Choose the
power of dedicated
WordPress hosting, a...

When you switch to AT&T
smallbiz.att.com
Shop small business offers
now

**Jim Deferio**
Yesterday at 12:20am

Learn to defend Christianity against the hate-filled homosexualists, atheists and anti-theists.

"Written by an L. A. County homicide detective and former atheist, Cold-Case Christianity examines the claims of the New Testament using the skills and strategies of a hard-to-convince criminal investigator."

https://www.amazon.com/Cold-Case-Christianity-.../.../1434704696

COLD-CASE
CHRISTIANITY

J. WARNER
WALLACE

Share

**Jim Deferio**
Yesterday at 12:09am

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0181



**Jim Deferio**
September 11 at 12:59pm

**EVOLUTIONISM IS A RELIGION AND IT IS ANTI-SCIENCE**

"When officials removed the Bible from public school classes, they didn't remove religion but eliminated Christianity and instead imposed the atheistic religion. When students in schools are told life arose by natural processes, they're being taught the religion of naturalism, which is atheism. And when schools teach naturalism to students, they are using tax dollars to impose a religion on the students—it's an anti-God religion. 85-90% of kids from church homes attend public schools and most are taught the religion of atheism/naturalism daily—what are parents doing about this?

Ask evolutionists for evidence for molecules-to-man evolution. There's nothing directly they can point to that makes it obvious—it's a belief. Evolutionists impose their naturalistic worldview on the evidence and try to brainwash people that evolution's obvious—when it's not. Evolution is really presented as a story to supposedly explain how life arose—a story imposed on evidence—a story you can't actually observe.

The majority of people want students taught different views of origins, but secularists are intolerant of that so only their view is imposed. If students were taught how to think correctly about science, and taught the difference between observation and interpretation, they'd see evolution as a belief. When you look at the actual evidence (not made-up models) in glass cases at museums, you don't see evolution—evolution's the story pasted on the case. Evolution doesn't explain the evidence of the present, it's a made up story that when scrutinized using observational science totally fails."
By KEN HAM

Share

**Jim Deferio** added **4 new photos.**
September 10 at 5:23pm



**Jim Deferio**
September 9 at 3:33pm

BE CAREFUL WHO YOU GIVE MONEY TO
I don't receive a penny for all of the evangelism that I do or have done (and I have been on both coasts preaching). I don't want money and I always refuse donations. I do realize that there are maybe one or two people in America who do need and rely on financial support for their college preaching ministry because they literally are doing it Monday through Friday of almost every week.

Some people have asked my wife and I for financial support because "God called them to be missionaries overseas." I ask them if they have ever evangelized in their own home town and State and usually the answer is that they haven't. So, if these dreamers are not willing to obey the Bible of starting at "Jerusalem" then they deserve rebuke, not money.

I want to encourage all Christians who read this that they must evangelize. Simply handing out tracts is a very effective form of evangelism and tracts helped me to eventually come to Christ. A friend of mine here in Syracuse just told me about two people who were saved because they read a tract that he handed out.

Get off your butts and stop making excuses. The atheists are not lazy like some of you are.

➤ Share

**Jim Deferio**
September 9 at 12:58pm

If you go by FEELINGS instead of FACTS, you have mentally disabled yourself and you are like a car broken down on the side of the highway whose mechanically-challenged driver refuses assistance.

➤ Share

**Jim Deferio**
September 9 at 12:49pm

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0183



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0184



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0185



Jim Deferio
September 7 at 7:07pm

Liberals are so blind. It is NOT the fact that NFLer COLIN KAEPERNICK refuses to stand for the Pledge that has morally upright people and patriots upset but the REASONS this wicked Muslim guy is giving for not standing.

He is a Muslim ingrate who pledges allegiance to a barbaric murderous and illogical religious ideology and who refuses to acknowledge that his black father is lower than a snakes navel.

Lets hear him acknowledge that it's because of godly white people that there is freedom in this nation to pursue your dream if you work hard. Don't hold your breath! Maybe he should move to an African nation and see what they are like (but since he is only half black...).

Oh, and he was raised in a nice white family and has the opportunity to make big bucks in the NFL. What "injustice"!

Injustice in this nation is when blacks murder and rape each other and murder and rape whites. Injustice is the welfare moms having babies by several different men and expecting white taxpayers to educate, house, feed and provide medical care for their bastard children.

Injustice is having the police demonized by Black Lives Matter when black lives obviously don't matter to other blacks and neither do blue lives.

Injustice is having white taxpayers foot the bill as American blacks go to college taking fluff courses (my observation is that foreign born blacks often take the tough college curricula).

Injustice is when the black government of Flint, MI wastes taxpayer money and refuses to fix the water problems. And it goes on and on and on and on...

Share

7

Neil Konitshek I didn't know he was a Muslim!! That is hidden of course from the Lamestream media!!!
September 7 at 9:00pm

Neil Konitshek Just saw this: http://www.cbssports.com/.../kaepernick-says-hes-not.../
September 6 at 2:51am

Kaepernick says he's not Muslim, blames rumor on American Islamophobia
CBSSPORTS.COM

Sponsored

Create Your Premium Web...
WordPress.com
Don't delay, create your website today! Choose the power of dedicated WordPress hosting, a...

Macy's & Calvin Klein
www.macys.com
A good night of sleep just got better. Shop Calvin Klein's Modern Cotton bedding @ Macy's!

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0186



Sponsored

Create Your Premium Web...
WordPress.com
Don't delay, create your
website today! Choose the
power of dedicated
WordPress hosting, a...

Macy's & Calvin Klein
www.macys.com
A good night of sleep just got
better. Shop Calvin Klein's
Modern Cotton bedding @
Macy's!

**Intro**

- Studied at Oregon State Univ. and SUNY Syracuse - 2 BS Degrees
- Went to Red Creek Junior - Senior High School
- Lives in Syracuse, New York
- Married
- From Fair Haven, New York

**Photos**

**Friends**

English (US) · Español · Português (Brasil)
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ▷ · Cookies ·
More ▾
Facebook © 2016

---

**Jim Deferio**
September 6 at 3:02pm ·

Governor of New York, ANDREW CUOMO (I call him Andrew Huomo) is an exceedingly wicked man. He married Robert Kennedy's daughter, Kerry, and apparently he did it for political expediency. This is from the book, The Contender, by Michael Shnayerson:

"There was no shortage of tense and painful moments: At the Manhattan party considered the informal launch of Cuomo's campaign, the Kennedy clan was aghast to hear 'SYMPATHY FOR THE DEVIL' by the Rolling Stones played at 'rousing volume.'" Shnayerson writes.

"The Kennedys, who had lost two of their loved ones to assassins' bullets, listened, 'disbelieving.'" Shnayerson details, as the sound system spewed Mick Jagger's famous lines: "I shouted out, 'Who killed the Kennedys?' / When after all, it was you and me." They wondered if Cuomo had chosen to play it, the bio says."

Andrew Huomo is a champion in New York for sexual perversity and he is currently shacked up with some tramp in the Governor's Mansion. Downstate NY is a liberal bastion of freaks who jerk the rest of the State around. I have long favored Upstate NY's formation into a separate state without the weight of New York City and its sexual freaks and socialists morally polluting us and also taking our water and electricity.

↱ Share

● 6

---

**Jim Deferio**
September 6 at 12:33pm ·

So, I go to make a cup of coffee just now only to find my wife used up the rest of the coffee and forgot to tell me. Tea is not a sufficient substitute. This is where I "grin and bear it" and apply 1 Peter 4:8,

"And above all things have fervent love for one another, for 'love will cover a multitude of sins.'"



Sponsored

Hyundai Hope On Wheels
September kicks off National
Childhood Cancer Awareness
Month. Hyundai Hope on
Wheels is p...

VIP Dance - Utica 2017
www.vipdance.com
RSVP now to VIP Utica 2017-
March 3-5 at Stanley Center
for the Arts. Reserve your spot
s..

**Jim Deferio** shared his photo
September 4 at 8:29pm

I was at the NYS Fair from 1pm to 7pm today preaching with this banner and this fat young woman comes up to me all mad and "indignant" and says, "I have one word for you! YOU SHALL LOVE YOUR NEIGHBOR AS YOURSELF!"

She pointed to the Romans 6:23 side of my banner and said, "That sign is hatred!"

I tried to set the product of the American school system straight but she was too bent out of shape. Numerous so-called Christians were upset at me. They're all fake, counterfeit believers, everyone of them. Not a single one could quote even one whole verse from the Bible.

https://www.facebook.com/photo.php?
fbid=587360861288513&set=pb.100000438132660.-2207520000.147303494
8.&type=3&theater

**WARNING:**
"Do you not know that the unrighteous shall not inherit the Kingdom of God?
Do not be deceived;
neither fornicators, nor idolaters, nor adulterers, nor homosexuals, nor sodomites, nor thieves, nor covetous, nor drunkards, nor revilers, nor extortioners shall inherit the Kingdom of God."

Share

6

View 1 more comment

Tony Alexander I referto them as Godless, Christless Christians.

Intro

Studied at Oregon State Univ. and SUNY Syracuse - 2 BS Degrees

Went to Red Creek Junior - Senior High School

Lives in Syracuse, New York

Married

From Fair Haven, New York

Photos

Friends

English (US) · Español · Português (Brasil)
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies
More ·
Facebook © 2016



September 3 at 2:13pm

NEW YORK STATE FAIR PREACHING
I preached at the Main Gate of the NYS Fair yesterday from 1pm until 7pm (the times indicated on my permit). There were 110,000 who passed through the gates (mostly the Main Gate and to a lesser extent Gate 4).

I had a very long backed up line of people waiting for buses to the amphitheater for the concert and so I was able to expound quite a bit on Biblical principles (with people passing by you can't deliver a "sermon", lol).

I had to turn around today and come back home as traffic was backed up for miles. I have never seen it so bad. It was a good thing I was near an exit. Traffic was backed up almost to downtown Syracuse! Wow! I knew I should have left this morning (even though my permit says 1pm to 7pm, I could have just hung out for a couple of hours until 1pm). Oh well....

So today my wife and I are going to see the movie: "THE LIGHT BETWEEN OCEANS".

Share

3

Nilda Perez AWESOMEEE
1 · September 3 at 6:55pm

Jim Deferio
September 3 at 11:43am

Homosexuality is a mutable behavioral characteristic. It is in no way similar to skin color. It is also an irrational behavior for it uses sexual reproductive organs, which were designed by the person's DNA for the opposite sex, in a way that is unnatural and perverse.

Share

3

Jim Deferio
September 3 at 11:15am

Don't be fooled. When our corrupt President cites the unemployment rate, he is using the U-3 method which does not accurately indicate the true numbers of those unemployed.

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0189



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0190



https://www.facebook.com/jim.deferio?fref=ts

(28) Jim Deferio

Jim Deferio

**Jim Deferio** · Timeline · Recent

Add Friend

Photos

Friends

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More · Facebook © 2016

Sponsored

Create Your Premium Web... WordPress.com Don't delay, create your website today! Choose the power of dedicated WordPress hosting, e...

Hyundai Hope On Wheels We want to share your triumphant story with the world. Enter below for a chance to be feat...

Like Page

**Jim Deferio**
August 27 at 3:06pm · 

I just received this from a homosexualist in my Fb private messages. WARNING, homosexualist language (i.e. filthy language). Btw, this guy is part of the NO H8 Campaign. Go figure!

Spence Pattee
Fuck u u sinful basted go rot in hell. Fuck off

Share

Tony Alexander It's funny how he tries to get the high-ground by using words like sinful and Hell.
In reality all he's doing is making the Preparation H company richer.
1 · August 27 at 4:41pm

Jim Deferio And Depends adult diapers.
1 · August 27 at 5:14pm

**Jim Deferio**
August 27 at 11:53am · 

Not one, and I repeat with more emphasis, NOT ONE, of the people who opposed me yesterday at the Fair had a civil or a cogent argument for the positions they were taking. Sad! The dumbing down of America is just about complete. The public schools and the media have won the culture war of stripping what once was the intelligent American custom of the traditional dialectic from the people and now everyone is wearing the Emperor's Clothes.

*** Notice I specifically said "the traditional dialectic", not the Hegelian dialectic used by Marxists and pseudo-intellectuals.

Share

5

Jim Deferio Btw, a former lesbian came up to me and thanked me for being there. She gave thanks to God for setting her free from this vice.
2 · August 27 at 11:54am

Nilda Perez GOD HELP US.
August 27 at 12:16pm

Jason Griffin Speaking of dumbing down of USA you're on the money. I strongly recommend watching all 3 parts of this old interview. An eye opener.
https://youtu.be/Obr1XqUPEII



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0192



**Sponsored**

VIP Dance - Rochester 2017
www.vipdance.com
RSVP now to VIP Rochester
2017 - January 26-29 at
Churchville-Chili High School
PAC. Reser...

Fall in Love with Kindle U...
amazon.com
Kindle Unlimited gives you the
freedom to explore over 1
million titles and thousands of
e...

Jason Griffin Then when will hillsong business people hold half hr begging sermon for $$$$$?

👍 1 · August 26 at 12:27am

**Jim Deferio**
August 26 at 7:47pm · 🌐

**NEW YORK STATE FAIR PREACHING**

I preached for 4 hours 15 minutes at the main entrance to the NY State Fair here in Syracuse. It was "gay day" so I had the EX-HOMOSEXUALS banner.

Our wicked Governor, Andrew Cuomo (Andrew Huomo), pushed "homo marriage" into law and he promotes "gay day" at the Fair. He is shacked up with some tramp in the Governor's Mansion.

I wanted to stay another two hours but the sun and heat began taking toll on me. Here's what bothers me: The Greater Syracuse Metropolitan Area (a five county region) has 740,000 people and I was the ONLY Christian there witnessing and preaching. I'm not trying to elevate myself because I am absolutely nothing without God but why are so many "Christians" disobedient to the clear commands of Scripture? Can't they see they are Hypocrites with a capital "H"?

A pastor I know walked by and didn't recognize me and I didn't recognize him but he said something like, "God Bless you." So I asked if he was from Syracuse and he said that he was a pastor in a certain suburb and that's when I knew who he was. I have long been disappointed that he disapproves of open air ministry (and he still seems to be that way). It's people like him that are partly to blame for America's slide toward Sodom & Gomorran.

↪ Share

👍😮 2

**Keith Terrill** You stand as John the Baptizer, a lone voice in the wilderness.
August 27 at 5:06pm

**Jim Deferio** Not my first choice, though. It gets difficult because constant talking and preaching greatly tires the diaphragm muscles. One much younger preacher (about half my age) said that after a few hours he feels exhausted because of the workout his diaphragm receives.

College professors have it easy in comparison (and get paid for it).

👍 1 · August 27 at 5:19pm

**Jim Deferio**
August 26 at 11:01am · 🌐



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0194



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0195



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0196



Jim Deferio
August 8

Hmmmm, what do you call a guy in his 60's who ruined two marriages (twice divorced), has a lesbian daughter, doesn't realize that the music and languages he is so good at is LOGIC-based but who acts and speaks irrationally, and whose four main concerns in life seem to be beer, stopping Donald Trump, eliminating GMO's and allowing illegal immigration?

Oh, and he used to be a Christian here in Syracuse before he moved to Eugene, OR (the nation's dumping ground for neo-hippies, New Age fanatics and extreme left wing liberal demagogues).

This is what I think. I think that certain geographic areas are ruled by spiritual forces of wickedness and unless the Christian is strong in the faith and in the defense of the Gospel, they will dry up and DIE like the quick-sprouting seed that fell on rocky soil (see Mark 4).

Jim Deferio
August 8

Good music is still being written and performed (just not that much in America). This is an Israeli band from Tel Aviv. There are five members who go by the band name of Lola Marsh with Gil Landau and lead singer Yael Shoshana Cohen being the two founding members.
Here Gil Landau and lead singer Yael Shoshana Cohen perform an acoustic version of "You're Mine".

Lola Marsh - You're Mine
Réalisation : Sébastien Brodart
http://www.februldesgraviers.com
http://www.facebook.com/LeBrutDesGraviers
https://twitter.com/brutgraviers

YOUTUBE.COM

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0197



MORMONS HAVE TARGETED SYRACUSE FOR GROWTH OF THEIR CULT

Yesterday evening my wife and I met two Mormons as we went for a walk at Woodland Reservoir Park in Syracuse (a high hill with an absolutely great view of Syracuse and the area).

I saw them from a distance and immediately I yelled, "HEY, Mormons!" They walked over to me and after about 20 minutes they seemed pretty shaken up over my presentation so I left them with the last message of their need to rely on the Bible alone and to repent and be born again.

I guess they meet few if any Christians who know their cult better than they do. I used apologetics and the Bible. I demonstrated the irrationality of believing in an infinite past, an infinite universe, why a finite being could never achieve infinite power & knowledge, and why you could never have an infinite regress of contingent beings. I quoted from two of their "apostles" (Orson Pratt and Bruce McConkie) and I quoted from their Book of Mormon, Doctrine & Covenants, Doctrines of Salvation, and Pearl Of Great Price (Book of Abraham chapter 2) to show the contradictions and irrationality of Mormonism.

I told them briefly that I grew up in a cult called Roman Catholicism and that I had become an atheist at the age of 16. However, after much investigation I began to see the truth of the Bible.
And so forth...

It's been almost six years since my wife has seen me in action and I think she was impressed that I didn't hem or haw even once and that my presentation was so well done. Practice makes perfect, as they say. (My wife Faith used to accompany me to some college campuses and a few other events but stopped after Nov. 2010. I often like to go to colleges alone.)

Brent Zenthoefer Praying for them. I love Mormons.
August 1 at 9:51pm



The Mormon Hill Cumorah Pageant ended last night. I preached and witnessed to the Mormons for five of the seven days of the pageant. I stayed until about 11:20 last night and I'm feeling a bit wiped out today because of a sinus infection I caught yesterday.

It is difficult trying to reason with Mormons because they have, for the most part, cast rationality aside and have allowed feelings to control them. In this respect they are like homosexuals. Still, we have had reports of people coming out of Mormonism due to our evangelistic efforts.

Susan Grape How are you feeling today? I heard you were having some issues last night.
July 17 at 7:34pm

Jim Deferio Thanks for asking
Yeah, my sinuses just began swelling and it caused much pain in my jaw. I'm starting on deoxycycline today for 21 days. Hopefully that'll clear it up (that is usually the antibiotic of choice for Lymes).
Of course when the jaw pain... See More
July 18 at 11:43am

Susan Grape Well that is good news about your ticker. Take a good nap and recuperate. We had some awesome witnessing opportunities too.
July 18 at 12:04pm

This comment has been hidden.
Unhide · Report · Block Jim

Tony Goddard Your the man, brother Jim! I'm sorry I missed working with on main st. for most of the days you were there. I was helping my mom pack up & move to Virginia since my dad died & she had to sell the house because of NY State taxes! So glad you pressed through & ministered!
July 18 at 10:34pm

Don Konz Awesome Jim!
July 18 at 8:46am

Elias Rivera Praise The Lord Jim. For Jesus is Using You To Bring Salvation To This Cultic People!!!! Me Too, Yesterday I went to Santa Monica to Preach at The 3rd Street Promenade. To Witness Especially to The Israelis and The American Jews. There's is A Lot of The... See More
July 18 at 9:33am

Jim Deferio Elias, there were also a group called What Mormons Don't Tell who witness and hand out tracts and three other street preachers. Multiple witnesses



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0200



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0201



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0202



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0203



**Jim Deferio** · Timeline ▾ · 2016 ▾ · All Posts ▾

Syracuse - 2 BS Degrees
Went to Red Creek Junior - Senior High School
Lives in Syracuse, New York
Married
From Fair Haven, New York

**Photos**

**Friends**

English (US) · Español · Português (Brasil)
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ▷ · Cookies ·
More ▾
Facebook © 2016

Share

🔵🔵 3

**Tim Connelly** So nasty. Typical liberals, ugly on the outside and the inside..
👍 1 · July 2 at 5:26pm

**Jim Deferio**
June 30 · ✓

LOVE IS LOVE?

At the homosexual event on June 18th many were wearing shirts that said
LOVE IS LOVE. I asked them to define "love" but none could except that
"LOVE IS LOVE"

There's also this looney tunes real estate agent in Bend, OR who said the
same thing. "LOVE IS LOVE". I wouldn't let someone this dumb ever sell me a
house.

How in the world does such a vacuous statement inform anyone what "love"
is? How does such a statement edify? It only informs the listener or reader
that the person making such empty statements is an idiot.

How about this?
Uniformitarianism is uniformitarianism.

Or this:
Endosymbiosis is endosymbiosis.

If your doctor says that you have Ankylosing Spondylitis and you ask:
WHAT is Ankylosing Spondylitis???
And your doctor responds:
Ankylosing Spondylitis is Ankylosing Spondylitis.
I think you should walk out and find another doctor!

Same thing with these emotional cripples who have cobwebs for gray matter
and say and even wear things like LOVE IS LOVE. You are dealing with idiots.
Time to move on.

Btw, I want to thank my wife for the medical term, Ankylosing Spondylitis,
and her definition and explanation that she gave for it. She's extremely
intelligent and that is of the reasons why I married her.

Share

🔵 3

**Kimberley Culbreth** Live is wanting the best for others "it's not desiring hell !
June 30 at 8:04pm

**Sponsored**

**Create Your Premium Web...**
WordPress.com
Don't delay, create your
website today! Choose the
power of dedicated
WordPress hosting, a...

**Google Class Action**
cases.gcginc.com/gg/
If you used Safari or IE web
browsers, a class action
settlement could affect you

🔍 Search

James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0204





James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0206



James Deferio v. City of Syracuse, et al. (5:16-cv-00361-LEK-TWD) 0207



https://www.facebook.com/jim.deferio

(28) Jim Deferio

**Jim Deferio**

**Intro**

- Studied at Oregon State Univ. and SUNY Syracuse - 2 BS Degrees
- Went to Red Creek Junior - Senior High School
- Lives in Syracuse, New York
- Married
- From Fair Haven, New York

**Photos**

**Friends**

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More ·
Facebook © 2016

Jim Deferio · Timeline · 2016 · All Posts

Add Friend

Share
4

**Jim Deferio**
June 27

So, in the last two weeks, a gay Muslim killed 49 sexual deviants and wounded another 53, a majority of sane-minded British voted to leave the tyrannical European Union, the Supreme Court again made baby murder easier, leftists started trouble with neo-Nazis in Sacramento and had their butts whipped, and the media continues to push the left-wing agenda of Huma Abedin's girlfriend who is running for the Presidency.
What a world we live in! Mostly evil, that's for sure, but some good is there in the mix.

Share
9

Nilda Perez END TIMES FOR SURE...GOD HELP US..!!
1 · June 27 at 11:57pm

**Jim Deferio**
June 9

In regards to open air preaching, CAYTIE DAVIS wrote:

"Poking a blind man in the eye doesn't help him see any better..."

We are supposed to have a "ministry of reconciliation", as "ambassadors of Christ", whereby we preach the law & grace (i.e "the word of reconciliation") in hopes that sinners repent and are reconciled to God the Father through Jesus Christ. Yes, point out the sinner's sin but just don't point & poke and point & poke...

2 CORINTHIANS 5:17-21
"Therefore, if anyone is in Christ, he is a new creation; old things have passed away; behold, all things have become new.
18) Now all things are of God, who has reconciled us to Himself through Jesus Christ, and has given us the ministry of reconciliation,
19) that is, that God was in Christ reconciling the world to Himself, not imputing their trespasses to them, and has committed to us the word of reconciliation.
20) Now then, we are ambassadors for Christ, as though God were pleading through us: we implore you on Christ's behalf, be reconciled to God.
2 1) For He made Him who knew no sin to be sin for us, that we might become

**Sponsored**

Hyundai Hope On Wheels
hyundaihopeonwheels.org
Every hand counts in the battle against pediatric cancer. Give a hand for hope and join us...

VIP Dance - Rochester 2017
www.vipdance.com
RSVP now to VIP Rochester 2017 - January 28-29 at Churchville-Chili High School PAC Reser...



https://www.facebook.com/jim.deferio | (28) Jim Deferio [redacted]

Jim Deferio [redacted]

Jim Deferio | Timeline | 2016 | All Posts | Add Friend

**Photos**

**Friends**

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More · Facebook © 2016

Jim Deferio replied · 1 Reply

**Jim Deferio**
May 26

As an emasculated man, Barack Hussein Obama must feel more comfortable going to the women's restroom. But why should his sickness be foisted upon the general public? When his manhood was taken away in the gay clubs of Chicago he had to know what it would eventually do to him.

Share

4

**Jim Deferio**
May 25

I really don't care if Donald Trump paid ZERO in income taxes. I want to know who has been financing Bill & Hillary Clinton all of these years. Who is behind this evil duo?

Share

12

David Brockie George Soros would be a good place to start looking.
1 · May 25 at 10:00pm

Jim Deferio Here's one from today's news.
http://www.foxnews.com/.../key-hillary-supporters...

Key Hillary supporter's offshore dealings surface in Panama Papers | Fox News
FOXNEWS.COM

May 27 at 10:49am

**Jim Deferio**
May 25

This afternoon I took my two oldest grandsons to see CAPTAIN AMERICA: CIVIL WAR again. They don't get to go to the theater often so I wanted them to see it in 3D before it goes to 2D only.

The drive from near Watkins Glen, NY along the ridge to Elmira was absolutely beautiful. I told my daughter that her mother and I will probably be

Sponsored

VIP Dance - Utica 2017
www.vipdance.com
RSVP now to VIP Utica 2017 - March 3-5 at Stanley Center for the Arts. Reserve your spot a...

Michelob ULTRA
Grab the beer that doesn't make you take a step back.
Like Page

[redacted]

[redacted] 4:07 PM 9/14/2016





# THOUSANDS OF EX-HOMOSEXUALS HAVE EXPERIENCED THE LIFE-CHANGING LOVE OF JESUS CHRIST

**CHECK OUT TESTIMONIES AT:**

www.exhomosexuals.com
www.exodusglobalalliance.org
www.hopeforhomosexuals.com

EXHIBIT
P
5/2/17  mob
PENGAD 800-631-6989