**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**JAMES DEFERIO,**

                    **Plaintiff,**

          **v.**

**CITY OF SYRACUSE; FRANK FOWLER,**
In his official capacity as Chief of Police for
the City of Syracuse Police Department, **JOSEPH**
**SWEENY**, individually and in his official
Capacity as Captain for the City of Syracuse
Police Department, and **JAMEY LOCASTRO,**
individually and in his official capacity as Sergeant
for the City of Syracuse Police Department,

                    **Defendants.**

**STATEMENT OF MATERIAL**
**FACTS NOT IN DISPUTE**
Civil Action No.: 5:16-CV-0361
(LEK/TWD)

Pursuant to L.R. 7.1 (a)(3), below are the material facts that Defendants, the moving party, contend are not in dispute, with specific citations to the record where such facts are set forth:

### History of the CNY Pride Festival

1.     The Syracuse CNY Pride Festival (hereinafter "Pride Festival" or "festival") is a one day family-friendly celebration, which is hosted by CNY Pride, Inc. (hereinafter "CNY Pride") a 501(c)(3) non-profit organization. (*See* Exhibit A to Attorney Affirmation of Todd M. Long, p. 11, 43; *see also* Long Aff., Ex. B, p. 9). The Festival also includes a parade (hereinafter "Pride parade" or "parade").

2.     Since 2012, the Pride festival has been held at the City of Syracuse Inner Harbor Park, located at the northeast corner of Van Rensselaer Street and West Kirkpatrick Street. The festival is open to the public and attracts four to five thousand people on average.  (*See* Long

Aff., Ex. A, p. 6, ll. 2-10; *see also* id., p. 13, ll. 13-23).

3.      In order to ensure public safety and order, City of Syracuse Police Department (hereinafter "SPD") provides a security detail for the Pride parade and the festival.  (*See* Long Aff., Ex. C, p. 8; *see also* Long Aff., Ex. E, p. 8).  Prior to the date of an event, SPD reviews permit applications for safety to the general public in order to ensure a safe environment at any festival or parade.  (*See* Long Aff., Ex. CC, Affidavit of Paul Kluge attested to on May 25, 2017, ¶ 6).

4.      SPD will review permit applications at the request of the Central Permit Office, which accepts a permit application and then assigns relevant departments for review within their areas of expertise.  (*See* Long Aff., Ex. I, Affidavit of Sam White attested to on May 24, 2017, Ex. 1, p. 10).

5.      In order to have an event at a public park in the City of Syracuse and the Inner Harbor, the requesting entity would have to first apply for a permit through the Parks Department. (*See* id., p. 9, ll. 12-23).  For larger events, the Central Permit Office ("CPO") requires a Special Events Application.  (*See* id., p. 9, ll. 18-20).

6.      Permits can be approved conditionally, upon review, only under certain terms that limit the scope of the requestor's application.  (*See* id., p. 12).  Then, the requesting organization has the ability to utilize the permitted space in the way that they have represented within the permit, subject to the conditions placed upon them by the CPO.  If those conditions of the permit are violated by the requestor, the City would revoke the permit.  (*See* id., p. 14).

7.      According to CNY Pride Board Member and festival organizer at all relevant times, Mr. Christopher Shepherd, there was no substantive collaboration between the City of Syracuse and CNY Pride with regard to the festival, with the "exception of mechanics of

electricity and stuff like that from the Parks Department. I mean, that's really, you know, nuts-and-boltsy stuff."  (Long Aff., Ex. A, pp. 17-18).

8.     Ms. Barrie Gewanter (hereinafter "Ms. Gewanter"), the former Executive Director of the Central New York Chapter of New York Civil Liberties Union (hereinafter "NYCLU") and advocate for human and civil rights (*see* Long Aff., Ex. B, pp. 5-6), who participates in the Pride event, and has also "assisted them with parade setup, with police liaison activities, assisted them in helping them figure out how to fill out permit requests." (Id., p. 7, ll. 21-24).  Ms. Gewanter has assisted CNY Pride in "figuring out what to put on the permit," sometimes helping CNY Pride "with that precision in their language [on permit applications] as far as starting point of a parade, ending point of a parade, times for gathering versus times for starting.  That kind of thing."  (Id., p. 12, ll. 11-25).

9.     The 2014 CNY Pride Festival application was filled out and submitted by Mr. Shepherd on behalf of CNY Pride (*see* Long Aff., Ex. A, p. 33-34 (Ex. 2, attached thereto)) while the 2015 CNY Pride Festival application was filled out by Ms. Gewanter with Mr. Shepherd or another representative of CNY Pride (*see* Long Aff., Ex. B, p. 36, 15-23; *see also* id., p. 37, ll. 1-8 (Ex. 4, thereto); id., p. 40, l. 21 – p. 41, l. 18 (Ex. 5, thereto)).  Furthermore, Ms. Gewanter specifically crafted the 2015 CNY Pride festival permit application according to her knowledge of the law regarding "exclusive use" and first amendment activities, which Defendant City rejected for a content neutral alternative.  (*See* id., pp. 38-42; *see also* Long Aff., Ex. I, ¶¶ 10, 11).

**Plaintiff's "Preaching" and Protesting Incites Confrontation and Violence with the Public.**

10.     Plaintiff's "public preaching," is saturated with speech that incites violence and on many occasions has resulted in violence or the threat of violence (*See, e.g.,* Long Aff., Ex. J,

3

p. 119, l.16 – p. 125, l. 10 (Plaintiff pepper sprays Pride parade attendee); id., p. 125, ll. 11-15 (Plaintiff attacked at 2015 CNY Pride Festival); id., pp. 117-119 (calling the common occurrences of the threats of violence and bodily harm against him by passerby's as "drive-by or a walk-by"); id., p. 141, ll. 6-15 ("I've seen it [people become agitated] so many times it's just— I just wait it—I try to wait it out") id., p. 206-207 (Plaintiff received verbal threats from members of the public on Facebook after CNY Pride festival); Long Aff., Ex. A, p. 26, l. 5-21; Ex. L, Bates Stamp 0178 (plaintiff threatened with physical assault at 2014 CNY Pride flag-raising at Syracuse City Hall); Ex. N (Plaintiff was assaulted with eggs, was physical contacted, and had property destroyed by women with whom he was having a debate regarding homosexuality)); Long Aff., Ex. L, Bates Stamp 0211 (Don't be afraid of ["homosexualists"].  I have been threatened with death, etc. numerous times.").

11.    Plaintiff uses disparaging remarks directed at individuals that have resulted in people being directly insulted and incited to threaten and/or perpetrate violence. (*See, e.g.,* Long Aff., Ex. M, p. 2 (investigation of the Citizen Review Board requested by Plaintiff found Plaintiff while preaching called a  minor a "faggot," "you are not like me, I'm going to heaven, you are going to hell," and told mother he comes from a bad family.))

12.    Plaintiff actively disrupted CNY Pride festivals and parades (along with other events), and stated his intention to do so. (*See, e.g.,* Long Aff., Ex. J, p. 257, ll. 10-15; Ex. EE, minute 00:28 – 00:36 ("I don't want to rain on somebody's parade, although this parade is an uncivil parade and I will rain on that"); Long Aff., Ex. B, pp. 27-28 (intruding on CNY Pride parade route); Long Aff., Ex. J, p. 230 (in 2003 at City Hall flag raising Plaintiff "was there as a protester and I stood between the person with the flag and the flag pole"); Long Aff., Ex. P, pp. 80-86 (Plaintiff in Manchester, New York was disruptive to a prayer event at the Hill Cumorah

pageant and convicted of disorderly conduct ignoring multiple requests to silence his sound amplification device)).

13.     Plaintiff's daughter, Michelle Deferio (hereinafter "Ms. Deferio"), who has been engaged with Plaintiff in his public ministry at CNY Pride events since the early 2000's (*see* Long Aff., Ex. Q, p. 41; Long Aff., Ex. J, pp. 113-115), characterized Plaintiff's message as confrontational by its nature because what the "Bible says is meant to confront every person, and the Bible says the purpose of the word of God is to convict people of sin and everybody has sin in their lives and that's not something that anybody wants to hear." (Id., pp. 55-56).

14.     In fact, Ms. Deferio, has expressed concerns to Plaintiff about his safety:

Q:     Okay.  Have you ever discussed your fears for your father's safety while he's preaching at these [CNY Pride] events?

A:     Only when he's planning to go by himself.

Q:     Okay.  Were you more concerned when he would go by himself?

A:     Yes.

Q:     And what were your concerns?

A:     That there wasn't, you know, somebody else there to, I guess, just reinforce him.

Q:     Okay. Were you concerned because you know that his message wouldn't be well-received by the people that he was preaching to?

A:     Yes.

(Id., p. 57, ll. 5-18).

15.     Ms. Deferio—who has been present and participated with Plaintiff at many events where he protested and preached over the last decade (*see* Long Aff., Ex. Q, pp. 41-45, 58-59, 60)— has witnessed violence being threatened against Plaintiff (*see* id., pp. 67-68), and testified that in the past her father has not stopped preaching after he was told he was unwelcome nor when someone actually has physically put their hands on him.  (*See* id., pp. 38-39).

16.     Ms. Deferio, during 2008 to 2010, in the height of her travelling with her father in

their public ministry, witnessed people throwing things at Plaintiff and people making unwanted physical contact with Plaintiff in the course of his public ministry, including their visits to other Pride events in other cities (of which she attended approximately ten (10) with Plaintiff). (*See* id., pp. 64-66).

17.     Moreover, Plaintiff's public social media postings go so far as to advocate the use of violence against those in the LGBTQ community. (*See* Long Aff., Ex. J, p. 222, l. 16 – p. 223, l. 12).

18.     Plaintiff's Facebook postings are thus part of his preaching by his own definition "preaching (publically proclaiming his beliefs)." (Dkt. No. 1, ¶ 18).

19.     Although Plaintiff admits to myriad derogatory posting and comments to the general user public on Facebook (*see, generally*, Long Aff., Ex. L), many of his public comments are harassment directly focused and directed at CNY Pride events, members, and the LGBTQ community.  Plaintiff, by his own admission in his public postings, is aware that his audience includes public Facebook users who are part of the LGBTQ community, or do not personally know him but have a differing opinion.  (*See* Long Aff., Ex. L, Bates Stamp 0191 ("I just received this from a homosexualist in my Fb private messages"); id., Bates Stamp 0205 ("[a]pparently these attacks against me are just fine according to Facebook…")).

20.     Despite Plaintiff's assertion that he categorically "does not encourage violence" (Dkt. No. 1, ¶ 20), his public posting to all Facebook users about hurting LGBTQ community members in public restrooms did just that, as noted in an online article to which Plaintiff affirmed by means of deposition testimony:

> "If some dude goes into the restroom while your wife or daughter is in there, you need to man up and **knock the queer right out of them**. Show no mercy. Yes, **I'm advocating violence** - justified violence."

6

(Long Aff., Ex. J, Ex. J thereto, p. 2) (emphasis supplied).  When asked in the same deposition if Plaintiff had ever advocated violence, Plaintiff answered in the affirmative vis-à-vis that same Facebook comment.  (*See* id., p. 222-227).  Plaintiff emphatically stated that "And a man, **a real man, would do something about that**," seeking to mollify the provocation of violence by saying that it was a reference to an assault on women.  (Id., p. 227, ll. 4-8) (emphasis supplied).

21.   In addition, Plaintiff's public Facebook comments and postings include:

a.   On June 27, 2016, Plaintiff wrote "I had to [turn off my account].   The **homosexuals and atheists are extremely intolerant and mean-spirited** and they were spamming me and making physical threats.  I blocked many people and deleted many photos. . ." (Long Aff., Ex. L, Bates Stamp 0208) (emphasis supplied).

b.   On the eve of the 2015 CNY Pride Festival, on June 15, 2015, Plaintiff made the following comments about Syracuse Common Council President Van Robinson and Syracuse Mayor Stephanie A. Miner:

"**HOMO** FLAG RAISING & VAN ROBINSON
I missed preaching at the homo flag raising rally at Syracuse City Hall this morning.. . .  Out [*sic*] **sexually confused mayor**, S. Miner, hosts this event every year and black Common Council member VAN ROBINSON is always there to "represent" the **Syracuse black community's support for sexual perversity**.. . .  I have yet to see a black Christian from the Syracuse community speak up against this evil.. . . In the past I have asked Robinson repeatedly (publicly over my amp) if his blackness is as mutable as homosexuality is but he refuses to answer me.  He's a very wicked guy . . . Robinson is nothing but a **perverse race hustler**.  Why aren't the black churches speaking out against this guy?"

(Id., Bates Stamp 0170) (emphasis supplied).

c.   Later on June 20, 2015, Plaintiff publicly posted again about CNY Pride:

7

"SEXUAL PERVERTS' DAY IN SYRACUSE
"God gave the rainbow to a righteous man, Noah, not to the unrighteous.  Today in Syracuse the **sexual perverts** in the area congregated to celebrate sin, irrationality, eros, and **perversity**.. . . Many [attendees] told me they were Roman Catholics.  Figures.  More and more are confessing that they were sexually molested and/or raped and that was their pathway into homosexuality.  They still have NO EXCUSE.  You don't do evil and justify evil because someone did evil to you.  Here's the difference in 2015: I'm seeing that people are using their past sexual molestation to harden their hearts and become "homosexual activists".. . . This is what I think: I think there will be greater **wrath** on all of the worldly and cowardly Christians in Central NY than on those who don't know Christ as Lord and Savior."

(Id., Bates Stamp 0171) (emphasis supplied).

d.  On the same day, while posting a story regarding a lawsuit involving a priest who was alleged to have been a pedophile, Plaintiff comments:

"Today at pridefest in Syracuse I met one of the relatives of this homosexual pedophile priest.  This priest was a **homosexualist** who sexually molested more than FORTY boys.. . . Research shows that **those who identify as "homosexual" are up to forty times more likely to sexually molest children** as those identifying as heterosexual.

(Id., Bates Stamp 0173) (emphasis supplied).

e.  On the eve of the 2014 CNY Pride Festival, i.e., June 16, 2014, Plaintiff made the following comment about the flag-raising at Syracuse City Hall:

"**HOMO FLAG RAISING** AT SYRACUSE CITY HALL
". . . I was the only Christian at Syracuse City Hall this afternoon to preach to the crowd that gathered for the **homo flag raising**.  There was a good-sized crowd of **sexually immoral, immoral politicians, immoral media journalists, and the other sin-laden pagans**."

(Id., Bates Stamp 0174) (emphasis supplied).

f.  On June 27, 2014, Plaintiff commented on his presence at the "Syracuse homosexual flag raising ceremony at Syracuse City Hall on June 16, 2014."

8

Plaintiff commented on how he was threatened with violence, saying that "[t]hese two guys trying to block me with their rainbow flag were also threatening me with physical assault."  Plaintiff ended his post by commenting on an elderly woman in the photo by saying "[h]ow sad and wicked for this old person with **one foot in the grave celebrating a deathstyle**!"   (Id., Bates Stamp 0178) (emphasis supplied).

g.   Plaintiff made light of the massacre at the Pulse Nightclub in Orlando and maligned the victims in a post on June 28, 2016, only sixteen (16) days after the massacre, while accusing members of the LGBTQ community as being complicit in the spread of AIDS by proclaiming publicly to all Facebook users:

> "There were dozens and dozens of memorial services and rallies to remember **49 sexual deviants who were gunned down in Orlando**, but why was there not a national outcry about the THOUSANDS of **innocent hemophiliacs who died because homosexuals with AIDS donated tainted blood**?"

(Id., Bates Stamp 0207) (emphasis supplied).  The day before, Plaintiff posted that "[s]o, in the last two weeks, a gay Muslim killed 49 sexual deviants and wounded another 53.  (Id., Bates Stamp 0209).

h.   When posting an article in 2016 regarding the murder of a child by her father, Plaintiff states on his public profile that "American feminists couldn't care less though.   They're **too busy having same-sex relations** with one another and **aborting babies** and screaming at American men."   (Id., Bates Stamp 0180) (emphasis supplied).

i.   On August 27, 2016, Plaintiff equates:

> "[a]rguing with a **homosexualist is like arguing with a cow**.  When I

9

was 14 years old I worked my entire summer on a dairy farm.. . . The cows were as stubborn as can be and just as dumb as they were stubborn.  It didn't matter if you tried to push them out of the way to get between them for chores or punched them or talked to them or yelled at them because they were close to brain dead.  All they know was food & water and where to get it.

"**All homosexualists know is food, water and perverted sex**."

(Id., Bates Stamp 0192) (emphasis supplied).

j.  Using the derogatory comment he did while protesting at the 2015 CNY Pride Festival—"**Homofascist**"—Plaintiff publicly commented on June 30, 2016 that:

"Apparently these attacks against me are just fine according to Facebook's hypocritical standards but if I criticize the LGBT I'll have my comment deleted and I'm then threatened with deletion of my Fb account by the Fb **homofascist** staff.  I saved only three of many such personal attacks.. . ."

(Id., Bates Stamp 0205) (emphasis supplied).

k.  On August 15, 2016, Plaintiff commented on an article from the Syracuse Media Group reporting on a Central New York man's proposal to his boyfriend at Destiny USA (a Syracuse shopping mall) by stating "Pollution along the shore of Onondaga Lake in Syracuse, NY continues.. . . The impact of reality on such foolishness may yet awaken you out of your delusion if it doesn't kill you first. **Yet AIDS has killed tens of thousands and the foolishness continues**…"  (Id., Bates Stamp 0195) (emphasis supplied).

l.  On August 10, 2016, Plaintiff made two posts regarding "transgenderism" and children, stating that "[t]ransgenderism is a mental disorder and parents who reinforce this disorder in their children or other children are as **guilty of child abuse as the pedophile is**," and "I'll say it again (this time with the backing of

these doctors), Transgenderism is a mental disorder!"   (Id., Bates Stamp 0196)

(emphasis supplied).

m.  Stating earlier to all Facebook users on May 23, 2016 that "TRANSGENDERISM

IS  A  MENTAL  DISORDER,"  in  response  to  a  comment  regarding

"homosexualists" who comment on his Facebook page, Plaintiff commented:

"Don't be afraid of them.  **I have been threatened with death, etc.
numerous times.  The LGBT are a bunch of big-mouth emotional
cripples.**

"I suppose that now the cops are going to be even more against me in
Syracuse this lawsuit was filed on March 31st but you know what?  At
least they know that I'm not going to lay down and play dead."

(Id., Bates Stamp 0211) (emphasis supplied).

n.  On September 7, 2016, Plaintiff goes on a public racist tirade against Muslims

and  African-Americans  by  invoking  his  ire  toward  NFL  Quarterback  Colin

Kaepernick, by commenting, in part:

"Liberals are so blind.  It is NOT the fact that NFLer COLIN
KAEPERNICK refuses to stand for the Pledge that has morally upright
people and patriots upset but the REASONS this wicked Muslim guy
is giving for not standing.

"He is a **Muslim ingrate who pledges allegiance to a barbaric
murderous and illogical religious ideology** and who refuses to
acknowledge that his black father is lower than a snakes navel.

"Lets [sic] hear him acknowledge that it's because of godly white
people there is freedom in this nation to pursue your dream if you
work hard.  Don't hold your breath!  Maybe he should move to an
African nation and see what they are like (but since he is only half
black…).

"Oh, and he was raised in a nice white family and has the opportunity
to make big bucks in the NFL.  What 'injustice'!

"**Injustice in this nation is when blacks murder and rape each**

11

> **other and murder and rape whites. . . Injustice is having white taxpayers foot the bill as American blacks go to college taking fluff courses**. . .”

(Id., Bates Stamp 0186) (emphasis supplied).

22.    In addition, Plaintiff made the following assertions:

    a.    Plaintiff in the regular course of his public ministry has called people **sodomites**, despite admitting that it has caused people to become verbally hostile toward him.  (Id., p. 170-171; *see e.g.,* id., pp. 212-215; *see also* id., p. 218, ll. 16-24; Id., p. 219, ll. 13-14, ll. 16-20).

23.    At the 2015 CNY Pride festival on June 20, 2015, Plaintiff referred to festivalgoers as "homofascists," (*see* Long Aff., Ex. Y, minute 00:23-00:28) in a verbal confrontation when arriving at the driveway entrance of the Inner Harbor on West Kirkpatrick Street. (*See also*, Long Aff., Ex. R, p. 29).

24.    Plaintiff kept contemporaneous notes of his interactions with festivalgoers and attendees while attending CNY Pride events in 2012, 2013, 2014, and 2015 (*see, e.g.,* Long Aff., Ex. J, pp. 208-212).  Among Plaintiff's notes:

    a.    Referring to the June 15, 2013 CNY Pride Festival, Plaintiff noted that "Bruce Carter, Barrie Gewanter, and another **homo** festival organizer came out of the festival complaining about us to the police."  (Long Aff., Ex. K, p. 2) (emphasis supplied).

    b.    Plaintiff referred to events at the June 21, 2014 CNY Pride Parade and Festival as the "**Syracuse Homo Parade and Festival**."  (Id., p. 3) (emphasis supplied).

**Plaintiff's History of Protesting, Incitement of Violence, Police Intervention, and Threats to His Safety**

25.     According to Ms. Deferio, Plaintiff has been engaged in public ministry in the City of Syracuse "informally" since the 1970's, but it was not until the 1990's that he reengaged in his public ministry in Syracuse, where he protested outside of the Landmark Theater. (*See* Long Aff., Ex. R, pp. 38-39).

26.     Plaintiff alleges that he initiated his "protesting," as an active obstructionist to activity in 2003, when at what he described as the "first homosexual flag-raising at [Syracuse] City Hall . . ." which he describes by saying "that was a protest," where he intended to disrupt the event (*See* Ex. J, p. 69, ll. 2-7).

### *Arrest History and Other Law Enforcement Interactions*

27.     Plaintiff has a history of temporarily abiding by police orders to discontinue the use of sound amplification equipment under warning of arrest, but then disobey those warnings by resuming use of sound amplification equipment. (*See* Long Aff., Ex. P, pp. 52-54; *see also* Long Aff., Ex. BB, Affidavit of Captain Joseph Sweeny attested to on May 30, 2017, ¶¶ 18-21).

28.     In April 2005, Plaintiff and an associate engaged in a counter-protest if the Syracuse Peace Council in Columbus Circle  (Long Aff., Ex. J, p. 25), by holding signs "of the jets flying into the Twin Towers and that sort of thing. I don't remember what all the signs were. There was a few."  (Id. p., 26).

29.     Plaintiff testified that he and his associate would ask "'Is he a baby killer?'" when members of the Syracuse Peace Council said the name of a dead service-member. (Id., p. 28).

30.     Plaintiff has also had multiple encounters with law enforcement, some of which resulted in criminal conviction, that were the result of his protesting activities.  (*See, generally,*

Long Aff., Ex. P).

31.     In April 2005, Plaintiff was arrested as a result of this counter-protest. (Long Aff., Ex. J, pp. 26-27).

32.     In 2014, Plaintiff was arrested by an SPD officer outside the Onondaga County War Memorial while "preaching" at a Syracuse Crunch game.  (*See* id., pp. 19-25).  In April 2007, Plaintiff was later arrested and charged with disorderly conduct at Kutztown University in Pennsylvania while holding a banner that read "'Thousands of ex-homosexuals have experienced a life change in the love of Jesus Christ. Check out their testimonies at,' and there's three websites." (*See* id., p. 29; *see also*, Id., Ex. P thereto).

33.     The next day, Plaintiff was arrested and charged with "Disorderly Conduct Hazardous/Physi Off" and "Criminal Trespass" at East Stroudsburg University in Pennsylvania. (See Long Aff., Ex. J, p. 31).  During this protest, Plaintiff held a sign that dealt with "Freedom from sin.  Various sins were mentioned," including "homosexuality," which Plaintiff considers a sin.  (*See* id., p. 34, ll. 2-25).

34.     On July 18, 2007, Plaintiff was arrested in Manchester, New York for disorderly conduct at the annual Hill Cumorah pageant associated with the Mormon religion, for which he was later convicted.  (*See* Long Aff., Ex. P, pp. 2-103).  Attendees described Plaintiff, who had a 10 watt amplification device as disruptive, (*see* id., pp. 5, 9, 12, 14, 20, 24, 30), and recalled someone with an amplification device saying that "'All you Mormons are going to hell,'" describing it as "hate speech" (id., p. 30).

35.     As a result of this arrest, Plaintiff was convicted on December 23, 2007 of Disorderly Conduct under Penal Law § 240.20(4) (*see* id., pp. 99-100), and was sentenced to a one-year conditional discharge conditioned on Plaintiff staying away from the Hill Cumorah

grounds for that period.  (*See* id., pp. 93-94).

36.     In July 2010, Plaintiff was arrested for his use of sound amplification equipment in Palmyra, New York.  *See* Long Aff., Ex. J, pp. 41, 43.  As part of his release, was required not to use his sound amplification equipment in Palmyra, because his arrest was related to his use of the equipment.  (*See* id.).

37.     In July 2006, Plaintiff was arrested in Chicago, Illinois for criminal trespassing when he and a group of individuals were preparing to preach and display signs. (*See* Long Aff., Ex. J, p. 44-48).

38.     Plaintiff was represented by the Alliance Defense Fund in 2009 (*see* Long Aff., Ex. O, pp. 7-11, 12-13; id., Ex. J, p. 103, ll. 3-23), which is currently called the "Alliance Defending Freedom" (p. 48, ll. 20-23). This group is considered  to be an "Extremist Group" by the Southern Poverty Law Center.[1]

### Plaintiff's Established History of Obstruction, Physical Violence, and Harassment CNY Pride Festival Activities.

39.     Plaintiff testified that he has "been to over 70 homosexual events in 18 different cities" (*See* id., p. 209), ten (10) of which he attended with Ms.  Deferio (*See* id., pp. 64-66).

40.     Since 2003, Plaintiff's protesting activities have been focused particularly on LGBTQ community events in the City of Syracuse (*see* Long Aff., Ex. J, p. 230)—attending the CNY Pride Festival almost annually since 2004 (*see* id., p. 88)—and with a particular concentration on the City of Syracuse in the last four (4) years.  (*See* id., pp. 83-84).

41.     Plaintiff went from publicly preaching two (2) to three (3) times a year to

---

1 *See* Southern Poverty Law Center, "Fighting Hate," "Extremist Files," "Group," "Alliance Defending Freedom (https://www.splcenter.org/fighting-hate/extremist-files/group/alliance-defending-freedom).

preaching thirty (30) to forty (40) times a year in Syracuse as of four (4) years ago.  (*See* id., p. 84, ll. 11-20).

42.     Captain Sweeny recalls interacting with Plaintiff while he protested various special event times and locations in the City of Syracuse, e.g.: (a) during large sporting events at Syracuse University's Carrier Dome while on corners near Waverly Avenue and Crouse Avenue; (b) the Landmark Theater at the corner of Jefferson Street and Salina Street; (c) Onondaga County War Memorial; and (d) the CNY Pride Parade and Festival before it moved to the Inner Harbor.  During some of his protesting activities, there were complaints regarding his excessive and high volume use of his personal sound amplification system, which created unnecessary noise that annoyed or disturbed the normal sensibilities of those individuals.  (*See* Long Aff., Ex. BB, ¶ 17).

43.     In 2003 Plaintiff initiated his "protesting" activity as an active obstructionist to the "first homosexual flag-raising at [Syracuse] City Hall . . ." where he intended to disrupt the event (See Ex. J, p. 69, ll. 2-7).

44.     Plaintiff asserted at the 2015 CNY Pride festival that "I don't want to rain on somebody's parade, although **this parade is an *uncivil* parade and I will rain on that**."  "*See, e.g.,* Long Aff., Ex. J, p. 257, ll. 10-15; Ex. EE, minute 00:28 – 00:36) (emphasis supplied).

45.     In describing the 2003 flag-raising protest, Plaintiff explained:

> Q:  Well, I'm just asking as James Deferio, not any sort of label you give
>      to yourself, how many times have you **attempted to interrupt or
>      disrupt** an event that you were attending or outside of?
>
>                            MR. MANGINI: Object to form.
>
> A:  Twice.
>
> Q:  And you said one was a flag-raising here?
>
> A:  Mm-hmm, yes.
>
> Q:  What you were doing to disrupt that event?
>
> A:  I stood between the flagpole and the Syracuse administrator who was going to

16

put the flag onto the pole.

Q:  Okay. And why did you do that?

A:  As a **protest**.

Q:  Why that action in particular?

A:  Because I don't think **civil government** has a right to celebrate **uncivil behavior**.

Q:  And you consider **homosexuality uncivil?**

A:  Yes.

(Long Aff., Ex. J, p. 70, l. 2 - p. 72, l. 6) (emphasis supplied)

46.     During the 2012, flag-raising, Plaintiff "arrived with a bullhorn to try and shout down the mayor and the City Clerk and a couple of other dignitaries at the flag raising event which is held in a cul-de-sac that's in front of our City Hall.  He was requested by the police to move across the street . . ." (Long Aff., Ex. A, p. 27, ll. 7-12).

47.     During one of the CNY Pride parades, Plaintiff:

". . . broke through the barricades and was out in the middle of the parade route, and Bruce -- Dr. Carter and I had to kind of flag down a police officer to make sure that he wasn't there because he was accosting -- like I say, if the first -- if he's in the middle of the route and here comes St. Andrew's church, he's there giving them grief.

Nobody is supposed to be out in the middle of a parade route during a parade."

(Id., p. 27, ll. 16-24; *see also*, id., p. 28, ll. 17-19; id., p. 29, l. 20 –p. 30, l. 6; id. p. 32, ll. 17-20; id., p. 44, ll. 8-17; p. 73, ll. 3-12).

48.     In 2014, Plaintiff accosted "people when they're trying to attend a house of worship," (id., p. 32, ll. 17-20).  In particular:

"[t]here was one very unpleasant experience that I personally had with him [Plaintiff] where he was harassing the churchgoers when we held the interfaith service. And admittedly, I mean, my religious background is you're supposed to turn the other cheek and I was not in the mood to turn the other cheek. At that moment a friend of mine, who was handing out the bulletins at the church door, came down the steps and removed me from the scene because I was aghast to find that level of political goings-on taking place at a church service."

17

(Id., p. 27, l. 24 – p. 28, l. 9).

49.     Plaintiff was also involved in an altercation: "I know in one case he got virtually surrounded -- not completely, but virtually surrounded -- by a bunch of drag queens who were, you know, really into his face about, you know, his views," which, among "several other incidents," caused Mr. Shepherd to be concerned to do something so "this nonsense didn't turn into a brawl . . ." (Id., p. 26, ll. 5-21).  Mr. Shepherd's concerns were founded on a violent incident that occurred at "the Spanish festival a couple of years ago."  (Id., p. 26, ll. 22-25).

50.     In addition, with respect to CNY Pride festivals, "there was a general concern [by CNY Pride] about protesters that were critical of the celebration of LGBT -- LGBTQ lives that was the focus of the festival. There was a concern about them actually coming on top of the parade route and getting very close to the people that were traveling on the parade route as part of the parade," based upon "[p]ast experience of protesters that were critical of the message of the Pride celebration getting right on top of individuals that were in the celebration, especially in regards to parents with children."  (Long Aff., Ex. B, p. 17, ll. 11-25).

51.     Mr. Shepherd feared the "possibility of further physical confrontations with" Plaintiff (Long Aff., Ex. A, p. 69, ll. 5-6) when Mr. Shepherd's home address was inadvertently disclosed on the 2015 CNY Pride festival permit (*See* id., pp. 67-69).

### *Plaintiff's History of Physical Altercations at CNY Pride Events and Concerns for His Safety*

52.     Plaintiff has a history of getting into verbal and physical altercations while involved in his public ministry. (*see* ¶¶ 18-25 , *above*).

53.     Plaintiff estimates that he has been subjected to bodily harm while preaching "six or seven" times.  (Long Aff., Ex. J, p. 119, ll. 15-19).

18

54.     Plaintiff, while publicly preaching at the 2005 CNY Pride parade, pepper-sprayed an attendee. (*See* id., pp. 119, 125).  The victim of Plaintiff's pepper-spray attack then reacted by punching Plaintiff in his face.  (*See* id., p. 124).

55.     Ms. Deferio recalls witnessing several physical altercations between Plaintiff and members of the public during their public ministry from 2008 to 2010.  (*See* Long Aff., Ex. Q, pp. 64-65).  At "Gay Pride" events, generally (*see* id., p. 66, l. 23), and CNY Pride events, in particular (*see* Long Aff., Ex. R, pp. 14-15), Ms. Deferio has observed verbal altercations and threats of violence directed toward Plaintiff who, despite this, will continue to preach—even when members of the public are really angry.  (*See* Long Aff., Ex. Q, pp. 66-68).  In fact, Ms. Deferio's experience was that Plaintiff would continue preaching even after someone put their hands on him.  (*See* Long Aff., Ex. R, pp. 38-39).  Ms. Deferio expressed concern about Plaintiff's safety:

> Q:   Okay. Have you ever discussed your fears for your father's safety while he's preaching at these [CNY Pride] events?
>
> A:   Only when he's planning to go by himself.
>
> Q:   Okay. Were you more concerned when he would go by himself?
>
> A:   Yes.
>
> Q:   And what were your concerns?
>
> A:   That there wasn't, you know, somebody else there to, I guess, just reinforce him.
>
> Q:   Okay. Were you concerned because you knew that his message wouldn't be well-received by the people that he was preaching to?
>
> A:   Yes.

(Id., p. 57, pp. 6-18).

56.     At one CNY Pride event, Ms. Deferio recounted that attendees tried to pull Plaintiff's signs away from him.

57.     Outside CNY Pride events, Plaintiff has been involved in violent altercations

while preaching.  (*See* Long Aff., Exs. M, N, and J, pp. 145-146).  At an incident on May 17, 2013, Plaintiff called a minor a "faggot," and allegedly told him "you are not like me, I'm going to heaven, you are going to hell." (*See* Long Aff., Ex. M, p. 2).  The minor's mother then dumped soda on Plaintiff.  *See* id.  Plaintiff allegedly told the mother that her son comes from a bad family.  *See* id.  Plaintiff allegedly used his cell phone camera in the minor's mother's face in an attempt to provoke her, to which she responded by swatting away his camera.  *See* id.

58.    According to an SPD police report, on October 6, 2011, Plaintiff "was present in the 100 block of Waverly for the purpose of preaching his views relative to religion / homosexuality," when "a female who came over and debated his views with him which is a typical reaction to his presence and one he is not alarmed by." (Long Aff., Ex. N, Bates Stamp 0014).  The female left and returned with eggs, which she threw at Plaintiff and then physically held the eggs and struck them "against his [Plaintiff's] person while she squashed them into his face and clothing."  (Id.)  She them allegedly tried to break his cellular telephone and then grabbed Plaintiff's hat and "tore it into several pieces."  (Id.)

59.    During an incident in Salem, Massachusetts, Plaintiff recounted:

A:  . . . Someone was holding a sign that said "Homosexuality's a sin. Christ can set you free." A small group of people were walking by, and I think one of their family members was a homosexual and this guy became very agitated, came over and started physically attacking the guy that was holding the sign. And I got the camera out, and he saw me with the camera and he gives me a straight right hand. He's a Puerto Rican guy from New York City. I think he was from New York City. Drove me backwards, but I never went down. And you know what? I came right back at him, I says, "Hey, man, I love you. That's why we're out here, to give you the Gospel." And I could have had him arrested, and I didn't.

Q:  Okay. So that time you were punched in the face?

A:  Straight...straight right hand.

Q:  Okay. All right. Did you suffer any physical injury as a result of being punched that time?

A:  Yes.

Q:  What was it?

A:  Well, I didn't know I had a physical injury at the time, but my front tooth loosened up and it had to be repaired.

(Long Aff., Ex. J, p. 145, l. 14 – p. 146, l. 17).

### CNY Pride Festival 2014, CNY Pride's Content Neutral Requests, Plaintiff's Hate Speech, and the Public Safety and Welfare of Plaintiff

60.    Mr. Shepherd signed, on behalf of CNY Pride, the application for "Parade/Public Assembly" for the 2014 CNY Pride Festival[2], which was held on June 21, 2014 at the Inner Harbor.

61.    CNY Pride requested that the assembly area of the Inner Harbor park include "sidewalks bordering KirkPatrick [*sic*] Street @ Inner Harbor park for security." (Long Aff., Ex. A, p. 34, ll. 3-22).  According to Mr. Shepherd, the City Parks Department required security for the purpose of creating a secure area at "the entrance to the park where we would check IDs and give people one colored wristband or another." Id.  Mr. Shepherd testified to his email sent prior to the festival on June 16, 2014, where he stated that "[t]his should leave unchanged our request [*sic*] use of the sidewalks at the end of the route surrounding the immediate perimeter [*sic*] of the entrance to Inner Harbor Park, as we have added security there per a request from the city Parks Department."  (Id., Ex. 1 thereto).  According to Mr. Shepherd, the City Parks Department made this request for the purpose of crowd control "ID'ing the crowd." (Id., p. 25, ll. 11-24).  According to Mr. Shepherd, for that reason of properly "ID'ing," CNY Pride was asked "to have added security there [at the entrance]."  (*See* id., p. 24, l. 25 – p. 25, l. 20).

---

2 Upon information and belief, this is application was submitted for the 2014 CNY Pride Parade and Festival, as indicated by the Central Permit Office stamp indicating "PC-0284-14," connoting the year as 2014.  This is supported by Sergeant Jamey Locastro's Affidavit (*See* Long Aff., Ex. V, ¶ 14 and Ex. 2 thereto).

62.     Plaintiff was present on June 21, 2014 at the CNY Pride festival using a sound amplification device that he identified as an "Aker amp" (Long Aff., Ex. J, p. 116-117; *see id.*, pp. 150-151, and Exs. G & H thereto; *see also* Ex. S; Exs. T & U).

63.     A short-while after arriving at the "public sidewalk between Inner Harbor and West Kirkpatrick Street" on June 21, 2014 at the CNY Pride festival, SPD Sergeant Jamey Locastro (hereinafter "Sgt. Locastro") informed Deferio that he was "in violation of the permit." (Dkt. No. 1, ¶¶ 38, 45).

64.     According to Sgt. Locastro,—shortly after the end of the parade, he was notified by a call over his police radio that he needed to attend to a matter at the driveway entrance to the Inner Harbor on West Kirkpatrick Street.  (*See* Long Aff., Ex. V, ¶ 10).

65.     When he arrived at the location, Sgt. Locastro observed Plaintiff at the entry way to the Inner Harbor on West Kirkpatrick Street, and it was his observation that Plaintiff was not just creating a disturbance, but Plaintiff was creating a safety issue for himself. (*See id.*, ¶ 11).

66.     Plaintiff was utilizing a sound amplification device as well as an inflammatory sign (*See id.*, ¶ 12; *see also* id., Ex. 2 thereto; Ex. J, Ex. E thereto).  Plaintiff was also using provocative and inflammatory language toward festivalgoers—which caused individuals surrounding him to become agitated.  (*See* Long Aff., Ex. V, ¶ 12).  Sgt. Locastro recalls approximately five (5) or six (6) different festivalgoers that were obviously upset because they were actively lunging at Plaintiff, harassing him, and refusing to leave Plaintiff's personal space, which Sgt. Locastro estimated to be within eighteen (18) inches from Plaintiff.  (*See* id.)  Sgt. Locastro recalled that these individuals were also yelling obscenities at Plaintiff.  (*See* id.)  There were approximately twenty (20) people in close proximity to Plaintiff, and in total fifty (50) to sixty (60) within his vicinity at this time.  (*See* id.; *see* Long Aff., Ex. T)

67.     Sgt. Locastro had a copy of the permit issued by the Central Permit Office for the festival. (*See* Long Aff., Ex. V, ¶ 14; *see also* id., Ex. 2 thereto).

68.     The permit indicated that CNY Pride had an approved public assembly space for their use at the Syracuse Inner Harbor, which included the "sidewalks bordering Kirkpatrick street @ Inner Harbor park." (*See* id., Ex. 1 thereto, p. 1).  In addition, the public assembly portion of the permit indicated that there were to be "No speakers @ sidewalks," which Sgt. Locastro understood to mean that no sound amplification devices were allowed to be used on that sidewalk as part of the permitted area at any time.   (*See* id.)

69.     Sgt. Locastro, upon confronting Plaintiff, informed him that he was not in conformance with those terms as Sgt. Locastro lawfully understood them to be.  (*See* Long Aff., Ex. T, minute 00:05-00:20).  Sgt. Locastro then showed a copy of the legally issued permit to Plaintiff and explained to him the parameters of the permit. (*See* id. minute 00:27-0037).  Sgt. Locastro informed Plaintiff of his reasonable and lawful understanding of what is considered the sidewalk under the conditions of CNY Pride's legally issued permit.  (*See* id., minute 00:37-01:00).  As a result, Sgt. Locastro asked Plaintiff several times to move across the street from the driveway entrance of the Inner Harbor Park on West Kirkpatrick Street, where he was standing. (*See* Long Aff., Ex. V, ¶¶ 13-18; *see* Long Aff., Ex. T, minute 01:19, 01:27, 01:31, 01:35, 01:37, 02:01).

70.     It was Sgt. Locastro's belief that Plaintiff's safety was at risk, and therefore Sgt. Locastro had a duty to preserve the peace by extracting Plaintiff from a situation for the sake of Plaintiff's safety and the safety of all present at the parade and festival that day. (*See* Long Aff., Ex. V, ¶¶ 11, 12, 14, 16).

71.     Based on Sgt. Locastro's extensive experience in law enforcement, and knowledge

from that experience and training, he assessed that people were agitated and prepared to use force, and so Sgt. Locastro believed that if he left the scene that unwanted physical contact would occur that could result in injury, with Plaintiff as a probable victim. (*See* id., ¶ 13). Sgt. Locastro achieved this objective by creating an area of separation between him and the agitated festivalgoers. (*See* id.)

72.     Plaintiff was provided multiple lawful orders by Sgt. Locastro to move across the street. (*See* Long Aff., Ex. T, minute 01:00-02:10).

73.     Plaintiff asked Sgt. Locastro if he didn't "move across the street will I be arrested?" to which Sgt. Locastro replied "you *could* be subject to arrest." (*See* id., minute 02:16-02:30).

74.     Sgt. Locastro was able to negotiate with Plaintiff an understanding that did not require an arrest for disorderly conduct, and so Plaintiff moved across the street, allowing Plaintiff to safely express his opinion outside the permitted area for which CNY Pride had what Sgt. Locastro understood to be a lawful permit as it was written. (*See* Long Aff., Ex. V, ¶ 17; *see also* Ex. T, minute 02:55-03:49).

75.     Plaintiff was further informed by Sgt. Locastro that per the CNY Pride permit, someone with a loudspeaker device could not be in the area proscribed under CNY Pride's permit. (*See* Long Aff., Ex. U, minute 01:39-01:42).

76.     Plaintiff was not arrested at the CNY Pride festival by SPD on June 21, 2014, and, in fact, Plaintiff does not recall ever being issued a ticket or citation while, or every being charged with a crime as a result of, preaching or protesting by SPD. (*See* Long Aff., Ex. J, p. 156, l. 21 – p. 157, l. 7).

77.     Plaintiff remained on the side of West Kirkpatrick Street opposite to the Inner Harbor permitted area for the festival for approximately four (4) more hours, from 11:15 a.m. to

3:25 p.m. with his sign.  (*See* Long Aff., Ex. J, pp. 260, l. 8 - 262, l. 4; *see also* id., Exs. N & I thereto).

## CNY Pride's 2015 Festival Application and the City's Content Neutral Restriction Placed on CNY Pride

78.    On or about June 6, 2015, CNY Pride completed an application for "Parade/Public Assembly Permit" for the CNY Pride festival on June 20, 2015.  (*See* Long Aff., Ex. B, Ex. 6 thereto (Bates Stamp 0134-0135)).

79.    Mr. Shepherd stated that his justification for CNY Pride's requests in the 2015 CNY Pride festival permit (See Long Aff., Ex. A, Ex. 5 thereto) was that the "entrance needs to be a safe means of people getting in and out [of the festival grounds] without having a crowd . . ." and that "we [CNY Pride] don't need people with bullhorns creating confrontations while we're trying to make sure that a safe festival about to being with."  (Id., p. 61, ll. 5-14).

80.    Ms. Gewanter had previously testified that she regularly assisted CNY Pride with permit applications (*see* ¶ 12, *above*).  Ms. Gewanter testified that she had composed an email to employees of the City of Syracuse in order to express her and CNY Pride's concerns regarding the use of sound amplification, safety from confrontational incidents, and the First Amendment interests of any "counter protesters."  (Id., p. 31, l. 7 – p. 32, l. 8, p. 33, ll. 3-24).

81.    Ms. Gewanter—who, upon information and belief, handwrote the 2015 CNY Pride application (*see* Ex. B, Ex. 6 thereto)—gave her explanation as to how she assisted CNY Pride in the composition of their 2015 CNY Pride applications (*see* id.), and, in particular, her and CNY Pride's meaning with regard to their application requests for "exclusive use" of "sound amplification" and (id.):

Q: Right. Right. Okay. Okay. So I guess where did the term "exclusive use" originate?

> MR. LONG: Object to form.

A: When I was with the NYCLU I worked under the supervision of experienced First Amendment lawyers who shared with me the names and the gist of certain significant First Amendment cases that went before the Supreme Court. I in turn read those cases myself to familiarize and have further discussions with those First Amendment lawyers.

> And one of the cases that was of particular interest was a case in which a group that I think is called the Hibernians in Boston got a Supreme Court decision that basically said that the people that request the permit have the right to control the message during that time of the permit and the space indicated on the permit, the location. So that was the idea that I suggested to Pride to use, that since that's what the Supreme Court suggested -- what the Supreme Court ruled that they would also have the right to request the ability to control the message for a defined limited period of time, for a defined limited location during that period of time.

(Id., p. 39, l. 8 – p. 40, l. 7).

82.     According to the Right-of-Way Permit Coordinator at all times relevant to this action, Mr. Sam White (hereinafter "Mr. White"), CNY Pride submitted to the Central Permit Office for review a signed Parade/Public Assembly Permit Application, dated June 6, 2015, for "First Amendment Activities At Entrance To Pride Festival," which was to be held June 20, 2015. (Long Aff., Ex. I, ¶¶ 2, 8; *see also* Ex. 2 thereto, pp. 1-2).

83.     CNY Pride requested exclusive use of the "driveway into Inner Harbor park on Kirkpatrick and adjacent sidewalks for 40 ft. to either side of driveway on N. side of Kirkpatrick." (Id., ¶ 9; *see also* Ex. 2 thereto).

84.     After Mr. White's review of CNY Pride's 2015 application, the determination was made to conditionally approve CNY Pride's application only under the condition that CNY Pride's request was strictly limited to "exclusive control to the entry area into the Inner Harbor festival area, as well as the 40-feet on either side of the northern portion of Kirkpatrick street **for the limited purpose of allowing exclusive use of sound amplification and access to the festival**."  (See id.,

26

¶¶ 10, 11; *see also* Ex. 2 thereto, p. 3) (emphasis in affidavit).

### <u>The 2015 CNY Pride Festival, Plaintiff's Incitement of Violence, Obstruction of the Festival, and the Public Safety and Welfare of Plaintiff.</u>

85.     On June 20, 2015, Plaintiff arrived at the CNY Pride festival at the Inner Harbor at 11:10 a.m. (*See* Long Aff., Ex. J, p. 262) with an Aker's sound amplification device (*see* Long Aff., Ex. S) and a large sign extolling "ex-homosexuals." (See Long Aff., Ex. X; *see also* Long Aff., Ex. J, Exs. G, H, and P thereto).

86.     Plaintiff arrived inciting the crowd as Ms. Deferio filmed (*see* Long Aff., Ex. R, pp. 22-26); saying derisively that "it's all about the feelings, right" (Long Aff., Ex. X[3], minute 00:02-00:06) as he crossed the street toward the West Kirkpatrick Street entrance to the Inner Harbor then referring to festivalgoers as "homofascists." (Long Aff., Ex. Y, minute 00:23).

87.     Just before making "homofascist" comments, Plaintiff was asked to move across the street by an unknown male who was at the driveway entrance to the CNY Pride festival who stated "sir, we have a permit" and after a short exchange grabbed Plaintiff's sign when the video ends (Long Aff., Ex. X, minute 00:21-00:45).

88.     The video ends (*see* Long Aff., Ex. X), despite the fact that the recorder of the video, Ms. Deferio, does not recall ever stopping the video, understanding her recording to be one continuous video with no intermittent stop.  (*See* Long Aff., Ex. R, p. 25, l. 6 - p. 28, l. 5).

89.     On June 19, 2017, Defendants were in receipt of an unedited video that shows that in the time between Exhibits X and Y, Plaintiff took a video from a first-person perspective wherein Plaintiff is told to move by the same unknown male (*see* Long Aff., Ex. Z, minute

---

3 Exhibits X and Y are Exhibit Q (videos four (4) and five (5) in the depositions transcripts of Michelle Deferio) and for the sake of judicial economy were not filed duplicatively.  The videos were disclosed to Defendants by Plaintiff.

00:07) and responds "I'm not going to move . . . I'm not movin'," during a physical engagement (id., minute 00:08-00:15).  An unknown person in close proximity to Plaintiff then says "get the hell outta here," to which he responds "no."  (Id., minute: 00:20-00:24).  Plaintiff then refers to festivalgoers in his close proximity with whom he is interacting as "[y]eah homofascists right here. Homofascists," after a festivalgoer states in relation to Plaintiff "[n]obody talk to him.  Do not feed the monkey." (id., minute 00:34-00:39).

90.     Less than five (5) minutes later, Plaintiff is struck in the face by a male assailant (hereinafter "male assailant") after engaging in a verbal altercation and having another female assailant (hereinafter "female assailant") try to take Plaintiff camera.  (*See* id., minute 05:23-05:44).   In another video from the June 20, 2015 event, Plaintiff converses with those in his immediate vicinity who accuse each other of pushing the other.  (*See* Ex. AA, minute 00:47-00:52, 01:10-01:15).

91.     The male assailant had approached Plaintiff over three (3) minutes prior to Plaintiff being struck (*see* id., minute 02:13), where they appear to engage in a conversation. (*see* id.; *see also* Long Aff.).  Plaintiff noted that the male assailant "seemed to be think -- he seemed to think that he was acting on behalf of the festival organizers," (Long Aff., Ex. J, p. 125, ll. 13-19), and that he kept telling Plaintiff that he "had to go across the street," (id., p. 126, ll. 4-7).  Plaintiff indicates that he responded by saying that he would "wait until an officer comes and clears this up," and that he was pushing Plaintiff.  (Id., ll, 6-9).  The male assailant then tried to grab Plaintiff's camera and grabbed his person.  (*See* id., ll. 9-11; *see also* Long Aff., Ex Y, minute 02:49-03:02).

92.     Ms. Deferio, who was filming, testified that she zoomed in at a certain point with her camera:

A:  If there was something going on, I wanted to be able to get a better view of it.

Q:  Okay. And what did you observe in the video that would have been something going on?

A:  People were starting to get too close to him.

Q:  Did you become concerned for your father?

A:  Yes.

Q:  Okay. Were you concerned for his safety?

MR. MANGINI: Object to form.

A:  Yes.

Q:  And what specific actions, if any, led you to be concerned for your father's safety?

A:  I noticed that someone looked like they were very angry.

Q:  Okay. Have you seen people get angry with your father in the past?

A:  Yes.

MR. MANGINI: Object to form.

Q:  When you've seen people get angry with your father in the past, did that result in you being concerned for your father's safety?

A:  Yes.

(Long Aff., Ex. R, p. 30, ll. 30-25)

93.     After Plaintiff is attacked, Plaintiff asked Ms. Deferio to call 911 (*See* Long Aff., Ex. Y, minute 05:41; *see also* Long Aff., Ex. R, p. 31).

94.     Ms. Deferio called 911, alleging that "a man is being attacked," referring to her father, Plaintiff, and that people were trying to steal his property, physical pushing on him, crowding up on him, and that these people were upset.  (Id., p. 32, ll. 5-24; *See* Long Aff., Ex. Y, minute 05:56-07:04).

95.     Plaintiff testified that after he was punched by the male assailant that he was fearful for his safety.  (*See* Long Aff., Ex. J, ll.16-19).

96.     While remaining in the area with upset people crowding upon on him (*see* Long

Aff., Ex. R, p. 32, ll. 5-24), Plaintiff's sign was struck by a festivalgoer (*see* Long Aff., Ex. Y, minute 10:38) and later the female assailant (who remained in the area) physically accosted Plaintiff to which Plaintiff responds twice "get your hands off me" while struggling with his sign (*see* id., minute 13:55-14:17).

97.     Captain Sweeny and Officer Dennis Burlingame (hereinafter "Ofc. Burlingame") arrived approximately nine (9) minutes after Plaintiff's altercation on June 20, 2015. (*See* id., minute 14:40).

98.     Ofc. Burlingame came to know that there had been a disturbance involving Plaintiff and numerous displeased festivalgoers at the entrance to the Inner Harbor park and was summoned to assist.  (*See* Long Aff., Ex. FF, ¶¶ 6, 7).  Ofc. Burlingame observed Plaintiff holding a large sign that was positioned over his head and utilizing a sound amplification device to enhance the volume of his speech.  (*See* id., ¶ 7).

99.     Capt. Sweeny was following the tail end of the parade, and while approaching the driveway entrance to the Inner Harbor on West Kirkpatrick Street, Capt. Sweeny was informed that there was an altercation in progress between Plaintiff and individuals that were part of the festival at or near the driveway entrance to the Inner Harbor on West Kirkpatrick Street.  (*See* Long Aff., Ex. BB, ¶ 14).  Capt. Sweeny also observed that Plaintiff was utilizing a sound amplification device, which he had observed Plaintiff use at previous events. (*See* id., ¶ 16; *see also* id., Ex. 2 thereto). Capt. Sweeny's initial observation was that while using his sound amplification device he was saying things back to the crowd in nose-to-nose altercations and verbalizations; surrounded on all sides by agitated festivalgoers.  (*See* id., ¶ 18; *see also* Long Aff.. Ex. DD; id., Ex. Y, minute 14:45-16:20).

100.     Capt. Sweeny's work at various Special Events details in recent years has caused

30

him to have encounters with Plaintiff and develop a cordial "working relationship," with Plaintiff. (*See* Long Aff., Ex. BB, ¶ 15).

101.    Capt. Sweeny was at that point concerned for Plaintiff's safety.  (*See* id., ¶ 19).  As a policing technique to diffuse a physically and emotionally tense situation in a large crowd, Capt. Sweeny sought to separate Plaintiff and those surrounding him in order to de-escalate the situation, along with investigate allegations of a physical assault of Plaintiff.  (*See* id.)  Capt. Sweeny felt in the totality of the circumstance, in order to do so in a safe, prudent, and professional manner, it was imperative that he separated Plaintiff from what was a distracting and agitated crowd of individuals. (*See* id.)

102.    While negotiating Plaintiff to cross the street to where SPD Patrol Vehicles were parked, Capt. Sweeny informed Plaintiff that he was in violation of the 2015 festival permit by his use of sound amplification equipment, regardless of the content of Plaintiff's message.  (*See* id., ¶ 20; *see also* Long Aff., Ex. EE, minute 00:00-00:25; *see also* Long Aff., Ex. BB, ¶ 21).

103.    According to Capt. Sweeny, Plaintiff was situated on the sidewalk of West Kirkpatrick Street at the corner abutting the driveway, he was using his sound amplification device (*see* Long Aff., Ex. BB, Ex. 2 thereto) within forty (40) feet of the driveway as described in CNY Pride's 2015 festival permit.  (*See* id., ¶ 20)

104.    Capt. Sweeny also informed Plaintiff that he would not let Plaintiff continue to stay within the exclusive use area after he had promised not to use his sound amplification device (*see* Long Aff., Ex. DD, minute 00:42-00:56) because Capt. Sweeny had reason to believe that upon his departure Plaintiff was going to turn on his sound amplification again, and that if Plaintiff were left where he was located Captain Sweeny believed that Plaintiff's safety remained at risk.  (*See* Long Aff., Ex. BB, ¶ 21).

31

105.    As noted above, Plaintiff asserted at the 2015 CNY Pride festival that "I don't want to rain on somebody's parade, although **this parade is an *uncivil* parade and I will rain on that**." "*See, e.g.,* Long Aff., Ex. J, p. 257, ll. 10-15; Ex. EE, minute 00:28 – 00:36) (emphasis supplied).

106.    Once Plaintiff agreed to his request to cross the street, Officer Dennis Burlingame further investigated Plaintiff's allegations that he had been physically assaulted.  (*See* Long Aff., Ex. BB, ¶ 22; *see also* Long Aff., Ex. EE, minute 01:29-03:24).

107.    Plaintiff was neither arrested nor charged with a crime.  (*See* id., ¶ 23).

**Defendants' Investigation of Assault on Plaintiff and Prosecution of Male Assailant**

108.    A discussion occurred with Ofc. Burlingame about Plaintiff being assaulted by a festivalgoer as we crossed the street.  (*See* Long Aff., Ex. FF, ¶ 11).  It was at this time that Ofc. Burlingame started to take an information from Plaintiff regarding an assault, as Plaintiff indicated that he was the victim.  (*See* id.)

109.    According to Ofc. Burlingame, Plaintiff advised him that Plaintiff was punched in the face during the disturbance and that the incident was captured on video.  (See id., ¶ 12) Plaintiff further informed him that he had images of the male assailant's (hereinafter "suspect") name and picture recorded on his camera.  (*See* id.)  Plaintiff requested that the suspect be arrested for punching him.  (*See* id.)

110.    Plaintiff refused medical attention on the scene and he did not observe any apparent injury to Plaintiff.  (*See* id., ¶ 14).  Plaintiff informed Ofc. Burlingame that he did not desire prosecution against the woman he indicated took his camera because he was able to recover it.  (*See* id., ¶ 16)

111.    According to Ofc. Burlingame, Plaintiff, on July 22, 2015, emailed Ofc. Burlingame

YouTube links of the videos that recorded the incident.  (*See* Id., Ex. FF, ¶ 17; *see also* id., Ex. 1 thereto, p. 1).  Ofc. Burlingame responded to Plaintiff that he had secured the footage onto discs and would submit them as evidence. (*See* id., p. 3).

112.    Ofc. Burlingame  then arranged to have Plaintiff come to the Public Safety Building (hereinafter "PSB") on June 24, 2017 in order to sign the direct information, which was required if Plaintiff desired the criminal prosecution of his assailant.  (*See* id; *see also* Ex. 1 attached thereto, pp. 3-10).

113.    On July 1, 2015, Ofc. Burlingame advised Plaintiff that he had submitted his case to the Onondaga County District Attorney's Office for a summons. (*See* id., p. 11-14).

Executed on June 30, 2017

_____/s/_____
Todd M. Long, Esq.
Fed. Bar Roll No. 519301