UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES DEFERIO,

                              Plaintiff,

        -against-                                          5:16-CV-0361 (LEK/TWD)

CITY OF SYRACUSE, *et al.*,

                              Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

"The First Amendment reflects 'a profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open.'" Snyder v. Phelps,

562 U.S. 443, 452 (2011) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

"The First Amendment offers sweeping protection that allows all manner of speech to enter the

marketplace of ideas. This protection applies to loathsome and unpopular speech with the same

force as it does to speech that is celebrated and widely accepted." Bible Believers v. Wayne

County, 805 F.3d 228, 243 (6th Cir. 2015) (collecting cases), cert. denied, 136 S. Ct. 2013

(2016). "First Amendment jurisprudence is clear that the way to oppose offensive speech is by

more speech, not censorship, enforced silence or eviction from legitimately occupied public

space." Gathright v. City of Portland, 439 F.3d 573, 578 (9th Cir. 2006) (citing Terminiello v.

City of Chicago, 337 U.S. 1, 4 (1949)).

        These principles are by no means new. E.g., Whitney v. California, 274 U.S. 357,

375–376 (1927) (Brandeis, J., concurring). Yet they are strangely absent from the papers

submitted by Defendants in defense of their actions toward plaintiff James Deferio, a Christian

evangelical who regularly proselytizes at the Central New York Pride Parade and Festival

("Pride Event"). This annual event, which is free and open to the public, attracts thousands of

attendees each year who wish to celebrate the lesbian, gay, bisexual, and transgender ("LGBT")

community and its allies in Central New York. Like many similar events across the country,

however, it also attracts attendees who wish to communicate messages to LGBT individuals and

their allies that are controversial and may be hurtful. But "[t]he right to free speech . . . may not

be curtailed simply because the speaker's message may be offensive to his audience." Hill v.

Colorado, 530 U.S. 703, 716 (2000).

While the dispute in this case may seem parochial—defendants Sergeant Jamey Locastro

and Captain Joseph Sweeny forced Plaintiff to move approximately forty feet from the north to

the south side of West Kirkpatrick Street—the issues presented here affect the heart of the First

Amendment's purpose. As the Supreme Court recently stated,

> Even today, [public streets and sidewalks] remain one of the few
> places where a speaker can be confident that he is not simply
> preaching to the choir. With respect to other means of
> communication, an individual confronted with an uncomfortable
> message can always turn the page, change the channel, or leave the
> Web site. Not so on public streets and sidewalks. There, a listener
> often encounters speech he might otherwise tune out.

McCullen v. Coakley, 134 S. Ct. 2518, 2528–29 (2014).

This Memorandum-Decision and Order affirms the importance of public sidewalks in the

development of the marketplace of ideas and reminds state actors of the requirements they must

meet in order to place restrictions on individuals' right to speak from traditional public fora.

## II.   BACKGROUND

### A.  Relevant Facts

Plaintiff is a Christian evangelist who regularly attempts to share his religious beliefs in public during large events. Dkt. No. 116-25 ("Plaintiff's Statement of Material Facts") ¶¶ 1, 4. He is a resident of the City of Syracuse, New York, Dkt. No. 109-10 ("Deferio Deposition") at 11, and, since 2004, he has attended the Central New York Pride Parade and Festival in Syracuse almost every year, id. at 88. The event is organized by CNY Pride, Inc., a private nonprofit organization, Pl.'s SMF ¶ 13, and CNY Pride receives a special events permit from the City in order to host the event each June, id. ¶ 23. The event is free and open to the public. Dkt. No. 109-6 ("Locastro Deposition") at 9; Dkt. No. 109-2 ("Shepard Deposition") at 13, 37; Dkt. No. 109-3 ("Gewanter Deposition") at 10.

Since 2012, the Pride Event has taken place in Syracuse's Inner Harbor neighborhood. Pl.'s SMF ¶¶ 14–18. Although its route has varied because of road construction, Shepard Depo. at 14, the Pride Parade has generally begun at the corner of Belden and Plum Streets, traversed north along Van Rensselaer Street, and ended on the West Kirkpatrick Street, which forms the southern border of Inner Harbor Park, Dkt. No. 109-2, Ex. 2 ("2014 Parade Permit"). Inner Harbor Park is public property managed by the Syracuse Parks Department, and the Pride Festival takes place following the Parade at the Inner Harbor Amphitheater inside the park. Shepard Depo. at 14, 37. Plaintiff has chosen to proselytize from the public sidewalk on the north side of West Kirkpatrick Street, adjacent to the driveway entering Inner Harbor Park, during the Pride Parade and Festivals because of the large number of people at that location during the event. Pl.'s SMF ¶ 12; see also Dkt. No. 109-6, Ex. 2 ("Map").

3

### 1. *2014 Pride Event*

The 2014 Pride Event took place on June 21, 2014. Prior to the event, CNY Pride applied for a "Parade/Public Assembly Permit." <u>See</u> 2014 Permit. The first substantive section of the permit is entitled "Parade Application," and CNY Pride provides formation and dispersal locations, start and finish times, and estimated number of participants. <u>Id.</u> In the second substantive section, entitled "Public Assembly Location," the "Location(s) of Assembly" are described as "sidewalks bordering Kirkpatrick Street @ Inner Harbor Park for security." <u>Id.</u> In response to the prompt, "Sound System," CNY Pride answered "N/A," and, in response to the prompt "Speakers, names," it answered, "No speakers @ sidewalks." <u>Id.</u> The City granted the permit application without modification. Pl.'s SMF ¶ 43.

Sergeant Locastro was assigned to supervise the police officers at the 2014 Pride Event. Locastro Depo. at 7–8. Prior to the event, he reviewed the 2014 Permit. <u>Id.</u> at 15. When the parade concluded, Locastro was called to the intersection of West Kirkpatrick Street and the driveway into Inner Harbor Park. <u>Id.</u> at 10. At that time, Plaintiff was standing on the sidewalk along the north side of West Kirkpatrick Street, holding a sign that said,

> WARNING: Do you not know that the unrighteous shall inherit the Kingdom of God? Do not be deceived; neither fornicators, nor idolators, nor adulterers, nor homosexuals, nor sodomites, nor thieves, nor covetous, nor drunkards, nor revilers, nor extortioners shall inherit the Kingdom of God. 1 Corinthians 6:9-10.

Dkt. No. 109-20 ("Locastro Affidavit"), Ex. 2. Plaintiff also had a sound amplification device, and Sergeant Locastro was told that Plaintiff had used "inflammatory" words prior to Locastro's arrival. Locastro Depo. at 10. When Locastro arrived, "five or six different festivalgoers . . . were trying to get at" Plaintiff. <u>Id.</u> at 11.

4

Sergeant Locastro told Plaintiff that he was "in violation of the permit that the parade has, sir," Dkt. No. 109, Ex. T at 00:07–00:08, and that Plaintiff would be required to move to the south side of West Kirkpatrick Street, Locastro Depo. at 18. In his deposition, Locastro provided two reasons for requiring Plaintiff to move across the street, under the threat of arrest:

> It was a two-fold reason. Firstly, it was that he was in violation of the permit. Where he was . . . standing, he's not allowed to be there based on the way that I interpreted the way the permit was written. . . . Secondly, and almost what I want to say was equally as important to me, was for his safety. . . . Where he was standing, there were people there actively trying to get at him. I was concerned for his safety because he, very impressively, stands his ground.

Id. at 17–18.

More specifically, Locastro understood the sidewalk on the north side of West Kirkpatrick Street to be part of CNY Pride's permitted area, and so CNY Pride could "sort of control what they want going in the festival and what they don't." Id. at 19; see also Dkt. No. 109, Ex. U at 01:33–01:40 ("[CNY Pride] could close the sidewalk to anyone they view as a protester. So someone similar to [Plaintiff].") When asked what distinguished Plaintiff from the hundreds of other people who were standing or walking on the north side of West Kirkpatrick Street, Sergeant Locastro said, "Nobody else was holding a large anti-gay sign, standing in the middle of the sidewalk, upsetting people." Locastro Depo. at 20. Under the threat of arrest, Plaintiff left his position on the north side of the street and remained on the south side of the street for approximately four hours. Locastro Aff. ¶ 17–19. Plaintiff was not arrested. Id. at 17.

5

### 2. *Plaintiff's Correspondence with the City*

Following the 2014 Pride Event, Plaintiff contacted relevant City officials through his

attorneys to express concern about the permit issued to CNY Pride and Sergeant Locastro's

actions. The first letter, dated September 5, 2014, sought, *inter alia*, "written assurance that

Syracuse will no longer apply the ban on [Plaintiff's] expression on public sidewalks during

future Pride parades and festivals." Dkt. No. 116-8 ("Plaintiff's First Letter") at 5.

On October 24, 2014, Joseph Doyle, Syracuse's Corporation Counsel, replied to the letter, stating

that "the City will closely review the geographic aspects of similar future permit applications as

they relate to locations of traditional public fora," and "the City of Syracuse will continue to

diligently ensure that the free speech rights of all citizens are protected within the City. . ." Dkt.

No. 116-9 ("Syracuse's Letter") at 6. While Plaintiff responded to Doyle, stating that his

"response is lacking" and requesting a supplemental response to avoid litigation, Dkt. No. 116-10

("Plaintiff's Second Letter") at 1–2, Doyle did not reply again and Plaintiff did not initiate

litigation, Pl.'s SMF ¶ 77.

### 3. *2015 Pride Event*

The 2015 Pride Event occurred on June 20, 2015. CNY Pride again applied for a special

events permit, though its submissions were more involved. See Dkt. Nos. 109-2, Ex. 4

("2015 Parade Permit"); 109-2, Ex. 5 ("2015 Festival Permit"). First, CNY Pride wrote, "We

request exclusive use of sound amplification along parade route, on Kirkpatrick and on Van

Rensselear at end of parade period and at dispersal point." 2015 Parade Permit. Second, CNY

Pride identified the "Location(s) of Assembly" as the "Driveway into Inner Harbor Park on

Kirkpatrick and adjacent sidewalks for 20ft to either side of driveway on [north] side of

Kirkpatrick." 2015 Festival Permit. CNY Pride stated that it would use a sound system "within

festival grounds adjacent to this location." Id.

        CNY Pride also made two related requests in reference to the assembly point: (1) "We

request exclusive use of this location for access to festival site, during festival, for set up time,

[and] for First Amendment activities related to festival [and] parade"; and (2) "We request

exclusive use of sound amplification on this portion of these sidewalks and on sidewalks directly

across street on Kirkpatrick during specified hours." Id. According to Barrie Gewanter, an

attorney who voluntarily assisted CNY Pride with its permit applications, these requests would

address potential counter-protesters at the entrance to the festival. In an email she sent to relevant

City officials, Gewanter stated that these requests "should reduce the kind of friction and

confrontation that has occurred at that location in past years that has required police attention."

Dkt. No. 109-2, Ex. 3 ("Gewanter Email") at 1–2. Further, "any such counter-protester would

still have adequate proximity to his intended audience, but constitutional precedent doesn't

require that such a counter-protester be allowed to be immediately adjacent to his audience."

Id. at 2.

        On June 19, 2015, Sam White, then the Right-of-Way Permit Coordinator in the City's

Central Permit Office, Dkt. No. 109-2 ("White Affidavit") ¶ 2, conditionally approved CNY

Pride's 2015 Parade and Festival Permits. Dkt. No. 109-2, Ex. 6 ("Central Permit Office

Manifest"). The CPO Manifest states, "[CNY Pride] is granted exclusive control to the entry area

into the inner harbor festival area as well as the 40-feet on either side of the northern portion of

Kirkpatrick street for the limited purpose of allowing exclusive use of sound amplification and

access to the festival." Id. According to White, the relevant officials "determined that that would

be an appropriate measure to protect everyone's First Amendment right, given the request from CNY Pride." Dkt. No. 109-2 ("White Deposition") at 21. When asked to describe the criteria for determining whether an exclusive-use zone should be approved, White replied, "[T]here's no specific criteria . . . we review it, make sure everyone's rights are respected in our approval or denial of the application." Id.

On June 20, 2015, Plaintiff attended the 2015 Pride Event with a large sign and a sound amplification device. The sign stated, "Thousands of Ex-Homosexuals Have Experienced the Life-Changing Love of Jesus Christ," which also provided links to relevant websites. See Dkt. No. 109, Ex. X at 00:17. During the parade, Plaintiff made generalized statements to the crowd regarding his religious beliefs. See, e.g., Dkt. No. 109, Ex. Z at 01:15–01:22 ("Time to repent people. You are not guaranteed tomorrow. No one is. Where's your love for God?"). Plaintiff also engaged with other attendees of the event, some of whom were clearly angered by Plaintiff's messages. For example, one person said to the crowd closest to Plaintiff, "Nobody talk to him. Do not feed the monkey." Plaintiff responded, "Homofascist right there." Id. at 00:33–00:37. Two other people attempted to take Plaintiff's camera phone from him, and Plaintiff requested that his daughter, who was filming Plaintiff from the south side of West Kirkpatrick Street, call 911 to report that a man had hit him in the face. Dkt. No. 109, Ex. Y at 05:20–05:58. She did so. Id. at 06:00.

Captain Sweeny was assigned to supervise the police officers at the 2015 Pride Event. Dkt. No. 106-4 ("Sweeny Deposition") at 8. At the conclusion of parade, Sweeny arrived at the intersection of West Kirkpatrick Street and the driveway into Inner Harbor Park, where Plaintiff was located with a sign and sound amplification device. Id. at 12; see also Dkt. No. 109, Ex. Y

at 14:45. When Captain Sweeny first spoke to Plaintiff, Sweeney did not address the 911 call or

the interactions between Plaintiff and other festival attendees; Sweeny told Plaintiff that he could

be arrested if he stayed at that location, because CNY had "exclusive use of this side of the street,

and you don't have a permit to be using any amplification devices, which they do." Dkt. No. 109,

Ex. DD at 00:30–00:39; see also Sweeny Depo. at 15 ("And I explained to him that he's not

where he should be. . . . Because if he's using the sound amplification devices, you can't be in

that 40-foot area."). When Plaintiff offered to turn off his amplification device, Sweeney said,

"You gotta go on that side," i.e. the south side of West Kirkpatrick Street. Dkt. No. 109, Ex. DD

at 00:51–00:53. "[CNY Pride] has exclusive use of this side." Id. at 00:54–00:56. After Plaintiff

crossed to the other side of the street, he and Sweeny further engaged in conversation, and

Sweeny explained, "The Corporation Counsel [of the City of Syracuse] stated that what they are

doing is giving a 40-foot buffer on the area around the entrance to and across the street for

anybody that is protesting, that's using any kind of sound amplification device, so they can't be

in that area." Dkt. No. 109, Ex. EE at 00:02–00:14.

Plaintiff remained on the south side of West Kirkpatrick Street for approximately two

hours while the festival took place inside Inner Harbor Park. Deferio Depo. at 262. He was not

arrested. Dkt. No. 109-22 ("Sweeny Affidavit") ¶ 23.

**B. Procedural History**

Plaintiff commenced this action on March 31, 2016 against the City of Syracuse and three

of its police department personnel—Captain Joseph Sweeny, Sergeant Jamey Locastro

(collectively, "the Officers"), and Chief of Police Frank Fowler—under 42 U.S.C. § 1983,

alleging violations of his First Amendment and Due Process Clause rights. Dkt. No. 1

("Complaint"). Specifically, Plaintiff alleges that, in both 2014 and 2015, on the day of the Pride Event, he was barred by the Officers from demonstrating on the public sidewalk immediately adjacent to the festival's entrance, and instead was forced to move across the street—away from pedestrian traffic into and out of the festival. See id. ¶¶ 45–46, 74. In so doing, Plaintiff claims that the Officers infringed upon his right to free speech and imposed unconstitutionally vague restrictions on his activity.

Five days after filing his Complaint, Plaintiff moved for a preliminary injunction concerning the then-upcoming 2016 Pride Parade and Festival. Dkt. Nos. 6-1 ("Preliminary Injunction Motion"), 6-15 ("Plaintiff's Memorandum"). In a Memorandum-Decision and Order dated June 8, 2016, the Court granted Plaintiff's Motion and enjoined the Defendants "from excluding Plaintiff from or restricting his ability to demonstrate in the areas surrounding the entrances to the 2016 CNY Pride Event based on the establishment of a buffer zone." Dkt. No. 24 ("June 2016 Order") at 20. Plaintiff attended the Pride Parade and Festival in 2016 and 2017 without incident. Pl.'s SMF ¶¶ 146–55.

After extensive discovery, Defendants moved for summary judgment on June 30, 2017. Dkt. Nos. 109 ("Motion"), 109-32 ("Defendants' Statement of Material Facts"), 109-33 ("Memorandum"). Plaintiff responded by cross-moving for summary judgment on July 31, 2017. Dkt. Nos. 116 ("Cross-Motion"), 116-26 ("Cross-Memorandum"). In addition to nominal monetary damages, Plaintiff seeks permanent injunctive relief and a declaratory judgment. Cross-Mem. at 26–29; Dkt. No. 116-1 ("Proposed Order") at 2. Defendants replied on August 14, 2017. Dkt. No. 117-2 ("Reply"). For the following reasons, Defendants' Motion is

10

granted in part and denied in part and Plaintiff's Cross-Motion is granted in part and denied in part.

## III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The Court may consider video evidence in determining whether material questions of fact exist. Scott v. Harris, 550 U.S. 372, 379–80 (2007); see also Fabrikant v. French, 691 F.3d 193, 201 n.6 (2d Cir. 2012) (affirming opinion that relied on video evidence where plaintiff did not dispute accuracy of video, but "dispute[d] only how to characterize that evidence").

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.   DISCUSSION

### A.  Claims Against Individual Officers

#### 1. State Action

Plaintiff  has brought this action pursuant to § 1983, which provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under the color of state law. In order to state a claim pursuant to § 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'" Velez v. Levy, 401 F.3d 75, 85 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980)).

State action is an essential element of any § 1983 claim. Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982); see also Hudgens v. NLRB, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only

12

against abridgment by government, federal or state."). Here, Defendants have presented a

confusing argument regarding the absence of state action in Plaintiff's allegations. Mem. at 2–4.

The Court is not convinced.

First, citing Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 693 (1978),

Defendants argue that all of Plaintiff's claims must be dismissed, because he failed to identify

"a statute, established regulation, ordinance, local law, or instituted written and applied policy"

on which the Officers relied. Mem. at 2–3. This argument fundamentally misunderstands Monell,

which constrains *municipal* liability, not *employee* liability. Plaintiff has sued the Officers in their

individual capacities, and he is not required to challenge an ordinance or policy promulgated by

the City in order to state a claim against its employees. E.g., Gonzalez v. Delaware County,

No. 17-CV-373, 2017 WL 6001823, at *7 (N.D.N.Y. Dec. 4, 2017) (Kahn, J.) (denying

individual police officers' motion to dismiss, even though Plaintiff did not present any claim that

they relied upon an ordinance or policy).[1]

Second, citing Stefanoni v. Darien Little League, Inc., 101 F. Supp. 3d 160, 172–73

(D. Conn. 2015), Defendants argue that Plaintiff's claims must be dismissed, because he did not

"show that CNY Pride's actions are attributable to the City by CNY Pride fairly understood as a

state actor." Mem. at 4. If Plaintiff had named CNY Pride as a defendant in this lawsuit, this

argument would have relevance. But Plaintiff chose to sue the Officers and the City, *not* CNY

---

[1] Construed liberally, Defendants may be arguing that the Officers' spontaneous orders at the 2014 and 2015 Pride Events are not subject to challenge pursuant to § 1983. The Second Circuit and other courts have rejected this argument in similar situations. E.g., Akinnagbe v. City of New York, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) ("[T]he Second Circuit has recognized that a spontaneous police order to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine." (citing Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir. 2013))).

Pride. <u>Stefanoni</u>, which concerned a lawsuit against a children's baseball league that had no direct affiliation with a governmental entity, is irrelevant to Plaintiff's claims against the Officers, who are City employees. Again, Defendants' argument misunderstands the relevant caselaw and the facts of this case.

Since the Court finds that the Officers acted under the color of state law when they interacted with Plaintiff during the 2014 and 2015 Pride Events, the Court will turn to Plaintiff's allegations that the Officers deprived him of his constitutional rights.

### 2. *First Amendment*

Plaintiff claims that his First Amendment rights were violated at the 2014 and 2015 Pride Events. Compl. ¶¶ 100–03. Free-speech claims require a three-step inquiry. <u>Marcavage v. City of New York</u>, 689 F.3d 98, 103 (2d Cir. 2012) (citing <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 790–91 (1989)). The Court must first examine whether Plaintiff engaged in First Amendment protected activity; second, the nature of the forum where Plaintiff spoke; and third, whether the Officers' actions were legitimate in light of the applicable standard of review. <u>Id.</u>; <u>accord</u> <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 797 (1985).

### a. Protected Speech

As described above, Plaintiff is a Christian evangelical who attends public events in Syracuse and elsewhere in order to spread his religious beliefs. Pl.'s SMF ¶¶ 1, 4. At the 2014 Pride Event, Plaintiff held a large sign that displayed a verse from the Bible regarding "the unrighteous." <u>See</u> Locastro Aff., Ex. 2. At the 2015 Pride Event, he held a different large sign that stated, "Thousands of Ex-Homosexuals Have Experienced the Life-Changing Love of Jesus Christ," which also provided links to relevant websites. <u>See</u> Ex. X, 00:17. He also used a sound

14

amplification device to propagate messages regarding sin, judgment, and redemption. E.g., Ex. Z, 01:15.

Typically, "[o]ral and written dissemination of . . . religious views and doctrine is protected by the First Amendment." Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981); see also Deegan v. City of Ithaca, 444 F.3d 135, 141 (2d Cir. 2006) ("[I]n Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." (quoting Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995))). In addition, "[t]he right to free speech . . . includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." Hill, 530 U.S. at 716. Attendees at both festivals were unsurprisingly offended by Plaintiff's religious beliefs, which advocate for "homosexuals" in particular "to repent." Dkt. No. 109, Ex. Z at 01:15. But "offense" is not the standard by which First Amendment protections end. In fact, "if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55 (1988) (citation omitted). "After all, much political and religious speech might be perceived as offensive to some." Morse v. Frederick, 551 U.S. 393, 409 (2007).

However, "[t]here are a limited number of categorical exclusions from the comprehensive protection offered by" the First Amendment's Free Speech Clause, even if speech is grounded in religious belief. Bible Believers, 805 F.3d at 243–44. One such exclusion is "so called 'fighting words,'" which are "personally abusive epithets which, when addressed to the ordinary citizen,

15

are . . . inherently likely to provoke violent reaction." Williams v. Town of Greenburgh,

535 F.3d 71, 77 (2d Cir. 2008) (quoting Cohen v. California, 403 U.S. 15, 20 (1971)).

　　　　In their initial Memorandum, Defendants did not contest that the First Amendment

protected Plaintiff's speech at the 2014 and 2015 Pride Events. Mem. at 5. However, in their

Reply, Defendants make a full-throttled argument that Plaintiff's speech at the 2015 Pride Event

constituted "fighting words" and is therefore not protected by the First Amendment. Reply

at 12–16. While the Court may "disregard argument[s] raised for the first time in a reply papers,

especially on a motion for summary judgment," Am. Hotel Int'l Grp., Inc., v. OneBeacon Ins.

Co., 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009), this issue and Defendants' argument are too

important to ignore.

　　　　The "fighting words" exception to the Free Speech Clause is narrow and consists of a

"small class" of expressive conduct. Texas v. Johnson, 492 U.S. 409, 410 (1989). Fighting words

"instantly 'inflict injury or tend to incite an immediate breach of the peace.'" Bible Believers,

805 F.3d at 246 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)). "Offensive

statements made generally to a crowd are not excluded from First Amendment protection; the

insult or offense must be directed specifically at an individual." Bible Believers, 805 F.3d at 246

(citing Cohen, 403 U.S. at 20 (defining fighting words as "a direct personal insult")). To

determine whether such words are "inherently likely to provoke violent reaction," Williams,

535 F.3d at 77, the Court must use an "objective standard"—whether "it is 'likely to provoke the

average person to retaliation,'" Bible Believers, 805 F.3d at 246 (quoting Street v. New York,

394 U.S. 576, 592 (1969)).

16

First, the Court must note that Defendants spend the majority of its Statement of Material Facts and almost all of their deposition of Plaintiff cataloging Plaintiff's controversial comments regarding religion, politics, and homosexuality over the course of many years. See SMF ¶¶ 10–59.[2] Defendants use these facts to gesture at the disturbing argument that *all* of Plaintiff's proselytizing, potentially forevermore, constitutes "fighting words." After citing to comments that Plaintiff published on Facebook, Defendants state, "While it is undisputed that religious expression is protected, Plaintiff's speech constitutes 'fighting words,' which by their utterance inflict injury or tend to incite an immediate breach of the peace." Reply at 13. Defendants make no effort to distinguish between Plaintiff's speech on Facebook, at the relevant Pride Events, or at other events that Defendants catalogued. The Court hopes that this sentence was merely sloppy writing, though Defendants' focus on Plaintiff's speech outside of the events at issue in this lawsuit is worrisome.

Turning to the 2015 Pride Event, about which Defendants argue with more specificity, the video evidence and Captain Sweeny's deposition do not indicate that Plaintiff used fighting words. Plaintiff attended the 2015 Pride Event with a large sign that stated, "Thousands of Ex-Homosexuals Have Experienced the Life-Changing Love of Jesus Christ," and provided links to relevant websites. Dkt. No. 109, Ex. X at 00:17. In the limited time that he spoke from the intersection of West Kirkpatrick Street and the driveway into Inner Harbor Park, he made generally applicable statements regarding sin and religion. See, e.g., Dkt. No. 109, Ex. Z

---

[2]  Defendants also malign Plaintiff's former attorneys, stating that the organization that provided representation to Plaintiff in 2009 is "considered to be an 'Extremist Group' by the Southern Poverty Law Center.'" SMF ¶ 39. Defendants do not state why this fact is material to the events at the 2014 or 2015 Pride Events.

at 01:15–01:22 ("Time to repent people. You are not guaranteed tomorrow. No one is. Where's your love for God?"). Such generally applicable statements cannot constitute fighting words. See Bible Believers, 805 F.3d at 246 ("Offensive statements made generally to a crowd are not excluded from First Amendment protection."); Gilles v. Davis, 427 F.3d 197, 205 (3d Cir. 2005) (same).

Plaintiff did direct at least one insult at an individual: He called a woman a "homofascist," after she said, "Nobody talk to him. Do not feed the monkey." Dkt. No. 109, Ex. Z at 00:33–00:37. Given the context of their conversation, the Court must view this comment "as unpleasant but petty, and not sufficiently provocative to constitute fighting words." Gilles, 427 F.3d at 205. The term "homofascist" is frequently used to accuse individuals of trying to silence those who do not support the LGBT community. See, e.g., Todd Starnes, *Oregon court rules Christian bakery must pay $135G to lesbian couple*, FOXNEWS.COM, Dec. 28, 2017, http://www.foxnews.com/opinion/2017/12/28/oregon-court-rules-christian-bakery-must-pay-135g-to-lesbian-couple.html ("The Kleins were subjected to a homofascist mob that boycotted their businesses, threatened other wedding vendors and subjected their young children to death threats."). By combining "homosexuality" and "fascist," the user of "homofascist" invokes the "exceedingly common—arguably hackneyed—rhetorical device" of "comparing a disliked authority figured to a fascist leader." Williams, 535 F.3d at 77 (holding that, "as matter of law," "comparing the manager of a recreational center to a fascist dictator . . . does not rise to the level of 'so-called fighting words.'" (quoting Cohen, 403 U.S. at 20)). While there is no indication that the woman who received Plaintiff's insult was a traditional "authority figure," such as the deputy commissioner at issue in Williams, Plaintiff's comment had the same meaning in the situation he

18

faced, since multiple people were asserting the authority allegedly provided by the City to move Plaintiff across the street.

The video evidence also indicates that the vast majority of the hundreds of attendees near Plaintiff ignored him. While a handful of attendees verbally accosted Plaintiff, and one attendee physically assaulted Plaintiff, the question is whether "the average individual" would be incited to violence by Plaintiff's words. See Bible Believers, 805 F.3d at 246. ("Furthermore, the average individual attending the Festival did not react with violence, and of the group made up of mostly adolescents, only a certain percentage engaged in bottle throwing when they heard the proselytizing."). Here, it is clear that the average individual was not incited to violence by Plaintiff's words.

The Court notes that Captain Sweeny—the commanding police officer at the Pride Event—never once indicated that Defendants' words were likely to elicit a violent response. When asked by Plaintiff's lawyer, "Was there anything about [Plaintiff's] conduct that concerned you?", Captain Sweeny said, "His conduct, no." Sweeny Depo. at 24. Captain Sweeny's Affidavit even takes pride in the fact that "Plaintiff was neither arrested nor charged with a crime, and, in fact, upon information and belief, [the Syracuse Police Department] pursued charges against [Plaintiff's] assailant." Sweeny Aff. ¶ 23. Defendants do not grapple with or even acknowledge these facts in their papers, which directly contradict their argument that Plaintiff's speech constituted fighting words.

In sum, Plaintiff's speech at the 2015 Pride Event did not constitute fighting words, and therefore was entitled to First Amendment protection. As noted above, Defendants have not

seriously argued that Plaintiff's speech at the 2014 Pride Event did not merit First Amendment protection.

### b. Nature of the Forum

"The protection afforded speech under the First Amendment is a function of both the type of speech and the place where the speech is uttered." Zalaski v. City of Hartford, 838 F. Supp. 2d 13, 30 (D. Conn. 2012), aff'd in part and vacated on other grounds, 723 F.3d 382 (2d Cir. 2013). During the 2014 and 2015 Pride Events, Plaintiff attempted to speak from the sidewalk at the intersection of West Kirkpatrick Street and the driveway into Inner Harbor Park. Pl.'s SMF ¶ 12. Defendants do not dispute that this sidewalk was a public forum during the festivals. Mem. at 5.

Sidewalks "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." McCullen v. Coakley, 135 S. Ct. 2518, 2528 (2014) (quoting United States v. Grace, 461 U.S. 171, 180 (1983)). "The government's authority to regulate speech or expressive conduct on property that has traditionally been open to the public for such activity, such as public streets and parks, is sharply circumscribed." Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir. 2005); see also Deegan, 444 F.3d at 142 ("Speech finds its greatest protection in traditional public fora." (quoting Make The Road By Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004))).

Even on sidewalks, however, the government may "impose reasonable restrictions on the time, place, or manner of protected speech." Ward, 491 U.S. at 791. "To withstand constitutional scrutiny, government restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression." Costello v. City of Burlington, 632

F.3d 41, 45 (2d Cir. 2011) (quoting <u>Deegan</u>, 444 F.3d at 142). Defendants argue that the permits issued to CNY Pride and the Officers' actions in enforcing those permits were permissible restrictions on the time, place, and manner of Plaintiff's speech. Mem. at 5–9.

c.  2014 Pride Event and Sergeant Locastro

As described above, Sergeant Locastro was assigned to supervise the police officers at the 2014 Pride Event. Locastro Depo. at 7–8. Upon arriving at Plaintiff's location at the entrance to Inner Harbor Park, Locastro told Plaintiff that he was "in violation of the permit that the parade has, sir," Dkt. No. 109, Ex. T at 00:07–00:08, and that Plaintiff would be required to move to the south side of West Kirkpatrick Street, Locastro Depo. at 18.

The parties first dispute whether Sergeant Locastro's actions were content-based or content-neutral. Content-based restrictions on constitutionally protected speech are "presumptively invalid." <u>Tsursa v. Pocatello Educ. Ass'n</u>, 555 U.S. 353, 358 (2009). Plaintiff argues that Locastro enforced a content-based "heckler's veto" against him, because Locastro "provided [CNY Pride] with unchecked discretion to decide who may speak" on the contested sidewalk. Cross-Mot. at 9. In contrast, Defendants argue that any restrictions placed on Plaintiff were content-neutral, because the permit issued to CNY Pride in 2014 treated all speakers on the north side of West Kirkpatrick Street alike. Mem. at 6–7. Sergeant Locastro's own deposition and the video evidence presented to the Court clearly demonstrate that he acted because of the content of Plaintiff's speech.

In his deposition, Locastro presented two reasons for demanding that Plaintiff move to the south side of West Kirkpatrick Street: First, because Plaintiff was in violation of CNY Pride's permit, and second, because Locastro was concerned for Plaintiff's safety. Locastro

21

Depo. at 17–18. Neither of these justifications—as portrayed in the deposition and video evidence—was content-neutral.

With regard to the permit, Sergeant Locastro interpreted the permit as providing CNY Pride with the right to "close the sidewalk to anyone they view as a protester. So someone similar to [Plaintiff]." Dkt. No. 109, Ex. T at 01:33–01:40. When asked what was the distinction between Plaintiff and the many other people near him, Locastro said, "Nobody else was holding a large anti-gay sign, standing in the middle of the sidewalk, upsetting people." Locastro Depo. at 20. Finally, in response to Plaintiff's question as to whether CNY Pride "could keep anybody they want to off of that sidewalk," Locastro said, "They could, yes." Dkt. No. 109, Ex. T at 01:00–01:08; see also Dkt. No. 117-1 ("Defendants' Response to Plaintiff's Statement of Material Facts") ("'48. Sgt. Locastro understood the permit to grant CNY Pride use of the sidewalks and control over the activities that may take place in those areas.' RESPONSE: ADMIT.").[3]

These facts are similar to those analyzed by the Sixth Circuit in Parks v. City of Columbus, 395 F.3d 643 (6th Cir. 2005). There, Douglas R. Parks attended the 2002 Arts Festival in Columbus, Ohio, wearing a sign bearing a religious message. The event was free and open to the public, yet the police forced Parks to move outside the area reserved for the festival

---

[3]  The Court notes that Locastro provided a different and narrower description of his interpretation of the permit in an affidavit. See Locastro Aff. ¶ 15 ("[T]he public assembly portion of the permit indicated that the were to be "No speakers @ sidewalks," which I understood to mean that no sound amplification devices were allowed to be used on that sidewalk as part of the permitted area at any time."). This description is contradicted by video evidence and Locastro's deposition and thus does not create an issue of fact. See Lopez v. Mathely, No. 12-CV-1338, 2015 WL 144713 (N.D.N.Y. Mar. 30, 2015) ("Plaintiff's self-serving affidavit that contradicts her prior sworn testimony does not raise a question of fact . . . .").

because "the event sponsor did not want him there." Id. at 646. The Sixth Circuit held that "under these circumstances we find it difficult to conceive that Parks's removal was based on something other than the content of his speech." Id. at 654; cf. McMahon v. City of Panama City Beach, 180 F. Supp. 3d 1076, 1106 (N.D. Fla. 2016) ("The City's stated policy of unquestioning deference to the whims of the permit holder . . . at a free and open-to-the-public event is, to put it gently, troubling.").

Defendants do not even argue that Locastro's actions were content-neutral; instead, their argument is limited to the words on the face of the permit. Mem. at 6–7; Reply at 18. But "it is irrelevant whether the [permit] is content-neutral because the officers enforcing it are ordained with broad discretion to determine, based on listener reaction, that a particular expressive activity" may be banned from a public forum. Bible Believers, 805 F.3d at 247. The same analysis must be applied to Locastro's interpretation of the permit: He banned Plaintiff from the sidewalk on the north side of West Kirkpatrick Street because of Plaintiff's message, including his "large anti-gay sign."

Locastro's second justification—Plaintiff's safety—was also content-based. It is a fundamental principle of First Amendment jurisprudence that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Forsyth County v. Nationalist Movement, 505 U.S. 123, 134 (1992). Speakers of protected speech—even speech that is offensive to many listeners—may not be punished because their critics "might react with disorder or violence." Brown v. Louisiana, 383 U.S. 131, 133 n.1 (1966). As the Sixth Circuit described in detail in Bible Believers:

> The Supreme Court . . . has repeatedly affirmed the principle that
> 'constitutional rights may not be denied simply because of hostility
> to their assertion or exercise.' If the speaker's message does not fall
> into one of the recognized categories of unprotected speech, the
> message does not lose its protection under the First Amendment due
> to the lawless reaction of those who hear it. Simply stated, the First
> Amendment does not permit a heckler's veto.

805 F.3d at 252 (quoting Watson v. City of Memphis, 373 U.S. 526, 535 (1963)).

Here, Locastro admits that he responded to the crowd's negative reaction. At his

deposition, Locastro stated that "people in the festival were upset and irate, and it was my

determination that the safest place for your client to be was to be across the street."

Dkt. No. 109-7 ("Locastro Deposition II") at 16. Asked why "people were agitated with"

Plaintiff, Locastro said, "It was the things he was saying over the loudspeaker . . . it was the

content of the—of the material on the sign and the things that he was saying prior to my arrival."

Locastro Depo. at 41–42. Finally, "[w]here he was standing, there were people there actively

trying to get at him. I was concerned for his safety because he, very impressively, stands his

ground." Id. at 17–18.

These facts are indistinguishable from the events that occurred at the 2012 Arab

International Festival in Dearborn, Michigan, and analyzed by the Sixth Circuit in Bible

Believers. There, a group of Christian evangelicals known as the "Bible Believers" attended the

2012 Arab International Festival, which annually celebrates the culture of Dearborn's large Arab

population, in order to spread a message about Islam that many attendees found offensive. See

Bible Believers, 805 F.3d at 238 ("The following is a sampling of the Bible Believers' messages:

'Islam Is A Religion of Blood and Murder'; 'Jesus Is the Way, the Truth and the Life. All Others

Are Thieves and Robbers' . . ."). A group of young attendees responded by throwing plastic

bottles, milk crates, and other debris at the Bible Believers. Id. at 239. Although the police scolded the youths, a police officer also told one of the Bible Believers, "[O]bviously your conduct is causing this disturbance and it is a direct threat to the safety of everyone here." Id. at 240. The officer also stated, "[Y]a know, apparently what you are saying to them and they are saying back to you is creating danger." Id. Soon thereafter, the Bible Believers exited the festival under the threat of being arrested for disorderly conduct. Id. at 240–41.

After first finding that the Bible Believers' signs and preaching were protected speech and not fighting words, id. at 246, the Sixth Circuit held that the police officers had violated the Bible Believers' First Amendment rights by threatening them with arrest without first attempting to quell the crowd. "When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." Id. at 253. Moreover, the police had a duty to protect the plaintiffs' right to speak, even though "[t]he way they conveyed their message may have been vile and offensive to most every person" attending the festival. Id. at 254–55; see also id. at 253 ("Nor can an officer sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule—only later to claim that the speaker's removal was necessary for his or her own protection.").

Defendants do not directly address the issue of a heckler's veto. Instead, citing Startzell v. City of Philadelphia, 533 F.3d 183, 196 (3d Cir. 2008), they argue that Locastro was legitimately protecting the right of CNY Pride to hold "a peaceful, family-friendly parade and festival" by forcing Plaintiff to move. Reply at 17. While Defendants are correct that the First Amendment would provide more freedom to the police if Plaintiff had intentionally disrupted the parade or

festival, the only facts to which they point concern the crowd's *reaction* to Plaintiff's speech. See id. ("In the 2014 footage, it shows a crowd surrounding Plaintiff, many shouting in the background that he should be removed."). Unlike Startzell, in which plaintiffs "used bullhorns and microphones in an attempt to drown out the platform speakers and then, most significantly, congregated in the middle of the walkway," 533 F.3d at 198, Plaintiff did not drown out the parade or festival speakers, nor did he actively interrupt the flow of pedestrian traffic into the festival. Defendants simply rely on the fact that "as evidenced by the video footage, there were clear disruptions captured." Reply at 17. The passive voice in this sentence allows Defendants to avoid the fact that the crowd—frustrated with Plaintiff's speech—caused the "disruptions," *not* Plaintiff. And "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Forsyth County, 505 U.S. at 134. On the record before the Court, there can be no reasonable dispute that Locastro effectuated a content-based heckler's veto.

Since the Court has determined that Locastro restricted Plaintiff's speech based on its content, Locastro's actions are subject to strict scrutiny. McCullen, 134 S. Ct. at 2530. "No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling interest." Bible Believers, 805 F.3d at 248 (citing United States v. Playboy Entm't Grp., 529 U.S. 803, 813 (2000)). Defendants have not presented an argument explaining why Locastro's actions served a compelling governmental interest. As noted above, Plaintiff did not disrupt the 2014 Pride Event like the protesters in Startzell disrupted Philadelphia's 2004 OutFest, which may have justified moving him farther from the entrance to the festival, and police officers may not—as a first reaction in the name of safety—punish a person's protected speech in the face of limited

hostilities; otherwise, the First Amendment's protection against a heckler's veto would have no meaning.[4] While Defendants state that the City had an interest in ensuring that CNY Pride could determine which attendees were of age to drink alcohol, Mem. at 8, they do not attempt to explain why moving speakers who are not approved by CNY Pride to the south side of West Kirkpatrick Street furthers this security interest.[5]

In short, Defendants have not met their burden to justify Locastro's actions. While the video evidence clearly shows that Locastro acted courteously toward Plaintiff, no reasonable juror could find that Sergeant Locastro did not violate Plaintiff's First Amendment rights at the 2014 Pride Event.

### d.   2015 Pride Event and Captain Sweeny

As described above, Plaintiff faced similar obstacles at the 2015 Pride Event in his attempt to proselytize on the sidewalk near the entrance to Inner Harbor Park. Prior to the 2015 Pride Event, the City had issued a modified permit to CNY Pride, which granted "exclusive control to entry area into the inner harbor festival area as well as the 40-feet on either side of the

---

[4] Defendants do not argue, as many jurisdictions in similar situations have, that Locastro's enforcement of the permit was necessary to protect CNY Pride's own message. See Gathright, 439 F.3d at 576–77 (analyzing the City of Portland's argument, in light of Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557 (1995), regarding "the right of organizations holding events not to be forced to include the words of a speaker 'expressing a message not of the private organizers' own choosing.").

[5] Courts have also found that providing permittees with such unfettered discretion to choose between speakers even fails to satisfy the narrow tailoring requirement applied to content-neutral restrictions on speech. E.g., Gathright, 439 F.3d at 577 ("[T]he policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in protecting its permittees' right[s]."); McMahon, 180 F. Supp. 3d at 1106 ("[W]hen a private actor is granted the unlimited discretion to suppress speech, whether based on its viewpoint, content, or anything else, the public forum is eviscerated.").

northern portion of Kirkpatrick street for the limited purpose of allowing exclusive use of sound amplification and access to the festival." CPO Manifest at 1.

Captain Sweeny supervised the police officers at the 2015 Pride Event and enforced the 2015 Festival Permit. Again, the parties dispute whether Captain Sweeny's actions were content-based or content-neutral. However, the evidence regarding Captain Sweeny's motivations and understanding of the 2015 Festival Permit are not nearly as clear as the evidence regarding Sergeant Locastro's motivations analyzed above. For example, in his depositions, Captain Sweeny provided contradictory information regarding whether Plaintiff had a right to protest without amplification from the north side of West Kirkpatrick Street. Compare Sweeny Depo. at 26 ("So if he was just going to talk [without amplification], he would have been able to stay there."), with Dkt. No. 109-5 ("Sweeny Deposition II") at 8 ("Question: So, even if Mr. Deferio wasn't using an amplifier, he wouldn't be allowed to be there because it's [CNY Pride's] exclusive use? Answer: I don't know. I think it would have been subjective to my interpretation whether he was causing an issue or not causing an issue."). For purposes of resolving the present motions, the Court will assume that Captain Sweeny acted primarily without consideration for the content of Plaintiff's speech.

Nevertheless, even when the Court analyzes Captain Sweeny's enforcement of the buffer zone as a content-neutral time, place, and manner restriction, Defendants have clearly failed to meet their burden. To survive intermediate scrutiny, Defendants must show that Sweeny's actions "'promote[d] a substantial government interest that would be achieved less effectively absent the regulation,' and is 'not substantially broader than necessary to achieve the

28

government's interest.'" Marcavage v. City of New York, 689 F.3d 98, 106 (2d Cir. 2012)

(quoting Ward, 491 U.S. at 799–800).

Here, Defendants have not provided an argument regarding how the buffer zone

promoted a significant governmental interest, let alone did so narrowly. While courts in this

Circuit have frequently held that governments have "a substantial interest in protecting its

citizens from unwelcome noise," Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011),

courts have also subjected regulatory regimes for amplified sound to intensive review, including

recently in Syracuse, e.g., Marcavage v. City of Syracuse, No. 12-CV-761, 2012 WL 1884471,

at *4 (N.D.N.Y. May 22, 2012) (Kahn, J.), aff'd 515 F. App'x 14 (2d Cir. 2013) (summary

order). At the 2015 Pride Event, the crowd on the north side of West Kirkpatrick Street was loud;

the sidewalks were filled with people cheering, clapping, and speaking. See, e.g., Dkt. No. 109,

Ex. X at 02:00. Defendants have provided no reason why CNY Pride needed the exclusive right

to use sound amplification in the buffer zone, which extended outside of Inner Harbor Park

where the Pride Festival took place. They have not identified a safety risk that sound

amplification at this intersection would have caused. Cf. Marcavage v. City of Chicago,

659 F.3d 626, 630–31 (7th Cir. 2011) (describing safety risk caused by protesters who blocked

sidewalks at large, LGBT event). Nor have they argued that CNY Pride needed exclusive use of

sound amplification in order to convey or protect its own associational message. Cf. Gathright,

439 F.3d at 576–77 (analyzing the City of Portland's argument, in light of Hurley, 515 U.S. at

557, regarding "the right of organizations holding events not to be forced to include the words of

a speaker 'expressing a message not of the private organizers' own choosing.'")  The Supreme

Court held in 1948 that "loud-speakers" were "indispensable instruments of effective public

speech." Saia v. New York, 334 U.S. 558, 561 (1948). Defendants must provide some reason to

justify why people not affiliated with CNY Pride could not use sound amplification devices *at*

*any decibel level* within forty feet of the entrance to Inner Harbor Park.[6]

      Second, the discretion with which Sweeny enforced the buffer zone cannot satisfy the

narrow tailoring requirement. See Crowder v. Housing Auth. of the City of Atlanta,

990 F.2d 586, 591 (11th Cir. 1993) ("A restriction which vests unlimited discretion in a

government actor . . . opens the way to arbitrary suppression of particular points of view. Such

arbitrariness is 'inherently inconsistent with a valid time, place, and manner regulation.'"

(quoting Heffron, 452 U.S. at 649))); Marcavage v. City of New York, 918 F. Supp. 2d 266, 271

(S.D.N.Y. 2013) ("Decision-making standards must be provided; a content-neutral permitting

scheme regulating speech in a public forum is not an unconstitutional prior restraint if it

'contain[s] adequate standards to guide the official's decision and render it subject to effective

judicial review.'" (quoting Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002))). Even after

Plaintiff turned off his amplification device, Sweeny threatened him with arrest and said that

Plaintiff could not return to the intersection of West Kirkpatrick Street and Inner Harbor Park.

When asked whether Plaintiff had a right to speak from the north side of West Kirkpatrick Street

---

[6]  In his deposition, Captain Sweeny stated that he did not test the decibel level of
Plaintiff's amplification to see if it violated Syracuse's noise control ordinance, which is a
regulatory regime independent of the 2015 Festival Permit. Sweeny Depo. at 24, 28. Defendants
do argue that "Defendant Officers feared for Plaintiff's safety as well as members of the general
public based on the emotional and physical responses that Plaintiff's comments elicited." Reply
at 19. As discussed extensively above, the police may not evict a speaker from public space
because of listeners' negative reactions to his speech without first trying to quell the audience.
The video evidence does not indicate that Captain Sweeny or the other officers at the scene
attempted to protect Plaintiff's right to speak from the north side of West Kirkpatrick Street
before moving him. In addition, even if this justification were countenanced, it has no bearing on
the necessity of the sound amplification buffer zone.

without using an amplifier, Captain Sweeny said, "I don't know. I think it would have been subjective to my interpretation whether he was causing an issue or not causing an issue." Sweeny Depo. II at 8. Such discretion is incompatible with a narrowly tailored time, place, and manner restriction. While Sweeny states, without elaboration, that "he had reason to believe that upon my departure Plaintiff was going to turn on his sound amplification again," Sweeney Aff. ¶ 21, Defendants have not presented any evidence that Plaintiff intended to use his sound amplification once he became aware of CNY Pride's new permit. In fact, Sweeny's own affidavit states that at events prior to the 2015 Pride Event he had asked "Plaintiff to turn-down his amplification device or turn it off" and that "Plaintiff would usually comply without incident." Id. ¶ 17.

In short, no reasonable jury could find that the buffer zone as enforced by Captain Sweeny against Plaintiff was narrowly tailored to serve a significant government interest.

### 3. Due Process

Plaintiff also challenges the Officers' actions on due process grounds. Compl. ¶¶ 104–06. "The Due Process Clause of the Fourteenth Amendment requires that laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.'" Betancourt v. Bloomberg, 448 F.3d 547, 552 (2d Cir. 2006) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)); see also United States v. Williams, 553 U.S. 285, 304 (2008) ("Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

31

Typically, such challenges focus on the wording of a specific statute or regulation. E.g., Betancourt, 448 F.3d at 553 (analyzing whether New York City Administrative Code § 16-122(b) is unconstitutionally vague). Plaintiff's void-for-vagueness claim is less specific; he challenges "the policies and practices of granting a private party power over speech on public property, creating a 40-foot buffer zone that incorporates a public sidewalk, and resultantly banning expression on [the] public sidewalk bordering Inner Harbor during Pride Events." Compl. ¶ 104. Plaintiff has not cited any analogous examples to support the viability of such a claim, and the Court has not found any similar cases.

The Court finds that Plaintiff's due process claim is not cognizable. A void-for-vagueness claim requires the Court to analyze text and determine whether such text was crafted with sufficient clarity and enforcement standards. See Williams, 553 U.S. at 306 ("[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."). Plaintiff's claim allows for no such analysis, and, therefore, Defendants are entitled to summary judgment on this claim.

### 4. Qualified Immunity

In their motion for summary judgment, Defendants argue that even if Plaintiff has stated an actionable claim, the Officers are shielded from liability by the doctrine of qualified immunity. Mot. at 11–18; Reply at 27–29. Qualified immunity entitles public officials to freedom from liability for civil damages, as a result of the consequences of the performance of their discretionary duties, when "their conduct does not violate clearly established rights of which a reasonable person would have been aware." Zalaski, 723 F.3d at 388. "The determination of

qualified immunity depends both on the specific facts of an official's actions—*e.g.*, 'what situation confronted [him], what acts he performed, and his motivation in performing those acts'—and on the clarity of the legal rules governing that particular conduct." Village of Freeport v. Barrella, 814 F.3d 594, 609 (2d Cir. 2016) (quoting Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)). In deciding whether an officer's actions were objectively reasonable in light of existing law, "the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." Zalaski, 723 F.3d at 389 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

### a.  Sergeant Locastro

As described above, Sergeant Locastro enforced content-based restrictions on Plaintiff's right to speak from the north side of West Kirkpatrick Street on June 21, 2014. First, he construed CNY Pride's permit to allow the removal of "anyone [CNY Pride] view[s] as a protester," Dkt No. 109, Ex. U at 01:33–01:40, and, second, he enforced a heckler's veto against Plaintiff. While "[c]ontent based regulation of speech is clearly prohibited by the First Amendment," Mozzochi v. Borden, 959 F.2d 1174, 1178 (2d Cir. 1992), the Second Circuit has instructed district courts to frame the qualified immunity inquiry more narrowly, see id. ("Our first task, therefore, is to focus the inquiry to the appropriate 'level of generality' utilizing the proper summary judgment standard."). The relevant question is not whether Plaintiff had a clearly established right to be free from content-based restrictions, but whether Plaintiff had a

clearly established right to speak from a public sidewalk in the face of a nearby permitted event and individuals who were agitated by Plaintiff's speech.

The Supreme Court and many lower courts have addressed the issue of permitted events in public fora: The government "may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums." United States v. Grace, 461 U.S. 171, 180 (1983); see also Zalaski, 838 F. Supp. 2d at 37 ("The City has not cited and the Court has not found any legal authority that a permit allowing a private party to stage a public event has the effect of destroying the historical public forum status traditionally bestowed on parks and streets."). While private parties may, in certain circumstances, dictate the speakers who participate in their events in public fora, such as a parade that occupies a normally public street, Hurley, 515 U.S. at 557, such events are not analogous to Plaintiff's attempt to speak from the north side of West Kirkpatrick Street. As the Court of Appeals for the D.C. Circuit explained, there is a significant difference between participating in a parade and "stand[ing] on the sidewalk and peacefully not[ing] [] dissent as the parade goes by." Mahoney v. Babbit, 105 F.3d 1452, 1456 (D.C. Cir. 1997). The government may not "suppress opposing viewpoints" in the vicinity of an event simply because the event's organizer disagrees with those viewpoints. Id. And, as noted above, Defendants have not argued that Plaintiff's speech on the north side of West Kirkpatrick Street threatened CNY Pride's own First Amendment rights, and Sergeant Locastro did not present such an argument to Plaintiff during the 2014 Pride Event.

Moreover, the case law is clear that "the First Amendment does not permit a heckler's veto." Bible Believers, 805 F.3d at 252. Speakers of protected speech—even speech that is offensive to many listeners—may not be punished because their critics "might react with disorder

34

or violence." Brown v. Louisiana, 383 U.S. 131, 133 n.1 (1966). As discussed above, the video evidence in no way indicates that Sergeant Locastro attempted to calm festival attendees who were bothered by Plaintiff's speech, nor does the video evidence indicate that a serious security threat necessitated Plaintiff's removal from the north side of West Kirkpatrick Street for the remainder of the Pride Festival.

While Defendants are correct that Sergeant Locastro relied upon a permit that he believed the City had properly granted, that reliance does not mean his actions were necessarily reasonable. The facts presented here are not analogous to situations in which a police officer enforces a criminal statute that is "on the books" but which a court has invalidated. See, e.g., Amore v. Novarro, 624 F.3d 522, 531 (2d Cir. 2010) ("[W]e generally extend qualified immunity to an officer for an arrest made pursuant to a statute that is 'on the books,' so long as the arrest was based on probable cause that the statute was violated."). In Amore, the defendant police officer enforced a loitering statute that the New York Court of Appeals had declared unconstitutional eighteen years earlier, but the New York State Legislature had failed to rescind the statute officially. Id. at 522. The Second Circuit deemed the police officer's reliance on his copy of the New York Penal Law objectively reasonable, since "he was relying on an accurate, if unannotated, copy of the New York Penal Law when he arrested Amore—indeed, he was literally reading the Penal Law during the course of the arrest." Id. at 534.

Here, the 2014 Permit simply stated "No speakers @ sidewalk." The permit did not state that CNY Pride could choose between speakers in order to move people whom the organization found objectionable. A different officer could have reasonably interpreted the provision as a content-neutral restriction on all festival attendees that was included to clear the sidewalk at the

entrance to Inner Harbor Park. Sergeant Locastro did not interpret the permit in that way, and, as noted above, he has provided contradictory explanations of the meaning of "No speakers @ sidewalk." At the scene and in his deposition, Locastro said that the permit empowered CNY Pride to close the sidewalk to any protester—that is, "anybody that is being confrontational . . . anybody that's holding a large sign, you know, disparaging people." Locastro Depo. II at 19. In his affidavit, by contrast, he said that "No speakers @ sidewalks" constituted a ban on "sound amplification devices" from the relevant sidewalk. Locastro Aff. ¶ 15. Given Locastro's inconsistent and arguably incorrect interpretation of the permit, he cannot find safe-harbor in Amore, where the police officers correctly interpreted the words of a clear statute, though the statute had been invalidated.

The Court is mindful of the "complex and nuanced contours of First Amendment Law," Zalaski, 838 F. Supp. 2d at 47, but a reasonable officer in Sergeant Locastro's position would not have believed that the First Amendment permitted CNY Pride to choose which people could speak from a publicly accessible sidewalk on a main thoroughfare in Syracuse, even when the sidewalk abutted the entrance to the Pride Festival. The facts of this case are not analogous to those facts in Zalaski, where police officers imposed a content-neutral place restriction on protesters in order to protect the movement of children and participants in an athletic event in a public park. 723 F.3d at 395 (holding that the police officers' actions were objectively reasonable). Given the specific facts present at the 2014 Pride Event, Plaintiff had a clearly established right to proselytize from his chosen location and not be subject to the content-based restrictions imposed by Sergeant Locastro. Therefore, Sergeant Locastro is not entitled to qualified immunity.

36

### b. Captain Sweeny

As described above, the 2015 Festival Permit included more specific restrictions than the 2014 Permit with regard to the corner of West Kirkpatrick Street and the driveway into Inner Harbor Park. The 2015 Festival Permit provided CNY Pride with "exclusive use of sound amplification" in the "40-feet on either side of the northern portion of Kirkpatrick street for the limited purpose of allowing and access to the festival." CPO Manifest at 1. At first blush, Captain Sweeny attempted to effectuate the letter of this permit, and he clearly believed that the City had imposed this permit condition upon the advice of legal counsel. See Dkt. No. 109, Ex. EE, 00:02–00:14 ("Corporation Counsel stated that what they are doing is giving a 40-foot buffer on the area around the entrance to and across the street for anybody that is protesting, that's using any kind of sound amplification device, so they can't be in that area."). Although Defendants have not provided sufficient reasons to justify the imposition of the sound amplification restriction, Captain Sweeny cannot be held responsible for that failure. See Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009) ("A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity."); McChesney v. Bastien, No. 10-CV-1409, 2012 WL 4338806 (N.D.N.Y. July 5, 2012) (determining that the court could consider reliance on advice of counsel in a qualified immunity defense), adopted by 2013 WL 4504459 (N.D.N.Y. Aug. 22, 2013).

However, Captain Sweeny did not merely enforce the words of the permit. He also prevented Plaintiff from proselytizing on the north side of West Kirkpatrick Street *even after* Plaintiff had turned off his sound amplification device. Defendants have presented no evidence that the Syracuse Corporation Counsel approved this interpretation of the permit. In fact, the City

37

rejected CNY Pride's request to restrict all "First Amendment activities" on the north side of West Kirkpatrick Street and instead adopted a narrower condition limited to the use of sound amplification. Compare 2015 Festival Permit, with CPO Manifest. Accordingly, Sweeny cannot rely on the argument that he acted reasonably on the advice of counsel, nor can he argue that he enforced the literal words of a properly promulgated legal instrument.

Defendants have presented no content-neutral reason for requiring Plaintiff to speak from the south side of West Kirkpatrick Street after he had turned off his sound amplification device. Even Captain Sweeny states in his affidavit that he had asked "Plaintiff to turn-down his amplification device or turn it off" at previous events and that "Plaintiff would usually comply without incident." Sweeny Aff. ¶ 17. As noted above, the First Amendment does not permit an arbitrary or unjustified imposition of restrictions on protected speech. See Marcavage, 918 F. Supp. 2d at 271 ("Decision-making standards must be provided; a content-neutral permitting scheme regulating speech in a public forum is not an unconstitutional prior restraint if it 'contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review.'" (quoting Thomas, 534 U.S. at 323)). Given the specific facts present at the 2015 Pride Event, Plaintiff again had a clearly established right to proselytize from his chosen location and not be subject to the ad hoc, unjustified restriction imposed by Captain Sweeny. Therefore, Sweeny is not entitled to qualified immunity.

### B. **Monell** Claim

To establish municipal liability under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing

Monell, 436 U.S. at 690–91). First, a plaintiff may establish the existence of a municipal policy

or custom by showing

> (1) a formal policy officially endorsed by the municipality; (2) actions
> or decisions made by municipal officials with decision-making
> authority; (3) a practice so persistent and widespread that it
> constitutes a custom of which policymakers must have been aware;
> or (4) a failure by policymakers to properly train or supervise their
> subordinates, such that the policymakers exercised "deliberate
> indifference" to the rights of the plaintiff and others encountering
> those subordinates.

McLennan v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). "Second, the plaintiff

must establish a causal connection—an 'affirmative link'—between the policy and the

deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44

(2d Cir. 1985).

Plaintiff argues that Syracuse is liable for the Officers' unconstitutional acts "through its

policy giving CNY Pride proprietary control of public sidewalks bordering Inner Harbor."

Cross-Mot. at 9, 19–22. However, Plaintiff does not specify whether the City's alleged actions

constitute "a formal policy," "decisions made by municipal officials with decision-making

authority," "a practice so persistent [that] policymakers must have been aware," or "a failure by

policymakers to properly train or supervise their subordinates." Viewing Plaintiff's claim in the

most favorable light, he appears to be arguing that the City is liable for decisions made by

officials with decision-making authority. Pursuant to Pembaur v. City of Cincinnati,

475 U.S. 469 (1986), "a decision by a municipal policymaker on even 'a single occasion' may

expose the municipality to Section 1983 liability." Stern v. City of New York, No. 12-CV-5210,

2015 WL 3827653, at *4 (E.D.N.Y. June 19, 2015). However, the Supreme Court has also stated

39

that plaintiffs must satisfy "a stringent standard of fault," namely that such a duly authorized policymaker acted with "deliberate indifference" to the constitutional rights of its inhabitants. Connick v. Thompson, 563 U.S. 51, 61 (2011); see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

As detailed above, the City provided CNY Pride with different permits in 2014 and 2015. The 2014 Permit simply stated, "No speakers @ sidewalks" "bordering Kirkpatrick Street @ Inner Harbor." 2014 Permit. While Sergeant Locastro interpreted the permit to provide CNY Pride with unfettered discretion to decide who could speak from the north side of West Kirkpatrick Street, there is no evidence that a City policymaker approved this interpretation. Furthermore, in 2015, the City denied CNY Pride's request for the exclusive right to perform "First Amendment activities" on the north side of West Kirkpatrick Street; instead, the City approved a narrower restriction in which CNY Pride would have "exclusive use" to "sound amplification." CPO Manifest at 1. While the Defendants have not provided sufficient justification for this restriction, Plaintiff has not presented any evidence that a City policymaker acted deliberately to deprive Plaintiff of his rights at the 2015 Pride Event. In fact, it appears that the City made a good-faith but misguided effort to improve compliance with the First Amendment following the 2014 Pride Event. White Depo. at 21. "Here, the City's actions can be characterized at worst as negligent—far from the 'stringent standard of fault' of deliberate indifference." Stern, 2015 WL 3827653, at *7 (quoting Connick, 563 U.S. at 61).

40

The evidence that Plaintiff presented is not analogous to the evidence regarding Wayne County, Michigan, in Bible Believers, in which the Corporation Counsel of Wayne County misapplied the First Amendment's fighting words doctrine in a letter to plaintiffs and later sanctified their arrest at the Arab International Festival. 805 F.3d at 260–61. Here, the letter sent by the Syracuse Corporation Counsel to Plaintiff properly recited First Amendment law and offered no specifics regarding Plaintiff's future treatment by the police. Syracuse's Letter at 6–7. In addition, Plaintiff presented no evidence that the Corporation Counsel or a different City policymaker specifically approved the Officers' actions during the 2014 and 2015 Pride Events.

Therefore, Defendants' motion with regard to Plaintiff's Monell claim is granted.[7]

## V.   RELIEF

### A.  Permanent Injunction and Declaratory Relief

While Plaintiff is clearly the prevailing party in this case, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as matter of course." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 32 (2008) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982)). Moreover, injunctions are an "extraordinary remedy," and "courts of equity should pay particular regard for the public consequences in employing [them]." Id. at 24 (2008) (quoting Romero-Barcelo, 456 U.S. at 312).

---

[7]  Plaintiff also names Chief of Police Frank Fowler as a defendant in this action in his individual and official capacities. Compl. at 1. However, Plaintiff has presented no evidence regarding Plaintiff's personal involvement in the deprivation of his constitutional rights, Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), and "district courts have [regularly] dismissed official capacity claims against individuals as redundant or unnecessary where Monell claims are asserted against an entity," Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist., 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002). Therefore, Defendants' Motion is granted with regard to Chief Fowler, and he is dismissed from this action.

As noted above, Plaintiff has not demonstrated that Syracuse adopted an unconstitutional policy affecting his First Amendment rights. Rather, he has demonstrated that two police officers misapplied permits issued by the City in ways that violated his First Amendment rights. Therefore, Plaintiff's request for a permanent injunction "enjoining Defendants from applying their policy to ban Deferio from engaging in religious expression on public sidewalks and ways abutting Inner Harbor during CNY Pride Festivals in the future," Proposed Order at 2, does not correct the wrongs identified in this case.

How CNY Pride chooses to organize and Syracuse chooses to permit future Pride Events are by no means set in stone. Likewise, the rights of Plaintiff and all other attendees at future permitted events in or near Inner Harbor Park are not set in stone. As Judge Walker recently explained in a similar case regarding a permitted event in a public park in Panama City Beach, Florida:

> The City or Thunder Beach *could* have taken steps to designate either the Site or the Thunder Beach event as a more limited forum. For example, the City could have barricaded off the Site and let it lie vacant when it is not used for private events, as are many state fairgrounds. Thunder Beach could have barricaded the event and charged admission. Even if it did not charge admission, and merely roped or otherwise demarcated the event as a purely private event (even to which all members of the public were invited), the event might be a limited forum. But those aren't the facts. *Facts matter*.

McMahon, 180 F. Supp. 3d at 1099.

In short, the facts presented in the record before the Court clearly demonstrate that Plaintiff's First Amendment rights were violated at the 2014 and 2015 Pride Events. But that finding does not mean that Syracuse cannot restrict attendees' ability to speak from the corner of West Kirkpatrick Street during future permitted events under a different set of facts.

E.g., Marcavage, 659 F.3d at 630–31 (upholding content-neutral restriction on stationary speaking on busy sidewalk outside LGBT event). The Court is confident that this Memorandum-Decision and Order delineates the deficiencies of Defendants' actions in 2014 and 2015 so they will not be repeated again.

Similarly, the Court finds that "there is no need for declaratory relief, as the matter [was] resolved in the context of [P]laintiff's claim for damages." Cain v. City of New York, No. 07-CV-1224, 2009 WL 2381351, at *1 (S.D.N.Y. July 28, 2009). The Court's holding that Sergeant Locastro and Captain Sweeny violated Plaintiff's First Amendment rights is sufficient.

### B. Nominal Damages

"[A] litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of compensable injury." Am. Freedom Def. Initiative v. Metro. Transp. Auth., 889 F. Supp. 2d 606, 612 (S.D.N.Y. 2012) (quoting Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir. 1999)). Plaintiff has requested $1 in nominal damages, which is appropriate. Id. The Court will order that relief.

### C. Attorney's Fees

Plaintiff also seeks reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988(b). "The legislative history of § 1988 makes clear that a plaintiff who has prevailed on a claim under § 1983 should ordinarily recover an attorney's fee unless special circumstances would render an award unjust." Id. (quoting Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 97 (2d Cir. 1997)). The parties have not addressed whether special circumstances exist in this case, nor—understandably—has Plaintiff submitted relevant records. The Court will defer ruling on this issue until further briefing occurs.

VI.     **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 109) is **GRANTED in part** and

**DENIED in part**; the Motion is **GRANTED** as to Plaintiff's due process and <u>Monell</u> claims,

and all claims against defendant Fowler; and it is further

**ORDERED**, that Plaintiff's Cross-Motion (Dkt. No. 116) is **GRANTED in part** and

**DENIED in part**; the Motion is **GRANTED** as to Plaintiff's First Amendment claims against

defendants Locastro and Sweeny; and it is further

**ORDERED**, that Plaintiff's motion for injunctive and declaratory relief is **DENIED**; and

it is further

**ORDERED**, that Plaintiff's motion for $1 in nominal damages for the violation of his

First Amendment rights is **GRANTED**; and it is further

**ORDERED**, that the Court's consideration of Plaintiff's motion for reasonable attorney's

fees, costs, and expenses pursuant to 42 U.S.C. § 1988(b) is **DEFERRED** pending further

briefing by the parties; and it is further

**ORDERED**, that Frank Fowler and the City of Syracuse are **DISMISSED** as defendants

in this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      January 31, 2018
                Albany, New York

Lawrence E. Kahn
U.S. District Judge